UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

------------------------------------------------------------------- x
In re:                                                              :   Case No. 08-03423-EE
                                                                    :
                                                                    :   Chapter 11
WAREHOUSE 86, LLC,                                                  :
                                                                    :
        Debtor.                                                :
                                                                    :
------------------------------------------------------------------- x
                                                                    :
SCK, INC. and RADIOSHACK CORPORATION,                               :   Adv. Pro. No. 09-00139-EE
                                                                    :
        Plaintiffs                                             :
                                                                    :
v.                                                                  :
                                                                    :
WAREHOUSE 86, LLC,                                                  :
                                                                    :
        Defendant.                                             :
                                                                    :
------------------------------------------------------------------- x

**RESPONSE AND MEMORANDUM BRIEF IN OPPOSITION TO
AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT (Adv. Dkt. #30)
AND MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR PARTIAL
<u>SUMMARY JUDGMENT (Adv. Dkt. #29)</u>**

Plaintiffs, SCK, Inc., f/k/a SC Kiosks, Inc. ("<u>SCK</u>"), and RadioShack Corporation ("<u>RadioShack</u>"), as and for their Response and Memorandum Brief in Opposition to Defendant, Warehouse 86, LLC's (the "<u>Debtor</u>"), Amended Motion for Partial Summary Judgment (Adv. Dkt. #30) (the "<u>Motion</u>") and Memorandum in Support of the Motion (Adv. Dkt. #29), pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and Rule 7056-1 of the Uniform Local Bankruptcy Rules for the Northern and Southern Districts of Mississippi, respectfully represent:

## Summary

The Court should deny the Motion because there are genuine issues of material fact in regards to the allocation of the Insurance Proceeds (as defined herein below): The bases for the Debtor's assertion that is it entitled to $851,825.75 of the Insurance Proceeds by summary judgment are Employers Mutual Casualty Insurance Company's ("EMC") statements of loss for the tornado and the fire. These statements of loss represent the loss adjustment as agreed to by the Debtor and EMC -- without Plaintiffs participation or consent. And the allocations of the Insurance Proceeds under the statements of loss were manipulated by the Debtor for its benefit and to Plaintiffs detriment. Accordingly, pursuant to the Sublease (as defined herein below), applicable law, and principles of equity, the allocations of the Insurance Proceeds as set forth in EMC's statements of loss are not conclusive and binding on Plaintiffs, and therefore, the Debtor's attempt to get $851,825.75 of the Insurance Proceeds pursuant to these statements of loss should be denied.

In addition, the Debtor requests in the Motion that the Court dismiss RadioShack's claim with prejudice, since it was not a party to the Sublease and was not a loss payee under the Policy (as defined herein below). As acknowledged by the Debtor's bankruptcy schedules, RadioShack has a secured claim against the Debtor in the amount of $35,407.90 for the rent deposit under the Sublease; under section 16 of the Sublease, the Debtor was required to send all rental payments to RadioShack; RadioShack guaranteed the obligations of SCK under the Lease (as defined herein below); RadioShack is the named insured under a commercial property insurance policy covering the leasehold improvements and the Subleased Equipment (as defined herein below); RadioShack has paid $500,000 to the landlord of the Southaven Warehouse (as defined herein below) for the two deductibles under its insurance policy; and RadioShack's insurer has paid

$940,993.48 to the landlord for damage to certain leasehold improvements that the Debtor was obligated to insure under the Sublease. Thus, RadioShack has sufficient claims to the Insurance Proceeds, which should not be dismissed.

### Disputed Material Facts

There are genuine issues of fact with respect to the following material facts:

1. The Debtor and EMC's agreement as to the adjustment of the loss is not conclusive or binding on Plaintiffs. See copies of EMC's statements of loss attached as Exhibit A.

2. EMC's "breakdown" of the insurance checks is not conclusive or binding on Plaintiffs. See copies of the insurance checks attached as Exhibit B.

3. The Insurance Proceeds are not allocable as set forth in EMC's statements of loss. See copies of EMC's statements of loss attached as Exhibit A.

4. Since Plaintiffs dispute the allocation of the Insurance Proceeds in EMC's statements of loss, the Debtor is not entitled to the immediate release of $851,825.75 of the Insurance Proceeds pursuant to these statements of loss. See copies of EMC's statements of loss attached as Exhibit A.

