# Exhibit C
## Part 1 of 2

POOR QUALITY



## SUBLEASE

This Sublease, entered into on this 11TH day of Jul, 2006 by SC Kiosks, Inc., (hereinafter referred to as "Sublandlord") and Warehouse 86, LLC, a Phoenix Arizona company (hereinafter referred to as "Subtenant").

**RECITALS:**

**R-1**   Industrial Developments International Inc., a Delaware Corporation ("Landlord") and Wireless Retail, Inc, a Texas corporation ("Tenant"), entered into that certain lease dated August 1, 2003, relating to certain space known as Suite 110 in the Airways Distribution Center located at 481 Airport Industrial Drive, Southaven, Mississippi (collectively the "Prime Lease"), a copy of which is attached hereto as Schedule A.

**R-2**   SC Kiosks, Inc., ("Sublandlord") is the successor in interest to Wireless Retail, Inc. by assignment dated October 1, 2004.

**R-3**   Sublandlord desires to sublease to Subtenant the premises described in the Prime Lease, and Subtenant desires to sublease the same from Sublandlord, upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed by and between the parties hereto as follows:

1.   **Definitions.** Except as otherwise expressly defined herein, all capitalized terms used in this Sublease and/or in the Landlord Consent attached hereto shall have the meanings ascribed to them in the Prime Lease.

2.   Subleased Premises and Subleased Equipment.

(a)   Sublandlord hereby subleases to Subtenant, and Subtenant hereby subleases from Sublandlord, the premises leased in the Prime Lease which totals approximately 177,039 rentable square feet of space, out of a 246,078 square foot Building C of the Airways Distribution Center with an address of 481 Airport Industrial Drive, Suite 110, Southaven, Mississippi 38671, as identified on Exhibit "A" to Schedule A attached hereto and made a part hereof (hereinafter sometimes referred to as the "Subleased Premises").

(b)   Sublandlord hereby subleases to Subtenant and Subtenant hereby subleases from Sublandlord, the Subleased Equipment described on Exhibit B to this Sublease (the "Subleased Equipment") located in the Subleased Premises. The sublease of the Subleased Equipment is governed by the terms and conditions set out on Schedule B, Special Terms and Conditions Applicable to Sublease of Equipment which is attached hereto and made a part hereof for all purposes and to those terms and conditions of this Sublease expressly made applicable to the Subleased Equipment herein on in Schedule B.

JUL 3 1 2006

POOR QUALITY

3.      Prime Lease; Role of Sublandlord and Landlord.

(a)      Except as modified or excluded herein or as may be manifestly inconsistent with the terms of this Sublease or with the status of Subtenant, all terms of the Prime Lease are incorporated by reference herein, and all references to "Landlord" in the Prime Lease shall be deemed to refer to Sublandlord, and, all references to "Tenant" will be deemed to refer to Subtenant. Except as otherwise provided in this Sublease, Subtenant shall have all the benefits and/or rights of Sublandlord, as Tenant, and Subtenant agrees to abide by and perform all obligations of "Tenant" in the Prime Lease, insofar as such obligations relate to the Subleased Premises and Subtenant's use thereof. Sublandlord shall abide by and perform all obligations of "Landlord" therein, except as set forth in this Sublease.  In the event of any conflict or inconsistency between the terms of this Sublease and the terms of the Prime Lease incorporated herein to describe the rights and duties of Sublandlord and Subtenant, the terms of this Sublease shall prevail and supersede the incorporated terms of the Prime Lease.  Exhibit B, Exhibit E, Exhibit G, Exhibit H to the Prime Lease shall not be applicable to this Sublease.  Sections 2, 3, 4, 5 and 10 of Exhibit C to the Prime Lease will not apply to this Sublease.

(b)      Sublandlord is not the owner of the Subleased Premises, therefore Sublandlord shall not be obligated to perform those obligations of Landlord which Sublandlord cannot immediately and unilaterally perform in its capacity as "Tenant" under the Prime Lease.  Nor shall Sublandlord be deemed to have made any representations made by Landlord in the Prime Lease. Without limiting the foregoing, under no circumstances shall Sublandlord be obligated to repair, reconstruct or rebuild the Subleased Premises, the Building, common areas, or any part thereof. Sublandlord shall reasonably cooperate with Subtenant in attempting to cause Landlord to fulfill its obligations to Sublandlord in the Prime Lease.  Subtenant agrees to indemnify and hold Sublandlord harmless from all loss, cost, expense or liability incurred by Sublandlord in such regard. Sublandlord shall have no liability to Subtenant resulting from any such breach of Landlord under the Prime Lease.  If Sublandlord recovers damages from Landlord for violation of Landlord's obligations under the Lease relating to the time of Subtenant's occupancy, Sublandlord shall remit to Subtenant such damages, less Sublandlord's cost of recovering the damages. Subtenant acknowledge that in certain circumstances, Sublandlord has no authority to grant privileges to, or consent to actions by, Subtenant, including such privileges or consents which may have been granted to Sublandlord or consented to by Landlord in the Prime Lease.  With respect to all matters for which Subtenant must ask approval under the Prime Lease or hereunder, including, without limitation, approval of any signage of Subtenant, the consent of both Sublandlord and Landlord must be obtained.

(c)      The following provisions of the Prime Lease shall not be effective as to Subtenant, and Subtenant shall not be obligated to comply with the provisions nor be entitled to avail itself of the benefits of the provisions:  (i) Section 5.(b);  (ii) Sections 7.(a); (iii) Section 17.; (iv) Section 29.  With respect to Section 24, Sublandlord does not have a mortgagee with respect to the property.  Section 24 shall apply only to mortgages of Landlord.

4.      Term; Subtenant's Access.      The term of this Sublease shall commence on July 14, 2006 and expire at 12:00 midnight on September 30, 2008 ("Sublease Term").

POOR QUALITY

5.    Condition, Acceptance and Use of Subleased Premises.

(a)    At the commencement of the Sublease Term as stipulated in Section 4, Subtenant shall accept the Subleased Premises in its existing condition and state of repair. Subtenant acknowledges that no representations, statements or warranties, express or implied, have been made by or on behalf of the Sublandlord in respect to its condition, or the use or occupation that may be made thereof, and that Sublandlord shall in no event whatsoever be liable for any latent defects in the Subleased Premises or in the equipment therein. Sublandlord shall enforce the provisions of the Prime Lease with regard to Landlord's obligations to provide services to the Subleased Premises and common areas.

(b)    Acceptance of the Subleased Premises by Subtenant shall be construed as recognition that the Subleased Premises are in a good state of repair and in sanitary condition. Subtenant shall maintain in good working order heating, air conditioning and ventilations system's, glass, windows and doors, sprinkler, all plumbing and sewage systems, fixtures, interior walls, floors (including floor slabs), ceilings, storefronts, plate glass, skylights, all electrical facilities and equipment referenced in Section 10 of Prime Lease. During the Sublease Term, Subtenant shall maintain in full force and affect a service contract for the maintenance of the heating, ventilation and air conditioning, fire/life safety systems. Subtenant shall deliver to Sublandlord (i) a copy of said service contract within thirty (30) days of the Sublease Commencement Date, and (ii) thereafter, a copy of a renewal or substitute service contract within thirty (3) days prior to the expiration of the existing service contract.

(c)    Sublandlord shall use commercially reasonable efforts to leave uncut in good working order, all communication and network wiring located in the Subleased Premises which exists as of the date of execution of this Sublease. Subtenant shall have access to and use of such wiring throughout the Sublease Term at no additional charge.

(d)    Pursuant to Section 2(b), Subtenant shall lease from Sublandlord and have the right to use Sublandlord's Subleased Equipment described on Exhibit B. Subtenant acknowledges and agrees that Sublandlord's Subleased Equipment shall remain the personal property of Sublandlord until Subtenant purchases the Subleased Equipment, pursuant to the terms in Schedule B. Furniture and Phone system associated with the Subleased Premises shall not remain for Subtenant's use. Security monitoring system, including cameras and digital recording equipment shall remain in the Sublease Premises throughout the Sublease Term and be conveyed to Subtenant at the expiration of the Sublease Term.

(e)    Subtenant shall use and occupy the Subleased Premises solely for general distribution and warehouse services, and in accordance with the uses permitted under applicable zoning regulations, and shall not use the Subleased Premises for any other purpose. Subtenant shall not use or occupy the Subleased Premises for any unlawful purpose.

(f)    Subtenant shall surrender the Subleased Premises at the expiration of the Sublease Term hereof; or any renewal thereof, or upon other termination hereunder, in the same condition as when Subtenant took possession, reasonable wear and tear excepted.

# POOR QUALITY

6.   <u>Rent</u>

(a)   <u>Minimum Rent for Subleased Premises.</u> Subtenant covenants and agrees to pay Sublandlord as minimum rent ("Minimum Rent") for the Subleased Premises without notice or demand, and without off-set; deduction or abatement, except as stated herein, annual rental at the rate of Two Dollars and 40/100 ($2.40) per rentable square foot of the Subleased Premises per annum payable in monthly installments of Thirty Five Thousand Four Hundred Seven Dollars and 80/100 ($35,407.80) in advance, commencing as described herein and on the first day of each and every successive month thereafter of the Sublease Term.

(b)   <u>Additional Rent.</u> Subtenant agrees to pay any and all additional charges as defined in Section 6 of the Prime Lease attributable to the Subleased Premises as Additional Rent ("Additional Rent").   Subtenant's expenses of operation paid to persons other than Sublandlord, including utilities, trash and maintenance costs, are not considered Additional Rent, and are payable at Subtenant's own expense.

(c)   <u>Equipment Rent.</u> Subtenant agrees to pay for the exclusive use of the Subleased Equipment, (described on <u>Exhibit B</u>), throughout the Sublease Term, without notice or demand, and without off-set; deduction or abatement, except as stated herein, equipment rental in monthly installments as follows: With respect to the Material Handling Equipment (designated as such on Exhibit B) the sum of Five Thousand Nine Hundred Forty Six Dollars and 00/100 ($5,946.00) per month and with respect to Conveyor/Racking and Miscellaneous Owned Equipment (designated as such on Exhibit B) the sum of Four Thousand Four Hundred Twenty Five Dollars and 00/100 ($4,425.00) all payable in advance, commencing as described herein and on the first day of each and every successive month thereafter of the Sublease Term.

(d)   <u>Rent.</u> Minimum Rent, Additional Rent, and Equipment Rent and all other sums owed by Subtenant to Sublandlord under the terms of this Sublease including <u>Schedule B</u>, shall be collectively referred to herein as "Rent".

(e)   <u>Rent Commencement Dates.</u> Subject to <u>Section 4</u> herein, the Rent Commencement Date shall be July 14, 2006.

(f)   <u>Payments.</u> All Rent payable pursuant to this Sublease shall be payable to Sublandlord at the address set forth for notices to Sublandlord in <u>Section 16</u> below or at such other place as Sublandlord may from time to time designate in writing to the Subtenant.

(g)   <u>Payments to Landlord.</u> The execution of this Sublease by the parties does not relieve any obligation of the Sublandlord, as tenant in the Prime Lease, to pay the required Rents and Additional Rents, or any other monetary obligation, to the Landlord in the Prime Lease in the amounts as required by the Prime Lease.

(h)   <u>Security Deposit.</u> The Subtenant shall deliver to Sublandlord a sum of Thirty Five Thousand Four Hundred Seven Dollars and 80/100 ($35,407.80), as a security deposit which shall be maintained throughout the Sublease Term and applied or retained in

POOR QUALITY

accordance with the terms and conditions of Section 5(a) of the Prime Lease. Sublandlord may comingle the security deposit with Sublandlord's own funds, and Sublandlord shall be entitled to all interest or other earnings from the security deposit.

(i) <u>Assignment of Right to Receive Termination Fees</u>. Subtenant acknowledges that a material inducement for Sublandlord to enter into this Sublease and without which Sublandlord would not lease the Sublease Premises to Subtenant is the receipt by Sublandlord of an assignment, in form acceptable to Sublandlord in Sublandlord's reasonable discretion, by which Subtenant assigns to Sublandlord as collateral to secure payment of all sums due to Sublandlord hereunder, Subtenant's right to receive Termination Fees as defined in the Service Agreement between Subtenant and United Parcel Service of America, Inc.

(j) <u>Personal Property Taxes</u>. Subtenant shall pay and be liable for all personal property taxes on Subtenant's furniture, equipment, fixtures, and the Subleased Equipment (described on <u>Exhibit B</u>). Such payment shall be made by Subtenant directly to such governmental body if billed to Subtenant, or if billed to Sublandlord, such payment shall be paid as Additional Rent to Sublandlord.

7. <u>Signage.</u> Subject to: (i) Exhibit I and Paragraph 5 of the Prime Lease; (ii) the prior written consent of Landlord and Sublandlord; and (iii) Subtenant occupying the entire Subleased Premises throughout the Subleased Term, Subtenant shall have the non-exclusive right to install signage at a mutually agreeable location of the Building. Such signage shall be proportionately equal in size to Subtenant's Proportionate Share, but in no event larger than Sublandlord's existing sign. Subtenant shall at its sole cost and expense erect signage approved in advance by Landlord and Sublandlord.

8. <u>Assumption of Obligations: Exclusion.</u>

(a) Except as otherwise required by this Sublease, Subtenant agrees to assume and perform, according to the terms of the Prime Lease, all of the duties, covenants, agreements and obligations of Sublandlord under the Prime Lease, as and when required by the Prime Lease, with respect to the Subleased Premises, except Sublandlord's duty to make Rent payments to Landlord. Subtenant further agrees to keep and obey, according to the terms of the Prime Lease, all of the rules, restrictions, conditions and provisions which pertain to the Subleased Premises, and are imposed by the terms of the Prime Lease upon Sublandlord with respect to the Subleased Premises or upon the use of the Subleased Premises. Subtenant agrees that it will take good care of the Subleased Premises, and will commit no waste, and will not do, suffer, or permit to be done any injury to the same. It is hereby understood and agreed that Subtenant's rights to use, possess and enjoy the Subleased Premises are subject to the terms, conditions, rules and regulations of the Prime Lease and the rights and remedies of Landlord thereunder. Subtenant agrees to indemnify, defend and protect Sublandlord against, and to hold Sublandlord harmless from, any liability, damages, costs or expenses of any kind or nature, including court costs and reasonable attorneys' fees, resulting from any applicable failure by Subtenant to perform, keep and obey the terms of this Sublease and the requirements of the Prime Lease with respect to the Subleased Premises. Any applicable failure by Subtenant to perform, keep and obey the same shall be a default by Subtenant hereunder.

POOR QUALITY

Sublandlord agrees to use commercially reasonable efforts to cause Landlord to perform all the duties, covenants, agreements and obligations of Landlord under the Prime Lease except as stated herein. Sublandlord shall pay any and all costs or expenses associated with the review and approval process of this Sublease by Landlord.

9.   Title and Possession. Sublandlord covenants, agrees and represents that it has full right and authority to enter into this Sublease for the full term hereof, that Sublandlord is not in default beyond any applicable cure periods under the Prime Lease and that Subtenant, subject to the provisions of the Prime Lease and upon paying the rents and other sums provided herein and upon performing the duties, covenants, agreements and obligations hereof and upon keeping and obeying all of the restrictions, conditions and provisions hereof, will have, hold and enjoy quiet possession of the Subleased Premises, free from claims of persons claiming by or through Sublandlord for the term herein granted but subject to all of the applicable duties, covenants, agreements, obligations, restrictions, conditions and provisions set forth or incorporated herein.

10.   Insurance.

(a)   Subtenant agrees, during the Sublease Term hereof, to carry and maintain liability insurance coverage to meet the requirements of Section 8 of the Prime Lease against liability with respect to events occurring on or about the Subleased Premises or arising out of the use and occupancy thereof by the Subtenant with the understanding that the general aggregate limits required by Subtenant shall not exceed $4,000,000.00. In addition to the requirements of Section 8 of the Prime Lease, Subtenant shall cause such policies of liability insurance to also include Sublandlord as an additional insured. Subtenant agrees to indemnify, protect, defend and hold Sublandlord and Landlord harmless against any and all claims, suits, actions, liabilities, costs and expenses, including reasonable attorneys' fees, resulting from the use or occupancy of the Subleased Premises by Subtenant, its employees, agents or contractors, or from any breach by Subtenant of its covenants hereunder or from any act, omission, accident, incident or occurrence upon the Subleased Premises during the Sublease Term hereof.

(b)   Subtenant shall maintain "all risk" property insurance with respect to the leasehold improvements and the Subleased Equipment in an amount equal to their replacement cost as may be approved by Sublandlord hereunder.

11.   Sublandlord's Liability. Except as specifically provided herein and except for Sublandlord's covenant not to voluntarily terminate the Prime Lease or otherwise place in jeopardy the validity of the Prime Lease, Sublandlord shall have no responsibility whatsoever with respect to the Subleased Premises, the condition thereof or Subtenant's property situated therein, except for loss, injury or damage caused by Sublandlord's gross negligence or willful misconduct. Sublandlord agrees to indemnify, protect, and hold Subtenant harmless from and against any and all claims, suits, actions, liabilities, costs and expenses, including reasonable attorneys' fees, resulting from or relating to the loss, injury or damage caused by the gross negligence or willful misconduct of the Sublandlord, its employees, agents or contractors, pursuant to the requirements of this Sublease or from any breach by the Sublandlord of the covenants of this Sublease or of the Prime Lease. Except as otherwise required by this Sublease,

POOR QUALITY

Sublandlord shall not be liable for the failure by Landlord to keep and perform, according to the terms of the Prime Lease, Landlord's duties, covenants, agreements, obligations, restrictions, conditions and provisions, nor for any delay or interruption in Landlord's keeping and performing the same. Sublandlord hereby assigns to Subtenant, for so long as this Sublease shall be in force and effect, any and all rights of Sublandlord under the Prime Lease with respect only to the Subleased Premises and causes of action which Sublandlord may have against Landlord with respect to the Subleased Premises due to default by Landlord under the Prime Lease, excluding however: (i) those provisions of the Prime Lease specifically excluded from this Sublease; (ii) any right of self-help or rent abatement, unless Sublandlord receives the benefit thereof; and (iii) any right or remedy which affects any portion of the premises leased by the Prime Lease other than the Subleased Premises. Subtenant agrees to cooperate with and join Subtenant in any claims or suits brought by Subtenant against Landlord under the Prime Lease, provided that such participation shall be without cost or expense to Sublandlord. Subtenant has inspected the Subleased Premises and its contents to its satisfaction and, except as specifically set forth herein, agrees to accept the Subleased Premises and its contents in its "as-is, where-is" condition without any obligations on Sublandlord to repair or modify the same. No allowances for moving, plans or tenant improvements are provided to Subtenant.