5. The DC7, expandos expanders, worktables, stools, workstation tables, and/or the computer shipping printer were property of SCK upon the termination of the Sublease. See copy of the Sublease attached as Exhibit C.

6. The damage to the conveyor/racking system is not entirely allocable to the fire loss. Compare EMC's statements of loss attached as Exhibit A, with GAB Robins Second Report attached as Exhibit D.

7. The security system incurred damages of at least $163,000. Compare copies of EMC's statements of loss attached as Exhibit A, with a copy of McLarens's report attached as Exhibit E.

8. RadioShack has an interest in the Sublease and the Insurance Proceeds. See copy of the Sublease attached as Exhibit C and Plaintiffs' Proof of Claim (#16).

**Factual Background**

*Lease and Equipment Lease*

On June 17, 2003, Industrial Developments International, Inc. ("IDI"), as Landlord, and Wireless Retail, Inc. ("WRI"), as Tenant, entered into an Industrial Lease Agreement (the "Lease") for the lease of certain space known as Suite 110 in the Airways Distribution Center located at 481 Airport Industrial Drive, Southaven, Mississippi (the "Southaven Warehouse"). A copy of the Lease is attached as Exhibit F.

On July 3, 2003, WRI leased (the "Equipment Lease") from General Electric Capital Corporation ("GE") a conveyor system, material handling equipment, and certain other equipment, which WRI used in the Southaven Warehouse. A copy of the Equipment Lease is attached as Exhibit G.

*Assignment of Lease and Equipment Lease*

On October 1, 2004, WRI assigned (the "Assignment") to SCK its interest in the Lease and the Southaven Warehouse. RadioShack guaranteed the obligations of SCK, its wholly owned subsidiary, under the Lease. RadioShack also obtained the requisite insurance policies under the Lease, including a commercial property insurance policy with Liberty Mutual Insurance Company ("Liberty Mutual") covering the leasehold improvements. A copy of the Assignment is attached as Exhibit H.

WRI also transferred (the "Transfer Agreement") to SCK all its interest in the Equipment Lease and the leased equipment. RadioShack's insurance policy with Liberty Mutual covered the leased equipment as well. A copy of the Transfer Agreement is attached as Exhibit I.

Under section 8 of the Lease, SCK was obligated to carry and maintain insurance covering

> (A) all of the items included in the leasehold improvements constructed in the Demised Premises by or at the expense of Landlord (collectively, the "Improvements"), including but not limited to demising walls and ductwork and portion of the heating, ventilating and air conditioning system located within the Demised Premise and (B) Tenant's trade fixtures, merchandise and personal property from time to time in, on or upon the Demised Premises, in an amount not less than one hundred percent (100%) of their full replacement value from time to time during the Term, providing protection against perils included within the standard form of "Special Form" fire and casualty insurance policy, together with insurance against sprinkler damage, vandalism and malicious mischief.

Further, SCK was obligated under section 8 of the Lease to name IDI as loss payee in such policy, and such policy was to be written as a primary policy that did not contribute to and was not in excess of insurance coverage carried by IDI.

Under section 9 of the Equipment Lease, SCK bore the entire risk of any loss, theft, damage to, or destruction of, any unit of equipment from any cause whatsoever. SCK was obligated to keep all equipment insured and to name GE in such policy as additional insured with a loss payable clause in favor of GE, as its interest may appear. The casualty/property damage coverage was required to be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the equipment.

In addition, under section 9 of the Equipment Lease, SCK was obligated to refrain from making adjustments with insurers except with respect to claims for damages to any unit of equipment where the repair costs were less than the lesser of 10% of the original equipment cost or $10,000.

*Sublease*

On July 11, 2006, SCK subleased (the "Sublease") to the Debtor the Southaven Warehouse and the leased equipment (the "Subleased Equipment"). A copy of the Sublease is attached as Exhibit C. The Debtor operated facilities located in Arizona, Utah, Mississippi, and Tennessee that sold customer returns, store overstocks, and damaged retail merchandise at discounted prices.

Under section 3 of the Sublease, except as otherwise provided, all terms of the Lease were incorporated into the Sublease, and all references to "Landlord" in the Lease were deemed to refer to SCK, and all references to "Tenant" were deemed to refer to the Debtor. Likewise, the terms of the Equipment Lease were incorporated by referenced into the Sublease, pursuant to the preamble to Schedule B to the Sublease, which contains special terms and conditions applicable to the Subleased Equipment.