12.    Damage, Destruction or Condemnation.  In the event of damage or destruction of the Subleased Premises or the taking of all or any part thereof under the power of eminent domain, this Sublease shall terminate only if the Prime Lease is terminated as a result thereof, and the rent payable hereunder shall abate only as long as and to the extent that the rent due from Sublandlord to Landlord under the Prime Lease with respect to the Subleased Premises abates as a result thereof, Subtenant shall have no claim to insurance or condemnation proceeds beyond any right to such proceeds that Sublandlord may hold as Tenant under the Prime Lease, and then only if and to the extent that Sublandlord actually receives any such proceeds..

13.    Release and Waiver of Subrogation  To the extent its insurance coverage is not thereby impaired, Sublandlord and Subtenant each hereby releases all causes of action and rights of recovery against each other and their respective agents, officers and employees for any loss, regardless of cause or origin, to the extent of any recovery to either party from any policy(s) of insurance carried or required to be carried hereunder. Sublandlord and Subtenant agree that any policies presently existing or obtained on or after the date hereof (including renewals of present policies) shall include a clause or endorsement to the effect that any such release shall not adversely affect or impair said policies or prejudice the right of the releasor to recover thereunder.

14.    Alterations, Improvement.  No alterations, additions or improvements in or upon the Subleased Premises shall be made by Subtenant without the prior written consent by Sublandlord, which consent shall not be unreasonably withheld or delayed and, to the extent required by Section 6 of the Prime Lease, the consent of Landlord. Subtenant shall comply with the provisions of Section 6 of the Prime Lease with respect to any such alterations, additions or improvements. All alterations, additions and improvements shall be made in accordance with applicable building codes and laws and in compliance with all provisions of the Prime Lease. Upon the termination or expiration of the Sublease Term hereof, all such alterations, additions and improvements (except personal property, business and trade fixtures, machinery and

POOR QUALITY

equipment, furniture and movable partitions owned by Subtenant) shall be and remain part of the Subleased Premises and be surrendered therewith without disturbance, molestation or injury and shall not be removed by Subtenant unless such removal is required by Sublandlord, in which case Subtenant shall remove the same and restore the Subleased Premises to the same condition in which they were on the date hereof, reasonable wear and tear excepted. If Subtenant shall fail to remove the same and restore the Subleased Premises to the same condition as of the effective date of this Sublease, reasonable wear and tear excepted, then Sublandlord may, but shall not be obligated to, do so at the expense of Subtenant. Personal property, business and trade fixtures, machinery and equipment, furniture and movable partitions owned by Subtenant shall be and remain the property of Subtenant and may be removed by Subtenant at any time during the Sublease Term hereof when Subtenant is not in default hereunder, and in any event, shall be removed on or before the expiration of the Sublease Term hereof. Subtenant shall repair any damage caused by such removal. Subtenant covenants and agrees to indemnify, protect and defend Sublandlord against, and hold Sublandlord harmless from, all liens, whether for labor or materials arising as the result of alterations, additions, repairs or improvements to the Subleased Premises made by Subtenant during the Sublease Term.

15.    Default. If any rent reserved or other monetary payment referred to herein, or any part thereof, whether the same be demanded or not, shall remain unpaid for a period of five (5) days from the date of written notice to Subtenant that such payment is past due; or if any other material term, condition or covenant of this Sublease, on the part of Subtenant to be kept or performed, shall be violated or neglected, and if Subtenant shall fail to correct the same within thirty (30) days from the date of written notice from Sublandlord to Subtenant specifying the violation, or such longer period as provided in Section 22 of the Prime Lease if Subtenant commences action to correct such violation and diligently prosecutes correction of such violation to completion; or if the Subleased Premises or Subtenant's interest therein shall be taken on execution or other process of law; or in the event of bankruptcy, receivership, insolvency, liquidation, dissolution or similar proceedings with respect to Subtenant, or if Subtenant shall enter into a general assignment of this Sublease for the benefit of creditors; or if any default under the Prime Lease shall occur with respect to Subtenant or the performance by Subtenant of any of its covenants and obligations under this Sublease, then and in any of said cases, Subtenant shall be deemed in default, and Sublandlord shall have the following rights and remedies against Subtenant: (i) to terminate this Sublease, (ii) to cure or attempt to cure the default, whereupon Subtenant shall upon demand reimburse Sublandlord for all costs thus expended together with interest thereon at the lesser rate (the "Interest Rate") of the highest rate permitted by law or two percent (2%) above the prime interest rate as established in The Wall Street Journal, (iii) to sue for Subtenant's performance, whereupon Subtenant shall upon demand reimburse Sublandlord for all costs thus expended together with interest thereon at the Interest Rate; (iv) to exercise all remedies set forth in the Prime Lease as if Sublandlord were the Landlord and Subtenant were the Tenant thereunder, or (v) to re-enter and take possession of the Subleased Premises, and to remove any property therein, without liability for damage to, and without the obligation to store such property but may store same at Subtenant's expense.   In the event of such re-entry, Sublandlord may, but shall not be obligated to, relet the Subleased Premises, or any part thereof from time to time, in the name of Sublandlord or Subtenant, without further notice, for such term or terms, on such conditions and for such uses and purposes as Sublandlord, in its reasonable discretion, may determine, and Sublandlord may collect and receive all rents derived therefrom

POOR QUALITY

and apply the same, after deduction of all appropriate expenses (including broker's, consultant's and attorney's fees, if incurred, and the expenses of putting the property in leasable condition), to the payment of the rent and other sums payable hereunder, Subtenant remaining liable for any deficiency to the extent required by this Sublease. Sublandlord shall not be responsible or liable for any failure to relet the Subleased Premises or any part thereof, or for failure to collect any rent connected therewith. The exercise by Sublandlord of any remedy shall not preclude the subsequent or simultaneous exercise of any other remedy. No delay in exercising any remedy shall be deemed a waiver thereof. In addition, any payment not made when due shall bear interest until paid at the Interest Rate.

16.   Notices.  Any notice or communication required or permitted to be given or served by either party hereto upon the other shall be deemed given or served in accordance with the provisions of this Sublease when mailed in a sealed wrapper by United States registered or certified mail, return receipt requested, or delivered to a nationally recognized overnight courier, postage prepaid, properly addressed as follows:

If to Sublandlord:     SC Kiosks, Inc.
                       300 RadioShack Circle, MS CF4-101
                       Fort Worth, TX 76102
                       Attention: David Goldberg
          Payments:    c/o RadioShack Corporation
                       300 RadioShack Circle, MS WF6-316
                       Fort Worth, TX 76102
                       Attn: Rent Accounting

If to Subtenant:       Warehouse 86 LLC
                       6055 Primacy Parkway, Suite 115
                       Memphis, TN 38119


                       Attention: Ernest Strahan, III

Each mailed notice or communication shall be deemed to have been given to, or served upon, the party to which it is addressed upon the acceptance or refusal of the same after it is deposited in the United States registered or certified mail, postage prepaid, or the day after the same is delivered for overnight delivery to such courier, properly addressed in the manner above provided.  Any party hereto may change its address for the service of notice hereunder by serving written notice hereunder upon the other party hereto, in the manner specified above, at least ten (10) days prior to the effective date of such change.

Sublandlord and Subtenant appoint the following representative as a point of contact for operational matters relating to the Sublease and the Subleased Premises:

Subtenant:     Eric Eilertsen, CEO_____

POOR QUALITY

Sublandlord: <u>Bill Knotts, VP of Corporate Real Estate</u>

17.    <u>Surrender of Subleased Premises.</u> Upon the expiration of the Sublease Term, or upon any earlier termination of this Sublease, Subtenant shall quit and surrender possession of the Subleased Premises to Sublandlord in as good order and condition as the same are now or hereafter may be improved by Landlord or Subtenant, reasonable wear and tear and repairs which are Landlord's obligation excepted, and shall, without expense to Sublandlord, remove or cause to be removed from the Subleased Premises all debris and rubbish, all furniture, equipment, business and trade fixtures, free-standing cabinet work, movable partitioning and other articles of personal property owned by Subtenant or installed or placed by Subtenant at its expense in the Subleased Premises, and all similar articles of any other persons claiming under Subtenant, and Subtenant shall repair all <u>damage</u> to the Subleased Premises resulting solely from such removal. Upon the expiration of this Sublease, or if Sublandlord or Landlord re-enters or re-takes possession of the Subleased Premises prior to the normal expiration of this Sublease, Sublandlord or Landlord shall have the right, but not the obligation, to remove from the Subleased Premises all personal property located therein belonging to Subtenant, and either party may discard such debris, rubbish and personal property or place such personal property in storage in a public warehouse, all at the expense and risk of Subtenant.

18.    <u>Termination of Prime Lease.</u> It is understood and agreed by and between the parties hereto that the existence of this Sublease is dependent and conditioned upon the continued existence of the Prime Lease and this Sublease shall automatically terminate on the termination, cancellation or expiration of the Prime Lease.   Notwithstanding the foregoing, Sublandlord shall not voluntarily terminate the Prime Lease as it relates to the Subleased Premises during the Sublease Term.

19.    <u>Waiver.</u> No provision of this Sublease shall be deemed to have been waived unless such waiver is in writing signed by the party holding the privilege of agreeing to such waiver. A waiver by one party of any default, breach or failure of the other party under this Sublease shall not be construed as a waiver of any subsequent or different default, breach or failure.

20.    <u>Access to the Subleased Premises.</u> Subtenant shall allow Sublandlord and/or Landlord, and the agents, employees and contractors of either, access to the Subleased Premises under the terms and for the purposes set forth in the Prime Lease or to exhibit the Subleased Premises to prospective purchasers, Mortgagees, ground lessors or tenants in accordance with the provisions of the Prime Lease.

21.    <u>Holding Over.</u> If Subtenant or anyone claiming under Subtenant holds over after the expiration or earlier termination of the Sublease Term hereof without the express written consent of Sublandlord, Subtenant shall become a tenant at sufferance only, at the rental rate payable under the Prime Lease upon the date of such expiration, plus any amount payable to Landlord as a result of such holdover, including any holdover costs for the entire premises described in the Prime Lease, and otherwise upon the terms, covenants and conditions herein specified, so far as applicable. Acceptance by Sublandlord of rent after such termination shall not constitute a consent to a holdover hereunder or result in a renewal. The foregoing provisions of

POOR QUALITY

this paragraph are in addition to and do not affect Sublandlord's right of reentry or any other rights of Sublandlord hereunder or as otherwise provided by law and Subtenant shall be liable to Sublandlord for any holding over after the expiration or earlier termination of the Sublease Term hereof.

22.   Subordination. This Sublease is subject and subordinate to the Prime Lease and to any and all matters which the Prime Lease is or shall be subordinate. In the event the Prime Lease is terminated, or re-entry or dispossession of the Sublandlord by the Landlord under the Prime Lease, Landlord, at its option, may either terminate the Sublease, in which case the Subtenant agrees to peacefully vacate the Subleased Premises, or require the Subtenant to attorn to Landlord as its sublessor pursuant to the then applicable terms of the Sublease for the remaining term thereof, except that Landlord shall not be (i) liable for any previous act or omission of Sublandlord under the Sublease, or (ii) bound by any previous modification of the Sublease not agreed to in writing by Landlord or by a previous prepayment of Rent more than one (1) month in advance.

23.   Choice of Law.   Unless otherwise specified herein, the parties agree that the interpretation and enforcement of this Sublease and related documents will be construed in accordance with all applicable federal laws.  If no federal laws are available to interpret such Sublease and related documents, then applicable Texas law will be used to interpret such Sublease and related documents.

24.   Successors and Assigns. All of the terms, covenants, provisions and conditions of this Sublease shall be binding upon and inure to the benefit of the successors and assigns of Sublandlord and on the successors and assigns of Subtenant but only to the extent herein specified.

25.   Captions. The captions herein are for convenience only and are not a part of this Sublease.

26.   Interest. Should interest become due and payable pursuant to the requirements of this Sublease, Subtenant shall pay to Sublandlord such interest on all sums from the time said sum shall become due and payable until the same is paid at the Interest Rate, unless such sums are paid in accordance with the terms and conditions of the Prime Lease and no interest is due thereunder.

27.   Relationship of Parties. This Sublease does not and shall not create the relationship of principal and agent, or of partnership, or of joint venture, or of any other association between Sublandlord and Subtenant, except that of Sublandlord and Subtenant.

28.   Brokerage. Sublandlord and Subtenant each represents to the other that no real estate broker or agent is involved in this Sublease and no commissions are due to any agent or broker with respect to this sublease except for The Staubach Company and McKee &McFarland.

29.   Approval of Predecessors. This Sublease is contingent upon the approval of Landlord or its successors in interest.

# POOR QUALITY

30.     Severability. In the event any part of this Sublease is held to be unenforceable or invalid, for any reason, the balance of this Sublease shall not be affected and shall remain in full force and effect during the Sublease Term.

IN WITNESS WHEREOF, the parties hereto have caused this Sublease to be executed as of the day and year first above written.

WITNESS/ATTEST:                          SUBLANDLORD:
                                         SC Kiosks, Inc.

By: _____
Name:                DAVID S. GOLDBERG
Title:    VP SCKiosks Inc.
Date:

WITNESS/ATTEST:                          SUBTENANT:

By: _____
Name:    ERNEST K. STRAMAN, III
Title:    CFO
Date:    7/11/96

Landlord's Consent

The undersigned Landlord, Industrial Developments International, Inc., a Delaware Corporation hereby consents to the this Sublease under the terms and conditions of the Sublease.

Landlord:
Industrial Developments International, Inc., a
Delaware Corporation

By: _____
Name:    See *Consent to Sublease* document
Title:
Date:

# POOR QUALITY

EXHIBIT A



 **POOR QUALITY** 

## Exhibit A continued

Located upon the real property described as follows (the "Premises Real Property"):

Being Part of the JMH Development property as described in Book 368 Page 509 and being in the Northeast Quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, DeSoto County, Mississippi and being more particularly described as follows:

Commencing at the recognized and accepted northeast corner of the northeast quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, Desoto County, Mississippi; thence South 00 Degrees 09 Minutes 32 Seconds West with the centerline of Airways Boulevard a distance of 1529.64 feet to a point; thence North 90 Degrees 00 Minutes 00 Seconds West a distance of 1677.91 feet to a point on curve in the south line of Airport Industrial Drive, said point being the true point of beginning; thence southeastwardly along a curve to the right having a radius of 35.00 feet a distance of 54.71 feet [chord = South 44 Degrees 35 Minutes 00 Seconds East 49.51 feet, Delta = 89 Degrees 33 Minutes 34 Seconds) to a point in the west line of Market Street (proposed); thence South 00 Degrees 11 Minutes 47 Seconds West with the west line of Market Street (proposed) a distance of 467.49 feet to a point in the north line of Lot 8, Airport Industrial Park P.B.P. (proposed); thence North 89 Degrees 48 Minutes 13 Seconds West with the north line of Lot 8 (proposed) a distance of 1055.59 feet to a point in the east line of Hamilton Road; thence North 00 Degrees 24 Minutes 18 Seconds West with the east line of Hamilton Road a distance of 461.85 feet to a point of curvature; thence northeastwardly along a curve to the right having a radius of 35.00 feet a distance of 55.16 feet (chord = North 44 Degrees 44 Minutes 28 Seconds East 49.62 feet, Delta = 90 Degrees 17 Minutes 33 Seconds) to a point of tangency in the south line of Airport Industrial Drive; thence North 89 Degrees 53 Minutes 14 Seconds East with the south line of Airport Industrial Drive a distance of 983.51 feet to a point of curvature; thence southeastwardly along a curve to the right having a radius of 566.00 feet and with the south line of Airport Industrial Drive a distance of 7.40 feet (chord = South 89 Degrees 44 Minutes 16 Seconds East 7.40 feet, Delta = 00 Degrees 44 Minutes 59 Seconds) to the point of beginning and containing 12.13 acres of land.

Note:
In the event of the subdivision of the Premises Real Property and the balance of the real estate not constituting part of the Premises Real Property, the Premises Real Property shall be described in said subdivision plat as "Lot 7 in Airport Industrial Park P.B.P.".