Pursuant to section 8 of the Sublease, except as otherwise provided, the Debtor agreed to assume and perform, according to the terms of the Lease, all obligations of SCK under the Lease, and the Debtor agreed to indemnify SCK against, and to hold SCK harmless from, any liability, damages, costs or expenses of any kind or nature, including court costs and reasonable attorneys' fees, resulting from any applicable failure by the Debtor to obey the terms of the Sublease and the requirements of the Lease.

Under section 10 of the Sublease, the Debtor agreed to "maintain 'all risk' property insurance with respect to the leasehold improvements and the Subleased Equipment in an amount equal to their replacement cost . . . ."

Pursuant to section 6 of Schedule B to the Sublease, which contains special terms and conditions applicable to the Subleased Equipment, the Debtor agreed that

> If for any reason any unit of Subleased Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ("Casualty Occurrence") Sublessee shall promptly and fully notify Sublessor in writing. Sublessee shall pay Sublessor the sum of (i) the Stipulated Loss Value (as set out on the list of Stipulated Loss Values attached to the Master Lease Agreements as <u>Exhibit C</u> of the affected unit determined as of the rent payment date prior to the Casualty Occurrence); (ii) all rent and which are then due under the Sublease on the Payment Date for the affected unit.

Under section 7 of Schedule B to the Sublease, the Debtor agreed to "bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Subleased Equipment from any cause whatsoever." The Debtor agreed to keep the Subleased Equipment insured and to name SCK as additional insured with a loss payable clause in favor of SCK, as its interest may appear. The casualty/property damage coverage was required to be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Subleased Equipment.

Further, the Debtor agreed under section 7 of Schedule B to the Sublease it would "not make adjustments with insurers except with respect to claims for damage to any unit of Subleased Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000)."

*Casualty Occurrences*

On February 5, 2008, a tornado hit the Southaven Warehouse damaging the leasehold improvements and the Subleased Equipment.

On February 11, 2008, a subcontractor caused a fire in the Southaven Warehouse further damaging the leasehold improvements and the Subleased Equipment.

*Bankruptcy Proceedings*

On November 4, 2008, the Debtor filed for reorganization relief under chapter 11 of the Bankruptcy Code. On December 11, 2008, the Debtor sold its assets to Kenneth A. May for a total consideration of $1,290,350.40. The Insurance Proceeds were excluded from the sale. The

- 7 -

Debtor no longer operates as a going concern. According to the Debtor's bankruptcy schedules, the claims of insiders amount to over $600,000.

*Insurance Policy*

At the time of the tornado and the fire, the Debtor carried a commercial property insurance policy (Policy No. 3A2 – 22 – 78 --- 08) (the "Policy") with EMC, covering business personal property ($1 million limit); debris removal ($10,000 limit); and business income ($50,000 limit). In addition, under the broadened property coverage extension the Policy covered extra expenses ($25,000 limit), cost of taking inventory ($25,000 limit), valuable papers ($25,000 limit), personal property of others ($10,000 limit), and spoilage ($2,500 limit). In accordance with the Sublease, the Debtor named SCK as loss payee in the Policy. A copy of the Policy is attached as Exhibit J.

EMC paid $2,099,882.35 (the "Insurance Proceeds") under the Policy for the tornado and fire losses. EMC paid jointly to the Debtor and SCK $2,089,882.35 of the Insurance Proceeds. The Insurance Proceeds were deposited with the registry of the Court.

*Plaintiffs' Loss*

Pursuant to the statement of loss by McLarens Young International ("McLarens"), the adjuster under RadioShack's property insurance policy with Liberty Mutual, which covers the leasehold improvements and the Subleased Equipment, Plaintiffs incurred a loss of $2,765,024.26 -- $1,417,756.48 for improvements and betterments; $163,000 for the security system; and $1,184,267.78 for the conveyor/racking system. RadioShack also paid $59,953 in certain repair costs. See Plaintiffs' Proof of Claim (#16). In addition, RadioShack has paid the landlord, IDI, $500,000 -- $250,000 per loss -- for the deductibles under its insurance policy. Liberty Mutual has paid $940,993.48 to IDI for certain damage to the leasehold improvements.