POOR QUALITY

## EXHIBIT B
### (Subleased Equipment description)

### "MISCELLANEOUS OWNED EQUIPMENT "

| Qty | Location | Item Name | Item Description | Model/Serial # |
|---|---|---|---|---|
| 1 | Server Room | Techlogics | Wireless Router | 9500 |
| 1 | Server Room | Power Supply | APC | 5000 |
| 1 | Server Room | Power Supply | APC | 3000XL |
| 1 | Server Room | KVM Switch | Belkin | n/a |
| 1 | Server Room | Switch | Catalyst | 3550 |
| 1 | Server Room | Switch | Catalyst | 3550 |
| 1 | Server Room | Switch | Catalyst | 6500 |
| 4 | Warehouse | Tapers | Tapers/Laminators | 3M 700E |
| 1 | Warehouse | Pallet Scale | Digital Read Out | UK |
| 8 | Warehouse | Workstation Desks | | UK |
| 275 | Warehouse | Grey Totes | | UK |
| 8 | Warehouse | Rolling Flat Carts | | UK |
| 8 | Warehouse | Laundry Baskets | | UK |
| 3 | Warehouse | Pallet Jacks | | UK |
| 15 | Warehouse | Trashcans | | UK |
| Multiple | Warehouse | Conveyor parts | Misc. spare parts | Siemens/UK |
| Multiple | Warehouse | Racking parts | Misc. spare parts | |
| 2 | Warehouse | Black Switch Boxes | | UK |

### "MATERIAL HANDLING EQUIPMENT LEASED FROM GE CAPITAL #4145183-002"

| Qty | Location | Item Name | Item Description | Model/Serial # |
|---|---|---|---|---|
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265785 |
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265786 |
| 1 | Warehouse | Electric Stockpicker | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265787 |
| 1 | Warehouse | Electric Reach | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265984 |
| 1 | Warehouse | Electric Reach | Forklift truck w/2 batteries & 1 charger | SP3220-30 / 1A265985 |
| 1 | Warehouse | Electric Forklift | With 2 batteries, 1 charger | RC3020-030 / 1A265502 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | With 2 batteries, 1 charger | PE4000-60 / 6A206583 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | With 2 batteries, 1 charger | PE4000-60 / 6A206584 |
| 1 | Warehouse | Electric Palletjack Forklift Truck | | WP2030-45 / 5A316671 |
| 5 | Warehouse | Battery Stands | w/pans, roller station, hertralization & deionizing | |

# POOR QUALITY

| | | | | system | | |
|---|---|---|---|---|---|---|

## "CONVEYOR / RACKING EQUIPMENT LEASED FROM GE CAPITAL #4145183-001"

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| RT+ | 0100 | 1102 | Belt Driven Live Roller | 30.25" | 163'-0" | 1.50 | 70 | FS | Tri-Wide Support, Gap Plates\ |
| RG+ | 0100 A | 0200 | Gravity Roller | 21.25" | 163'-0" | | | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0100 B | 0200 | Gravity Roller | 21.25" | 163'-0" | | | FS | Tri-Wide Support, Gap Plates |
| WG+ | 0101 | 0300 | Gravity Miscellaneous | 30.25" | 4'-0" | | | FS | Gravity Gate |
| RT+ | 0102 | 1256 | Lineshaft Conveyor | 30.25" | 10'-9" | .750 | 90 | FS | (1) 90° Curve |
| RA+ | 0103 | 1265 | Flat Belt APC | 30.25" | 36'-0" | 1.00 | 160 | FS | DZB, Photo Eye Accum |
| BT+ | 0104 | 0410 | Belt on Roller | 30.25" | 30'-0" | 1.00 | 80/160 | FS | Powertail, Vector Drive |
| RT+ | 0105 | 1102 | Belt Driven Live Roller | 30.25" | 166'-3" | 1.50 | 70 | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0105 A | 0200 | Gravity Roller | 24.25" | 166'-6" | | | FS | Tri-Wide Support, Gap Plates |
| RG+ | 0105 B | 0200 | Gravity Roller | 24.25" | 166'-6" | | | FS | Tri-Wide Support, Gap Plates |
| WG+ | 0106 | 0300 | Gravity Miscellaneous | 30.25" | 4'-0" | | | FS | Gravity Gate |
| RT+ | 0107 | 1256 | Lineshaft Conveyor | 30.25" | 14'-9" | .750 | 90 | FS | (1) 90° Curve |
| RA+ | 0108 | 1265 | Flat Belt APC | 30.25" | 96'-0" | 1.50 | 160 | FS | DZB, Photo Eye Accum |
| BT+ | 0109 | 0410 | Belt on Roller | 30.25" | 32'-3" | 1.00 | 80/160 | FS | Powertail, Vector Drive |
| BT+ | 0110 | 0220 | Wide Belt Merge | 74" | 16'-0" | 3.00 | 250 | FS | With Powered Verti-belt |
| VB+ | 0110 A | 0220 | Fixed Verti-belt | 4" | 16'-0" | 1.00 | 300 | FS | Mounted to Unit BT+0110 |
| RT+ | 0111 | 0410 | Belt on Roller | 30.25" | 15'-11" | 2.00 | 250 | FS | |
| SS+ | 0112 | 2455 | PS 140 Positive Sorter | 39.25" | 113'-4" | 20.00 | 325 | FS | (7) Diverts w/20° Spurs, (1) 70° Curve, (5) Future Diverts |

# POOR QUALITY

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| RG+ | 0113 | 0100 | Gravity Wheel | 30.25" | 10'-0" | | | FS | |
| RT+ | 0114 | 1256 | Lineshaft Conveyor | 30.25" | 29'-5" | 1.50 | 150 | FS | (1) 90° Curve |
| RA+ | 0115 | 0200 | Flat Belt Apc | 30.25" | 45'-0" | 1.00 | 160 | FS | Fixed End Stop |
| BT+ | 0116 | 0410 | Belt on Roller | 30.25" | 24'-5" | 2.00 | 140 | FS | Powertail, Brake Motor |
| RT+ | 0116 S | 0996 | Round Belt Live Roller | 30.25" | 9'-6" | | 140 | FS | (1) 70° Curve, Slave Driven From Unit BT+0116 |
| BT+ | 0117 | 0410 | Belt on Roller | 30.25" | 32'-0" | 2.00 | 170 | FS | Powertail, Brake Motor |
| RA+ | 0118 | 1265 | Flat Belt APC | 30.25" | 108'-0" | 2.00 | 200 | FS | DZB, Photo Eye Accum |
| BM+ | 0119 | 2305 | Meter Belt | 31.375" | 10'-0" | 1.00 | 100/210 | FS | Powertail, Brake Motor |
| RT+ | 0120 | 0996 | Round Belt Live Roller | 30.25" | 6'-9" | 1.00 | 220 | FS | (1) 45° Curve |
| WG+ | 0200 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0201 | 1265 | Flat Belt APC | 24.25" | 57'-0" | 1.50 | 160 | FS | DZB |
| RT+ | 0202 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RA+ | 0203 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0204 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0204 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0205 | 1102 | Belt Driven Live Roller | 24.25" | 65'-0" | 1.00 | 60 | FS | Gap Plates |
| RG+ | 0206 | 0200 | Gravity Wheel | 24.25" | 10'-0" | | | FS | |
| RT+ | 0207 | 0996 | Round Belt Live Roller | 24.25" | 9'-0" | 1.00 | 120 | FS | (1) 90° Curve |
| RA+ | 0208 | 1265 | Flat Belt APC | 24.25" | 48'-0" | 1.00 | 130 | FS | DZB, Photo Eye Accum |

# POOR QUALITY

| Unit | Model | Description | Conv. Width. | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| BT+ | 0209 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| WG+ | 0210 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0211 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0212 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RT+ | 0213 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RT+ | 0214 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0214 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0215 | 1102 | Belt Driven Live Roller | 24.25" | 61'-0" | 1.00 | 60 | FS | Gap Plates |
| WG+ | 0216 | 0200 | Gravity Wheel | 24.25" | 10'-0" | | | FS | |
| RT+ | 0217 | 0996 | Round Belt Live Roller | 24.25" | 9'-0" | 1.00 | 120 | FS | (1) 90° Curve |
| RA+ | 0218 | 1265 | Flat Belt APC | 24.25" | 48'-0" | | 130 | FS | DZB, Photo Eye Accum |
| BT+ | 0219 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| WG+ | 0220 | 0100 | Gravity Wheel | 24.25" | 15'-0" | | | FS | |
| RA+ | 0221 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye Accum |
| RG+ | 0222 | 0200 | Gravity Roller | 24.25" | 15'-0" | | | FS | |
| RA+ | 0223 | 1265 | Flat Belt APC | 24.25" | 60'-0" | 1.50 | 160 | FS | Photo Eye |
| RT+ | 0224 | 1102 | Belt Driven Live Roller | 24.25" | 54'-0" | 1.50 | 60 | FS | Gap Plates |
| RT+ | 0224 S | 0996 | Round Belt Live Roller Lineshaft Conveyor | 24.25" | 15'-1" | SD | 60 | FS | (2) 90° Curves, Slave Driven |
| RT+ | 0225 | 1102 | Belt Driven Live Roller | 24.25" | 61'-0" | 1.00 | 60 | FS | Gap Plates |

# POOR QUALITY

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| RT+ | 0226 | 1256 | Lineshaft Conveyor | 24.25" | 36'-7" | 1.00 | 120 | FS | Three (3) 90° Curves |
| RA+ | 0227 | 1265 | Flat Belt APC | 24.25" | 43'-0" | 1.00 | 130 | FS | DZB, Photo Eye Accum |
| BT+ | 0228 | 0410 | Belt on Roller | 24.25" | 17'-8" | 1.00 | 50/100 | FS | Powertail, Brake Motor |
| RT+ | 0229 | 1102 | Belt Driven Live Roller | 30.25 | 16'-0" | 2.00 | 140 | FS | Sawtooth Merge w/ (3) tooth infeed |
| RT+ | 0229 S | 0996 | Round Belt Live Roller | 30.25 | 7'-0" | SD | 140 | FS | One (1) 45° Curve, Slave Driven |
| RA+ | 0230 | 1265 | Flat Belt APC | 30.25 | 66'-0" | 1.50 | 160 | FS | Photo Eye Accum, Stop |
| RT+ | 0231 | 1256 | Lineshaft Conveyor | 30.25 | 101'-0" | 2.00 | 90 | FS | Two (2) 90° Curves, One (1) 60° Curve, One (1) 30° Merge |
| BT+ | 0232 | 0410 | Belt on Roller | 30.25 | 48'-0" | 2.00 | 120 | FS | Powertail, Brake Motor |
| RT+ | 0233 | 0996 | Live Belt Live Roller | 30.25 | 25'-0" | 1.00 | 130 | FS | Two (2) 90° Curves |
| RA+ | 0234 | 1265 | Flat Belt APC | 30.25 | 153'-0" | 3.00 | 200 | FS | DZB, Photoeye accum. |
| BM+ | 0235 | 2305 | Meter Belt | 31.375 | 10'-0" | 1.00 | 100/210 | FS | Powertail, Brake Motor |
| RT+ | 0236 | 0996 | Round Belt Live Roller | 30.25 | 6'-9" | 1.00 | 220 | FS | (1) 45° Curve |
| RG+ | 0237 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | | |
| RG+ | 0239 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | FS | With 3' Gate |
| RG= | 0240 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | | |
| RG+ | 0242 | 0200 | Gravity Roller | 24.25 | 5'-0" | | | FS | With 3' Gate |
| RT+ | 0300 | 1131 | Live Roller | 36.25 | 28'-4" | 2.00 | 250 | FS/PLT | Sawtooth Merge, With(4) Teeth Infeeds |
| RA+ | 0301 | 1265 | Flat Belt APC | 30.25" | 48'-0" | 2.00 | 220 | FS/PLT | DZB, Photo Eye Accum |
| BI+ | 0302 | 2305 | Meter Belt | 31.375" | 12'-0" | 2.00 | 110/220 | FS/PLT | Powertail, Vector Drive |
| BT+ | 0303 | 0977 | Flat Belt Turn | 30" | 90° | 3.00 | 280 | FS/PLT | |
| BT+ | 0304 | 0977 | Flat Belt | 30" | 90° | 3.00 | 280 | FS/PL | |

# POOR QUALITY

| Unit | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|
| | | Turn | | | | | T | |
| BT+ | 0305 | 2310 | Slider Bed | 30" | 4'-0" | 1.00 | 280 | FS/PL T | |
| SC+ | 0306 | | In-Motion Scale | 30" | 5'-0" | 1.00 | 280 | FS/PL T | |
| BT+ | 0306 A | 2310 | Slider Bed | 30" | 4'-0" | 1.00 | 280 | FS/PL T | |
| SS+ | 0307 | 2455 | PS 140 Positive Sorter | 39.25" | 166'-8" | 25.00 | 325 | FS/PL T | (6) Diverts w/ 20° Spurs & 70° Gravity Curves (4) Future Diverts |
| RT+ | 0308 | 2490 | Round Belt Live Roller | 30.25" | 22'-10" | 1.00 | 300 | FS/PL T | (2) 90° Curve |
| RA+ | 0309 | 1265 | Flat Belt APC | 30.25" | 87'-0" | 1.00 | 250 | FS/PL T | DZB, PE |
| BM+ | 0310 | 2305 | Meter Belt | 30.625" | 10'-0" | 1.00 | 125/250 | FS/PL T | Powertail, Brake Motor |
| CH+ | 0311 | | Gravity Chute | 30.25" | 25'-0" | | | FS | Typical of (4) |
| BF+ | 0312 | | Powered Extendable | 30.25" | 26'-0"/60'-0" | | 0-120 | FS | Typical of (4) Units w/Transistion,Guide Tracks, & PowerTrax |
| BT+ | 0315 | 0410 | Belt on Roller | 30.25" | 14'-0" | 1.00 | 120 | FS/PL T | Brake Motor |
| WG+ | 0316 | 0100 | Gravity Wheel | 30.25 | 8'-5" | | | FS/PL T | (1) 70° Curve |
| RA+ | 0317 | 1265 | Flat Belt APC | 30.25 | 30'-0" | 1.00 | 140 | FS/PL T | DZB, Photo Eye Accum |
| RG+ | 0317 A | 0200 | Gravity Roller | 24.25 | 30'-0" | | | FS/PL T | Fixed End Stop |
| RG+ | 0317 B | 0200 | Gravity Roller | 24.25 | 30'-0" | | | | Fixed End Stop |
| RT+ | 0318 A | 0996 | Round Belt Live Roller | 30.25 | 15'-0" | 1.00 | 150 | FS/PL T | Two (2) 45° Curves |
| RA+ | 0318 | 1265 | Flat Belt APC | 30.25" | 30'-0" | 1.00 | 200 | FS/PL T | DZB, Photo Eye Accum |
| BT+ | 0319 | 2305 | Meter Belt | 30.625" | 10'-0" | 1.00 | 50/100 | FS/PL T | Powertail,Brake Motor |
| RT+ | 0320 | 1131 | Flat Belt Live Roller | 72.25" | 12'-0" | 1.00 | 120 | FS/PL T | 2:1 Fixed Divert Rail Merge |
| RT+ | 0321 | 1256 | Lineshaft | 30.25" | 18'-0" | .750 | 120 | FS/PL T | (2) 90° Curve |

# POOR QUALITY

| Unit | | Model | Description | Conv. Width | Lgth. Feet | HP | Speed (fpm) | Support Type | Comment |
|---|---|---|---|---|---|---|---|---|---|
| | | | Conveyor | | | | | T | |
| RA+ | 0322 | 1265 | Flat Belt APC | 30.25" | 48'-0" | 1.00 | 120 | FS/PL T | DZB, Photo Eye Accum |
| RG+ | 0322 A | 0200 | Gravity Roller | 24.25" | 60'-0" | | | FS/PL T | Fixed End Stops |
| RT+ | 0323 | 1256 | Lineshaft Conveyor | 30.25" | 18'-9" | .750 | 120 | FS/PL T | (2) 90° Curve |
| RA+ | 0324 | 1265 | Flat Belt APC | 30.25" | 30'-0" | 1.00 | 120 | FS/PL T | DZB, Photo Eye Accum |
| BM+ | 0325 | 2305 | Meter Belt | 30.625" | 10'-0" | 1.00 | 50/100 | FS/PL T | Brake Motor |
| RA+ | 0326 | 1265 | Flat Belt APC | 30.25" | 67'-0" | 1.00 | 90 | FS/PL T | DZB |
| RG+ | 0326 E | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 F | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 G | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RG+ | 0326 H | 0200 | Gravity Roller | 24.25" | 3'-0" | | | | |
| RT+ | 0327 | 0996 | Round Belt Live Roller | 30.25" | 12'-0" | .750 | 100 | FS/PL T | 1) 90° Curve |

POOR QUALITY

SCHEDULE A

PRIME LEASE

Lease dated August 1, 2003,
relating to certain space known as Suite 110
in the Airways Distribution Center
located at 481 Airport Industrial Drive,
Southaven, Mississippi

# IMAGING SERVICES

# IMAGING SERVICES

POOR QUALITY

## SCHEDULE A

## PRIME LEASE

Lease dated August 1, 2003,
relating to certain space known as Suite 110
in the Airways Distribution Center
located at 481 Airport Industrial Drive,
Southaven, Mississippi

# IMAGING SERVICES

# IMAGING SERVICES

POOR QUALITY

INDUSTRIAL LEASE AGREEMENT

BETWEEN

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC.

AS LANDLORD

AND

WIRELESS RETAIL, INC.

AS TENANT

# IMAGING SERVICES

# IMAGING SERVICES

ATL01/11403/12v9

# POOR QUALITY

**LEASE INDEX**

| Section | Subject |
|---------|---------|
| 1 | Basic Lease Provisions |
| 2 | Demised Premises |
| 3 | Term |
| 4 | Base Rent |
| 5 | Security Deposit |
| 6 | Operating Expenses and Additional Rent |
| 7 | Use of Demised Premises |
| 8 | Insurance |
| 9 | Utilities |
| 10 | Maintenance and Repairs |
| 11 | Tenant's Personal Property; Indemnity |
| 12 | Tenant's Fixtures |
| 13 | Signs |
| 14 | Landlord's Lien |
| 15 | Governmental Regulations |
| 16 | Environmental Matters |
| 17 | Construction of Demised Premises |
| 18 | Tenant Alterations and Additions |
| 19 | Services by Landlord |
| 20 | Fire and Other Casualty |
| 21 | Condemnation |
| 22 | Tenant's Default |
| 23 | Landlord's Right of Entry |
| 24 | Lender's Rights |
| 25 | Estoppel Certificate and Financial Statement |
| 26 | Landlord's Liability |
| 27 | Notices |
| 28 | Brokers |
| 29 | Assignment and Subleasing |
| 30 | Termination or Expiration |
| 31 | Intentionally Omitted |
| 32 | Late Payments |
| 33 | Rules and Regulations |
| 34 | Quiet Enjoyment |
| 35 | Miscellaneous |
| 36 | Special Stipulations |
| 37 | Lease Date |
| 38 | Authority |
| 39 | No Offer Until Executed |

Exhibit "A"  Demised Premises
Exhibit "B"  Preliminary Plans and Specifications/Work
Exhibit "C"  Special Stipulations
Exhibit "D"  Rules and Regulations
Exhibit "E"  Certificate of Authority
Exhibit "F"  SNDA
Exhibit "G"  Memorandum of Lease
Exhibit "H"  Plans and Specifications for Conveyor Belt System

ATL01/11453516v9



# POOR QUALITY

## INDUSTRIAL LEASE AGREEMENT

THIS LEASE AGREEMENT (the "Lease") is made as of the "Lease Date" (as defined in Section 37 herein) by and between INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation ("Landlord"), and WIRELESS RETAIL, INC., a Texas corporation ("Tenant") (the words "Landlord" and "Tenant" to include their respective legal representatives, successors and permitted assigns where the context requires or permits).

### WITNESSETH:

1. **Basic Lease Provisions**  The following constitute the basic provisions of this Lease:

   (a)  Demised Premises Address:  481 Airport Industrial Drive
   Suite 110
   Southaven, Mississippi 38671

   (b)  Demised Premises Square Footage: approximately 177,039 sq. ft.

   (c)  Building Square Footage:  approximately 246,078 sq. ft.