*Dispute over Insurance Proceeds*

On November 2, 2009, Plaintiffs commenced this proceeding seeking a determination that they are entitled to the Insurance Proceeds. Plaintiffs have not received any proceeds under any insurance policy, or from any other source, with respect to their losses.

### Argument

I.  **The Debtor is <u>Not</u> Entitled to any Insurance Proceeds, Because Plaintiffs are <u>Not</u> Bound by the Allocations under EMC's Statements of Loss**

   *A.  Plaintiffs dispute the loss adjustment between the Debtor and EMC, as evidenced by the statements of loss*

By the Motion, the Debtor seeks the immediate release of $851,825.75 of the Insurance Proceeds, pursuant to EMC's statements of loss. The Court should deny the Debtor's request. The loss adjustment was by agreement between the Debtor and EMC, without Plaintiffs participation or consent. And the Debtor influenced the final allocation of the Insurance Proceeds under the statements of loss for its benefit and to Plaintiffs detriment. Thus, pursuant to the Sublease, applicable law, and principles of equity, EMC's statements of loss are not binding on Plaintiffs, and thus, the Debtor's attempt to get $851,825.75 of the Insurance Proceeds pursuant to these statements of loss should be denied. All Insurance Proceeds should remain on deposit with the registry of the Court until a proper allocation of the Insurance Proceeds can be determined following discovery and a trial on the merits.

In particular, Plaintiffs dispute the following in regards to EMC's statements of loss: (i) that leasehold improvements incurred damage of only $174,963.04 and that all damage to leasehold improvements was caused by the fire; (ii) that no loss is attributable to the security system; and (iii) that all damage to the conveyor/racking system is allocable to the fire loss.

In addition, Plaintiffs dispute that the Debtor is entitled to any Insurance Proceeds respecting business personal property attached to the conveyor system, including but not limited to the DC7, worktables, expandos expanders, stools, workstation tables, and computer-shipping printer. Any property attached to the conveyor system that was not readily removable was property of Plaintiffs pursuant to section 7 of the Equipment Lease and section 5 of Schedule B to the Sublease.

### B. *The Debtor impermissibly adjusted claims regarding the Subleased Equipment without Plaintiffs participation and consent*

Pursuant to section 9 of the Equipment Lease and section 7 of Schedule B to the Sublease, the Debtor agreed to "not make adjustments with insurers except with respect to claims for damage to any unit of Subleased Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000)." Following the tornado and the fire, it was abundantly clear that the repair costs for the Subleased Equipment exceeded $10,000. Indeed, the Debtor and the adjusters quickly determined that the conveyor system was a total loss. See GAB Robins Second Report attached hereto as Exhibit D. Nonetheless, the Debtor adjusted the claims for damage to the Subleased Equipment without Plaintiffs' contribution or consent, in breach of its covenant under the Sublease. Therefore, Plaintiffs are not bound by the loss allocation in EMC's statements of loss.

### C. *Pursuant to applicable law, Plaintiffs are not bound by the loss adjustment between the Debtor and EMC*

Under applicable law, Plaintiffs are not bound by the adjustment of loss by agreement between the Debtor and EMC. See Georgia Home Ins. Co. v. Stein, 18 So. 414 (Miss. 1895) (holding that that lower court did not err in refusing to permit insurer's jury instruction that sum awarded by appraisers was conclusive, since mortgagee, as loss payee, was real party in interest

and was not a party to the arbitration or appraisement, and was therefore not bound by adjustment of loss by agreement between mortgagor and insurer); First Nat. Bank v. National Liberty Ins. Co. of America, 194 N.W. 6 (Minn. 1923) (holding that where insurance policy makes loss payable to mortgagee, mortgagee is not bound by adjustment between insurance company and mortgagor, because rights of mortgagee to proceeds of insurance could not be compromised or bargained away by mortgagor without consent of mortgagee). The Debtor cannot compromise and bargain away Plaintiffs right to the Insurance Proceeds without Plaintiffs knowledge or consent. As loss payee, SCK is entitled to participate in the loss adjustment under the Policy. Accordingly, SCK is not bound to an allocation of Insurance Proceeds which may possibly be gleaned from the adjustment by the Debtor and EMC.