   (d)  Annual Base Rent (based on 177,039 sq. ft. at $3.272 per square foot; see Section 17 hereof):

   | | | |
   |---|---|---|
   | Lease Year 1 | $579,252.00 | (plus the prorated amount for any Fractional Month per Section 3 hereof, if applicable) |
   | Lease Year 2 | $579,252.00 | |
   | Lease Year 3 | $579,252.00 | |
   | Lease Year 4 | $579,252.00 | |
   | Lease Year 5 | $579,252.00 | |

   (e)  Monthly Base Rent Installments (based on 177,039 sq. ft. at $3.272 per square foot; see Section 17 hereof):

   | | | |
   |---|---|---|
   | Lease Year 1 | Months 1-2: $0.00 | |
   | | Months 3-15: $48,271.00 | (plus the prorated amount for any Fractional Month per Section 3 hereof, if applicable) |
   | Lease Year 2 | $48,271.00 | |
   | Lease Year 3 | $48,271.00 | |
   | Lease Year 4 | $48,271.00 | |
   | Lease Year 5 | $48,271.00 | |

   (f)  Lease Commencement Date:  August 1, 2003

   (g)  Base Rent Commencement Date:  October 1, 2003

   (h)  Expiration Date:  The last day of the Sixtieth (60th) full calendar month following the Base Rent Commencement Date

   (i)  Primary Term:  Sixty-Two (62) months plus, in the event the Base Rent Commencement Date does not occur on the first (1st) day of a calendar month, the period from and including the Base Rent Commencement Date to and including the last day of the calendar month in which the Base Rent Commencement Date occurs (if applicable, the "Fractional Month")

   (j)  Tenant's Operating Expense Percentage: 71.94%

   (k)  Security Deposit: $48,271.00

ATL01/11405576v9

 **POOR QUALITY** 

    (l)     Permitted Use:  Distribution, warehousing and assembly of wireless telephones and related products and administrative uses reasonably incidental thereto

    (m)    Address for notice:

           Landlord:          INDUSTRIAL DEVELOPMENTS
                                    INTERNATIONAL, INC.
                                    c/o IDI, Inc.
                                    3424 Peachtree Road, N.E., Suite 1500
                                    Atlanta, Georgia 30326
                                    Attn:  Manager - Lease Administration

           Tenant:            WIRELESS RETAIL, INC.
                                      8800 E. Chaparral Road, Suite 300
                                    Scottsdale, Arizona 85250
                                    Attn:  Real Estate Department
                                    Telephone:  (480) 346-4400
                                    Facsimile:  (480) 346-4557

    (n)    Address for rental payments:

                                    INDUSTRIAL DEVELOPMENTS
                                    INTERNATIONAL, INC.
                                    c/o IDI Services Group, LLC
                                    P. O. Box 281464
                                    Atlanta, Georgia 30384-1464

    (o)    Broker(s):           CB Richard Ellis

    (p)    Guarantor:         Wireless America, Inc.

    **2.**        Demised Premises.  For and in consideration of the rent hereinafter reserved and the mutual covenants hereinafter contained, Landlord does hereby lease and demise unto Tenant, and Tenant does hereby hire, lease and accept, from Landlord all upon the terms and conditions hereinafter set forth the following premises, referred to as the "Demised Premises", as outlined on Exhibit A attached hereto and incorporated herein:  an agreed upon approximately 177,039 square feet of space, approximately 11,310 square feet of which is to be office space, located within Building C, shown on Exhibit A (the "Building"), which Building is to be constructed by Landlord, is to contain a total of approximately 246,078 square feet and is to be located within Airways Distribution Center (the "Project") in DeSoto County, Mississippi.

    **3.**        Term.  To have and to hold the Demised Premises for a preliminary term (the "Preliminary Term") commencing on the Lease Date and ending on the day immediately preceding the Lease Commencement Date as set forth in Section 1(f), and a primary term (the "Primary Term") commencing on the Lease Commencement Date and terminating on the Expiration Date as set forth in Section 1(b), as the Lease Commencement Date and the Expiration Date may be revised pursuant to Section 17, and subject to Tenant's extension option contained in Special Stipulation 4 on Exhibit C attached hereto (the Preliminary Term, the Primary Term, and any and all extensions thereof, herein referred to as the "Term").  The term "Lease Year", as used in this Lease, shall mean the 12-month period commencing on the Base Rent Commencement Date, and each 12-month period thereafter during the Term; provided, however, that (I) if the Base Rent Commencement Date occurs after the Lease Commencement Date, the first Lease Year will include the period between the Lease Commencement Date and the Base Rent Commencement Date, and (II) if the Base Rent Commencement Date is a day other than the first day of a calendar month, the first Lease Year shall include the resulting Fractional Month and shall extend through the end of the twelfth (12th) full calendar month following the Base Rent Commencement Date.

    **4.**        Base Rent.  Tenant shall pay to Landlord at the address set forth in Section 1(n), as base rent for the Demised Premises, commencing on the Base Rent Commencement Date and continuing throughout the Term in lawful money of the United States, the annual amount set forth in Section 1(d) payable in equal monthly installments as set forth in Section 1(e) (the "Base Rent"), payable in advance, without demand and without abatement, reduction, set-off or deduction, on the first day of each calendar month during the Term.  If the Base Rent Commencement Date shall fall on a day other than the first day of a calendar month, the Base Rent shall be apportioned pro rata on a per diem basis for the resulting Fractional Month (which pro rata payment shall be due and payable on the Base Rent Commencement Date).  No payment by Tenant or receipt by Landlord of rent hereunder shall be deemed to be other than on account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of rent shall be deemed an accord and satisfaction, and Landlord may accept such check as payment without prejudice to Landlord's right to recover the balance of such installment or payment of rent or pursue any other remedies available to Landlord

    **5.**        Security Deposit.

ATL01/11405528v9

# POOR QUALITY

(a)    Upon Tenant's execution of this Lease, Tenant will pay to Landlord the sum set forth in Section 1(k) (the "Security Deposit") as security for the full and faithful performance by Tenant of each and every term, covenant and condition of this Lease. The acceptance by Landlord of the Security Deposit paid by Tenant shall not render this Lease effective unless and until Landlord shall have executed and delivered to Tenant a fully executed copy of this Lease. The Security Deposit may be commingled with Landlord's other funds or held by Landlord in a separate interest bearing account, with interest paid to Landlord, as Landlord may elect. In the event that Tenant is in default under this Lease, Landlord may retain the Security Deposit for the payment of any sum due Landlord or which Landlord may expend or be required to expend by reason of Tenant's default or failure to perform; provided, however, that any such retention by Landlord shall not be or be deemed to be an election of remedies by Landlord or viewed as liquidated damages, it being expressly understood and agreed that Landlord shall have the right to pursue any and all other remedies available to it under the terms of this Lease or otherwise. In the event all or any portion of the Security Deposit is so retained by Landlord, Tenant shall, within five (5) days of demand therefor from Landlord, replenish the Security Deposit to the full amount set forth in Section 1(k). In the event that Tenant shall comply with all of the terms, covenants and conditions of this Lease, the Security Deposit shall be returned to Tenant within thirty (30) days after the later of (a) the Expiration Date or (b) the date that Tenant delivers possession of the Demised Premises to Landlord. In the event of a sale of the Building, Landlord shall have the right to transfer the Security Deposit to the purchaser, and upon acceptance by such purchaser, Landlord shall be released from all liability for the return of the Security Deposit. Tenant shall not assign or encumber the money deposited as security, and neither Landlord nor its successors or assigns shall be bound by any such assignment or encumbrance.

(b)    Tenant shall have the right on the date which is the first day of the thirty-first (31st) month following the Base Rent Commencement Date (the "Return Date"), to request a return of the Security Deposit. If, on the Return Date (a) no Event of Default has occurred and is continuing, (b) Tenant then has a tangible net worth which is (as of the fiscal quarter of Tenant then most recently ended) not less than its tangible net worth as of the Lease Date and (c) the business of Tenant has generated positive net operating income for the six (6) fiscal quarters of Tenant most recently preceding the Return Date, as verified by Qualified Financial Statements (as hereinafter defined), the Tenant shall be entitled to have the Security Deposit returned. If Tenant becomes entitled to the return of the Security Deposit in accordance with the foregoing, and the Security Deposit is then being held by Landlord in cash, Landlord will, within fifteen (15) business days after receipt by Landlord from Tenant of a written notice confirming the occurrence of the requirements above and providing any related, supporting Qualified Financial Statements, return the Security Deposit to Tenant. If Landlord is then holding a letter of credit for the Security Deposit, Landlord will, not later than fifteen (15) business days after receipt by Landlord from Tenant of a written notice confirming the occurrence of the requirements above and providing any related, supporting Qualified Financial Statements, return the letter of credit to Tenant. Notwithstanding the foregoing, in the event the Security Deposit has been returned to Tenant in accordance with the terms of this subsection (b), on the date which is six (6) months prior to the expiration of the Initial Term (the "First Re-Deposit Date"), Tenant shall re-deposit the Security Deposit with Landlord as security for the full and faithful performance by Tenant of each and every term, covenant and condition of this Lease (the "Security Deposit Re-Deposit"); provided however that Tenant shall not be required to make the Security Deposit Re-Deposit on the First Re-Deposit Date if Tenant has, as of the First Re-Deposit Date, exercised its option to extend the Term as provided in Special Stipulation 4 of Exhibit C attached hereto. In the event Tenant does so exercise its first extension option on or prior to the First Re-Deposit Date (such that Tenant does not, at that time make the Security Deposit Re-Deposit), Tenant shall, on the date which is six (6) months prior to the expiration of the first extended term (the "Second Re-Deposit Date"), make the Security Deposit Re-Deposit, provided however that Tenant shall not be required to make the Security Deposit Re-Deposit on the Second Re-Deposit Date if Tenant has, as of the Second Re-Deposit Date, exercised its second extension option as provided in Special Stipulation 4 of Exhibit C attached hereto. In the event Tenant does so exercise its second extension option, Tenant shall, on the date which is six (6) months prior to the expiration of the second extended term (the "Third Re-Deposit Date") make the Security Deposit Re-Deposit, it being the intention of the parties that in any event the Landlord shall hold the Security Deposit on the date which is six (6) months prior to the expiration of the Term (as such Term may be extended pursuant to said Special Stipulation 4). In order for a financial statement to constitute a "Qualified Financial Statement", as that term is used herein, such financial statement must (a) cover the relevant fiscal period for the determination being made, (b) be either one or more quarterly statements or an annual statement, (c) be prepared in accordance with generally accepted accounting principles consistently applied, (d) be prepared by one of the "Big Four" accounting firms, (e) be reviewed by such accountants (with respect to quarterly statements) or audited by such accountants (with respect to annual statements), and (f) be certified in writing by the chief financial officer of Tenant to be true, correct and complete.

6.    **Operating Expenses and Additional Rent.**

(a)    Tenant agrees to pay as Additional Rent (as defined in Section 6(b) below) its proportionate share of Operating Expenses (as hereinafter defined). "Operating Expenses" shall be defined as all reasonable expenses for operation, repair, replacement and maintenance as necessary to keep the Building and the common areas, driveways, and parking areas associated therewith (collectively, the "Building Common Area") fully operational and in good order, condition and repair, including but not limited to, utilities for the Building Common Area, expenses associated with the driveways and parking areas (including sealing and restriping, and trash, snow and ice removal), security systems, fire detection and prevention systems, lighting facilities, landscaped areas, walkways, painting and caulking, directional

-3-

ATL01/11409528v9



# POOR QUALITY

signage, curbs, drainage strips, sewer lines, all charges assessed against or attributed to the Building pursuant to any applicable easements, covenants, restrictions, agreements, declaration of protective covenants or development standards, property management fees, all real property taxes and special assessments imposed upon the Building (but excluding special assessments assessed and due and payable for periods prior to the current calendar year), the Building Common Area and the land on which the Building and the Building Common Area are constructed, all costs of insurance paid by Landlord with respect to the Building and the Building Common Area (including, without limitation, commercially reasonable deductibles), and costs of improvements to the Building and the Building Common Area required by any law, ordinance or regulation applicable to the Building and the Building Common Area generally (and not because of the particular use of the Building or the Building Common Area by a particular tenant), which cost shall be amortized on a straight line basis over the useful life of such improvement, as reasonably determined by Landlord. Operating Expenses shall not include expenses for the costs of any maintenance and repair required to be performed by Landlord at its own expense under Section (10)(b). Further, Operating Expenses shall not include (i) the costs for capital improvements unless such costs are incurred for the purpose of causing a material decrease in the Operating Expenses of the Building or the Building Common Area or are incurred with respect to improvements made to comply with laws, ordinances or regulations as described above or (ii) any of the costs expressly excluded from Operating Expenses pursuant to Special Stipulation 8 on Exhibit "C" attached hereto. The proportionate share of Operating Expenses to be paid by Tenant shall be a percentage of the Operating Expenses based upon the proportion that the square footage of the Demised Premises bears to the total square footage of the Building (such figure referred to as "Tenant's Operating Expense Percentage" and set forth in Section 1(j)); provided that, as to management fees, Tenant shall pay Landlord the management fees directly attributable to the Rent (as hereinafter defined) payable hereunder with respect to the Demised Premises, and not Tenant's Operating Expense Percentage of the management fees payable on the entire Building. Notwithstanding the foregoing, Landlord shall, in Landlord's reasonable discretion, have the right to adjust Tenant's proportionate share of individual components of Operating Expenses if Tenant's Operating Expense Percentage thereof would not equitably allocate to Tenant its share of such component of Operating Expenses in light of Tenant's particular use, manner of use and/or level of tenant improvements in the Demised Premises. Prior to or promptly after the beginning of each calendar year during the Term, Landlord shall estimate the total amount of Operating Expenses to be paid by Tenant during each such calendar year and Tenant shall pay to Landlord one-twelfth (1/12) of such sum on the first day of each calendar month during each such calendar year, or part thereof, during the Term. Within a reasonable time after the end of each calendar year, Landlord shall submit to Tenant a statement of the actual amount of Operating Expenses for such calendar year, and the actual amount owed by Tenant, and within thirty (30) days after receipt of such statement, Tenant shall pay any deficiency between the actual amount owed and the estimates paid during such calendar year, or in the event of overpayment, Landlord shall credit the amount of such overpayment toward the next installment of Operating Expenses owed by Tenant or remit such overpayment to Tenant if the Term has expired or has been terminated and no Event of Default exists hereunder. The obligations in the immediately preceding sentence shall survive the expiration or any earlier termination of this Lease. If the Lease Commencement Date shall fall on other than the first day of the calendar year, and/or if the Expiration Date shall fall on other than the last day of the calendar year, Tenant's proportionate share of the Operating Expenses for such calendar year shall be apportioned prorata. Landlord shall be responsible for keeping the Building Common Areas fully operational and in good order, provided that the related costs shall be paid in accordance with this Section 6(a).

(b)      Any amounts required to be paid by Tenant hereunder (in addition to Base Rent) and any charges or expenses incurred by Landlord on behalf of Tenant under the terms of this Lease shall be considered "Additional Rent" payable in the same manner and upon the same terms and conditions as the Base Rent reserved hereunder except as set forth herein to the contrary (all such Base Rent and Additional Rent sometimes being referred to collectively herein as "Rent"). Any failure on the part of Tenant to pay such Additional Rent when and as the same shall become due shall entitle Landlord to the remedies available to it for non-payment of Base Rent. Tenant's obligations for payment of Additional Rent shall begin to accrue on the Lease Commencement Date regardless of the Base Rent Commencement Date.

(c)      If applicable to the jurisdiction where the Demised Premises are located, Tenant shall pay and be liable for all rental, sales, use and inventory taxes or other similar taxes, if any, on the amounts payable by Tenant hereunder levied or imposed by any city, state, county or other governmental body having authority, such payments to be in addition to all other payments required to be paid Landlord by Tenant under the terms of this Lease. Such payment shall be made by Tenant directly to such governmental body if billed to Tenant, or if billed to Landlord, such payment shall be paid concurrently with the payment of the Base Rent, Additional Rent, or such other charge upon which the tax is based, all as set forth herein.

7.      Use of Demised Premises.

(a)      The Demised Premises shall be used for the Permitted Use set forth in Section 1(l) and for no other purpose.

(b)      Tenant will permit no liens to attach or exist against the Demised Premises, and shall not commit any waste.

-4-

ATL01/11405526v9

 

# POOR QUALITY

(c)     The Demised Premises shall not be used for any illegal purposes, and Tenant shall not allow, suffer, or permit any vibration, noise, odor, light or other effect to occur within or around the Demised Premises that could constitute a nuisance or trespass for Landlord or any occupant of the Building or an adjoining building, its customers, agents, or invitees. Upon notice by Landlord to Tenant that any of the aforesaid prohibited uses are occurring, Tenant agrees to promptly remove or control the same.

(d)     Tenant shall not in any way violate any law, ordinance or restrictive covenant affecting the Demised Premises ("Laws"), and shall not in any manner use the Demised Premises so as to cause cancellation of, prevent the use of, or increase the rate of, the fire and extended coverage insurance policy required hereunder. Tenant shall have the right, after written notice to Landlord, to contest by appropriate legal proceedings, diligently conducted in good faith, at its sole cost and expense, the validity or application of any Law with which Tenant is not in compliance, and to delay compliance therewith pending the prosecution of such proceedings, provided no civil or criminal penalty would be suffered or incurred by Landlord or the Building and no lien would be imposed upon or satisfied out of the Demised Premises or the Building by reason of such delay, and provided, further, that Landlord shall in no event be obligated to join in any such proceedings. Landlord makes no (and does hereby expressly disclaim any) covenant, representation or warranty as to the Permitted Use being allowed by or being in compliance with any applicable laws, rules, ordinances or restrictive covenants now or hereafter affecting the Demised Premises, and any zoning letters, copies of zoning ordinances or other information from any governmental agency or other third party provided to Tenant by Landlord or any of Landlord's agents or employees shall be for informational purposes only, Tenant hereby expressly acknowledging and agreeing that Tenant shall conduct and rely solely on its own due diligence and investigation with respect to the compliance of the Permitted Use with all such applicable laws, rules, ordinances and restrictive covenants and not on any such information provided by Landlord or any of its agents or employees.

(e)     In the event insurance premiums pertaining to the Demised Premises, the Building, or the Building Common Area, whether paid by Landlord or Tenant, are increased over the least hazardous rate available due to the nature of the use of the Demised Premises by Tenant, Tenant shall pay such additional amount as Additional Rent.

(f)     Tenant, its permitted subtenants and their employees, licensees and guests, shall have access to the Demised Premises at all times, twenty-four (24) hours per day, every day of the year, subject to such after-normal business hour security procedures as Landlord may require.

8.     **Insurance.**

(a)     Tenant covenants and agrees that from and after the Lease Commencement Date or any earlier date upon which Tenant enters or occupies the Demised Premises or any portion thereof, Tenant will carry and maintain, at its sole cost and expense, the following types of insurance, in the amounts specified and in the form hereinafter provided for:

(i)     Liability Insurance in the Commercial General Liability form (including Broad Form Property Damage and Contractual Liabilities or reasonable equivalent thereto) covering the Demised Premises and Tenant's use thereof against claims for bodily injury or death, property damage and product liability occurring upon, in or about the Demised Premises, such insurance to be written on an occurrence basis (not a claims made basis), to be in combined single limits amounts not less than $3,000,000.00 and to have general aggregate limits of not less than $10,000,000.00 for each policy year, with such commercially reasonable deductible as may be approved by Landlord, which approval shall not be unreasonably withheld. The insurance coverage required under this Section 8(a)(i) shall, in addition, extend to any liability of Tenant arising out of the indemnities provided for in Section 11 and, if necessary, the policy shall contain a contractual endorsement to that effect.