### D. *Equity prohibits entry of summary judgment*

Moreover, equity precludes binding Plaintiffs to a loss settlement between the Debtor and EMC. The Debtor failed to insure the leasehold improvements and the Subleased Equipment in an amount not less than 100% of their full replacement value as required under the Sublease. Plaintiffs have incurred a loss of more than $2,825,053, and the Insurance Proceeds total only $2,099,882.35. And the loss adjustment, which favors the Debtor and prejudices Plaintiffs, was by agreement between the Debtor and EMC, without Plaintiffs participation or consent. Indeed, the reports of GAB Robins Risk Management Services, Inc., EMC's adjuster, show that the allocations in the statements of loss were at least in part a product of the Debtor's persuasion rather than hard evidence. Therefore, the Motion should be denied and all Insurance Proceeds should remain with the registry of the Court until the conclusion of discovery and a trial on the merits.

### II. Plaintiffs' Claims against the Debtor are Relevant to the Allocation of the Insurance Proceeds

By executing the Sublease, the Debtor agreed to assume sole responsibility for all damage to the leasehold improvements and the Subleased Equipment due to fire or other casualty. Moreover, by naming SCK as loss payee in the Policy, the Debtor agreed that the leasehold improvements and the Subleased Equipment would be insured against loss due to fire or other casualty, and that in the event there should be such a loss, the insurance proceeds would be payable to SCK to the extent of any damage to the leasehold improvements and the Subleased Equipment. Accordingly, as loss payee in the Policy, SCK holds a lien or even greater interest in the Insurance Proceeds to the extent of the Debtor's liability to Plaintiffs under the Sublease for any damage to the leasehold improvements and the Subleased Equipment. See In re Estes, 105 F. Supp. 761 (N.D. Tex. 1952) (holding that loss payee entitled to fire insurance proceeds to extent of unpaid balance of note and that portion of proceeds due loss payee not property of bankruptcy estate); Farwell v. Johnson, 121 Misc. 556, 201 N.Y. 327 (1923) (holding that loss payee entitled to judgment establishing lien upon and title to fire insurance proceeds in amount of unpaid purchase price of merchandise and directing depository to pay same with all interest and costs 86). Thus, Plaintiffs claims against the Debtor are *not*, for present purposes, irrelevant.

### III. RadioShack's Claim Should Not be Dismissed

The Debtor asks the Court to dismiss RadioShack as a plaintiff, because RadioShack has no interest in the Sublease, the Policy, or the Insurance Proceeds. Yet, pursuant to the Debtor's bankruptcy schedules, RadioShack has a secured claim against the Debtor in the amount of $35,407.90 for the rent deposit under the Sublease; RadioShack guaranteed the obligations of SCK under the Lease; under section 16 of the Sublease, the Debtor was required to send all rental payments to RadioShack; RadioShack is the named insured under a property insurance policy covering the Southaven Warehouse improvements and betterments and the Subleased

Equipment; RadioShack has paid $500,000 to IDI for the two deductibles under its insurance policy covering the leasehold improvements and the Subleased Equipment; and RadioShack's insurer, Liberty Mutual, has paid $940,993.48 to IDI for certain damage to the leasehold improvements, which the Debtor was obligated to insure under the Sublease. And discovery is not yet complete. Accordingly, RadioShack has sufficient claims to the Insurance Proceeds, which should not be dismissed.

WHEREFORE, Plaintiffs respectfully request that the Court deny the Motion in its entirety and grant such other and further relief this Court deems proper and just.

Dated: April 28, 2010

Respectfully submitted,

SCK INC. and RADIOSHACK CORPORATION

/s/ Marcus M. Wilson
Marcus M. Wilson (MS Bar #7308)
W. Lee Watt (MS Bar #6998)
Andrew R. Wilson (MS Bar #102862)
BENNETT LOTTERHOS SULSER
& WILSON, P.A.
One Jackson Place
188 East Capitol Street
Suite 1400
Jackson, Mississippi 39201
Telephone: (601) 944-0466
Facsimile: (601) 944-0467
mwilson@blswlaw.com
lwatt@blswlaw.com
awilson@blswlaw.com

ATTORNEYS FOR SCK INC. AND RADIOSHACK CORPORATION

- 14 -

## CERTIFICATE OF SERVICE

I hereby certify that I have this day forwarded a true and correct copy of the above paper to all counsel of record via the CM/ECF system.

Dated: April 28, 2010

/s/ Marcus M. Wilson