(ii)     Insurance covering (A) all of the items included in the leasehold improvements constructed in the Demised Premises by or at the expense of Landlord (collectively, the "Improvements"), including but not limited to demising walls and ductwork and portions of the heating, ventilating and air conditioning system located within the Demised Premises and (B) Tenant's trade fixtures, merchandise and personal property from time to time in, on or upon the Demised Premises, in an amount not less than one hundred percent (100%) of their full replacement value from time to time during the Term, providing protection against perils included within the standard form of "Special Form" fire and casualty insurance policy, together with insurance against sprinkler damage, vandalism and malicious mischief. Any policy proceeds from such insurance relating to the Improvements shall be used solely for the repair, construction and restoration or replacement of the Improvements damaged or destroyed unless this Lease shall cease and terminate under the provisions of Section 20.

(b)     All policies of the insurance provided for in Section 8(a) shall be issued in form reasonably acceptable to Landlord by insurance companies with a rating of not less than "A," and financial size of not less than Class XII, in the most current available "Best's Insurance Reports", and licensed to do business in the state in which the Building is located. Each and every such policy:

(i)     shall name Landlord, Lender (as defined in Section 24), and any other party reasonably designated by Landlord, as an additional insured. In addition, the coverage described in Section 8(a)(ii)(A) relating to the Improvements shall also name Landlord as "loss payee";

-5-

ATL01/11405528v9



POOR QUALITY

(ii)      shall be delivered to Landlord, in the form of an insurance certificate acceptable to Landlord as evidence of such policy, prior to the Lease Commencement Date and thereafter within thirty (30) days prior to the expiration of each such policy, and, as often as any such policy shall expire or terminate. Renewal or additional policies shall be procured and maintained by Tenant in like manner and to like extent;

(iii)      shall contain a provision that the insurer will give to Landlord and such other parties in interest at least thirty (30) days notice in writing in advance of any material change, cancellation, termination or lapse, or the effective date of any reduction in the amounts of insurance; and

(iv)      shall be written as a primary policy which does not contribute to and is not in excess of coverage which Landlord may carry.

(c)      In the event that Tenant shall fail to carry and maintain the insurance coverages set forth in this Section 8, Landlord may upon thirty (30) days notice to Tenant (unless such coverages will lapse in which event no such notice shall be necessary) procure such policies of insurance and Tenant shall promptly reimburse Landlord therefor.

(d)      Landlord and Tenant hereby waive any right each may have against the other on account of any loss or damage occasioned to Landlord or Tenant, as the case may be, their respective property, the Demised Premises, its contents or to the other portions of the Building, arising from any risk covered by "Special Form" fire and extended coverage insurance of the type and amount required to be carried hereunder, provided that such waiver does not invalidate such policies or prohibit recovery thereunder. The parties hereto shall cause their respective insurance companies insuring the property of either Landlord or Tenant against any such loss, to waive any right of subrogation that such insurers may have against Landlord or Tenant, as the case may be.

9.      **Utilities** During the Term, Tenant shall promptly pay as billed to Tenant all rents and charges for water and sewer services and all costs and charges for gas, steam, electricity, fuel, light, power, telephone, heat and any other utility or service used or consumed in or servicing the Demised Premises and all other costs and expenses involved in the care, management and use thereof as charged by the applicable utility companies. To the extent possible, all such utilities, except for sewer shall be separately metered and billed to Tenant, and Tenant shall establish an account with the utility provider with respect to each such separately metered utility. Sewer shall not be separately metered, and shall be billed to Tenant by Landlord, at Landlord's actual cost, in an amount equal to a reasonable estimation of such utility actually used by Tenant. Tenant's obligation for payment of all utilities shall commence on the earlier of the Lease Commencement Date or the date of Tenant's actual occupancy of all or any portion of the Demised Premises, including any period of occupancy prior to the Lease Commencement Date, regardless of whether or not Tenant conducts business operations during such period of occupancy. In the event Tenant's use of any utility not separately metered is in excess of the average use by other tenants, Landlord shall have the right to install a meter for such utility, at Tenant's expense, and bill Tenant for Tenant's actual use. If Tenant fails to pay any utility bills or charges, Landlord may, at its option and upon reasonable notice to Tenant, pay the same and in such event, the amount of such payment, together with interest thereon at the Interest Rate as defined in Section 32 from the date of such payment by Landlord, will be added to Tenant's next payment due as Additional Rent. Notwithstanding the foregoing, if: (i) such utility service is interrupted solely because of the acts of Landlord, its employees, agents or contractors; (ii) Tenant notifies Landlord of such interruption in writing (the "Interruption Notice"); (iii) such interruption does not arise in whole or in part as a result of an act or omission of Tenant, its employees, agents, invitees or contractors; (iv) such interruption is not caused by a fire or other casualty; (v) the repair or restoration of such service is the responsibility of and is reasonably within the control of Landlord; and (vi) as a result of such interruption, the Demised Premises or a material portion thereof is rendered untenantable (meaning that Tenant is unable to use the Demised Premises in the normal course of its business) and Tenant in fact ceases to use the Demised Premises, or material portion thereof, then, Tenant's sole remedy for such interruption shall be as follows: on the third (3rd) consecutive business day following the later to occur of (a) the date the Demised Premises (or material portion thereof) becomes untenantable, (b) the date Tenant ceases to use such space and (c) the date Tenant provides Landlord with an Interruption Notice, the Base Rent payable hereunder shall be abated on a per diem basis for each day after such three (3) business day period based upon the percentage of the Demised Premises so rendered untenantable and not used by Tenant, and such abatement shall continue until the date the Demised Premises or the applicable portions thereof become tenantable again.

10.      **Maintenance and Repairs.**

(a)      Tenant shall, at its own cost and expense, maintain in good condition and repair and replace as necessary the interior of the Demised Premises, including but not limited to the heating, air conditioning and ventilation systems, glass, windows and doors, sprinkler, all plumbing and sewage systems, fixtures, interior walls, floors (including floor slabs), ceilings, storefronts, plate glass, skylights, all electrical facilities and equipment including, without limitation, lighting fixtures, lamps, fans and any exhaust equipment and systems, electrical motors, and all other appliances and equipment (including, without limitation, dock levelers, dock shelters, dock seals and dock lighting) of every kind and nature located in, upon or about the Demised Premises, except as to such maintenance, repair and replacement as

-6-

ATL01/11405526v9

# POOR QUALITY

is the obligation of Landlord pursuant to Section 10(b).  During the Term, Tenant shall maintain in full force and effect a service contract for the maintenance of the heating, ventilation and air conditioning systems with an entity reasonably acceptable to Landlord. Tenant shall deliver to Landlord (i) a copy of said service contract prior to the Lease Commencement Date, and (ii) thereafter, a copy of a renewal or substitute service contract within thirty (30) days prior to the expiration of the existing service contract. Tenant's obligation shall exclude any maintenance, repair and replacement required because of the act or negligence of Landlord, its employees, contractors or agents, which shall be the responsibility of Landlord.

(b)    Landlord shall, at its own cost and expense, maintain in good condition and repair the foundation (beneath the floor slab), the roof and structural frame of the Building. Landlord's obligation shall exclude the cost of any maintenance or repair required because of the act or negligence of Tenant or any of Tenant's subsidiaries or affiliates, or any of Tenant's or such subsidiaries' or affiliates' agents, contractors, employees, licensees or invitees (collectively, "Tenant's Affiliates"), the cost of which shall be the responsibility of Tenant.  Landlord shall never have any obligation to repair, maintain or replace, pursuant to this subsection 10(b) or any other provision of this Lease, any Tenant's Change (as defined in Section 18 hereof).  If Landlord fails to make any repairs or to perform any maintenance required of Landlord hereunder and within Landlord's reasonable control, and such failure shall permit for an unreasonable time (not less than thirty (30) days or, in the event Landlord's failure to make any such repair or perform any such maintenance results in the inability of Tenant to conduct its business at the Demised Premises for a period in excess of forty eight (48) hours) after written notice of the need for such repairs or maintenance is given to Landlord (unless Landlord has commenced such repairs or maintenance during such period and is diligently pursuing the same, Tenant may (but shall not be required to) following a second notice (which notice shall have a heading in at least 12-point type, bold and all caps "FAILURE TO RESPOND SHALL RESULT IN TENANT EXERCISING SELF-HELP RIGHTS") with a specific description of the work to be performed by Tenant and the name of Tenant's contractor, and Landlord's failure to commence repairs within forty eight (48) hours after receipt of such second notice, perform such repairs or maintenance in accordance with the provisions of this Lease governing Tenant's repairs and Tenant Changes and Landlord shall reimburse Tenant for the reasonable, actual costs and expenses therefor within thirty (30) days after receipt of adequate invoices and back-up documentation substantiating said cost, less any amounts otherwise reimbursable to Tenant under any insurance policies carried by Tenant.

(c)    Unless the same is caused solely by the negligent action or inaction of Landlord, its employees or agents, and is not covered by the insurance required to be carried by Tenant pursuant to the terms of this Lease, Landlord shall not be liable to Tenant or to any other person for any damage occasioned by failure in any utility system or by the bursting or leaking of any vessel or pipe in or about the Demised Premises, or for any damage occasioned by water coming into the Demised Premises or arising from the acts or neglects of occupants of adjacent property or the public.

11.    Tenant's Personal Property; Indemnity.  All of Tenant's personal property in the Demised Premises shall be and remain at Tenant's sole risk.  Landlord, its agents, employees and contractors, shall not be liable for, and Tenant hereby releases Landlord from, any and all liability for theft thereof or any damage thereto occasioned by any act of God or by any acts, omissions or negligence of any persons. Landlord, its agents, employees and contractors, shall not be liable for any injury to the person or property of Tenant or other persons in or about the Demised Premises, Tenant expressly agreeing to indemnify and save Landlord, its agents, employees and contractors, harmless, in all such cases, except, in the case of personal injury only, to the extent caused by the negligence of Landlord, its agents, employees and contractors (and to such extent, Landlord expressly agrees to indemnify and save Tenant, its agents, employees and contractors, harmless); provided, however, that in the case of property damage caused by the negligence of Landlord, its agents, employees and contractors, but without otherwise limiting or impairing the waivers contained in Section 8(d) hereof, Landlord shall reimburse Tenant for the amount of any commercially reasonable deductible payable by Tenant under its insurance policy covering such property, up to but not to exceed $5,000.00. Tenant further agrees to indemnify and reimburse Landlord for any costs or expenses, including, without limitation, attorneys' fees, that Landlord reasonably may incur in investigating, handling or litigating any such claim against Landlord by a third person, unless such claim arose from the negligence of Landlord, its agents, employees or contractors. The provisions of this Section 11 shall survive the expiration or earlier termination of this Lease with respect to any damage, injury or death occurring before such expiration or termination.

12.    Tenant's Fixtures.  Tenant shall have the right to install in the Demised Premises trade fixtures required by Tenant or used by it in its business, and if installed by Tenant, to remove any or all such trade fixtures from time to time during and upon termination or expiration of this Lease, provided no Event of Default, as defined in Section 22, then exists; provided, however, that Tenant shall repair and restore any damage or injury to the Demised Premises (to the condition in which the Demised Premises existed prior to such installation) caused by the installation and/or removal of any such trade fixtures. Landlord and Tenant acknowledge and agree that Tenant's racking and conveyor belt system shall at all times be considered and remain the personal property of Tenant and shall be removed by Tenant upon expiration or earlier termination of this Lease and that Tenant shall repair any damage or injury to the Demised Premises (and restore the Demised Premises to the condition in which the Demised Premises existed prior to such installation) caused by the installation and/or removal of the racking and conveyor belt system.

13.    Signs.  No sign, advertisement or notice shall be inscribed, painted, affixed, or displayed on the windows or exterior walls of the Demised Premises or on any public area of the Building, except in such

-7-

ATL01/11405520v9

 

# POOR QUALITY

place, numbers, sizes, colors and styles as are approved in advance in writing by Landlord, and which conform to all applicable laws, ordinances, or covenants affecting the Demised Premises. Any and all signs installed or constructed by or on behalf of Tenant pursuant hereto shall be installed, maintained and removed by Tenant at Tenant's sole cost and expense. During the Initial Term, Tenant shall have the non-exclusive right to place its name on the Building in such location as is reasonably acceptable to Landlord (the "Signage"). The Signage shall be installed and maintained in accordance with all terms of this Lease and at Tenant's sole cost and expense throughout the Term and the installation, maintenance and removal of the Signage shall be completed lien free. The rights of Tenant under this paragraph: (i) are personal to Tenant and may not be assigned to any other party, including without limitation any assignee or subtenant; (ii) are terminable by Landlord following any default not cured within applicable cure periods; and (iii) are terminable by Landlord if Tenant reduces the size of the Demised Premises, notwithstanding the consent of Landlord thereto. The location, size, material and design of the Signage shall be subject to the prior written approval of Landlord, and Tenant shall be responsible for compliance with Laws in connection with the Signage. Upon the expiration or earlier termination of this Lease or the termination of Tenant's sign rights as set forth herein, Tenant shall remove the Signage, at Tenant's sole cost and expense, and restore the Building to its condition immediately prior to the installation of the Signage. If Tenant fails to timely remove the Signage, then the Signage shall conclusively be deemed to have been abandoned by Tenant and may be appropriated, sold, stored, destroyed, or otherwise disposed of by Landlord without further notice to Tenant or any other person and without obligation to account therefor. Tenant shall reimburse Landlord for all reasonable costs incurred by Landlord in connection therewith within ten (10) days of Landlord's invoice. The provisions of this paragraph shall survive the expiration or earlier termination of the Lease.

14.  **Landlord's Lien.**  Notwithstanding any other provision hereof to the contrary, Tenant does hereby grant to Landlord, and Landlord shall have at all times, a security interest in and a valid first lien upon all of the personal property and trade fixtures of Tenant situated in and upon the Demised Premises to secure the obligations of Tenant for all Base Rent, Additional Rent and other sums to become due hereunder and the performance by Tenant of each and all of Tenant's other covenants and obligations hereunder. The security interest and lien granted herein may be foreclosed in the manner and form provided by law for the foreclosure of chattel mortgages or in any other manner provided or permitted by law. Landlord agrees to subordinate its foregoing contractual lien rights to a third party providing furniture, fixtures and/or equipment for Tenant's use in the Demised Premises during the Term (the "Collateral"), or providing funds for the acquisition of same or any other financing to Tenant which requires a pledge of the Collateral, provided that: (i) there is no uncured Event of Default by Tenant under the Lease at the time of such subordination; (ii) such subordination shall be limited to the Collateral and time stated in the subordinating instrument; and (iii) such subordination shall be in writing, signed by all parties and in a form reasonably acceptable to Landlord.

15.  **Governmental Regulations.**  Tenant shall promptly comply throughout the Term, at Tenant's sole cost and expense, with all present and future laws, ordinances, orders, rules, regulations or requirements of all federal, state and municipal governments and appropriate departments, commissions, boards and officers thereof (collectively, "Governmental Requirements") relating to (a) all or any part of the Demised Premises, and (b) the use or manner of use of the Demised Premises and the manner of use and use by Tenant of the Building Common Area. Tenant shall also observe and comply with the requirements of all policies of public liability, fire and other policies of insurance at any time in force with respect to the Demised Premises. Without limiting the foregoing, if as a result of one or more Governmental Requirements it is necessary, from time to time during the Term, to perform an alteration or modification of the Demised Premises or the Building Common Area (a "Code Modification") which is made necessary as a result of the specific use being made by Tenant of the Demised Premises or a Tenant's Change, then such Code Modification shall be the sole and exclusive responsibility of Tenant in all respects; any such Code Modification shall be promptly performed by Tenant at its expense in accordance with the applicable Governmental Requirement and with Section 18 hereof except to the extent such Code Modification arises as a result of the failure of the initial construction of the Building and/or Improvements made by Landlord pursuant to Section 17 hereinbelow to be in compliance with Governmental Requirements in effect as of the Lease Date (without regard to Tenant's specific use), in which event any such Code Modification shall be the sole and exclusive responsibility of Landlord in all respects and any such Code Modification shall be promptly performed by Landlord at its expense in accordance with the applicable Governmental Requirement. Furthermore, if as a result of one or more Governmental Requirements it is necessary from time to time during the Term to perform a Code Modification which (i) would be characterized as a capital expenditure under generally accepted accounting principles and (ii) is not made necessary as a result of the specific use being made by Tenant of the Demised Premises (as distinguished from an alteration or modification which would be required to be made by the owner of any warehouse-office building comparable to the Building irrespective of the use thereof by any particular occupant) or a Tenant's Change, then (a) Landlord shall have the obligation to perform the Code Modification at its expense, (b) the cost of such Code Modification shall be amortized on a straight-line basis over the useful life of the item in question, as reasonably determined by Landlord, and (c) Tenant shall be obligated to pay (as Additional Rent, payable in the same manner and upon the same terms and conditions as the Base Rent reserved hereunder) for (i) Tenant's proportionate share (based on Tenant's Operating Expense Percentage) of the portion of such amortized costs attributable to the remainder of the Term, including any extensions thereof, with respect to any Code Modification respecting the Building Common Area, and (ii) the entire portion of such amortized costs attributable to the remainder of the Term, including any extensions thereof, with respect to any Code Modification respecting the Demised Premises (except to the extent Landlord is required to perform the Code Modification pursuant to the immediately preceding sentence of this Section

-8-

ATLO1/11403522v9

# POOR QUALITY



15 or pursuant to Section 17(e) hereinbelow and/or Special Stipulation 6 of Exhibit C attached hereto). Tenant shall promptly send to Landlord a copy of any written notice received by Tenant requiring a Code Modification.

16.   Environmental Matters.

(a)   For purposes of this Lease:

(i)   "Contamination" as used herein means the presence of or release of Hazardous Substances (as hereinafter defined) into any environmental media from, upon, within, below, into or on any portion of the Demised Premises, the Building, the Building Common Area or the Project so as to require remediation, cleanup or investigation under any applicable Environmental Law (as hereinafter defined).

(ii)   "Environmental Laws" as used herein means all federal, state, and local laws, regulations, orders, permits, ordinances or other requirements, which exist now or as may exist hereafter, concerning protection of human health, safety and the environment, all as may be amended from time to time including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. 9601 et seq. ("CERCLA") and the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq. ("RCRA").

(iii)   "Hazardous Substances" as used herein means any hazardous or toxic substance, material, chemical, pollutant, contaminant or waste as those terms are defined by any applicable Environmental Laws add any solid wastes, polychlorinated biphenyls, urea formaldehyde, asbestos, radioactive materials, radon, explosives, petroleum products and oil.

(b)   Landlord represents that, except as revealed to Tenant in writing by Landlord, to Landlord's actual knowledge, Landlord has not treated, stored or disposed of any Hazardous Substances upon or within the Demised Premises, nor, to Landlord's actual knowledge, has any predecessor owner of the Demised Premises.

(c)   Tenant covenants that all its activities, and the activities of Tenant's Affiliates (as defined in Section 10(b)), on the Demised Premises, the Building, or the Project during the Term will be conducted in compliance with Environmental Laws. Tenant warrants that it is currently in compliance with all applicable Environmental Laws and that there are no pending or threatened notices of deficiency, notices of violation, orders, or judicial or administrative actions involving alleged violations by Tenant of any Environmental Laws. Tenant, at Tenant's sole cost and expense, shall be responsible for obtaining all permits or licenses or approvals under Environmental Laws necessary for Tenant's operation of its business on the Demised Premises and shall make all notifications and registrations required by any applicable Environmental Laws. Tenant, at Tenant's sole cost and expense, shall at all times comply with the terms and conditions of all such permits, licenses, approvals, notifications and registrations and with any other applicable Environmental Laws. Tenant warrants that it has obtained all such permits, licenses or approvals and made all such notifications and registrations required by any applicable Environmental Laws necessary for Tenant's operation of its business on the Demised Premises.

(d)   Tenant shall not cause or permit any Hazardous Substances to be brought upon, kept or used in or about the Demised Premises, the Building, or the Project without the prior written consent of Landlord, which consent shall not be unreasonably withheld; provided, however, that the consent of Landlord shall not be required for the use at the Demised Premises of cleaning supplies, toner for photocopying machines and other similar materials, in containers and quantities reasonably necessary for and consistent with normal and ordinary use by Tenant in the routine operation or maintenance of Tenant's office equipment or in the routine janitorial service, cleaning and maintenance for the Demised Premises. For purposes of this Section 16, Landlord shall be deemed to have reasonably withheld consent if Landlord determines that the presence of such Hazardous Substance within the Demised Premises could result in a risk of harm to person or property or otherwise negatively affect the value or marketability of the Building or the Project.

(e)   Tenant shall not cause or permit the release of any Hazardous Substances by Tenant or Tenant's Affiliates into any environmental media such as air, water or land, or into or on the Demised Premises, the Building or the Project in any manner that violates any Environmental Laws. If such release shall occur, Tenant shall (i) take all steps reasonably necessary to contain and control such release and any associated Contamination, (ii) clean up or otherwise remedy such release and any associated Contamination to the extent required by, and take any and all other actions required under, applicable Environmental Laws and (iii) notify and keep Landlord reasonably informed of such release and response.

(f)   Regardless of any consents granted by Landlord pursuant to Section 16(d) allowing Hazardous Substances upon the Demised Premises, Tenant shall under no circumstances whatsoever cause or permit (i) any activity on the Demised Premises which would cause the Demised Premises to become subject to regulation as a hazardous waste treatment, storage or disposal facility under RCRA or the regulations promulgated thereunder, (ii) the discharge of Hazardous Substances into the storm sewer system serving the Project or (iii) the installation of any underground storage tank or underground piping on or under the Demised Premises.

-9-

ATL01/11405526v9

# POOR QUALITY

(g)     Tenant shall and hereby does indemnify Landlord and hold Landlord harmless from and against any and all expense, loss, and liability suffered by Landlord (except to the extent that such expenses, losses, and liabilities arise out of Landlord's own negligence or willful act), by reason of the storage, generation, release, handling, treatment, transportation, disposal, or arrangement for transportation or disposal, of any Hazardous Substances (whether accidental, intentional, or negligent) by Tenant or Tenant's Affiliates or by reason of Tenant's breach of any of the provisions of this Section 16. Such expenses, losses and liabilities shall include, without limitation, (i) any and all expenses that Landlord may incur to comply with any Environmental Laws; (ii) any and all costs that Landlord may incur in studying or remedying any Contamination at or arising from the Demised Premises, the Building, or the Project; (iii) any and all costs that Landlord may incur in studying, removing, disposing or otherwise addressing any Hazardous Substances; (iv) any and all fines, penalties or other sanctions assessed upon Landlord; and (v) any and all legal and professional fees and costs incurred by Landlord in connection with the foregoing. The indemnity contained herein shall survive the expiration or earlier termination of this Lease.

(g)     Landlord shall indemnify Tenant and hold Tenant harmless from and against any and all expenses, losses and liabilities actually suffered by Tenant (with the exception of any and all consequential damages, including but not limited to the loss of use of the Demised Premises, lost profits and loss of business, and those expenses, losses, and liabilities arising from Tenant's own negligence or willful act of Tenant or Tenant's Affiliates) as a result of a governmental authority having jurisdiction ordering a cleanup, removal or other remediation by Tenant of any Hazardous Substances placed on, under or about the Demised Premises by Landlord. Notwithstanding the foregoing, Landlord shall have the right to undertake and perform any studying, remedying, removing or disposing of, or otherwise addressing, any Contamination which is the responsibility of Landlord hereunder and to control all communications with regulatory or governmental agencies with respect thereto, and Tenant shall not perform such acts and communications nor be entitled to any indemnification hereunder unless (w) Tenant is specifically required by Environmental Laws to perform such acts, (x) Tenant notifies Landlord of such Contamination promptly after Tenant has actual knowledge or reasonable belief of its existence, (y) Tenant promptly provides copies to Landlord of any notices given or received by Tenant related to such Contamination and (z) Landlord has failed or refused to perform such acts and communications after having been afforded reasonable written notice by Tenant and having had reasonable opportunity to perform such acts and communications.

17.     Construction of Demised Premises.

(a)     Within thirty (30) days after the Lease Date, Landlord shall prepare, at Landlord's sole cost and expense, and submit to Tenant a set of plans and specifications and/or construction drawings (collectively, the "Plans and Specifications") based on the preliminary plans and specifications and/or preliminary floor plans set forth on Exhibit B attached hereto and incorporated herein, covering all work to be performed by Landlord (at Landlord's sole cost and expense except as hereinafter set forth in this Section 17(a) and Special Stipulation 2(a)) in constructing the Improvements (as defined in Section 8(a)(ii)). Tenant shall have ten (10) days after receipt of the Plans and Specifications in which to review and to give to Landlord written notice of its approval of the Plans and Specifications or its requested changes to the Plans and Specifications. Tenant shall have no right to request any changes to the Plans and Specifications which would materially alter either the Demised Premises or the exterior appearance or basic nature of the Building, as the same are contemplated by the Preliminary Plans. If Tenant fails to approve or request changes to the Plans and Specifications by ten (10) days after its receipt thereof, then Tenant shall be deemed to have approved the Plans and Specifications and the same shall thereupon be final. If Tenant requests any changes to the Plans and Specifications, Landlord shall make those changes which are reasonably requested by Tenant and shall within ten (10) days of its receipt of such request submit the revised portion of the Plans and Specifications to Tenant. Tenant may not thereafter disapprove the revised portions of the Plans and Specifications unless Landlord has unreasonably failed to incorporate reasonable comments of Tenant and, subject to the foregoing, the Plans and Specifications, as modified by said revisions, shall be deemed to be final upon the submission of said revisions to Tenant. Landlord and Tenant shall at all times in their review of the Plans and Specifications, and of any revisions thereto, act reasonably and in good faith. Tenant acknowledges that the Improvements are being constructed on a "fast track" basis and that Landlord shall have the right and option to submit various parts of the proposed Plans and Specifications from time to time during said thirty (30) day period and the time period for approval of any part of the proposed Plans and Specifications shall commence upon receipt of each submission. The date on which Tenant approves or is deemed to have approved the Plans and Specifications is hereinafter referred to as the "Approval Date". After Tenant has approved the Plans and Specifications or the Plans and Specifications have otherwise been finalized pursuant to the procedures set forth hereinabove, any subsequent changes to the Plans and Specifications requested by Tenant (herein referred to as a "Change Order") shall be at Tenant's sole cost and expense and subject to Landlord's written approval, which approval shall not be unreasonably withheld, conditioned or delayed. In the event Landlord approves any such requested Change Order, Landlord shall give written notice thereof to Tenant, which notice will specify the Change Order approved by Landlord as well as the estimated incremental cost thereof. The cost to Tenant for Change Orders shall be Landlord's incremental cost plus fifteen percent (15%) of such amount as Landlord's overhead. Tenant acknowledges and agrees that Landlord shall be under no obligation to proceed with any work related to the approved Change Order unless and until Tenant delivers to Landlord an amount equal to the full estimated incremental cost of such approved Change Order as set forth in Landlord's notice. When the final incremental cost of any such Change Order has been determined and incurred, Landlord and Tenant each agree to pay or refund the amounts owed to the other with respect to

-10-

ATL01/11405528/9



POOR QUALITY

such Change Order, based on the estimated payment made to Landlord. If after the Plans and Specifications have been finalized pursuant to the procedures set forth hereinabove Tenant requests a Change Order or any further changes to the Plans and Specifications and, as a result thereof, Substantial Completion (as hereinafter defined) of the Improvements is delayed (such delay to be referred to herein as "Tenant Delay"), then for purposes of establishing any date tied to the date of Substantial Completion, Substantial Completion shall be deemed to mean the date when Substantial Completion would have been achieved but for such Tenant delay. Notwithstanding the foregoing, any changes to the Plans and Specifications required by Landlord as a result of any Law applicable to industrial warehouse and/or distribution facilities generally (and without respect to the Improvements or Tenant's intended use of the Demised Premises), shall be the sole responsibility of Landlord; provided that Landlord shall obtain Tenant's approval, which approval shall not be unreasonably withheld, conditioned or delayed, for any such change by Landlord that will materially affect Tenant's use of or access to the Demised Premises

(b)    Landlord shall schedule and attend periodic progress meetings (not more than once per month), walk-throughs and any other reasonably requested meetings with the architect, the contractor performing the construction work and Tenant to discuss the progress of the construction of the Improvements ("Meetings"). Landlord shall give Tenant approximately seven (7) days prior notice (written or telephonic) of all such Meetings. Tenant shall designate in writing the person or persons appointed by Tenant to attend the Meetings and such designated party shall be entitled to be present at and to participate in the discussions during all Meetings; but Landlord may conduct the Meetings even if Tenant's appointees are not present. In addition to the foregoing and to Tenant's early entry rights as provided in Special Stipulation 5 of Exhibit "C" attached hereto, Tenant or its agents shall have the right at reasonable times to conduct inspections, tests, surveys and reports of work in progress ("Inspections") for the purpose of reviewing whether the Improvements are being constructed in accordance with the Plans and Specifications, provided Tenant shall not interfere with Landlord's completion of the Improvements. Landlord shall use reasonable speed and diligence to Substantially Complete the Improvements, at Landlord's sole cost and expense, and have the Demised Premises ready for occupancy on or before August 1, 2003, provided that Landlord shall not be liable to Tenant in any way for achieving Substantial Completion after such target date, and any such failure to complete by such target date shall not in any way affect the obligations of Tenant hereunder. No liability whatsoever shall arise or accrue against Landlord by reason of its failure to deliver or afford possession of the Demised Premises, and Tenant hereby releases and discharges Landlord from and of any claims for damage, loss, or injury of every kind whatsoever as if this Lease were never executed.

(c)    Upon Substantial Completion of the Demised Premises, a representative of Landlord and a representative of Tenant together shall inspect the Demised Premises and generate a punchlist of defective or uncompleted items relating to the completion of construction of the Improvements (the "Punchlist"). Landlord shall, within a reasonable time after the Punchlist is prepared and agreed upon by Landlord and Tenant, complete such incomplete work and remedy such defective work as is set forth on the Punchlist. Subject to Landlord's Warranty (as hereinafter defined), all construction work performed by Landlord shall be deemed approved by Tenant in all respects except for items of said work which are not completed or do not conform to the Plans and Specifications and which are included on the Punchlist.

(d)    Upon Substantial Completion of the Demised Premises and the creation of the Punchlist, Tenant shall execute and deliver to Landlord a letter of acceptance in which Tenant (i) accepts the Demised Premises subject only to Landlord's completion of the items listed on the Punchlist and (ii) confirms the Lease Commencement Date, the Base Rent Commencement Date and the Expiration Date. Within thirty (30) calendar days after substantial completion of the Demised Premises, Landlord shall deliver to Tenant a written certification of an architect, duly licensed as such under the laws of the State of Mississippi, of the square footage contained in the Building and in the Demised Premises, based on a "drip-line" measurement from the outside of the exterior walls of the Building and the Demised Premises. The square footage so certified by such architect shall conclusively determine the Building Square Footage and the square footage of the Demised Premises for all purposes under this Lease, including, without limitation, calculation of Base Rent and Tenant's Operating Expense Percentage. The Annual Base Rent and Monthly Base Rent Installments shall be adjusted on the basis of the square footage of the Building and the Demised Premises so certified by such architect, using the per square foot rental rates set forth in Section 1 of this Lease. The letter of acceptance from Tenant shall also confirm the final square footage of the Building and the Demised Premises and Tenant's Operating Expense Percentage.

(e)    Landlord hereby warrants to Tenant, which warranty ("Landlord's Warranty") shall survive for the one (1) year period following the Lease Commencement Date (the "Warranty Period"), that (i) the materials and equipment furnished by Landlord's contractors in the completion of the Improvements and the Building will be of good quality and new, and (ii) such materials and equipment and the work of such contractors shall be free from defects not inherent in the quality required or permitted hereunder. This warranty shall exclude damages or defects caused by Tenant or Tenant's Affiliates, improper or insufficient maintenance, improper operation, and normal wear and tear under normal usage. Landlord grants to Tenant, until the expiration or earlier termination of the Term, without recourse or warranty, a non-exclusive right during the Term to exercise Landlord's rights under any warranties obtained with respect to the heating, ventilation and air conditioning system, or any other portions of the Improvements within the Demised Premises required to be maintained or repaired by Tenant pursuant to this Lease.

-11-

 **POOR QUALITY** 

(f)     For purposes of this Lease, the term "Substantial Completion" (or any variation thereof) shall mean completion of construction of the Improvements in accordance with the Plans and Specifications, subject only to Punchlist (items established pursuant to Section 17(a), as established by the delivery by Landlord to Tenant of a certificate of occupancy or its equivalent (or temporary certificate of occupancy or its equivalent, which is subject only to work or improvements to be performed or installed by Tenant) for the Demised Premises issued by the appropriate governmental authority, if a certificate is so required by a governmental authority, or if not so required or if unavailable because of unfinished work to be performed by Tenant, then by the delivery by Landlord to Tenant of a Certificate of Substantial Completion for the Improvements on Standard AIA Form G-704 certified by Landlord's architect. In the event Substantial Completion is delayed because of Tenant's failure to approve the Plans and Specifications as set forth in Section 17(a), by change orders requested by Tenant after approval of the Plans and Specifications or by any other delay caused by Tenant or Tenant's Affiliates, then for the purpose of establishing the Lease Commencement Date and any other date tied to the date of Substantial Completion, Substantial Completion shall be deemed to mean the date when Substantial Completion would have been achieved but for such delay.

18.     **Tenant Alterations and Additions.**

(a)     Tenant shall not make or permit to be made any alterations, improvements, or additions to the Demised Premises (a "Tenant's Change"), without first obtaining on each occasion Landlord's prior written consent (which consent Landlord agrees not to unreasonably withhold) and Landlord's prior written consent (if such consent is required). As part of its approval process, Landlord may require that Tenant submit plans and specifications to Landlord, for Landlord's approval or disapproval, which approval shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, Tenant shall not be obligated to receive the written consent of Landlord for interior Tenant's Changes to the Demised Premises if said Tenant's Changes are not structural in nature and do not impair the Building systems or structural integrity of the Building, do not exceed the total amount of Twenty-Five Thousand Dollars ($25,000.00) in the aggregate in any calendar year and the total amount of such Tenant Changes do not exceed One Hundred Fifty Thousand Dollars ($150,000.00) in the aggregate over the term of the Lease, and Tenant is not required by applicable law to obtain a permit to perform the Tenant Change (provided that in the event the consent of Landlord is not required, Tenant shall, at its sole cost and expense and at Landlord's option upon the termination or expiration of this Lease, remove the same and restore the Demised Premises to its condition prior to such Tenant's Change. All Tenant's Changes shall be performed in accordance with all legal requirements applicable thereto and in a good and workmanlike manner with first-class materials. Tenant shall maintain insurance reasonably satisfactory to Landlord during the construction of all Tenant's Changes. If Landlord at the time of giving its approval to any Tenant's Change notifies Tenant in writing that approval is conditioned upon restoration, then Tenant shall, at its sole cost and expense and at Landlord's option upon the termination or expiration of this Lease, remove the same and restore the Demised Premises to its condition prior to such Tenant's Change. Notwithstanding the foregoing, upon Tenant's request at the time it seeks Landlord's consent to a Tenant's Change, Landlord agrees to indicate in writing whether it will require such alteration to be removed upon the expiration or earlier termination of the Lease (provided that no such early election shall be required by Landlord in the event Tenant does not request the consent of Landlord to the Tenant's Change). No Tenant's Change shall be structural in nature or impair the structural strength of the Building or reduce its value. Tenant shall pay the full cost of any Tenant's Change and shall give Landlord such reasonable security as may be requested by Landlord to insure payment of such cost. Except as otherwise provided herein and in Section 12, all Tenant's Changes and all repairs and all other property attached to or installed on the Demised Premises by or on behalf of Tenant shall immediately upon construction or installation thereof be and become part of the Demised Premises and the property of Landlord without payment therefor by Landlord and shall be surrendered to Landlord upon the expiration or earlier termination of this Lease. Landlord hereby approves Tenant's plans and specifications in connection with the installation of its conveyor belt system, which are attached hereto as Exhibit H, and such installation shall not be considered a Tenant's Change.

(b)     To the extent permitted by law, all of Tenant's contracts and subcontracts for such Tenant's Changes shall provide that no lien shall attach to or be claimed against the Demised Premises or any interest therein other than Tenant's leasehold interest in the Demised Premises, and that all subcontracts let thereunder shall contain the same provision. Whether or not Tenant furnishes the foregoing, Tenant agrees to hold Landlord harmless against all liens, claims and liabilities of every kind, nature and description which may arise out of or to any way be connected with such work. Tenant shall not permit the Demised Premises to become subject to any mechanics', laborers' or materialmen's lien on account of labor, material or services furnished to Tenant or claimed to have been furnished to Tenant in connection with work of any character performed or claimed to have been performed for the Demised Premises by, or at the direction or sufferance of Tenant and if any such liens are filed against the Demised Premises, Tenant shall promptly discharge the same; provided, however, that Tenant shall have the right to contest, in good faith and with reasonable diligence, the validity of any such lien or claimed lien, if Tenant shall give to Landlord, within fifteen days after demand, such security as may be reasonably satisfactory to Landlord to assure payment thereof and to prevent any sale, foreclosure, or forfeiture of Landlord's interest in the Demised Premises by reason of non-payment thereof; provided further that on final determination of the lien or claim for lien, Tenant shall immediately pay any judgment rendered, with all proper costs and charges, and shall have the lien released and any judgment satisfied. If Tenant fails to post such security or does not diligently contest such lien, Landlord may, without investigation of the validity of the lien claim, discharge such lien and Tenant shall reimburse Landlord upon demand for all costs and expenses incurred

-12-



POOR QUALITY

in connection therewith, which expenses shall include any attorneys' fees, paralegals' fees and any and all costs associated therewith, including litigation through all trial and appellate levels and any costs in posting bond to effect a discharge or release of the lien. Nothing contained in this Lease shall be construed as a consent on the part of Landlord to subject the Demised Premises to liability under any lien law now or hereafter existing of the state in which the Demised Premises are located.

19.     Services by Landlord.  Landlord shall be responsible for providing for maintenance of the Building Common Area, and, except as required by Section 6(a) or 10(b) hereof or as otherwise specifically provided for herein, Landlord shall be responsible for no other services whatsoever. Tenant, by payment of Tenant's share of the Operating Expenses, shall pay Tenant's pro rata share of the expenses incurred by Landlord hereunder.

20.     Fire and Other Casualty.  In the event the Demised Premises are damaged by fire or other casualty insured by Landlord, Landlord agrees to promptly restore and repair the Demised Premises at Landlord's expense, including the Improvements to be insured by Tenant but only to the extent Landlord receives insurance proceeds therefor, including the proceeds from the insurance required to be carried by Tenant on the Improvements. Notwithstanding the foregoing, in the event that the Demised Premises are (i) in the reasonable opinion of Landlord, so destroyed that they cannot be repaired or rebuilt within two hundred seventy (270) days after the date of such damage; or (ii) destroyed by a casualty which is not covered by Landlord's insurance, or if such casualty is covered by Landlord's insurance but Lender or other party entitled to insurance proceeds fails to make such proceeds available to Landlord in an amount sufficient for restoration of the Demised Premises, then Landlord shall give written notice to Tenant of such determination (the "Determination Notice") within sixty (60) days of such casualty. Either Landlord or Tenant may terminate and cancel this Lease effective as of the date of such casualty by giving written notice to the other party within thirty (30) days after Tenant's receipt of the Determination Notice. Upon the giving of such termination notice, all obligations hereunder with respect to periods from and after the effective date of termination shall thereupon cease and terminate. If no such termination notice is given, Landlord shall, to the extent of the available insurance proceeds, make such repair or restoration of the Demised Premises to the approximate condition existing prior to such casualty, promptly and in such manner as not to unreasonably interfere with Tenant's use and occupancy of the Demised Premises (if Tenant is still occupying the Demised Premises). Base Rent and Additional Rent shall proportionately abate during the time that the Demised Premises or any part thereof are unusable by reason of any such damage thereto.

21.     Condemnation.

(a)     If all of the Demised Premises is taken or condemned for a public or quasi-public use, or if a material portion of the Demised Premises is taken or condemned for a public or quasi-public use and the remaining portion thereof is not usable by Tenant in the reasonable opinion of Landlord and Tenant, cooperating together in good faith, this Lease shall terminate as of the earlier of the date title to the condemned real estate vests in the condemnor or the date on which Tenant is deprived of possession of the Demised Premises. In such event, the Base Rent herein reserved and all Additional Rent and other sums payable hereunder shall be apportioned and paid in full by Tenant to Landlord to that date, all Base Rent, Additional Rent and other sums payable hereunder prepaid for periods beyond that date shall forthwith be repaid by Landlord to Tenant, and neither party shall thereafter have any liability hereunder, except that any obligation or liability of either party, actual or contingent, under this Lease which has accrued on or prior to such termination date shall survive. Landlord shall promptly notify Tenant upon its receipt of notice of the instigation of any condemnation proceedings affecting the Demised Premises.

(b)     If only part of the Demised Premises is taken or condemned for a public or quasi-public use and this Lease does not terminate pursuant to Section 21(a), Landlord shall, to the extent of the award it receives, restore the Demised Premises to a condition and to a size as nearly comparable as reasonably possible to the condition and size thereof immediately prior to the taking, and there shall be an equitable adjustment to the Base Rent and Additional Rent based on the actual loss of use of the Demised Premises suffered by Tenant from the taking.

(c)     Landlord shall be entitled to receive the entire award in any proceeding with respect to any taking provided for in this Section 21, without deduction therefrom for any estate vested in Tenant by this Lease, and Tenant shall receive no part of such award. Nothing herein contained shall be deemed to prohibit Tenant from making a separate claim, against the condemnor, to the extent permitted by law, for the value of Tenant's movable trade fixtures, machinery and moving expenses, provided that the making of such claim shall not and does not adversely affect or diminish Landlord's award.

22.     Tenant's Default.

(a)     The occurrence of any one or more of the following events shall constitute an "Event of Default" of Tenant under this Lease:

(i)     If Tenant fails to pay Base Rent or any Additional Rent hereunder as and when such rent becomes due and such failure shall continue for more than five (5) days after Landlord gives written notice to Tenant of such failure (provided, however, that if payment of any Base Rent or Additional Rent required hereunder is by check, and following deposit thereof such check is

-13-

ATL01/11405528v9



# POOR QUALITY

rejected or returned due to insufficient funds, then such event shall constitute an immediate Event of Default and no such five (5) day notice and cure period shall be required);

(ii)     if Tenant fails to pay Base Rent or any Additional Rent on time more than three (3) times in any period of twelve (12) months, notwithstanding that such payments have been made within the applicable cure period;

(iii)     if the Demised Premises become vacant, deserted, or abandoned for more than ten (10) consecutive days or if Tenant fails to take possession of the Demised Premises on the Lease Commencement Date or promptly thereafter;

(iv)     if Tenant permits to be done anything which creates a lien upon the Demised Premises and fails to discharge or bond such lien, or post security with Landlord acceptable to Landlord within thirty (30) days after receipt by Tenant of written notice thereof;

(v)     if Tenant fails to maintain in force all policies of insurance required by this Lease and such failure shall continue for more than ten (10) days after Landlord gives Tenant written notice of such failure;

(vi)     if any petition is filed by or against Tenant or any guarantor of this Lease under any present or future section or chapter of the Bankruptcy Code, or under any similar law or statute of the United States or any state thereof (which, in the case of an involuntary proceeding, is not permanently discharged, dismissed, stayed, or vacated, as the case may be, within sixty (60) days of commencement), or if any order for relief shall be entered against Tenant or any guarantor of this Lease in any such proceedings;

(vii)     if Tenant or any guarantor of this Lease becomes insolvent or makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors;

(viii)     if a receiver, custodian, or trustee is appointed for the Demised Premises or for all or substantially all of the assets of Tenant or of any guarantor of this Lease, which appointment is not vacated within sixty (60) days following the date of such appointment; or

(ix)     if Tenant fails to perform or observe any other term of this Lease and such failure shall continue for more than thirty (30) days after Landlord gives Tenant written notice of such failure, or, if such failure cannot be corrected within such thirty (30) day period, if Tenant does not commence to correct such default within said thirty (30) day period and thereafter diligently prosecute the correction of same to completion within a reasonable time.

(b)     Upon the occurrence of any one or more Events of Default, Landlord may, at Landlord's option, without any demand or notice whatsoever (except as expressly required in this Section 22):

(i)     Terminate this Lease by giving Tenant notice of termination, in which event this Lease shall expire and terminate on the date specified in such notice of termination and all rights of Tenant under this Lease and in and to the Demised Premises shall terminate. Tenant shall remain liable for all obligations under this Lease arising up to the date of such termination, and Tenant shall surrender the Demised Premises to Landlord on the date specified in such notice; or

(ii)     Terminate this Lease as provided in Section 22(b)(i) hereof and recover from Tenant all damages Landlord may incur by reason of Tenant's default, including, without limitation, an amount which, at the date of such termination, is calculated as follows: (1) the value of the excess, if any, of (A) the Base Rent, Additional Rent and all other sums which would have been payable hereunder by Tenant for the period commencing with the day following the date of such termination and ending with the Expiration Date and this Lease not been terminated (the "Remaining Term"), over (B) the aggregate reasonable rental value of the Demised Premises for the Remaining Term (which excess, if any shall be discounted to present value at the "Treasury Yield" as defined below for the Remaining Term); plus (2) the costs of recovering possession of the Demised Premises and all other expenses incurred by Landlord due to Tenant's default, including, without limitation, reasonable attorney's fees; plus (3) the unpaid Base Rent and Additional Rent earned as of the date of termination plus any interest and late fees due hereunder, plus other sums of money and damages owing on the date of termination by Tenant to Landlord under this Lease or in connection with the Demised Premises. The amount as calculated above shall be deemed immediately due and payable. The payment of the amount calculated in subparagraph (ii)(1) shall not be deemed a penalty but shall merely constitute payment of liquidated damages, it being understood and acknowledged by Landlord and Tenant that actual damages to Landlord are extremely difficult, if not impossible, to ascertain. "Treasury Yield" shall mean the rate of return in percent per annum of Treasury Constant Maturities for the length of time specified as published in document H.15(519) (presently published by the Board of Governors of the U.S. Federal Reserve System titled "Federal Reserve Statistical Release") for the calendar week immediately preceding the calendar week in which the termination occurs. If the rate of return of Treasury Constant Maturities for the calendar week in question is not published on or before the business day preceding the date of the Treasury Yield in question is to become effective, then the Treasury Yield shall be based upon the rate of return of Treasury Constant Maturities for the length of time specified for the

-14-

ATL01/11405S26v9



# POOR QUALITY

most recent calendar week for which such publication has occurred. If no rate of return for Treasury Constant Maturities is published for the specific length of time specified, the Treasury Yield for such length of time shall be the weighted average of the rates of return of Treasury Constant Maturities most nearly corresponding to the length of the applicable period specified. If the publishing of the rate of return of Treasury Constant Maturities is ever discontinued, then the Treasury Yield shall be based upon the index which is published by the Board of Governors of the U.S. Federal Reserve System in replacement thereof or, if no such replacement index is published, the index which, in Landlord's reasonable determination, most nearly corresponds to the rate of return of Treasury Constant Maturities. In determining the aggregate reasonable rental value pursuant to subparagraph (ii)(1)(B) above, the parties hereby agree that, at the time Landlord seeks to enforce this remedy, all relevant factors should be considered, including, but not limited to, (a) the length of time remaining in the Remaining Term, (b) the then current market conditions in the general area in which the Building is located, (c) the likelihood of reletting the Demised Premises for a period of time equal to the remainder of the Term, (d) the net effective rental rates then being obtained by landlords for similar type space of similar size in similar type buildings in the general area in which the Building is located, (e) the vacancy levels in the general area in which the Building is located, (f) current levels of new construction that will be completed during the Remaining Term and how this construction will likely affect vacancy rates and rental rates and (g) inflation; or

(iii)       Without terminating this Lease, declare immediately due and payable the sum of the following: (1) the present value (calculated using the "Treasury Yield") of all Base Rent and Additional Rent due and coming due under this Lease for the entire Remaining Term (as if by the terms of this Lease they were payable in advance), plus (2) the cost of recovering and reletting the Demised Premises and all other expenses incurred by Landlord in connection with Tenant's default (but excluding any extraordinary expenses incurred to prepare the Demised Premises for a replacement tenant to the extent such expenses demonstratively exceed those which are at that time currently standard and prevailing for buildings comparable to the Building in the Southaven, Mississippi market area), plus (3) any unpaid Base Rent, Additional Rent and other rentals, charges, assessments and other sums owing by Tenant to Landlord under this Lease or in connection with the Demised Premises as of the date this provision is invoked by Landlord, plus (4) interest on all such amounts from the date due at the Interest Rate, and Landlord may immediately proceed to distrain, collect, or bring action for such sum, or may file a proof of claim in any bankruptcy or insolvency proceedings to enforce payment thereof; provided, however, that such payment shall not be deemed a penalty or liquidated damages, but shall merely constitute payment in advance of all Base Rent and Additional Rent payable hereunder throughout the Term, and provided further, however, that upon Landlord receiving such payment, Tenant shall be entitled to receive from Landlord all rents received by Landlord from other assignees, tenants and subtenants on account of said Demised Premises during the remainder of the Term (provided that the monies to which Tenant shall so become entitled shall in no event exceed the entire amount actually paid by Tenant to Landlord pursuant to this subparagraph (iii)), less all costs, expenses and attorneys' fees of Landlord incurred but not yet reimbursed by Tenant in connection with recovering and reletting the Demised Premises; or

(iv)       Without terminating this Lease, in its own name but as agent for Tenant, enter into and upon and take possession of the Demised Premises or any part thereof. Any property remaining in the Demised Premises may be removed and stored in a warehouse or elsewhere at the cost of, and for the account of, Tenant without Landlord being deemed guilty of trespass or becoming liable for any loss or damage which may be occasioned thereby unless caused by Landlord's negligence or the negligence of Landlord's employees, agents or contractors. Thereafter, Landlord may, but shall not be obligated to, lease to a third party the Demised Premises or any portion thereof as the agent of Tenant upon such terms and conditions as Landlord may deem necessary or desirable in order to relet the Demised Premises. The remainder of any rentals received by Landlord from such reletting, after the payment of any indebtedness due hereunder from Tenant to Landlord, and the payment of any costs and expenses of such reletting (but excluding any extraordinary expenses incurred to prepare the Demised Premises for a replacement tenant to the extent such expenses demonstratively exceed those which are at that time currently standard and prevailing for buildings comparable to the Building in the Southaven, Mississippi market area), shall be held by Landlord to the extent of and for application in payment of future rent owed by Tenant, if any, as the same may become due and payable hereunder. If such rentals received from such reletting shall at any time or from time to time be less than sufficient to pay to Landlord the entire sums then due from Tenant hereunder, Tenant shall pay any such deficiency to Landlord. Notwithstanding any such reletting without termination, Landlord may at any time thereafter elect to terminate this Lease for any such previous default provided same has not been cured; or

(v)        Without terminating this Lease, and with or without notice to Tenant, enter into and upon the Demised Premises and, without being liable for prosecution or any claim for damages therefor, maintain the Demised Premises and repair or replace any damage thereto unless caused by the negligence of Landlord, its employees, agents or contractors or do anything or make any payment for which Tenant is responsible hereunder. Tenant shall reimburse Landlord immediately upon demand for any expenses which Landlord incurs in thus effecting Tenant's compliance under this Lease and Landlord shall not be liable to Tenant for any damages with respect thereto; or

(vi)       Without liability to Tenant or any other party and without constituting a constructive or actual eviction, suspend or discontinue furnishing or rendering to Tenant any property, material, labor, utilities or other service, wherever Landlord is obligated to furnish or render the same so long as an Event of Default exists under this Lease; or

-15-

 

# POOR QUALITY

(vii)   With or without terminating this Lease, allow the Demised Premises to remain unoccupied and collect rent from Tenant as it comes due; or

(viii)   Pursue such other remedies as are available at law or equity.

(c)   If this Lease shall terminate as a result of or while there exists an Event of Default hereunder, any funds of Tenant held by Landlord may be applied by Landlord to any damages payable by Tenant (whether provided for herein or by law) as a result of such termination or default.

(d)   Neither the commencement of any action or proceeding, nor the settlement thereof, nor entry of judgment thereon shall bar Landlord from bringing subsequent actions or proceedings from time to time, nor shall the failure to include in any action or proceeding any sum or sums then due be a bar to the maintenance of any subsequent actions or proceedings for the recovery of such sum or sums so omitted.

(e)   No agreement to accept a surrender of the Demised Premises and no act or omission by Landlord or Landlord's agents during the Term shall constitute an acceptance or surrender of the Demised Premises unless made in writing and signed by Landlord. No re-entry or taking possession of the Demised Premises by Landlord shall constitute an election by Landlord to terminate this Lease unless a written notice of such intention is given to Tenant. No provision of this Lease shall be deemed to have been waived by either party unless such waiver is in writing and signed by the party making such waiver. Landlord's acceptance of Base Rent or Additional Rent in full or in part following an Event of Default hereunder shall not be construed as a waiver of such Event of Default. No custom or practice which may grow up between the parties in connection with the terms of this Lease shall be construed to waive or lessen either party's right to insist upon strict performance of the terms of this Lease, without a written notice thereof to the other party.

(f)   If an Event of Default shall occur, Tenant shall pay to Landlord, on demand, all expenses incurred by Landlord as a result thereof, including reasonable attorneys' fees, court costs and expenses actually incurred.

23.   Landlord's Right of Entry.   Tenant agrees to permit Landlord and the authorized representatives of Landlord and of Lender to enter upon the Demised Premises at all reasonable times for the purposes of inspecting the Demised Premises and Tenant's compliance with this Lease, and making any necessary repairs thereto; provided that, except in the case of an emergency, Landlord shall give Tenant reasonable prior notice of Landlord's intended entry upon the Demised Premises. Nothing herein shall imply any duty upon the part of Landlord to do any work required of Tenant hereunder, and the performance thereof by Landlord shall not constitute a waiver of Tenant's default in failing to perform it. Landlord shall not be liable for inconvenience, annoyance, disturbance or other damage to Tenant by reason of making such repairs or the performance of such work in the Demised Premises or on account of bringing materials, supplies and equipment into or through the Demised Premises during the course thereof, and the obligations of Tenant under this Lease shall not thereby be affected; provided, however, that Landlord shall use reasonable efforts not to disturb or otherwise interfere with Tenant's operations in the Demised Premises in making such repairs or performing such work. Landlord also shall have the right to enter the Demised Premises at all reasonable times upon reasonable prior notice to Tenant to exhibit the Demised Premises to any prospective purchaser, mortgagee or tenant thereof. Tenant shall have the right to have an officer or employee of Tenant accompany Landlord in the event of any such entry under this Section 23 (except in the case of an emergency, to the extent infeasible under the circumstances).

24.   Lender's Rights.

(a)   For purposes of this Lease:

(i)   "Lender" as used herein means the holder of a Mortgage;

(ii)   "Mortgage" as used herein means any or all mortgages, deeds to secure debt, deeds of trust or other instruments in the nature thereof which may now or hereafter affect or encumber Landlord's title to the Demised Premises, and any amendments, modifications, extensions or renewals thereof.

(b)   This Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien and security title of any Mortgage. Tenant recognizes and acknowledges the right of Lender to foreclose or exercise the power of sale against the Demised Premises under any Mortgage.

(c)   Tenant shall, in confirmation of the subordination set forth in Section 24(b) and notwithstanding the fact that such subordination is self-operative, and no further instrument or subordination shall be necessary, upon demand, at any time or times, execute, acknowledge, and deliver to Landlord or to Lender any and all instruments requested by either of them to evidence such subordination.

(d)   At any time during the Term, Lender may, by written notice to Tenant, make this Lease superior to the lien of its Mortgage. If requested by Lender, Tenant shall, upon demand, at any time

-16-

ATL01/11405528v9

POOR QUALITY

or times, execute, acknowledge, and deliver to Lender, any and all instruments that may be necessary to make this Lease superior to the lien of any Mortgage.

(e) If Lender (or Lender's nominee, or other purchaser at foreclosure) shall hereafter succeed to the rights of Landlord under this Lease, whether through possession or foreclosure action or delivery of a new lease, Tenant shall, if requested by such successor, attorn to and recognize such successor as Tenant's landlord under this Lease without change in the terms and provisions of this Lease and shall promptly execute and deliver any instrument that may be necessary to evidence such attornment, provided that such successor shall not be bound by (i) any payment of Base Rent or Additional Rent for more than one month in advance, except prepayments in the nature of security for the performance by Tenant of its obligations under this Lease, and then only if such prepayments have been deposited with and are under the control of such successor, (ii) any provision of any amendment to the Lease to which Lender has not consented, (iii) the defaults of any prior landlord under the Lease, or (iv) any offset rights arising out of the defaults of any prior landlord under this Lease. Upon such attornment, this Lease shall continue in full force and effect as a direct lease between each successor landlord and Tenant, subject to all of the terms, covenants and conditions of this Lease.

(f) In the event there is a Mortgage at any time during the Term, Landlord shall use reasonable efforts to cause the Lender to enter into a subordination, nondisturbance and attornment agreement with Tenant reasonably satisfactory to Tenant and consistent with this Section 24.

25. Estoppel Certificate and Financial Statement.

(a) Landlord and Tenant agree, at any time, and from time to time, within fifteen (15) days after written request of the other, to execute, acknowledge and deliver a statement in writing in recordable form to the requesting party and/or its designee certifying that (i) this Lease is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect, as modified), (ii) the dates to which Base Rent, Additional Rent and other charges have been paid, (iii) whether or not, to the best of its knowledge, there exists any failure by the requesting party to perform any term, covenant or condition contained in this Lease, and, if so, specifying each such failure, (iv) (if such be the case) Tenant has unconditionally accepted the Demised Premises and is conducting its business therein, and (v) and as to such additional matters as may be requested, it being intended that any such statement delivered pursuant hereto may be relied upon by the requesting party and by any purchaser of title to the Demised Premises or by any mortgagee or any assignee thereof or any party to any sale-leaseback of the Demised Premises, or the landlord under a ground lease affecting the Demised Premises.

(b) If Landlord desires to finance, refinance, or sell the Building, Tenant and all guarantors of Tenant's obligations hereunder, if any, shall deliver to any potential lender or purchaser designated by Landlord such financial statements of Tenant and such guarantors as may be reasonably required by such lender or purchaser, including but not limited to Tenant's financial statements for the past 3 years. All such financial statements shall be received by Landlord and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

26. Landlord Liability. No owner of the Demised Premises, whether or not named herein, shall have liability hereunder after it ceases to hold title to the Demised Premises. Neither Landlord nor any officer, director, shareholder, partner or principal of Landlord, whether disclosed or undisclosed, shall be under any personal liability with respect to any of the provisions of this Lease. IN THE EVENT LANDLORD IS IN BREACH OR DEFAULT WITH RESPECT TO LANDLORD'S OBLIGATIONS OR OTHERWISE UNDER THIS LEASE, TENANT SHALL LOOK SOLELY TO THE EQUITY OF LANDLORD IN THE BUILDING FOR THE SATISFACTION OF TENANT'S REMEDIES. IT IS EXPRESSLY UNDERSTOOD AND AGREED THAT LANDLORD'S LIABILITY UNDER THE TERMS, COVENANTS, CONDITIONS, WARRANTIES AND OBLIGATIONS OF THIS LEASE SHALL IN NO EVENT EXCEED LANDLORD'S EQUITY INTEREST IN THE BUILDING.

27. Notices. Any notice required or permitted to be given or served by either party to this Lease shall be deemed given when made in writing, and either (i) personally delivered, (ii) deposited with the United States Postal Service, postage prepaid, by registered or certified mail, return receipt requested, or (iii) delivered by licensed overnight delivery service providing proof of delivery, properly addressed to the address set forth in Section 1(m) (as the same may be changed by giving written notice of the aforesaid in accordance with this Section 27). If any notice mailed is properly addressed with appropriate postage but returned for any reason, such notice shall be deemed to be effective notice and to be given on the date of mailing.

28. Brokers. Tenant represents and warrants to Landlord that, except for those parties set forth in Section 1(o) (the "Brokers"), Tenant has not engaged or had any conversations or negotiations with any broker, finder or other third party concerning the leasing of the Demised Premises to Tenant who would be entitled to any commission or fee based on the execution of this Lease. Tenant hereby further represents and warrants to Landlord that Tenant is not receiving and is not entitled to receive any rebate, payment or other remuneration, either directly or indirectly, from the Brokers, and that it is not otherwise sharing in or entitled to share in any commission or fee paid to the Brokers by Landlord or any other party in connection with the execution of this Lease, either directly or indirectly. Tenant hereby indemnifies Landlord against and from any claims for any brokerage commissions (except those payable to the Brokers, all of which are

-17-

ATL01/11405522v9

POOR QUALITY

payable by Landlord pursuant to a separate agreement) and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses, for any breach of the foregoing. The foregoing indemnification shall survive the termination of this Lease for any reason. Landlord represents and warrants to Tenant that, except for the Brokers, Landlord has not engaged or had any conversations or negotiations with any broker, finder or other third party concerning the leasing of the Demised Premises to Tenant who would be entitled to any commission or fee based on the execution of this Lease. Landlord hereby indemnifies Tenant against and from any claims for any brokerage commissions and all costs, expenses and liabilities in connection therewith, including, without limitation, reasonable attorneys' fees and expenses, for any breach of the foregoing. The foregoing indemnification shall survive the termination of this Lease for any reason other than an Event of Default by Tenant.

29.   Assignment and Subleasing.

(a)   Except as provided in subsection (b), below, Tenant may not assign, mortgage, pledge, encumber or otherwise transfer this Lease, or any interest hereunder, or sublet the Demised Premises, in whole or in part, without on each occasion first obtaining the prior express written consent of Landlord, which consent Landlord shall not unreasonably withhold or delay. Any change in control of Tenant resulting from a merger, consolidation, stock transfer or asset sale shall be considered an assignment or transfer which requires Landlord's prior written consent. For purposes of this Section 29, by way of example and not limitation, Landlord shall be deemed to have reasonably withheld consent if Landlord determines (i) that the prospective assignee or subtenant is not of a financial strength similar to Tenant as of the Lease Date, (ii) that the prospective assignee or subtenant has a poor business reputation, (iii) that the proposed use of the Demised Premises by such prospective assignee or subtenant (including, without limitation, a use involving the use or handling of Hazardous Substances) will negatively affect the value or marketability of the Building or the Project or (iv) that the prospective assignee or subtenant is a current tenant in the Project or is a bona-fide third-party prospective tenant.

(b)   Notwithstanding Section 29(a) above, provided that there then exists no Event of Default under this Lease which remains uncured, Tenant shall have the right, upon thirty (30) days' prior written notice to Landlord but without Landlord's prior consent, (i) to sublet all or part of the Demised Premises to any related entity which controls Tenant, is controlled by Tenant or is under common control with Tenant; or (ii) to assign this Lease to a successor entity into which or with which Tenant is merged or consolidated or which acquired substantially all of Tenant's assets and property, provided that such successor entity assumes substantially all of the obligations and liabilities of Tenant (including, without limitation, those obligations of Tenant arising under this Lease) and, after such transaction, shall have assets, capitalization, tangible net worth and creditworthiness at least equal to the assets, capitalization, tangible net worth and creditworthiness of Tenant as of the Lease Date as determined by generally accepted accounting principles. For the purpose hereof, (i) "control" shall mean ownership of not less than fifty percent (50%) of all the voting stock or legal and equitable interest in such entity, and (ii) "tangible net worth" shall mean the excess of the value of tangible assets (i.e. assets excluding those which are intangible such as goodwill, patents and trademarks) over liabilities. Any sublease or assignment pursuant to and in compliance with this subsection (b) shall be referred to herein as a "Related Assignment". With respect to any Related Assignment, Tenant shall provide in its notice to Landlord such information as may be reasonably required by Landlord to determine that the requirements of this subsection (b) have been satisfied.

(c)   Except with respect to a Related Assignment, if Tenant desires to assign this Lease or sublet the Demised Premises or any part thereof, Tenant shall give Landlord written notice no later than forty-five (45) days in advance of the proposed effective date of any proposed assignment or sublease, specifying (i) the name and business of the proposed assignee or sublessee, (ii) the amount and location of the space within the Demised Premises proposed to be subleased, (iii) the proposed effective date and duration of the assignment or subletting and (iv) the proposed rent or consideration to be paid to Tenant by such assignee or sublessee. Tenant shall promptly supply Landlord with financial statements and other information as Landlord may reasonably request to evaluate the proposed assignment or sublease. Landlord shall have a period of thirty (30) days following receipt of such notice and other information requested by Landlord within which to notify Tenant in writing that Landlord elects: (i) to terminate this Lease as to the space so affected as of the proposed effective date set forth in Tenant's notice, in which event Tenant shall be relieved of all further obligations hereunder as to such space, except for obligations under Sections 11 and 28 and all other provisions of this Lease which expressly survive the termination hereof; or (ii) to permit Tenant to assign or sublet such space; provided, however, that, if the rent rate agreed upon between Tenant and its proposed subtenant is greater than the rent rate that Tenant must pay Landlord hereunder for that portion of the Demised Premises, or if any consideration shall be promised to or received by Tenant in connection with such proposed assignment or sublease (in addition to rent), then one half (1/2) of such excess rent and other consideration (after payment of brokerage commissions, attorneys' fees and other disbursements reasonably incurred by Tenant for such assignment and subletting if acceptable evidence of such disbursements is delivered to Landlord) shall be considered Additional Rent owed by Tenant to Landlord, and shall be paid by Tenant to Landlord, in the case of excess rent, in the same manner that Tenant pays Base Rent and, in the case of any other consideration, within ten (10) business days after receipt thereof by Tenant; or (iii) to refuse, in Landlord's reasonable discretion (taking into account all relevant factors including, without limitation, the factors set forth in the Section 29(a) above), to consent to Tenant's assignment or subleasing of such space and to continue this Lease in full force and effect as to the entire Demised Premises. If Landlord should fail to notify Tenant in writing of such election within the

-18-

ATL01/11405632v9

**POOR QUALITY**

aforesaid thirty (30) day period, Landlord shall be deemed to have elected option (iii) above. Tenant agrees to reimburse Landlord for reasonable legal fees (not to exceed $3,000.00) and any other reasonable costs incurred by Landlord in connection with any requested assignment or subletting, and such payments shall not be deducted from the Additional Rent owed to Landlord pursuant to subsection (ii) above. Tenant shall deliver to Landlord copies of all documents executed in connection with any permitted assignment or subletting, which documents shall be in form and substance reasonably satisfactory to Landlord and which shall require such assignee to assume performance of all terms of this Lease on Tenant's part to be performed.

(d)   No acceptance by Landlord of any rent or any other sum of money from any assignee, sublessee or other category of transferee shall be deemed to constitute Landlord's consent to any assignment, sublease, or transfer. Permitted subtenants or assignees shall become liable directly to Landlord for all obligations of Tenant hereunder, without, however, relieving Tenant of any of its liability hereunder. No such assignment, subletting, occupancy or collection shall be deemed the acceptance of the assignee, tenant or occupant, as Tenant, or a release of Tenant from the further performance by Tenant of Tenant's obligations under this Lease. Any assignment or sublease consented to by Landlord shall not relieve Tenant (or its assignee) from obtaining Landlord's consent to any subsequent assignment or sublease.

30.   Termination or Expiration.

(a)   No termination of this Lease prior to the normal ending thereof, by lapse of time or otherwise, shall affect Landlord's right to collect rent for the period prior to termination thereof.

(b)   At the expiration or earlier termination of the Term of this Lease, Tenant shall surrender the Demised Premises and all improvements, alterations and additions thereto, and keys therefor to Landlord, clean and neat, and in the same condition as at the Lease Commencement Date, excepting normal wear and tear, condemnation and casualty other than that required to be insured against by Tenant hereunder.

(c)   If Tenant remains in possession of the Demised Premises after expiration of the Term, with or without Landlord's acquiescence and without any express agreement of the parties, Tenant shall be a tenant-at-sufferance at the greater of (i) one hundred fifty percent (150%) of the then current fair market base rental value of the Demised Premises or (ii) one hundred fifty percent (150%) of the Base Rent in effect at the end of the Term. Tenant shall also continue to pay all other Additional Rent due hereunder, and there shall be no renewal of this Lease by operation of law. In addition to the foregoing, Tenant shall be liable for all damages, direct and consequential, incurred by Landlord as a result of such holdover. No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right of possession of the Demised Premises shall reinstate, continue or extend the Term or Tenant's right of possession.

31.   Intentionally omitted.

32.   Late Payments.  In the event any installment of rent, inclusive of Base Rent, or Additional Rent or other sums due hereunder, if any, is not paid within five (5) days after the due date therefor, Tenant shall pay an administrative fee (the "Administrative Fee") equal to five percent (5%) of such past due amount, plus interest on the amount past due at the lesser of (i) the maximum interest rate allowed by law or (ii) a rate of fifteen percent (15%) per annum (the "Interest Rate"), in order to defray the additional expenses incurred by Landlord as a result of such late payment. The Administrative Fee is in addition to, and not in lieu of, any of the Landlord's remedies hereunder. Notwithstanding the foregoing, the interest referenced above shall not be charged with respect to the first occurrence (but may be charged for any subsequent occurrence) during any twelve-month period that Tenant fails to make payment when due, until five (5) days after Landlord gives written notice of any such delinquency to Tenant.

33.   Rules and Regulations.  Tenant agrees to abide by the rules and regulations set forth on Exhibit D attached hereto, as well as other rules and regulations reasonably promulgated by Landlord from time to time, so long as such rules and regulations are uniformly enforced against all tenants of Landlord in the Building.

34.   Quiet Enjoyment.  So long as Tenant has not committed an Event of Default hereunder, Landlord agrees that Tenant shall have the right to quietly use and enjoy the Demised Premises for the Term.

35.   Miscellaneous.

(a)   The parties hereto hereby covenant and agree that Landlord shall receive the Base Rent, Additional Rent and all other sums payable by Tenant hereinabove provided as net income from the Demised Premises, without any abatement (except as set forth in Section 20 and Section 21), reduction, set-off, counterclaim, defense or deduction whatsoever.

(b)   If any clause or provision of this Lease is determined to be illegal, invalid or unenforceable under present or future laws effective during the Term, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and that in lieu

-19-

ATL01/11409528v9

 

# POOR QUALITY

of such illegal, invalid or unenforceable clause or provision there shall be substituted a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

(c)  All rights, powers, and privileges conferred hereunder upon the parties hereto shall be cumulative, but not restrictive to those given by law.

(d)  TIME IS OF THE ESSENCE OF THIS LEASE.

(e)  No failure of Landlord or Tenant to exercise any power given Landlord or Tenant hereunder or to insist upon strict compliance by Landlord or Tenant with its obligations hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Landlord's or Tenant's rights to demand exact compliance with the terms hereof.

(f)  This Lease contains the entire agreement of the parties hereto as to the subject matter of this Lease and no prior representations, inducements, letters of intent, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force and effect. Any future amendment to this Lease must be in writing and signed by the parties hereto. The masculine (or neuter) pronoun, singular number shall include the masculine, feminine and neuter gender and the singular and plural number.

(g)  This contract shall create the relationship of landlord and tenant between Landlord and Tenant; no estate shall pass out of Landlord; Tenant has a usufruct, not subject to levy and sale, and not assignable by Tenant except as expressly set forth herein.

(h)  Under no circumstances shall Tenant have the right to record this Lease or a memorandum thereof.

(i)  The captions of this Lease are for convenience only and are not a part of this Lease, and do not in any way define, limit, describe or amplify the terms or provisions of this Lease or the scope or intent thereof.

(j)  This Lease may be executed in multiple counterparts, each of which shall constitute an original, but all of which taken together shall constitute one and the same agreement.

(k)  This Lease shall be interpreted under the laws of the State where the Demised Premises are located.

(l)  The parties acknowledge that this Lease is the result of negotiations between the parties, and in construing any ambiguity hereunder no presumption shall be made in favor of either party. No inference shall be made from any item which has been stricken from this Lease other than the deletion of such item.

36.  Special Stipulations.  The Special Stipulations, if any, attached hereto as Exhibit C are incorporated herein and made a part hereof, and to the extent of any conflict between the foregoing provisions and the Special Stipulations, the Special Stipulations shall govern and control.

37.  Lease Date.  For purposes of this Lease, the term "Lease Date" shall mean the later date upon which this Lease is signed by Landlord and Tenant.

38.  Authority.  If Tenant is not a natural person, Tenant shall cause its corporate secretary or general partner, as applicable, to execute the certificate attached hereto as Exhibit E. Tenant is authorized by all required corporate or partnership action to enter into this Lease and the individual(s) signing this Lease on behalf of Tenant are each authorized to bind Tenant to its terms.

39.  No Offer Until Executed.  The submission of this Lease by Landlord to Tenant for examination or consideration does not constitute an offer by Landlord to lease the Demised Premises and this Lease shall become effective, if at all, only upon the execution and delivery thereof by Landlord and Tenant. Execution and delivery of this Lease by Tenant to Landlord constitutes an offer to lease the Demised Premises on the terms contained herein. The offer by Tenant will be irrevocable until 6:00 p.m. Eastern time for ten (10) business days after the date of execution of this Lease by Tenant and delivery to Landlord.

40.  Memorandum of Lease.  At Tenant's request, Landlord shall execute, acknowledge and deliver to Tenant a memorandum of this Lease substantially in the form attached hereto as Exhibit "G", which shall be countersigned by Tenant and recorded in the official records of the jurisdiction in which the Demised Premises are located at Tenant's expense.

[the remainder of this page is intentionally left blank]

-20-

POOR QUALITY

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands under seals, the day and year first above written.

Date: 6/17/03

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation

By: _____
Name: Timothy J. Gunter
Title: Secretary

Attest: _____
Name: G. Bryan Blasingame
Title: Assistant Secretary

[CORPORATE SEAL]

Date: 06/09/03
02/14/03

TENANT:

WIRELESS RETAIL, INC., a Texas corporation

By: _____
Name: J. DAN M<sup>c</sup>MAHAN
Title: PRESIDENT + CEO

Attest: _____
Name: STUART MYRICK
Title: S.D. REAL ESTATE + RETAIL OPS

[CORPORATE SEAL]

# IMAGING SERVICES

ATLD1/11405528v9