# Exhibit C

# Part 2 of 2






11/08/2007 133

ATTESTATION

Landlord - Corporation:

STATE OF Georgia

COUNTY OF Fulton

BEFORE ME, a Notary Public in and for said County, personally appeared Tim Gunter and Bryan Blasingame, known to me to be the person(s) who, as Secretary and Assistant Secretary, respectively, of Industrial Developments International, Inc., the corporation which executed the foregoing instrument in its capacity as Landlord, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this 17 day of June, 2003.

Mona L Kenton
Notary Public
My Commission Expires: 2-8-05

MONA KENTON NOTARY PUBLIC GEORGIA GWINNETT COUNTY Expires Feb. 8, 2005

Tenant - Corporation:

STATE OF Arizona

COUNTY OF Maricopa

BEFORE ME, a Notary Public in and for said County, personally appeared J. Dan McMahan and ________, known to me to be the person(s) who, as President & CEO and ________, respectively, of Wireless Retail, Inc., the corporation which executed the foregoing instrument in its capacity as Tenant, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this 9th day of June, 2003

VICTORIA PARKER Notary Public, Maricopa Co., AZ My Comm. Expires Sept. 22, 2003

Victoria Parker
Notary Public

My Commission Expires: Sept 22, 2003



ATL01/11405526v9



POOR QUALITY

11/08/2007 134

Exhibit A continued

Located upon the real property described as follows (the "Premises Real Property"):

Being Part of the JMH Development property as described in Book 368 Page 509 and being in the Northeast Quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, DeSoto County, Mississippi and being more particularly described as follows:

Commencing at the recognized and accepted northeast corner of the northeast quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, Desoto County, Mississippi; thence South 00 Degrees 09 Minutes 32 Seconds West with the centerline of Airways Boulevard a distance of 1529.64 feet to a point; thence North 90 Degrees 00 Minutes 00 Seconds West a distance of 1677.91 feet to a point on curve in the south line of Airport Industrial Drive, said point being the true point of beginning; thence southeastwardly along a curve to the right having a radius of 35.00 feet a distance of 54.71 feet (chord = South 44 Degrees 35 Minutes 00 Seconds East 49.31 feet, Delta = 89 Degrees 33 Minutes 34 Seconds) to a point in the west line of Market Street (proposed); thence South 00 Degrees 11 Minutes 47 Seconds West with the west line of Market Street (proposed) a distance of 467.49 feet to a point in the north line of Lot 8, Airport Industrial Park P.B.P. (proposed); thence North 89 Degrees 48 Minutes 13 Seconds West with the north line of Lot 8 (proposed) a distance of 1055.59 feet to a point in the east line of Hamilton Road; thence North 00 Degrees 24 Minutes 18 Seconds West with the east line of Hamilton Road a distance of 461.85 feet to a point of curvature; thence northeastwardly along a curve to the right having a radius of 35.00 feet a distance of 55.16 feet (chord = North 44 Degrees 44 Minutes 28 Seconds East 49.62 feet, Delta = 90 Degrees 17 Minutes 33 Seconds) to a point of tangency in the south line of Airport Industrial Drive; thence North 89 Degrees 53 Minutes 14 Seconds East with the south line of Airport Industrial Drive a distance of 983.51 feet to a point of curvature; thence southeastwardly along a curve to the right having a radius of 566.00 feet and with the south line of Airport Industrial Drive a distance of 7.40 feet (chord = South 89 Degrees 44 Minutes 16 Seconds East 7.40 feet, Delta = 00 Degrees 44 Minutes 59 Seconds) to the point of beginning and containing 12.13 acres of land.

Note:
In the event of the subdivision of the Premises Real Property and the balance of the real estate not constituting part of the Premises Real Property, the Premises Real Property shall be described in said subdivision plat as "Lot 7 in Airport Industrial Park P.B.P.".



POOR QUALITY

11/08/2007 135

EXHIBIT A






ATL01/11405576v9



POOR QUALITY

11/08/2007 137

**EXHIBIT B**

**Preliminary Plans and Specifications/Work**

**BASE BUILDING SPECIFICATIONS**

| | |
|---|---|
| **BUILDING AREA:** | 246,078 square feet |
| **PREMISES:** | 177,039 square feet on the west side of the building. Including approximately 11,130 square feet of office space. |
| **PREMISES CONFIGURATION:** | 702' X 250' |
| **PARKING AREA:** | Approximately 239 parking spaces provided. Note: Landlord is constructing approximately 82 of the 239 parking spaces as part of the Improvements for Tenant. |
| **FIRE PROTECTION:** | ESFR sprinkler system with electric booster pump. |
| **COLUMN SPACING:** | 54' X 50' |
| **CLEAR CELING HEIGHT:** | 30' minimum |
| **WAREHOUSE HEATING AND VENTILATION:** | Gas fired Cambridge units provide heating to maintain 60° F when 15° F outside.<br><br>Ventilation provided by roof-mounted exhaust fans, mechanically operated to provide three (3) air changes per hour in the warehouse area. Fire rated belt driven fans are used to minimize fan noise. Wall and roof mounted louvers provide the make-up air. |
| **FLOOR SPECIFICATIONS:** | 6" concrete slab on soil cement treated grade, 4,000 PSI. The floor is sealed with a water based penetrating sealer (Dayton Superior J-17 or equal). Construction specifications are $F_f35$, $F_l25$. |
| **ROOF AND DRAINS:** | EPDM single ply, reinforced membrane with minimum thickness of 45 mils. Roof is black, mechanically fastened, and insulated to R-10 with a ten year warranty. The roof drains to the rear to a gutter and downspouts. |
| **EXTERIOR WALLS:** | Painted concrete tilt wall with architectural reveals. |
| **INTERIOR WALLS:** | All interior warehouse walls will be painted white. |
| **EXIT DOORS:** | Landlord shall provide sufficient exit man doors as required by code, subject to review of tenant's equipment layout. |
| **SECURITY LIGHTING:** | Car parking and truck court lighting to be provided to 1.5 FC average by pole and building mounted fixtures. |
| **TRUCK LOADING:** | Thirty-six (36) manually operated dock high loading doors (9'x10' doors; 4' above grade). |

POOR QUALITY

11/08/2007 136

| | |
|---|---|
| | One manually operated grade level door provided (14'X16'). |
| **TRUCK COURT:** | 130' total (60' concrete paving on compacted subgrade reinforced with wire mesh. |
| **CONCRETE APRON SPECIFICATIONS:** | 7", 3,000 PSI concrete paving on compacted subgrade reinforced with wire mesh. |
| **LANDSCAPING:** | Class A landscaping including automatic irrigation system. |
| **SIGNAGE:** | Tenant may install building or ground mounted signage subject to Landlord's approval of design and location. |
| **CODE COMPLIANCE:** | Building and Improvements will meet all code requirements including A.D.A. guidelines, as required at time of initial occupancy by Tenant. |

**TENANT IMPROVEMENTS**

| | |
|---|---|
| **POWER:** | 277/480 volt; three phase, four wire; amperage to be provided on a design/build basis. Tenant requires 225 amps at 480 volt for Tenant's equipment. Distribution and hookup is by Tenant. |
| **BATTERY AREA:** | Power for ten (10) disconnects at 480 volt, 30 amps provided. Distribution and hookup by Tenant.<br><br>Plumbing provided for eyewash, floor drain, and hose bib in the battery charging area. |
| **DOCK EQUIPMENT:** | Landlord to install, mechanical dock levelers (25,000 pound equal to RITE-HITE), dock lights, dock seals (equal to Frommelt), track guards and bumpers on twenty-nine (29) doors. One of the dock doors shall be used for a trash compactor, furnished and installed by Tenant. |
| **LIGHTING:** | Warehouse: 400 wall metal halide fixtures to provide 30 foot-candles at the warehouse floor.<br><br>In 8,000 SF of processing and pick areas, fluorescent fixtures will be dropped from the rack structure to approximately 14' a.f.f. to provide 100 foot-candles.<br><br>Offices: Standard UV-type ballasts providing 100 foot-candles (part of office allowance). |
| **STRUCTURAL SUPPORT FOR CONVEYOR SYSTEM:** | No structural enhancements have been included for Tenant's equipment. |



POOR QUALITY

11/08/2007 138

EXHIBIT C

Special Stipulations

The Special Stipulations set forth herein are hereby incorporated into the body of the lease to which these Special Stipulations are attached (the "Lease"), and to the extent of any conflict between these Special Stipulations and the preceding language, these Special Stipulations shall govern and control.

1. SNDA. Simultaneously with the execution of this Lease, Landlord and Tenant shall execute a Subordination, Non-Disturbance and Attornment Agreement in the form attached hereto as Exhibit "F". Notwithstanding anything to the contrary contained in Section 24 of this Lease, this Lease and all rights of Tenant hereunder are and shall be subject and subordinate to the lien and security title of any Mortgage created after the Lease Date provided that the holder of said Mortgage agrees not to disturb Tenant's possession of the Demised Premises so long as Tenant is not in default hereunder, as evidenced by a subordination and non-disturbance agreement signed by said holder which agreement may include (a) the conditions contained in Section 24(e) of this Lease, (b) a requirement that said holder be given notice and opportunity to cure a landlord default and (c) other provisions customarily required by lenders. Tenant shall promptly execute such a subordination and non-disturbance agreement upon Landlord's request.

2. Construction of Demised Premises.

(a) Notwithstanding the provisions of Section 17 of this Lease, Landlord shall be responsible for the cost of the construction of the portion of the Improvements designated as office improvements, which shall include restrooms and break rooms whether or not attached to the office space (collectively, the "Office Improvements") only up to an amount equal to $499,936 (the "Tenant Allowance"). Prior to commencement of construction of the Office Improvements, Landlord shall provide to Tenant a Work Order Agreement setting forth the amount of the hard costs of the Office Improvements, together with an administrative and coordination fee charged by Landlord against the Tenant Allowance equal to five percent (5%) of the total cost to complete the design, permit process and construction of the Office Improvements. Tenant shall have five (5) business days after receipt of the Work Order Agreement in which to review and to give to Landlord written notice of its approval of the Work Order Agreement or its requested changes to the plans and specifications for the Office Improvements in order that the cost of the Office Improvements may be revised. If Tenant fails to approve or request changes to the Work Order Agreement within five (5) business days after its receipt thereof, then Tenant shall be deemed to have approved the Work Order Agreement and the same shall thereupon be final. If Tenant requests any changes to the Work Order Agreement, Landlord shall make those changes which are reasonably requested by Tenant and shall within ten (10) days of its receipt of such request submit the revised portion of the Work Order Agreement to Tenant. In no event shall the cost of constructing the demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant be included in the calculation of the cost of the Office Improvements. In the event the Work Order Agreement, as approved (or deemed approved) by Tenant provides that the construction of the Office Improvements will cost in excess of the amount of the Tenant Allowance, Tenant agrees to pay such excess amount within ten (10) calendar days following Substantial Completion of the Office Improvements. Failure by Tenant to make such payment to Landlord shall be a default hereunder. If Tenant does not use the full amount of the Tenant Allowance, the difference between the amount of the Tenant Allowance actually used and the full Tenant Allowance is hereinafter referred to as the "Allowance Savings". Landlord shall, at its option either (a) credit the amount of the Allowance savings against Tenant's first installment of Base Rent or (b) pay the amount of the Allowance Savings directly to Tenant within a reasonable amount of time following Landlord's determination of the amount such Allowance Savings.

(b) For purposes of this Special Stipulation, the cost of the construction of the Office Improvements shall be deemed to include, but not be limited to, the cost of the Plans and Specifications related to the Office Improvements, permits related solely to the Office Improvements and all tenant build-out related to the Office Improvements, including, without limitation, demising walls (other than demising walls between the Office Improvements and the remaining portion of the Building not leased by Tenant), utilities, and portions of the heating, ventilating and air conditioning system servicing the Office Improvements

3. Right of First Offer to Lease. So long as the Lease is in full force and effect and no Event of Default has occurred and is then continuing and no facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default, Landlord hereby grants to Tenant a right of first offer (the "Right of First Offer") to expand the Demised Premises to include that 40,500 square foot area labeled on Exhibit A attached hereto (the "Offer Space") subject to the terms and conditions set forth herein.

(a) Tenant's and any guarantor's then current financial condition, as revealed by its most current financial statements (which shall include quarterly and annual financial statements, including income statements, balance sheets, and cash flow statements, as required by Landlord), must demonstrate either that each of Tenant's and such guarantor's net worth is at least equal to its net worth at the time the Lease was signed; or that Tenant and such guarantor otherwise meet financial criteria acceptable to Landlord.



POOR QUALITY

11/08/2007 139

(b) The term of the Right of First Offer shall commence on the Lease Commencement Date and continue throughout the initial Term (the "First Offer Period"), unless sooner terminated pursuant to the terms hereof.

(c) Subject to the other terms of this Right of First Offer, after any part of the Offer Space has or will "become available" (as defined herein) for leasing by Landlord, Landlord shall not, during the term of the Right of First Offer, lease to a third party that available portion of the Offer Space (the "Available Offer Space") without first offering Tenant the right to lease such Available Offer Space as set forth herein.

(i) Space shall be deemed to "become available" when Landlord desires to lease all or a portion of the Offer Space.

(ii) Notwithstanding subsection c(i) above, Offer Space shall not be deemed to "become available" if the space is (a) assigned or subleased by the current tenant of the space; or (b) re-let by the current tenant or permitted subtenant of the space by renewal, extension, or renegotiation or (c) leased on a temporary basis for a period of less than twelve (12) months without any right to extend.

(d) Consistent with subsection (c), Landlord shall not lease any such Available Offer Space to a third party unless and until Landlord has first offered the Available Offer Space to Tenant in writing (the "Offer", the date of presentment of such Offer shall hereinafter be referred to as the "Offer Date"). The Offer shall contain (i) a description of the Available Offer Space (which description shall include the square footage amount and location of such Available Offer Space) and an attached floor plan that shows the Available Offer Space; (ii) the date on which Landlord expects the Available Offer Space to become available; (iii) the base rent for the Available Offer Space; and (iv) the term for the Available Offer Space (which shall be no less than the remainder of the Term of this Lease then in effect). Upon receipt of the Offer, Tenant shall have the right, for a period of five (5) calendar days after receipt of the Offer, to exercise the Right of First Offer by giving Landlord written notice that Tenant desires to lease the Available Offer Space at the base rent and upon the special terms and conditions as are contained in the Offer.

(e) If, within such five (5)-day period, Tenant exercises the Right of First Offer, then Landlord and Tenant shall amend the Lease to include the Available Offer Space subject to the same terms and conditions as the Lease, as modified, with respect to the Available Offer Space, by the terms and conditions of the Offer. If this Lease is guaranteed now or at anytime in the future, Tenant simultaneously shall deliver to Landlord an original, signed, and notarized reaffirmation of each Guarantor's personal guaranty, in form and substance acceptable to Landlord.

(f) If, within such five (5)-day period, Tenant declines or fails to exercise the Right of First Offer, Landlord shall then have the right to lease the Available Offer Space in portions or in its entirety to a third party, unrelated to and unaffiliated with Landlord, at any time within twelve (12) months after the Offer Date, without regard to the restrictions in this Right of First Offer and on whatever terms and conditions Landlord may decide in its sole discretion, provided the base rent (as adjusted to account for any changes in the tenant improvement allowance), additional rent and any rent concessions are not substantially more favorable to such tenant than those set forth in the Offer, without again complying with all the provisions of this Right of First Offer. In the event Landlord does not lease the Available Offer Space to a third party within twelve (12) months after the Offer Date, Landlord shall thereafter be required to again comply with the provisions of this Special Stipulation 3 prior to leasing the Available Offer space to a Third Party.

(g) If Landlord does lease all or any portion of the Available Offer Space to such a third party after complying with the terms and conditions of this Right of First Offer, then the Right of First Offer shall terminate, and Tenant shall have no further Right of First Offer.

(h) If Landlord desires to lease the Available Offer Space at a base rent rate substantially less than the base rent rate set forth in the Offer (provided, that if the base rent rate is at least ninety percent (90%) of the base rent rate set forth in the Offer, said base rent rate shall be conclusively deemed to be not substantially less than the base rent set forth in the Offer), or if Landlord desires to materially alter or modify the special terms and conditions of the Offer, if any, Landlord shall be required to present the altered or modified Offer to Tenant pursuant to this Right of First Offer, in the same manner that the original Offer was submitted to Tenant.

(i) This Right of First Offer is personal to Wireless Retail, Inc. and shall become null and void upon the occurrence of an assignment of Tenant's interest in the Lease or a sublet of all or a part of the Demised Premises

(j) This Right of First Offer shall be null and void if Tenant is a holdover Tenant pursuant to Section 30(c) of the Lease at the time Landlord is required to notify Tenant of the Offer or at the time Tenant exercises its Right of Offer.

4. Option to Extend Term.



POOR QUALITY

11/08/2007 140

(a) Landlord hereby grants to Tenant two (2) consecutive options to extend the Term for a period of five (5) years each time, each such option to be exercised by Tenant giving written notice of its exercise to Landlord in the manner provided in this Lease at least one hundred eighty (180) days prior to (but not more than two hundred ten (210) days prior to) the expiration of the Term, as it may have been previously extended. No extension option may be exercised by Tenant if an Event of Default has occurred and is then continuing or any facts or circumstances then exist which, with the giving of notice or the passage of time, or both, would constitute an Event of Default either at the time of exercise of the option or at the time the applicable Term would otherwise have expired if the applicable option had not been exercised.

(b) If Tenant exercises its options to extend the Term, Landlord shall, within thirty (30) days after the receipt of Tenant's notice of exercise, notify Tenant in writing of Landlord's reasonable determination of the Base Rent for the Demised Premises for the applicable five (5) year option period (including any space added thereto pursuant to Special Stipulation 3), which amount shall be based on the greater of (i) the market rate for such space or (ii) the Annual Base Rent rate to be in effect immediately prior to the commencement of such option period. Tenant shall have thirty (30) days from its receipt of Landlord's notice to notify Landlord in writing that Tenant does not agree with Landlord's determination of the Base Rent and that Tenant elects to determine the Prevailing Market Rate (as defined and calculated below). If Tenant does not notify Landlord of such election within thirty (30) days of its receipt of Landlord's notice, Base Rent for the Demised Premises for the applicable extended term shall be the Base Rent set forth in Landlord's notice to Tenant. The phrase "Prevailing Market Rate" shall mean the then prevailing market rate for base minimum rental calculated on a per square foot basis for leases covering buildings comparable to the Building (as adjusted for any variances between such buildings and the Building) located in the area of Southaven, Mississippi (hereinafter referred to as the "Market Area"). The Prevailing Market Rate shall be determined by an appraisal procedure as follows:

> In the event that Tenant notifies Landlord that Tenant disagrees with Landlord's determination of the market rate and that Tenant elects to determine the Prevailing Market Rate, then Tenant shall specify, in such notice to Landlord, Tenant's selection of a real estate appraiser who shall act on Tenant's behalf in determining the Prevailing Market Rate. Within twenty (20) days after Landlord's receipt of Tenant's selection of a real estate appraiser, Landlord, by written notice to Tenant, shall designate a real estate appraiser, who shall act on Landlord's behalf in the determination of the Prevailing Market Rate. Within twenty (20) days of the selection of Landlord's appraiser, the two (2) appraisers shall render a joint written determination of the Prevailing Market Rate, which determination shall take into consideration any differences between the Building and those buildings comparable to the Building located in the Market Area, including without limitation age, location, setting and type of building. If the two (2) appraisers are unable to agree upon a joint written determination within said twenty (20) day period, the two appraisers shall select a third appraiser within such twenty (20) day period. Within twenty (20) days after the appointment of the third appraiser, the third appraiser shall render a written determination of the Prevailing Market Rate by selecting, without change, the determination of one (1) of the original appraisers as to the Prevailing Market Rate and such determination shall be final, conclusive and binding. All appraisers selected in accordance with this subparagraph shall have at least ten (10) years prior experience in the commercial leasing market of the Market Area and shall be members of the American Institute of Real Estate Appraisers or similar professional organization. If either Landlord or Tenant fails or refuses to select an appraiser, the other appraiser shall alone determine the Prevailing Market Rate. Landlord and Tenant agree that they shall be bound by the determination of Prevailing Market Rate pursuant to this paragraph. Landlord shall bear the fee and expenses of its appraiser; Tenant shall bear the fee and expenses of its appraiser; and Landlord and Tenant shall share equally the fee and expenses of the third appraiser, if any.

Notwithstanding anything to the contrary contained herein, in the event the Prevailing Market Rate as determined herein is less than the Annual Base Rent to be in effect immediately prior to the commencement of such option period, the Base Rent during the applicable extension Term shall equal the Annual Base Rent in effect during the last year of the Term.

(c) Except for the Base Rent, which shall be determined as set forth in subparagraph (b) above, leasing of the Demised Premises by Tenant for the applicable extended term shall be subject to all of the same terms and conditions set forth in this Lease, including Tenant's obligation to pay Tenant's share of Operating Expenses as provided in this Lease; provided, however, that any improvement allowances, termination rights, rent abatements or other concessions applicable to the Demised Premises during the initial Term shall not be applicable during any such extended term, nor shall Tenant have any additional extension options unless expressly provided for in this Lease. Landlord and Tenant shall enter into an amendment to this Lease to evidence Tenant's exercise of its renewal option. If this Lease is guaranteed, it shall be a condition of Landlord's granting the renewal that Tenant deliver to Landlord a reaffirmation of the guaranty in which the guarantor acknowledges Tenant's exercise of its renewal option and reaffirms that the guaranty is in full force and effect and applies to said renewal.

5. Tenant's Early Occupancy. If and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of the Demised Premises shown on Exhibit "A-1" attached hereto and incorporated herein (the "First Entry Space") on the date which is the later of (a) July 1, 2003 or (b) the twenty-fifth (25th) day following the Approval Date (as defined in Section 17 of this



POOR QUALITY

11/08/2007 14:14

Lease) (such date of early entry to be referred to as the "First Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the First Entry Space for occupancy; provided however, that the First Entry Date shall be postponed by one (1) day for every day of Tenant Delay or delay caused by force majeure (collectively, "Excused Delay"). Further, if and to the extent permitted by applicable laws, rules and ordinances, Tenant shall have the right to enter the portion of Demised Premises shown on Exhibit "A-2" attached hereto and incorporated herein (the "Second Entry Space") on the date which is the thirtieth (30th) day following the First Entry Date (the "Second Entry Date") in order to install and test equipment including but not limited to racking, conveyor systems, network cable, and computer and telephone equipment and otherwise prepare the Demised Premises for occupancy; provided that the Second Entry Date shall be postponed by one (1) day for every day of Excused Delay. The provisions of this Special Stipulation Number 5 are subject to the following: during any period of early entry, (i) Tenant shall comply with all terms and conditions of this Lease other than the obligation to pay Base Rent, (ii) Tenant shall not interfere with Landlord's completion of the Demised Premises, (iii) Tenant shall not begin operation of its business and (iv) Tenant shall be responsible for payment of all costs and charges for gas, steam, electricity, fuel, light, power, telephone, heat and any other utility or service used or consumed by Tenant or Tenant's agents or employees (but not by Landlord or Landlord's agents or contractors in Landlord's completion of the Improvements pursuant to Section 17 of this Lease) in or servicing the Demised Premises during such period of early entry. Landlord and Tenant agree to cooperate with one another and to cause their respective employees, agents and contractors to cooperate with one another to coordinate any work being performed by Landlord and/or Tenant during the early occupancy period

In the event that Landlord does not allow access to Tenant of the First Entry Space by the First Entry Date or the Second Entry Space by the Second Entry Date, as extended by Excused Delay (each day after the First Entry Date or Second Entry Date for which Landlord does not grant Tenant access to the applicable space shall be hereinafter referred to as a "Day of Delay"), from and after the Base Rent Commencement Date, Tenant shall receive a credit against Base Rent equal to one day of Base Rent for each Day of Delay until said credit is fully realized by Tenant, as its sole remedy.

6. Building Compliance with Laws. Landlord represents and warrants to Tenant that, to Landlord's actual knowledge, the design and construction of the Improvements in accordance with the Plans and Specifications will materially comply with all applicable federal, state, county and municipal laws, ordinances and codes in effect as of the Lease Date, excepting therefrom any requirements related to Tenant's specific use of the Demised Premises. Further, subject to the last sentence hereof, Landlord, at its sole cost and expense, shall be responsible for causing the Improvements to comply with Title III of the Americans With Disabilities Act of 1990 (the "ADA"), or the regulations promulgated thereunder (as said Title III is in effect and pertains to the general public), as of the Lease Commencement Date During the Term, Tenant hereby agrees that it shall be responsible, at its sole cost and expense, for (a) causing the Building, the Building Common Area and the Demised Premises to comply with Title III of the ADA as a result of (i) any special requirements of the ADA relating to accommodations for individual employees, invitees and/or guests of Tenant and (ii) any improvements or alterations made to the Demised Premises by Tenant, and (b) complying with all obligations of Tenant under Title I of the ADA.

7. Road Access. Landlord represents and warrants to Tenant that, as of the First Entry Date, Tenant will have temporary access to Hamilton Road for purposes of ingress and egress to and from the Building and that, as of the Lease Commencement Date, Tenant will have permanent access to Hamilton Road for such purposes.

8. Additional Operating Expense Exclusions.

The following items shall be excluded from Operating Expenses:

a. Expenditures for capital improvements except as expressly allowed under the Lease;
b. Tenant improvements expenses for other tenants of the Building;
c. The cost of any work performed for, or equipment furnished to, any tenant of the Building to the extent performed for, or furnished to Tenant;
d. The cost of any repair in accordance with the casualty and condemnation sections of this Lease to the extent covered by insurance or condemnation proceeds;
e. Any expenses for repairs and maintenance which are actually covered by warranty;
f. Charges for electricity, steam and other utilities which are separately reimbursed by any tenant;
g. Interest and penalties due to late payment of any amounts owed by Landlord, except as may be incurred as a result of Tenant's failure to timely pay its portion of such amounts or as a result of Landlord's contesting such amounts in good faith; and
h. The cost of correcting defects covered by Landlord's warranty contained in Section 17(e) of this Lease, within such warranty period.
i. Management fees, royalties or other fees charged for the management of the Property in excess of 3 1/2% per annum.

9. Inspection Rights.

a. Landlord's books and records pertaining to the calculation of Operating Expenses for any calendar year within the Term may be inspected by Tenant (or by an independent certified accountant) at



POOR QUALITY

11/08/2007 142

Tenant's expense, at any reasonable time within sixty (60) days after Tenant's receipt of Landlord's statement for Operating Expenses; provided that Tenant shall give Landlord not less than fifteen (15) days' prior written notice of any such inspection. If Landlord and Tenant agree that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year was incorrect, the parties shall enter into a written agreement confirming such error and then, and only then, Tenant shall be entitled to a credit against future Base Rent for said overpayment (or a refund of any overpayment if the Term has expired) or Tenant shall pay to Landlord the amount of any underpayment, as the case may be. If Tenant's inspection proves that Landlord's calculation of Tenant's share of Operating Expenses for the inspected calendar year resulted in an overpayment by more than fifteen percent (15%) of Tenant's share, Landlord shall also pay the reasonable fees and expenses of Tenant's independent professionals, if any, conducting said inspection.

b. All of the information obtained through Tenant's inspection with respect to financial matters (including, without limitation, costs, expenses, income) and any other matters pertaining to Landlord, the Demised Premises, the Building and/or the Project as well as any compromise, settlement, or adjustment reached between Landlord and Tenant relative to the results of the inspection shall be held in strict confidence by Tenant and its officers, agents, and employees; and Tenant shall cause its independent professionals and any of its officers, agents or employees to be similarly bound. The obligations within this subsection (b) shall survive the expiration or earlier termination of the Lease.

10. Contesting of Taxes. If Landlord does not elect to contest real estate taxes applicable to the Building and the Building Common Area for a particular tax period during the Term, Tenant may request that Landlord contest such taxes by written notice to Landlord given, if at all, within sixty (60) days following Tenant's receipt of the statement required to be delivered by Landlord pursuant to Section 6(a) of the Lease covering the tax period in question. Landlord may then elect either to contest such taxes or to allow Tenant to so contest such taxes subject to Landlord's reasonable approval of the firm or individual hired to conduct such contest. In either case, Tenant shall be responsible for all costs of contesting such taxes to the extent that said costs exceed the savings realized by such contest. Any resulting savings over and above the cost of such contest shall be distributed on a prorata basis between Landlord, Tenant and the other tenants of the Building that contributed toward payment of the applicable tax bill. Tenant shall have the right to seek an abatement of real estate taxes and other tax incentives. In the event Tenant receives an abatement or reduction in real estate taxes which is attributable solely to the Demised Premises, any such savings shall be credited solely to Tenant's share of Operating Expenses.

11. Landlord Insurance.

(a) Landlord shall maintain at all times during the Term of this Lease, with such deductible as Landlord in its sole judgment determines advisable, insurance on the "Special Form" or equivalent form on a Replacement Cost Basis against loss or damage to the Building. Such insurance shall be in the amount of 80% of the replacement value of the Building (excluding all fixtures and property required to be insured by Tenant under this Lease).

(b) Landlord shall maintain at all times during the Term commercial general liability insurance with limits at least equal to the amount as Tenant is required to maintain pursuant to Section 8(a)(l) of this Lease.

12. Confidentiality.

(a) Landlord will not disclose any aspect of Tenant's financial statements which Tenant designates to Landlord as confidential except (a) to Landlord's lenders or prospective purchasers or joint venture partners of or with respect to the Property, (b) in litigation between Landlord and Tenant, and/or (c) if required by Law.

(b) Landlord and Tenant agree to hold the terms of this Lease in strict confidence, and will not disclose, except for any disclosure required by Laws, such terms to any person other than the respective partners, directors, officers, employees, attorneys, accountants or financing sources of Landlord and Tenant, without the prior written consent of the other party. Notwithstanding the foregoing, Landlord may disclose any information in public notices required by Laws or otherwise traditionally made by entities similar to Landlord and the financial community.

13. Disclosure of Underlying Title Exceptions; Description of Property. Landlord has provided to Tenant a true and correct copy of its title insurance policy covering the property on which the Building is located, as well as Landlord's most current ALTA survey of such property.






11/08/2007 143

**EXHIBIT D**

**Rules And Regulations**

These Rules and Regulations have been adopted by Landlord for the mutual benefit and protection of all the tenants of the Building in order to insure the safety, care and cleanliness of the Building and the preservation of order therein.

1. The sidewalks shall not be obstructed or used for any purpose other than ingress and egress. No tenant and no employees of any tenant shall go upon the roof of the Building without the consent of Landlord.

2. No awnings or other projections shall be attached to the outside walls of the Building.

3. The plumbing fixtures shall not be used for any purpose other than those for which they were constructed, and no sweepings, rubbish, rags or other substances, including Hazardous Substances, shall be thrown therein.

4. No tenant shall cause or permit any objectionable or offensive odors to be emitted from the Demised Premises.

5. The Demised Premises shall not be used for (i) an auction, "fire sale", "liquidation sale", "going out of business sale" or any similar such sale or activity, (ii) lodging or sleeping, or (iii) any immoral or illegal purposes.

6. No tenant shall make, or permit to be made any unseemly or disturbing noises, sounds or vibrations or disturb or interfere with tenants of this or neighboring buildings or premises or those having business with them.

7. Each tenant must, upon the termination of this tenancy, return to the Landlord all keys of stores, offices, and rooms, either furnished to, or otherwise procured by, such tenant, and in the event of the loss of any keys so furnished, such tenant shall pay to the Landlord the cost of replacing the same or of changing the lock or locks opened by such lost key if Landlord shall deem it necessary to make such change.

8. Canvassing, soliciting and peddling in the Building and the Project are prohibited and each tenant shall cooperate to prevent such activity.

9. Landlord will direct electricians as to where and how telephone or telegraph wires are to be introduced. No boring or cutting for wires or stringing of wires will be allowed without written consent of Landlord. The location of telephones, call boxes and other office equipment affixed to the Demised Premises shall be subject to the approval of Landlord.

10. Parking spaces associated with the Building are intended for the exclusive use of passenger automobiles. Except for intermittent deliveries, no vehicles other than passenger automobiles may be parked in a parking space (other than spaces expressly designated on the Plans for truck parking) without the express written permission of Landlord. Trucks may be parked only in truck dock positions and in other paved areas expressly designated for such purpose in the Plans. Trailers may be parked only in paved areas expressly designated for such purpose in the Plans. Neither trucks nor trailers may be parked or staged in (i) areas adjacent to truck docks, serving any portion of the Building, which are intended by Landlord for truck maneuvering or (ii) any driveway, drive aisle or other paved area which provides ingress or egress for cars or trucks to or from any portion of the Building or any street adjoining the Building.

11. No tenant shall use any area within the Project for storage purposes other than the interior of the Demised Premises.

POOR QUALITY



11/08/2007 144

EXHIBIT E

CERTIFICATE OF AUTHORITY
CORPORATION

The undersigned, Secretary of WIRELESS RETAIL, INC., a Texas corporation ("Tenant"), hereby certifies as follows to INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation ("Landlord"), in connection with Tenant's proposed lease of premises in Building C, at Airways Distribution Center, DeSoto County, Mississippi (the "Premises"):

1. Tenant is duly organized, validly existing and in good standing under the laws of the State of Texas, and duly qualified to do business in the State of Mississippi.

2 That the following named persons, acting individually, are each authorized and empowered to negotiate and execute, on behalf of Tenant, a lease of the Premises and that the signature opposite the name of each individual is an authentic signature:

| (name) | (title) | (signature) |
|---|---|---|
| J. DAN McMAHAN | PRESIDENT – CEO | [signature] |
| | | |
| | | |

3. That the foregoing authority was conferred upon the person(s) named above by the Board of Directors of Tenant, at a duly convened meeting held ________, 2003.

[signature]
Secretary

[CORPORATE SEAL]

IMAGING SERVICES



ATL01/11405126v9

3





POOR QUALITY

11/08/2007

145

EXHIBIT F

SNDA

**SUBORDINATION, NON-DISTURBANCE, AND ATTORNMENT AGREEMENT**
(Commercial Real Estate)

THIS AGREEMENT, made effective as of the _____ day of _________, 2003, by and between _______________, a _______________ ("Tenant"), with its principal offices at _______________, and U.S. BANK NATIONAL ASSOCIATION, a national banking association ("Lender"), whose mailing address is c/o Commercial Real Estate Loan Department, 150 4th Avenue North, CN-TN-PL02, Nashville, TN 37219, and/or its participants, successors or assigns.

**WITNESSETH:**

A. WHEREAS, by Lease dated __________, 200__ (hereinafter referred to as the "Lease"), Industrial Developments International, Inc., a Delaware corporation ("Landlord"), leased to Tenant a portion of the building located at and commonly known as _______________ (such building and the land on which the building is located being called the "Property," and the portions of such building leased to Tenant pursuant to the Lease being called the "Premises"); and

B. WHEREAS, Landlord has obtained a loan from Lender secured by, among other things, a deed of trust on the Property (the "Deed of Trust"), and as a condition of such loan, Landlord is required to obtain from Tenant certain written agreements; and

C. WHEREAS, Tenant and Lender desire hereby to establish certain rights, safeguards, obligations and priorities with respect to their respective interests by means of the following agreement.

NOW THEREFORE, for and in consideration of the premises and of the mutual covenants and promises herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tenant and Lender agree as follows:

1. The Lease and the rights of Tenant thereunder are and shall be subject and subordinate to the lien of the Deed of Trust and to all of the terms, conditions and provisions thereof, to all advances made or to be made thereunder, to the full extent of the principal sum, interest thereon and other amounts from time to time secured thereby, and to any renewal, substitution, extension, modification or replacement thereof, including any increase in the indebtedness secured thereby or any supplements thereto. In the event that Lender or any other person (Lender, any other such person and their successors and assigns being referred to herein as the "Purchaser") acquires title to the Property pursuant to the exercise of any remedy provided for in the Deed of Trust or by reason of the acceptance of a deed in lieu of foreclosure, Tenant covenants and agrees to attorn to and recognize and be bound to Purchaser as its new landlord, and subject to the other terms, provisions and conditions of this Agreement, the Lease shall continue in full force and effect as a direct lease between Tenant and Purchaser.

2. So long as the Lease is in full force and effect and Tenant shall not be in default under any provision of the Lease or this Agreement, and no event has occurred which has continued to exist for a period of time (after notice, if any, required by the Lease) as would entitle Landlord to terminate the Lease or would cause, without further action by Landlord, the termination of the Lease or would entitle Landlord to dispossess Tenant thereunder:

a. the right of possession of Tenant to the Property shall not be terminated or disturbed by any steps or proceedings taken by Lender in the exercise of any of its rights under the Deed of Trust;

b. the Lease shall not be terminated or affected by said exercise of any remedy provided for in the Deed of Trust, and Lender hereby covenants that any sale by it of the Property pursuant to the exercise of any rights and remedies under the Deed of Trust or otherwise, shall be made subject to the Lease and the rights of Tenant thereunder.

3. In no event shall Lender or any other Purchaser be:

a. liable for any act or omission of any prior landlord;

b. liable for the return of any security deposit which has not been delivered to the Purchaser;




POOR QUALITY

11/08/2007 146

c. subject to any offsets or defenses which Tenant might have against any prior landlord;

d. bound by any payment of rent or additional rent which Tenant might have paid to any prior landlord for more than the current month.

4. Tenant agrees to give prompt written notice to Lender of any default by Landlord under the Lease which would entitle Tenant to cancel the Lease or abate the rent payable thereunder, and agrees that notwithstanding any provision of the Lease, no notice of cancellation thereof shall be effective unless Lender has received the notice aforesaid and has failed within 30 days of the date of receipt thereof to cure, or if the default cannot be cured within 30 days, has failed to commence and to pursue diligently the cure of Landlord's default which gave rise to such right of cancellation or abatement. Tenant further agrees to give such notices to any successor-in-interest of Lender, provided that such successor-in-interest shall have given written notice to Tenant of its acquisition of Lender's interest in the Deed of Trust and designated the address to which such notices are to be sent.

5. Tenant acknowledges that Landlord has executed and delivered to Lender an Assignment of Rents and Leases conveying the rentals under the Lease as additional security for said loan, and Tenant hereby expressly consents to and recognizes such Assignment, and agrees to pay the rent to Lender or its nominee whenever Lender claims or requests the rent under the terms of said Assignment.

6. Tenant agrees that it will not, without the prior written consent of Lender, do any of the following, and any such purported action without such consent shall be void as against Lender:

a. make a prepayment in excess of one month of rent under the Lease;

b. subordinate or permit subordination of the Lease to any lien subordinate to the Deed of Trust; or

c. make or enter into any amendment or modification or termination of the Lease.

7. Tenant agrees to certify in writing to Lender, upon request, whether or not any default on the part of Landlord exists under the Lease and the nature of any such default. Tenant states that as of this date, the Lease is in full force and effect, without modification, a copy of said Lease being attached hereto Tenant further states as follows:

a. Tenant is the tenant under the Lease for the Premises, which contain approximately ________ rentable square feet of space.

b. Tenant has accepted possession of the Premises pursuant to the Lease. The Lease term commenced on __________, 200__. The termination date of the Lease term, excluding renewals and extensions, is __________, 20___. Tenant has the right to extend or renew the Lease for ________ period(s) of ________ years.

c. Any improvements required by the terms of the Lease to be made by Landlord have been completed to the satisfaction of Tenant in all respects, and Landlord has fulfilled all of its duties under the Lease.

d. The Lease has not been assigned, modified, supplemented or amended in any way by Tenant. The Lease constitutes the entire agreement between the parties and there are no other agreements concerning the Premises, and Tenant is not entitled to receive any concession or benefit (rental or otherwise) or other similar compensation in connection with renting the Premises other than as set forth in the Lease.

e. The Lease is valid and in full force and effect, and, to the best of Tenant's knowledge, no party thereto is presently in default thereunder. Tenant has no defense, set-off or counterclaim against Landlord arising out of the Lease or in any way relating thereto, and no event has occurred and no condition exists, which with the giving of notice or the passage of time, or both, will constitute a default under the Lease.

f. No rent or other sum payable under the Lease has been paid more than one month in advance.

g. The amount of the security deposit, if any, to secure Tenant's performance under the Lease is $________.

8. The foregoing provisions shall be self-operative and effective without the execution of any further instruments on the part of either party hereto. However, Tenant agrees to execute and deliver to



POOR QUALITY

11/08/2007 147

Lender or to any person to whom Tenant herein agrees to attorn to such other instruments as either shall request in order to effect said provisions.

9. The agreements herein contained shall be binding upon and shall inure to the benefit of the parties hereto, their respective successors and assigns, and, without limiting such, the agreements of Lender shall specifically be binding upon any Purchaser of the Property at foreclosure or otherwise.

10. This Agreement may not be modified other than by an agreement in writing signed by the parties hereto or their respective successors.

11. This Agreement may be signed in counterparts.

12. If any term or provision of this Agreement shall to any extent be held invalid or unenforceable, the remaining terms and provisions hereof shall not be affected thereby, but each term and provision hereof shall be valid and enforceable to the fullest extent permitted by law.

13. All notices, statements and other communications to be given under the terms of this Agreement shall be in writing and delivered by hand against written receipt or sent by certified or registered mail, return receipt requested, postage prepaid and addressed as provided in the first paragraph of this Agreement, or at such other address as from time to time designated by the party receiving the notice.

IN WITNESS WHEREOF, Tenant and Lender have caused this instrument to be executed as of the day and year first above written.

TENANT:

______________________

By:______________
Name:______________
Title:______________

LENDER:

U.S. BANK NATIONAL ASSOCIATION

By:______________
Name:______________
Title:______________

*AGREED:*

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC.

By:______________
Name:______________
Title:______________

IMAGING SERVICES

IMAGING SERVICES

POOR QUALITY

11/08/2007 148

STATE OF ___________
COUNTY OF ___________, ss:

The foregoing instrument was acknowledged before me this _____ day of ___________, 2003, by ___________, ___________ of ___________, a ___________, on behalf of the ___________.

___________________
Notary Public

STATE OF ___________
COUNTY OF ___________, ss:

The foregoing instrument was acknowledged before me this _____ day of ___________, 2003, by ___________, ___________ of U.S. Bank National Association, a national banking association, on behalf of the national banking association.

___________________
Notary Public

IMAGING SERVICES

IMAGING SERVICES



POOR QUALITY

11/08/2007 149

EXHIBIT G

FORM OF MEMORANDUM OF LEASE

WHEN RECORDED RETURN TO:

Helen D. Shapiro, Esq.
Greenberg Traurig, LLP
2375 E. Camelback Road, Suite 700
Phoenix, Arizona 85016

MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE shall evidence that there is in existence a Lease as hereinafter described. It is executed by the parties hereto for recording purposes only as to the Lease hereinafter described, and it is not intended and shall not modify, amend, supersede or otherwise effect the terms and provisions of said Lease.

| | | |
|---|---|---|
| 1. | Name of Document: | INDUSTRIAL LEASE AGREEMENT |
| 2. | | Name of Landlord: INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation |
| 3. | Name of Tenant: | WIRELESS RETAIL, INC., a Texas corporation |
| 6. | Date of Lease: | _____________, 2003 |
| 7. | Initial Lease Term: | Five years, commencing on _____________, 2003 and ending _____________, 2008. |
| 8. | Option to Extend: | Lessee has the option to extend the initial lease term for two (2) additional periods of five (5) years each. |
| 9 | Demised Premises: | Approximately 177,039 square feet in the building located on the real property more particularly described in Exhibit "A" attached hereto, together with the improvements thereon. |

[Signature Pages Follow]

IMAGING SERVICES

IMAGING SERVICES



ATL01/11405526v9



POOR QUALITY



11/08/2007 15:50

IN WITNESS WHEREOF, the Parties have executed this Memorandum of Lease as of the day and year first written above.

Date:

LANDLORD:

INDUSTRIAL DEVELOPMENTS INTERNATIONAL, INC., a Delaware corporation

By:
Name:
Title:

Attest:
Name:
Title:

[CORPORATE SEAL]

Date:

TENANT:

WIRELESS RETAIL, INC., a Texas corporation

By:
Name:
Title:

Attest:
Name:
Title:

[CORPORATE SEAL]

IMAGING SERVICES

POOR QUALITY



ATTESTATION

Landlord:

STATE OF

COUNTY OF

BEFORE ME, a Notary Public in and for said County, personally appeared ____________ and ____________, known to me to be the person(s) who, as ____________ and ____________, respectively, of Industrial Developments International, Inc., the corporation which executed the foregoing instrument in its capacity as Landlord, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this day of , 2003.

Notary Public
My Commission Expires:

Tenant:

STATE OF

COUNTY OF

BEFORE ME, a Notary Public in and for said County, personally appeared ____________ and ____________, known to me to be the person(s) who, as ____________ and ____________, respectively, of Wireless Retail, Inc., the corporation which executed the foregoing instrument in its capacity as Tenant, signed the same, and acknowledged to me that they did so sign said instrument in the name and upon behalf of said corporation as officers of said corporation, that the same is their free act and deed as such officers, respectively, and they were duly authorized thereunto by its board of directors; and that the seal affixed to said instrument is the corporate seal of said corporation.

IN TESTIMONY WHEREOF, I have hereunto subscribed my name, and affixed my official seal, this day of , 2003.

Notary Public
My Commission Expires:

POOR QUALITY

11/08/2007

152

EXHIBIT H

CONVEYOR SYSTEM






ATL01/11405526v9

POOR QUALITY

11/08/2007

**SCHEDULE B**

Special Terms and Conditions Applicable to Sublease of Equipment described on Exhibit B to the Sublease.

The Subleased Equipment affected by this Schedule B of this Sublease is subject to that certain Master Lease Agreement between Sublessor's predecessor in interest Wireless Retail, Inc., as Lessee, and General Electric Capital Corporation as Lessor dated as of July 3, 2003. For purposes of this Schedule B, Sublandlord under the Sublease is referred to as Sublessor and Warehouse 86, LLC is referred to as Sublessee.

1. TERM:

The term of the Equipment Sublease shall commence on July 14, 2006. The Sublease with respect to Material Handling Equipment (as designated on Exhibit B to the Sublease) will expire at September 30, 2007 and the Sublease with respect to Conveyor/Racking and Miscellaneous Owned Equipment (as designated on Exhibit B to the Sublease) will expire at 12:00 midnight on September 30, 2008, or at such earlier time as the Sublease terminates.

2. TAXES:

(a) If permitted by law, Sublessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Subleased Equipment (or purchase. ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), Lessor, Sublessor or Sublessee by any governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes"). Sublessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Sublessor. Sublessee shall promptly reimburse Sublessor (on an after tax basis) for any Taxes charged to or assessed against Sublessor. Sublessee shall show Sublessor as the owner of the Equipment on all tax reports or returns, and send Sublessor a copy of each report or return and evidence of Sublessee's payment of Taxes upon request.

(b) Sublessee's obligations, and Sublessor's rights and privileges, contained in this Section 2 shall survive the expiration or other termination of this Agreement.

3. REPORTS:

(a) If any tax or other lien shall attach to any Subleased Equipment, Sublessee will notify Sublessor in writing, within ten (10) days after Sublessee becomes aware of the tax or lien. The notice shall include the full particulars of the tax or lien and the location of such Subleased Equipment on the date of the notice

POOR QUALITY

11/08/2007 15:54

(b) Sublessee will deliver to Sublessor, Sublessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Sublessee. Sublessee will deliver to Sublessor copies of Sublessee's quarterly financial report certified by the chief financial officer of Sublessee, within ninety (90) days of the close of each fiscal quarter of Sublessee, Sublessee will deliver to Sublessor all forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c) Sublessor may inspect any Subleased Equipment during normal business hours after giving Sublessee reasonable prior notice.

(d) Sublessee will keep the Subleased Equipment at the Subleased Premises and will give Sublessor prior written notice of any relocation of Subleased Equipment. If Sublessor asks, Sublessee will promptly notify Sublessor in writing of the location of any Subleased Equipment

(e) If any Subleased Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000), or is otherwise involved in an accident causing personal injury or property damage. Sublessee will promptly and fully report the event to Sublessor in writing.

(f) Sublessee will promptly notify Sublessor of any change in Sublessee's state of incorporation or organization.

4. DELIVERY, USE AND OPERATION:

(a) Sublessee agrees that the Subleased Equipment will be used by Sublessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Sublessee shall not discontinue use of the Subleased Equipment.

(b) Sublessee will not move any equipment from the Subleased Premises, without the prior written consent of Sublessor.

(c) Sublessee will keep the Subleased Equipment free and clear of all liens and encumbrances other than those which result from acts of Sublessor.

(d) Sublessor shall not disturb Sublessee's quiet enjoyment of the Subleased Equipment during the term of the Agreement unless a default has occurred and is continuing under the Agreement.

5. MAINTENANCE:

(a) Sublessee will, at its sole expense, maintain each unit of Subleased Equipment in good operating order and repair, normal wear and tear excepted. The Sublessee shall also maintain the Subleased Equipment in accordance with manufacturer's recommendations Sublessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement. If Sublessor requests, Sublessee shall affix plates, tags or other identifying labels showing ownership thereof by Sublessor. The tags or labels shall be placed in a prominent position on each unit of Subleased Equipment.

POOR QUALITY



(b) Sublessee will not attach or install anything on any Subleased Equipment that will impair the originally intended function or use of such Subleased Equipment without the prior written consent of Sublessor. All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached to any Subleased Equipment that is not readily removable shall become the property of Sublessor, until Subleased Equipment is purchased by Subtenant in accordance with Sublease section 6. (c). All Additions shall be made only in compliance with applicable law. Sublessee will not attach or install any Subleased Equipment to or in any other personal or real property without the prior written consent of Sublessor

6. STIPULATED LOSS VALUE: If for any reason any unit of Subleased Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ("Casualty Occurrences") Sublessee shall promptly and fully notify Sublessor in writing. Sublessee shall pay Sublessor the sum of (i) the Stipulated Loss Value (as set out on the list of Stipulated Loss Values attached to the Master Lease Agreement as Exhibit C of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; (ii) all rent and which are then due under the Sublease on the Payment Date for the affected unit The Payment Date shall be the next rent payment date after the Casualty Occurrence. Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate.

7. INSURANCE:

(a) Sublessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Subleased Equipment from any cause whatsoever.

(b) Sublessee agrees, at its own expense, to keep all Subleased Equipment insured for such amounts and against such hazards as Sublessor may reasonably require All such policies shall be with companies, and on terms, reasonably satisfactory to Sublessor The insurance shall include coverage for damage to or loss of the Subleased Equipment; liability for personal injuries, death or property damage Sublessor shall be named as additional insured with a loss payable clause in favor of Sublessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Sublessee The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION US DOLLARS ($1,000,000.00) total liability per occurrence. The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Subleased Equipment. No insurance shall be subject to any co-insurance clause. The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Sublessor, Sublessee agrees to deliver to Sublessor evidence of insurance reasonably satisfactory to Sublessor.

(c) Sublessee hereby appoints Sublessor as Sublessee's attorney-in-fact with power to appoint Lessor as a substitute attorney-in-fact, to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments. Sublessor shall not act as Sublessee's attorney-in-fact and will not appoint Landlord as substitute attorney in fact, unless Sublessee is in default. Sublessee shall pay any reasonable expenses of Sublessor and Lessor in adjusting or collecting insurance. Sublessee will not make adjustments with insurers except with respect to claims for damage to any unit of Subleased Equipment where the repair costs are less than the

POOR QUALITY

11/08/2007 156

lesser of ten percent (10%) of the original Subleased Equipment cost or Ten Thousand Dollars and 00/100 ($10,000.00). Sublessor or Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Subleased Equipment or any portion thereof, or (ii) satisfy any obligation of Sublessee to Sublessor under this Agreement.

8. RETURN OF EQUIPMENT:

(a) At the expiration of the Term of this Sublease with respect to any equipment, Sublessee shall perform any testing and repairs required to place the units of Subleased Equipment in the same condition and appearance as when received by Sublessee (reasonable wear and-tear excepted) and in good working order for the original intended purpose of the Subleased Equipment. If required the units of Subleased Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor. Sublessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Subleased Equipment. All Subleased Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Subleased Equipment was originally intended to be used. All waste material and fluid must be removed from the Subleased Equipment and disposed of in accordance with then current waste disposal laws.

(b) Until Sublessee has fully complied with the requirements of Section 8(a) above, Sublessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term Sublessor may terminate the Sublessee's right to use the Subleased Equipment upon thirty (30) days notice to Sublessee.

(c) Sublessee shall provide to Sublessor a detailed inventory of all components of the Subleased Equipment including model and serial numbers Sublessee shall also provide an up-to-date copy of all other documentation pertaining to the Subleased Equipment. All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Sublessor at least one hundred (100) days and not more than one hundred twenty (120) days prior to lease termination.

(d) Sublessee shall make each item of the Subleased Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination for that item of Subleased Equipment, Sublessor shall provide Sublessee with reasonable notice prior to any inspection Sublessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Subleased Equipment

9. DEFAULT AND REMEDIES:

(a) Sublessor may in writing declare this Agreement in default if: (i) Sublessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Sublessee breaches any of its insurance obligations under Section 7 of this Schedule A; (iii) Sublessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Sublessor; (iv) any representation or warranty made by Sublessee in connection with this Agreement shall be false or misleading in any material respect; (v)

POOR QUALITY

11/08/2007 15:

Sublessee or any guarantor or other obligor for the Sublessee's obligations hereunder ("Guarantor") becomes insolvent or ceases to do business as a going concern; (vi) any Subleased Equipment is illegally used; (vii) if Sublessee or any Guarantor is a natural person, any death or incompetence of Sublessee or such Guarantor; or (viii) a petition is filed by or against Sublessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date.

(b) After a default, at the request of Sublessor, Sublessee shall comply with the provisions of Section 8(a) Sublessee hereby authorizes Sublessor or Lessor to peacefully enter any premises where any Subleased Equipment may be add take possession of the Subleased Equipment Sublessee shall immediately pay to Sublessor without further demand as liquidated damages for loss of a bargain and not as a penalty, all rents and other sums then due under the Sublease (calculated as of the rent payment date prior to the declaration of default). Sublessor may terminate this Agreement as to any or all of the Subleased Equipment. A termination shall occur only upon written notice by Sublessor to Sublessee . Sublessor may, but shall not be required to, sell Subleased Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Subleased Equipment present at the place of sale Sublessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Subleased Equipment. Sublessor or Lessor may use Subleased premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise. The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities: (i) to pay all of Sublessor's costs, charges and expenses incurred in taking. removing, holding, repairing and selling, leasing or otherwise disposing of Subleased Equipment: then, (ii) to the extent not previously paid by Sublessee, to pay Sublessor all sums due from Sublessee under this Agreement; then (iii) to reimburse to Sublessee any sums previously paid by Sublessee as liquidated damages; and (iv) any surplus shall be retained by Sublessor. Sublessee shall immediately pay any deficiency in (i) and (ii) above.

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute Sublessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising Sublessee shall pay Sublessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Sublessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted. Waiver of any default shall not be a waiver of any other or subsequent default

(d) Any default under the terms of this or any other agreement between Sublessor and Sublessee may be declared by Sublessor a default under this and any such other agreement

10. ASSIGNMENT: SUBLESSEE SHALL NOT SELL. TRANSFER, ASSIGN, ENCUMBER. OR SUBLET ANY SUBLEASED EQUIPMENT OR THE INTEREST OF SUBLESSEE IN THE SUBLEASED EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR AND SUBLESSOR. Sublessor may, without the consent of Sublessee, assign the Agreement. Sublessee agrees that if Sublessee receives written notice of an assignment from Sublessor, Sublessee will pay all rent and all other amounts payable with respect to any Subleased Equipment under this Schedule A to such assignee or as instructed by Sublessor. Sublessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee Sublessee hereby waives and agrees not to assert against any



11/08/2007

such assignee any defense, set-off, recoupment claim or counterclaim which Sublessee has or may at any time have against Sublessor for any reason whatsoever

11. NET LEASE: Sublessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Subleased Equipment is damaged or destroyed, if it is defective or if Sublessee no longer can use it. Sublessee is not entitled to reduce or set-off against rent or other amounts due to Sublessor or to anyone to whom Sublessor assigns this Agreement whether Sublessee's claim arises out of this Agreement, any statement by Sublessor, Sublessor's liability or any manufacturer's liability, strict liability, negligence or otherwise

12. INDEMNIFICATION:

(a) Sublessee hereby agrees to indemnify Lessor and Sublessor, their agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Subleased Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's or Sublessor's gross negligence or willful misconduct ("Claims").

This indemnity shall include, but is not limited to. Lessor's or Sublessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Subleased Equipment, the ownership of Subleased Equipment during the term of this Agreement, and the delivery, lease, possession. maintenance, uses,. condition, return or operation of Subleased Equipment (including, without limitation. latent and other defects, whether or not discoverable by Sublessor or Sublessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Subleased Equipment sold or disposed of after use by Sublessee, any Sublessee or employees of Sublessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing

(b) Sublessor At no time during the term of this Agreement will Sublessee take or omit to take, nor will it permit any Sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or Sublessor or by this Agreement), which will result in the disqualification of any Subleased Equipment for, or recapture of, all or any portion of tax benefits accruing to Lessor with respect to the Subleased Equipment.

(c) If as a result of a breach of any representation, warranty or covenant of the Sublessee contained in the Master Lease (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Subleased Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "Loss"), then Sublessee shall pay to Lessor, as an indemnity an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred. Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were

POOR QUALITY

used by Lessor in originally evaluating the transaction ("Net Economic Return") . If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted. Sublessee shall indemnify and hold Sublessor harmless from any cost or liability to Lessor under this paragraph.

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member. All of Lessor's and Sublessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement. The rights, privileges and indemnities contained herein are expressly made for the benefit of and shall be enforceable by Lessor, and/or Sublessor, and their successors and assigns

15. DISCLAIMER: SUBLESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE SUBLEASED EQUIPMENT WITHOUT ANY ASSISTANCE FROM SUBLESSOR, ITS AGENTS OR EMPLOYEES. SUBLESSOR DOES NOT MAKE, HAS NOT MADE, NOR. SHALL BE DEEMED TO MAKE OR. HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE SUBLEASED EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR. WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK. OR. COPYRIGHT INFRINGEMENT, OR TITLE All such risks, as between Sublessor and Sublessee, are to be borne by Sublessee. Without limiting the foregoing, Sublessor shall have no responsibility or liability to Sublessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Subleased Equipment, any inadequacy thereof any deficiency or defect (latent or otherwise) of the Subleased Equipment, or any other circumstance in connection with the Subleased Equipment; (ii) the use, operation or performance of any Subleased Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Subleased Equipment. If, and so long as, no default exists under this Agreement and the Sublease, Sublessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Sublessor may have against any Supplier of the Subleased Equipment at Sublessee's sole cost and expense, in the name of and for the account of Sublessor and/or Sublessee, as their interests may appear

16. REPRESENTATIONS AND WARRANTIES OF SUBLESSEE; Sublessee makes each of the following representations and warranties to Sublessor;

(a) Sublessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents") Sublessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdictions) where the Subleased Equipment is or is to be located;

(b) The Documents have been duly authorized, executed and delivered by Sublessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws;

POOR QUALITY

11/08/2007

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Sublessee of the Documents except such as have already been obtained;

(d) The entry into and performance by Sublessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Sublessee or any provision of Sublessee's Certificate of Incorporation or bylaws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Subleased Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Sublessee is a party;

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Sublessee, which if decided against Sublessee will have a material adverse effect on the ability of Sublessee to fulfill its obligations under this Agreement;

(f) The Subleased Equipment is and will remain tangible personal property;

(g) Each financial statement delivered to Sublessor has been prepared in accordance with generally accepted accounting principles consistently applied. Since the date of the most recent financial statement, there has been no material adverse change;

(h) Sublessee's exact legal name is as set forth in the first sentence of the Sublease and Sublessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of the Sublease );

(i) The Subleased Equipment will at all times be used for commercial or business purposes as defined in the Sublease;

(j) Sublessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Sublessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

17. PURCHASE OPTION:

(a) Pursuant to Sublease Section 6.(c), Sublessee may at Sublease expiration purchase the Subleased Equipment on an AS IS BASIS for cash equal to the sum of Six Hundred Sixty Nine Thousand Dollars and 00/100 ($669,000.00) plus all applicable sales taxes. Sublessee must notify Sublessor of its intent to purchase the Subleased Equipment in writing as follows; (i) Material Handling Equipment notice received by Sublandlord on or before March 15, 2007, payment of Sixty Nine Thousand Dollars and 00/100 ($69,000) plus sales tax (if applicable)

POOR QUALITY

11/08/2007

must be received by Sublandlord on or before September 15, 2007; (ii) Conveyor/Racking and Miscellaneous Owned Equipment notice received by Sublandord on or before April 15, 2008, payment of Six Hundred Thousand Dollars and 00/100 ($600,000) plus sales tax (if applicable) must be received by Sublandlord on or before August 15, 2008. If Sublessee is in default or if the Sublease has already been terminated Sublessee may not purchase the Subleased Equipment.

161

18. MISCELLANEOUS:

(a) SUBLESSEE AND SUBLESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN SUBLESSEE AND SUBLESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN SUBLESSEE AND SUBLESSOR. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT. THIS WAIVER IS IRREVOCABLE. THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING. THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT, ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION. THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

(b) The Subleased Equipment shall remain Lessor's property unless Sublessor purchases the Subleased Equipment from Lessor and until such time Sublessee shall only have the right to use the Subleased Equipment as a Sublessee. Any cancellation or termination by Lessor of the Master Lease Agreement, any Schedule, supplement or amendment hereto, or the lease of any Subleased Equipment hereunder shall not release Sublessee from any then outstanding obligations to Sublessor hereunder. All Subleased Equipment shall at all times remain personal property of Lessor even though it may be attached to real property. The Subleased Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property.

(c) If Sublessee does not comply with any provision of this Agreement, Sublessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part. All reasonable amounts spent and obligations incurred or assumed by Sublessor in effecting such compliance shall constitute additional rent due to Sublessor. Sublessee shall pay the additional rent within five (5) days after the date Sublessor sends notice to Sublessee requesting payment. Sublessee's effecting such compliance shall not be a waiver of Sublessee's default.

(d) Any rent or other amount not paid to Sublessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law. Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto.

(e) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN

POOR QUALITY

11/08/2007

ACCORDANCE WITH, THE INTERNAL. LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE SUBLEASED EQUIPMENT.

(f) Any cancellation or termination by Sublessor, pursuant to the provisions of this Agreement, supplement or amendment hereto, of the lease of any Subleased Equipment hereunder, shall not release Sublessee from any then outstanding obligations to Sublessor hereunder.

(g) Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively. the "Transactions"). Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1.6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended- and shall be construed in a manner consistent with such purpose In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions.

POOR QUALITY

11/08/2007 1:23

## ASSIGNMENT

WHEREAS, Industrial Developments International Inc., a Delaware Corporation ("Landlord") and Wireless Retail, Inc, a Texas corporation ("Tenant"), entered into that certain lease dated August 1, 2003, relating to certain space known as Suite 110 in the Airways Distribution Center located at 481 Airport Industrial Drive, Southaven, Mississippi (collectively the "Prime Lease");

WHEREAS, SC Kiosks, Inc., a Delaware corporation is the successor in interest to Wireless Retail, Inc. by assignment dated October 1, 2004;

WHEREAS, by Sublease of even date herewith, between SC Kiosks, Inc., as "Sublandlord" and Warehouse 86, LLC, an Arizona limited liability company as "Subtenant," (the "Sublease") Subtenant has subleased from Sublandlord the space subject to the Prime Lease (the "Subleased Premises");

WHEREAS, by agreement dated _______________, Subtenant has contracted with UPS Oasis Supply Corp., ("UPS") to perform certain services to and on behalf of UPS ("Service Agreement") and will use the Subleased Premises in the performance thereunder. Pursuant to the Service Agreement UPS is obligated to pay to Subtenant certain sums in the event that UPS terminates the service agreement for its convenience as provided therein (the "Termination Fees"); and

WHEREAS, the execution and delivery of this Assignment by Subtenant is a condition of the Sublease;

NOW, THEREFORE, to induce Sublandlord to enter into the Sublease agreement, to secure payment of sums owed to Sublandlord under the Sublease:

1. <u>Assignment</u>. Subtenant hereby assigns to Sublandlord all its right to receive Termination Fees from UPS as provided in the Service Agreement in an amount not to exceed the amount of all sums owed or to be owed, which are due and to become due to Sublandlord from Subtenant under the terms of the Sublease for any remaining term of the Sublease. Sublandlord shall have first priority in receipt of sums owed to Subtenant as Termination Fees until such time as all sums owed to Sublandlord under the Sublease are paid in full.

2. <u>Direction to Pay</u>. By this assignment, Subtenant agrees to make payments of Termination Fees directly to Sublandlord

3. <u>Secured Debt</u>. This Assignment is made to secure the payment by Assignor to Assignee of the following described obligations (collectively, the "Secured Debt"):

(a) The payment and performance by Assignor of all of Assignor's Obligations for rent and other sums due to Assignee, under the terms of the Sublease The term

POOR QUALITY

11/08/2007

"Obligations" includes but is not limited to the rents and other sums owed or to become due which are or may become payable by Assignor to Assignee under the Sublease; and

(b) All reasonable costs incurred by Assignee to obtain, preserve, and enforce this Assignment, collect the Secured Debt, and maintain and preserve the Leases and the Rents, including specifically, but without limitation, Assignee's reasonable attorneys' fees, disbursements and legal expenses.

1614

4. Assignor's Warranties and Representations.

(a) Ownership of Right to Payment. Assignor is the owner and holder of the right to receive payment of the Termination Fees, and all requisite right, power and authority to assign Assignor's interest in the Termination Fees and the right to receive them, and no other person, firm or corporation has any right, title or interest therein.

(b) No Defaults. Assignor has substantially performed all and singular the terms, covenants, conditions and warranties of the Service Agreement on Assignor's part to be kept, observed and performed.

(c) No Modification of Service Agreement. The Service Agreement is valid and enforceable by Assignor and unmodified except as indicated herein and is in full force and effect; Assignor has not previously sold, assigned, transferred, mortgaged or pledged the Termination Fees or the right to receive Termination Fees, whether now due or hereafter to become due.

(d) Assignability. The right of Assingor to receive Termination Fees under the Service Agreement is assignable, and this assignment is not a breach of the Service Agreement.

5. Assignor's Covenants and Agreements.

(a) Performance. Assignor shall observe, perform and discharge punctually all and singular the obligations, terms, covenants, conditions and warranties of the Sublease, the Service Agreement and this Assignment, and Assignor shall give prompt notice to Assignee of any failure on the part of Assignor to observe, perform and discharge the same.

(b) Modification of Service Agreement. Without obtaining in each instance the prior written consent of Assignee, Assignor shall not cancel, terminate or consent to any surrender of the Service Agreement nor modify or in any way materially alter the terms thereof, including without limitation the rights to receive Termination Fees under Article 11.

POOR QUALITY



(c) Financing Statement. Sublandlord may file a UUC financing statement to perfect its claim against the sums assigned hereunder, and Subtenant shall sign and deliver to Sublandlord all instruments, documents, or other writings that may be necessary to perfect Sublandlord's security interest in the sums assigned.



(d) . Collection of Termination Fee. In the event of termination of the Service Agreement by UPS under circumstances in which UPS becomes obligated to pay a Termination Fee, Landlord will submit to Subtenant a statement reflecting the full amount of rent and other sums that may come due through the entire remaining term of the Sublease, and may submit a copy of the statement to UPS accompanied by a demand for payment of such amount. Sublandlord may accelerate the due date of all sums to be paid thereunder and apply the amounts received under this Assignment to such sum without terminating the Sublease or without accelerating the due date of any sum due, hold the Termination Fee received and apply a portion to pay any monthly rent payment or other sums owed on their due date. If Subtenant fails to pay to Assignee any portion of a Termination Fee which is payable under the Service Agreement within 30 days of the notice by Sublessor to UPS of the amount payable, Assignee may by written notice to Assignor and terminate the Sublease and regain possession of the leased premises.

7. Default. Assignor shall be in default under this Assignment upon the occurrence of any of the following events or conditions:

(a) If Assignor shall fail, refuse or neglect to pay, in full, any portion or installment of the Secured Debt when same shall become due and payable as agreed by Assignor and Assignee, whether at the due date thereof stipulated in the Sublease or other instrument evidencing the Secured Debt, or by acceleration or otherwise.

(b) If any representation, warranty or covenant made by Assignor, under or pursuant to the Service Agreement, the Sublease, this Assignment or otherwise executed in connection with the Sublease shall be false or misleading in any material respect.

(c) If Assignor shall (a) procure the voluntary or allow the involuntary appointment of a receiver, trustee or liquidator for himself or for all or any part of his property, (b) file any petition seeking a discharge, rearrangement or reorganization of his debts, pursuant to the bankruptcy laws or any other debtor relief laws of the United States or any state or any other competent jurisdiction, (c) make a general assignment for the benefit of his creditors, or (d) admit in writing his inability to pay his debts as they mature.

(d) If (a) a petition is filed against Assignor seeking relief under the bankruptcy, arrangement, reorganization or other debtor relief laws of the United States or any state or other competent jurisdiction and such proceeding is not vacated or dismissed within ninety (90) days of the filing thereof, or (b) a court of competent

POOR QUALITY

11/08/2007

jurisdiction enters an order, judgment or decree appointing, without the consent of Assignor, a receiver or trustee for him, or for all or any part of his property.

(e) If UPS terminates the Service Agreement for any reason.

1196

(f) Any event which results in the acceleration of the maturity of the Debt of Assignor to others under any note, security agreement, mortgage or agreement or undertaking of any kind whatsoever.

(g) Levy on, seizure, or attachment of the Lessor's interest in the Service Agreement, or any part thereof.

8. Remedies. Upon or at any time after the occurrence of an event of default hereunder, Assignee at its option shall have the complete right, power and authority hereunder then or at any time thereafter to exercise and enforce any or all of the following rights and remedies:

(a) to demand, collect, receive, sue for, attach and levy on the Termination Fees and the right to receive the Termination Fees, and give proper receipts, releases and acquittances therefor, and after deducting all necessary and proper costs and expenses of operation and collection, as reasonably determined by Assignee, including reasonable attorneys' fees, and apply the net proceeds thereof, together with any funds of Assignor deposited with Assignee, in reduction or payment of the Secured Debt in such order of priority as Assignee may, in its sole discretion, determine;

(b) to declare all sums secured hereby immediately due and payable and, at the option of Assignee, exercise all of the rights and remedies contained in the Sublease and this Assignment;

(c) to exercise all rights under this Assignment; and

9. Exculpation of Assignee. The acceptance by Assignee of this Assignment with all of the rights, powers, privileges and authority created hereby shall not be deemed or construed to constitute assumption by Assignee of any obligation under the Service Agreement.

10. No Waiver. The collection of the Termination Fees as provided for in this Assignment shall not be deemed to cure or waive any default or waive, modify or affect any notice of default under the Sublease or invalidate any act done pursuant to any such notice.

11. Continuation - Termination. Upon payment and discharge in full of the Secured Debt and of all sums payable hereunder, this Assignment shall become and be void and of no force or effect, but the affidavit of any officer of Assignee stating that any part of the Secured Debt remains unpaid and undischarged shall be and constitute conclusive

POOR QUALITY

11/08/2007

evidence of the validity, effectiveness and continuing force of this Assignment, and any person, firm or corporation may and is hereby authorized to rely thereon.

12. Notices. All notices, demands or documents of any kind which Assignee may be required or may desire to serve upon Assignor hereunder shall be sufficiently served and shall be deemed delivered by personal delivery to Assignor or by depositing a copy thereof addressed to Assignor at the address of Assignor set forth herein or by depositing a copy thereof in the United States mail, postage prepaid and addressed to Assignor at such address.

167

13. Modifications. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provision so modified or limited and signed by both Assignor and Assignee, nor by course of conduct, usage of trade, or by the law merchant.

14. Applicable Law. This Assignment shall be construed according to the laws of the State of Texas.

15. Venue. It is agreed that venue in any proceeding hereunder shall be in Tarrant County, Texas.

IMAGING SERVICES

IMAGING SERVICES

11/08/2007

POOR QUALITY

168

IN WITNESS WHEREOF, this Assignment is effective as of June ____, 2006.

ADDRESS:
P.O. Box 17361
Memphis TN 38187

ASSIGNOR:
Warehouse 86, LLC

By: [signature]
Name: Ernest K. Strahan, III
Title: CFO

ADDRESS:
300 RadioShack Circle
Fort Worth, TX 76102
MS-CF6-314

ASSIGNEE:
SC Kiosks, Inc.

By: [signature]
Name: DAVID S. GOLDBERG
Title: VP SC Kiosks, Inc.

[signature]

IMAGING SERVICES



11/08/2007 169

CONSENT TO SUBLEASE

WHEREAS, Industrial Property Fund VI, LLC, a Delaware limited liability company (successor-in-interest to Industrial Developments International, Inc., the "Prime Lessor"), is the "Landlord" under that certain Industrial Lease Agreement dated August 1, 2003, by and between Prime Lessor and SC Kiosks, Inc. (successor-in-interest to Wireless Retail, Inc., "Lessor"), as "Tenant" (said Lease, as the same was heretofore modified, being hereinafter collectively referred to as the "Prime Lease") with respect to premises (the "Leased Premises") more particularly described in the Prime Lease located within that certain building having a street address of 481 Airport Industrial Drive, Southaven, Mississippi (the "Building").

WHEREAS, Lessor has requested that Prime Lessor consent to the execution and delivery of a certain Sublease dated as of July 11, 2006 (the "Sublease") effecting a subleasing of the Leased Premises by the Lessor to Warehouse 86, LLC (the "Sublessee"), all as more particularly set forth in the Sublease.

NOW, THEREFORE, the undersigned does hereby consent to the execution and delivery by and between Lessor and Sublessee of the Sublease in the form annexed hereto as Exhibit A and made a part hereof, by the terms of which, among other matters, Lessor subleases to Sublessee the Leased Premises, all as more particularly described in the Sublease, upon and subject to the following representations, terms and conditions:

1. As a condition to the effectiveness hereof Prime Lessor shall be furnished with a counterpart of this instrument duly executed by Lessor and Sublessee acknowledging the accuracy of their respective representations contained and their acceptance of the conditions herein set forth. Lessor shall pay Prime Lessor an amount equal to the legal fees (not to exceed $1,500) and disbursements sustained or incurred by Prime Lessor in connection with the preparation, negotiation and finalization of this Consent and the matters contemplated hereby.

2. This instrument shall not, unless otherwise expressly set forth herein:

(a) constitute a consent or approval by Prime Lessor of any of the terms, covenants or conditions of the Sublease and Prime Lessor shall not be bound thereby;

(b) be construed to modify, waive or affect (i) any of the terms, covenants or conditions of the Prime Lease, (ii) any of Lessor's obligations under the Prime Lease, or to waive any breach thereof or (iii) any rights of Prime Lessor under the Prime Lease; and;

(c) be construed to enlarge or increase Prime Lessor's obligations under the Prime Lease, to establish Sublessee as the party entitled to the performance or benefit of any such obligations, or to confer upon Sublessee any benefits or legal rights under the Prime Lease, without, however, limiting Lessor's right to enforce the same against Prime Lessor under the Prime Lease or Sublessee's rights to cause Lessor to enforce Lessor's rights against Prime Lessor under the Prime Lease.

3. This consent shall not be assignable by Sublessee and shall not run to the benefit of or be enforceable by any assignee or sublessee of Sublessee.

POOR QUALITY

11/08/2007 1178

4. The Sublease shall at all times be subject and subordinate to the Prime Lease and all of the terms, covenants and conditions thereof, and any provision of the Sublease which may be in conflict with, or purports to vary, any provision of the Prime Lease as it pertains to the Prime Lessor or the rights and obligations of the Prime Lessor thereunder shall be null and void as it relates to Prime Lessor, notwithstanding Prime Lessor's execution of this Consent. It is agreed and understood that notwithstanding anything contained in the Sublease but subject to the provisions of paragraph 12 of this Consent any termination of the Prime Lease for any reason shall terminate the Sublease and Sublessee's and Lessor's right to use and occupy the Leased Premises.

5. Neither the Sublease nor the consent of the Prime Lessor thereto nor any acceptance of rent by Prime Lessor from Sublessee shall release or discharge Lessor from any liability under the Prime Lease, and Lessor shall remain liable and responsible for the full payment, performance and observance of all the terms, covenants and conditions contained in the Prime Lease on the part of Lessor to be performed and observed thereunder. Notwithstanding anything contained herein or in the Sublease to the contrary, any breach or violation of any provision of the Prime Lease by Sublessee shall be deemed to be and shall constitute a Default of Tenant by Lessor in fulfilling such provision under the Prime Lease.

6. The consent by Prime Lessor to the use and occupancy of the Leased Premises by Sublessee shall not be construed as a consent by Prime Lessor to the use and occupancy of the Leased Premises by anyone other than Sublessee or Lessor, or as a consent to further subletting by Lessor or by Sublessee of the Leased Premises, or any part thereof. Neither the Sublease nor any of the rights, privileges or obligations thereunder shall be assigned, modified, renewed or extended, nor shall the Leased Premises or any part thereof, be further sublet or occupied by others (except by Lessor, in accordance with and subject to the terms and provisions of the Prime Lease).

7. Notwithstanding anything contained in the Sublease to the contrary, Lessor and Sublessee, jointly and severally represent and agree with Prime Lessor that upon the expiration or any earlier termination of the term of the Prime Lease, the Sublease and its term shall expire, terminate and come to an end on or prior to the date of the expiration or termination of the Prime Lease, and Lessor shall cause Sublessee to vacate and surrender the Leased Premises on or before such date in accordance with the applicable provisions of the Prime Lease.

8. Intentionally omitted.

9. The consent herein granted shall not be deemed to be an acknowledgement by Prime Lessor of any recital, statement or representation contained in the Sublease (nor shall Prime Lessor be bound thereby) or a waiver by Prime Lessor of any uncollected or unbilled rentals or other charges that may be due or payable by Lessor under the Prime Lease.

10. Lessor and Sublessee each represents that the Sublease annexed hereto as Exhibit A is a true copy of the Sublease entered into between Lessor and Sublessee and constitutes the entire agreement between Lessor and Sublessee relating to the use and occupancy by Sublessee of the Leased Premises. Sublessee hereby further agrees to subordinate its interest in the Sublease to the lien of any Mortgage, Security Agreement or Lease now or hereafter affecting the Building.



POOR QUALITY

11/08/2007 17:11

11. Lessor shall indemnify and hold Prime Lessor harmless with respect to any and all liability to and claims by any party (including Sublessee) in connection with the Sublease, Sublessee's use and occupancy of the Leased Premises, or the subject matter hereof. The within indemnity shall include all losses, costs, damages or expenses including, without limitation, reasonable attorneys fees sustained or incurred by Prime Lessor arising out of the matters contained herein. In no event shall Prime Lessor be liable to Sublessee for Prime Lessor's failure, if any, to perform and observe any of the terms, covenants, and conditions contained in the Prime Lease on the part of the Prime Lessor to be performed and observed thereunder. The provisions of this paragraph 11 shall survive any expiration or earlier termination of the Sublease or the Prime Lease.

12. Lessor and Sublessee agree that in no event (including, but not limited to an instance where Sublessee may become a direct tenant of Prime Lessor for the Leased Premises or any part thereof), Prime Lessor shall not be responsible for the payment of any commissions or fees in connection with such direct lease, and Lessor and Sublessee jointly and severally agree to indemnify and hold Prime Lessor harmless from and against any claims, liability, losses or expenses, including reasonable attorneys' fees, incurred by Prime Lessor in connection with any claims for a commission by any broker or agent in connection with any such direct lease.

13. Intentionally omitted.

14. Sublessee shall, within 15 days of written request from Prime Lessor herefore, execute and deliver to Prime Lessor and/or the holder of any mortgage upon or proposed purchasers of the Building, a so-called "Estoppel Letter" in form satisfactory to Prime Lessor or such holder of a Mortgage or proposed purchaser which shall include, among other things, if so requested, a statement (i) certifying that the Sublease is in full force and effect and has not been assigned, modified or amended, (ii) that Lessor is not in default thereunder, (iii) the date through which rent has been paid and (iv) that there are no defenses or set-offs against enforcement of the Sublease or this Agreement against Sublessee.

15. Lessor and Sublessee each covenant and agree with Prime Lessor that they shall not alter, modify or amend the Sublease (but the Sublease may be terminated in accordance with its terms or by mutual consent of Lessor and Sublessee) and (ii) Sublessee shall not pay the rent due thereunder in advance for more than thirty (30) days without, in each case, obtaining the prior written consent of the Prime Lessor.

16. In the event that there shall be any conflict between the terms, covenants and conditions of this Consent to Sublease and the terms, covenants and conditions of the Sublease, then the terms, covenants and conditions of this Consent to Sublease shall prevail in each instance and any conflicting terms, covenants or conditions of the Sublease shall be modified to conform with the terms, covenants and conditions of this Consent to Sublease.

11/08/2007

POOR QUALITY

IN WITNESS WHEREOF, the parties hereto have executed this instrument on the date written below.

172

PRIME LESSOR:

INDUSTRIAL PROPERTY FUND VI, LLC, a Delaware limited liability company

By: Strategic Industrial Properties I, LLC, a Delaware limited liability company, its sole member

By: IDI Holdings III, LLC, a Delaware limited liability company, its managing member

By: ______________________
Timothy J. Gunter, Manager

IMAGING SERVICES

LESSOR:

SC KIOSKS, INC.

By: [signature]
Name: DAVID S. GOLDBERG
Title:: VP SC Kiosks, Inc.

IMAGING SERVICES

SUBLESSEE:

WAREHOUSE 86 LLC

By: [signature]
Name: Ernest K Strahan, III
Title: CFO



ATL01/12256348v2

POOR QUALITY



CONSENT

LESSOR'S GUARANTOR

The undersigned, being the Guarantor of the Lease under that certain Guaranty dated October 1, 2004 from Guarantor to Landlord, hereby consents to this Consent to Sublease, and acknowledges and affirms that the Guaranty is in full force and effect as it relates to the Lease, as amended and supplemented by the Consent to Sublease.

GUARANTOR:

RADIOSHACK CORPORATION, a Delaware corporation

By: [signature] DAVID S. GOLDBERG
Name:
Title: SVP - General Counsel

Attest: ____________
Name:
Title:
[signature]

IMAGING SERVICES

IMAGING SERVICES

4145183-002

POOR QUALITY

# CONSENT TO SUBLEASE

This Consent to Sublease made and entered into as of July 13, 2006 (the "Addendum"), by and among General Electric Capital Corporation, a Delaware corporation (together with its successors and assigns, if any, "Lessor"), SC Kiosks, Inc. a Delaware corporation ("Lessee"), and , Warehouse 86, LLC an Arizona limited liability company ("Sublessee"), is hereby incorporated into and made a part of that certain Master Lease Agreement dated as of July 3, 2003 (the "Lease") All capitalized terms used herein shall, unless otherwise defined, have the meanings ascribed to them in the Lease

## RECITALS

A Lessor and Lessee have entered into the Lease pursuant to which Lessor has leased to Lessee certain equipment more specifically described below (the "Equipment");

Three (3) 2003 Crown SP3220-30 stockpicker electric one stage mast forklift trucks, s/n 1A265785, 1A265786, 1A265787 with six (6) batteries, s/n MBE705146, MBE705147, MBE705148, MBE705149, MBE705150, and MBE705183 and three (3) chargers s/n BF81934, BF81935, and BF81936, Two (2) 2003 Crown, model RR5220-45 reach electric one stage mast forklift trucks, s/n 1A265984, 1A265985 with four (4) batteries, s/n MBF724487, MBF724488, MBF724489, and MBF724491 and two (2) chargers, s/n BF81937 and BF81938, One (1) 2003 Crown Forklift, model RC3020-30, s/n 1A265502 with two (2) batteries, s/n RBD178694 and RBD178697 and one (1) charger, s/n BF81939, two (2) 2003 Crown Electric pallet jack forklift trucks, model PE4000-60, s/n 6A206583, and 6A206584, with four (4) batteries, s/n MBE704630, MBE704631, MBE704632 and MBE704633 and 2 chargers, s/n BF81940 and BF81941, One (1) 2003 Crown electric Pallet Jack forklift, model WP2030-45, s/n 5A31667, battery accessories including five (5) battery stands with plastic drip pans, stainless steel roller wash station, recirculation/neutralization system, water deionizing system, water gun, protective kit, twenty gallon safety spillkit, shower eye wash and cable retractor

B Among other things, the Lease prohibits Lessee from subleasing the Equipment; and

C Lessee desires to sublease the Equipment to Sublessee, whose principal place of business is 481 Airport Industrial Drive, Suite 110, Southaven, MS, Desoto county, 38671 and Lessor is willing to consent to the sublease (the "Sublease"), subject to the terms and conditions hereafter set forth

**NOW THEREFORE,** in consideration of the agreements and covenants contained herein, and intending to be legally bound hereby, Lessor, Lessee and Sublessee mutually agree as follows:

1 The Sublease shall be in substantially the form attached hereto as Exhibit "1" and shall not be materially amended, supplemented or otherwise changed without the prior written consent of Lessor

2 Lessee hereby acknowledges that it is now and continues to be obligated and bound by all of provisions of the Lease, including but not limited to the provisions relating to the indemnity and the obligation to pay rent, notwithstanding any delegation of duties or other term of the Sublease Any such delegation shall be effective only as between Lessee and Sublessee

3 Lessee and Sublessee, jointly and severally, hereby covenant, represent and warrant that:

(a) Sublessee's interest in the Sublease and the Equipment shall be subject and subordinate to the rights of Lessor under the Lease and to the rights of any assignee of Lessor;

(b) Sublessee waives, and agrees that it will not assert against Lessor, or any successor or any assignee of Lessor, any defense, set-off, recoupment, claim or counterclaim which Sublessee may at any time have against Lessee for any reason whatsoever;

(c) Lessor shall have no obligation to perform any of the duties of Lessee under the Sublease, including but not limited to payment of any taxes or other sums, furnishing of maintenance, repairs, replacement vehicles, service or insurance;

(d) the Equipment when subjected to Sublessee's use and control will continue to be tangible personal property under applicable law at all times during the term of the Sublease, and Sublessee agrees that the Lessor or its designated employee(s) or agent(s) may inspect the Equipment at its location during normal business hours;

(e) the Equipment shall not be further subleased or assigned without the express prior written consent of Lessor;

(f) the Equipment shall be located and used in the United States at all times during the term of the Sublease;

 POOR QUALITY 

11/08/2007 175

(g) Sublessee is not a governmental entity or tax exempt organization and the use by and sublease of the Equipment to Sublessee shall not result in any loss of depreciation or recovery deductions available to Lessor;

(h) no default under the Lease or Sublease has occurred and is continuing;

(i) the Sublease shall expire and control of the Equipment will be returned to Lessee on or before the expiration of the term of Lease in respect of the Equipment, unless the purchase option or termination option, if any, in the Lease is exercised pursuant to its terms;

(j) Lessee shall provide Lessor with evidence of insurance as required under the Lease (and of the continuing authority of the Sublessee to operate the Equipment);

(k) any and all credit information made available by Lessee to Lessor concerning Sublessee is true, complete and correct; and

(l) Lessor may rely upon the truth and accuracy of all representations and warranties made to Lessee by Sublessee in the Sublease to the same extent and effect as if such representations and warranties had been made directly to and for the benefit of Lessor

4 Sublessee specifically acknowledges and agrees that, notwithstanding anything to the contrary in the Sublease, LESSOR HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE OR TO MAKE ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, OPERATION OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN, THE EQUIPMENT OR ANY COMPONENT THEREOF DELIVERED TO LESSEE OR SUBLESSEE HEREUNDER, AND LESSOR DOES NOT MAKE ANY WARRANTY OF MERCHANTABILITY OR FITNESS OF THE EQUIPMENT OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE OR AS TO TITLE TO THE UNITS OR ANY COMPONENT THEREOF, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY UNIT OR ANY COMPONENT THEREOF (EITHER UPON DELIVERY THEREOF TO THE LESSOR OR OTHERWISE)

5. Sublessee hereby agrees that it is bound by all of the provisions of the INDEMNIFICATION Section of the Lease

6 Except as otherwise provided herein, Lessor hereby covenants and agrees that, so long as no default has occurred under the Lease, Lessor will not disturb Sublessee's quiet and peaceful possession of the Equipment and its use thereof

7 As security for its obligations under the Lease, Lessee hereby assigns, sets over, and transfers to Lessor, its successors and assigns, all (except as otherwise provided herein) of its right, title, and interest in and to (i) the Sublease and all extensions and renewals thereof, (ii) all rentals and other sums due, now or hereafter under the Sublease, (iii) any and all proceeds of any insurance required under the Sublease, and (iv) all products and proceeds of the foregoing; provided, however, that Lessor shall not exercise its rights hereunder unless and until a default or event which, with notice and the lapse of time or both, would constitute a default under the Lease has occurred and is continuing. Lessee does not hereby assign, set over or transfer to Lessor any of its right, title or interest in and to any provision of the Sublease which permits the Lessee to require the Sublessee, or which requires the Sublessee, to purchase any unit of Equipment. Notwithstanding the foregoing assignment, Sublessee shall pay Lessee all rentals and other sums payable under the Sublease until Lessor delivers notice of a default under the Lease to Sublessee Upon Sublessee's receipt of such notice of default, Lessee hereby authorizes and directs Sublessee to pay Lessor all rentals and other sums payable and to become payable under the Sublease, provided however, that Lessor shall retain only such of the rentals herein assigned as are required from time to time to discharge Lessee's obligations under the Lease and shall remit any excess to Lessee If any rentals are not paid within 10 days of the applicable due date, Sublessee agrees, notwithstanding anything to the contrary in the Sublease, to pay to Lessor a late charge of five cents ($ 05) per dollar on, and in addition to, the amount of such rental but not exceeding the lawful maximum, if any

8. Lessee agrees that at any time and from time to time, upon the written request of Lessor, Lessee will promptly and duly execute and deliver or cause to be duly executed and delivered any and all further instruments and documents as Lessor may deem desirable in perfect its security interest in the Sublease, to deliver to Lessor all original copies of the Sublease promptly upon execution thereof, and to mark prominently all other copies of the Sublease "Not an Original"

9 Lessor and Lessee agree that, notwithstanding anything to the contrary herein contained:

(a) Lessee shall remain liable for the payment of all sums and the performance of all obligations under the Lease, whether or not Lessor has exercised its rights under this Addendum; and

(b) Lessee shall promptly reimburse Lessor for all expenses incurred by Lessor in connection herewith or with the enforcement hereof.




POOR QUALITY

11/08/2007 176

10 The representations, warranties and covenants contained herein shall be binding upon Lessee and Sublessee and their respective successors and assigns, and the benefits thereof shall extend to and include the successors and assigns of Lessor All of Lessor's rights, privileges and indemnities contained herein shall survive the expiration or other termination of the Lease, the Sublease or this Addendum

11. Lessor's failure to exercise any right hereunder shall not be considered a waiver of such or any other right

12 Subject to the forgoing terms and conditions, Lessor hereby consents to the execution and delivery of the Sublease and, if required by the Sublease, Lessee and Sublessee hereby consent to the assignment of the Sublease as set forth herein to Lessor

13 Except as expressly modified herein, the terms of the Lease shall remain in full force and effect

**IN WITNESS WHEREOF,** the parties have executed this Addendum

LESSOR:

General Electric Capital Corporation

By:__________

Name:__________

Title:__________

LESSEE:

SC Kiosks, Inc.

By: [signature]

Name: DAVID S. GOLDBERG

Title: VP SCKiosks Inc.

SUBLESSEE:

Warehouse 86, LLC

By: [signature]

Name: Ernest K Strahan, III

Title: CEO

AFFIRMATION OF GUARANTY

The undersigned ("Guarantor"), having executed and delivered to Lessor a corporate guaranty ("Guaranty") pursuant to which Guarantor guaranteed to Lessor the full payment and performance of all obligations under the Lease, does hereby affirm, to and for the benefit of Lessor, that (a) Guarantor hereby consents to the sublease of the Equipment to Sublessee and (b) the Guaranty shall continue to apply to all obligations under the Lease to no less extent as a result of such sublease.

GE signature following on 7/19/06

RadioShack Corporation

By: [signature]

Its: SVP-General Counsel



POOR QUALITY

4145183001

# CONSENT TO SUBLEASE

This Consent to Sublease made and entered into as of July 13, 2006 (the "Addendum"), by and among General Electric Capital Corporation, a Delaware corporation (together with its successors and assigns, if any, "Lessor"), SC Kiosks, Inc. a Delaware corporation ("Lessee"), and Warehouse 86, LLC an Arizona limited liability company ("Sublessee"), is hereby incorporated into and made a part of that certain Master Lease Agreement dated as of July 3, 2003 (the "Lease"). All capitalized terms used herein shall, unless otherwise defined, have the meanings ascribed to them in the Lease

## RECITALS

A Lessor and Lessee have entered into the Lease pursuant to which Lessor has leased to Lessee certain equipment more specifically described in Exhibit A thereto, which Schedule which Schedule is incorporated herein (the "Equipment");

B Among other things, the Lease prohibits Lessee from subleasing the Equipment; and

C Lessee desires to sublease the Equipment to Sublessee, whose principal place of business is 481 Airport Industrial Drive, Suite 110, Southaven, MS. Desoto county, 38671 and Lessor is willing to consent to the sublease (the "Sublease"), subject to the terms and conditions hereafter set forth

**NOW THEREFORE,** in consideration of the agreements and covenants contained herein, and intending to be legally bound hereby, Lessor, Lessee and Sublessee mutually agree as follows:

1 The Sublease shall be in substantially the form attached hereto as Exhibit "1" and shall not be materially amended, supplemented or otherwise changed without the prior written consent of Lessor

2 Lessee hereby acknowledges that it is now and continues to be obligated and bound by all of provisions of the Lease, including but not limited to the provisions relating to the indemnity and the obligation to pay rent, notwithstanding any delegation of duties or other term of the Sublease Any such delegation shall be effective only as between Lessee and Sublessee

3 Lessee and Sublessee, jointly and severally, hereby covenant, represent and warrant that:

(a) Sublessee's interest in the Sublease and the Equipment shall be subject and subordinate to the rights of Lessor under the Lease and to the rights of any assignee of Lessor;

(b) Sublessee waives, and agrees that it will not assert against Lessor, or any successor or any assignee of Lessor, any defense, set-off, recoupment, claim or counterclaim which Sublessee may at any time have against Lessee for any reason whatsoever;

(c) Lessor shall have no obligation to perform any of the duties of Lessee under the Sublease, including but not limited to payment of any taxes or other sums, furnishing of maintenance, repairs, replacement vehicles, service or insurance;

(d) the Equipment when subjected to Sublessee's use and control will continue to be tangible personal property under applicable law at all times during the term of the Sublease, and Sublessee agrees that the Lessor or its designated employee(s) or agent(s) may inspect the Equipment at its location during normal business hours;

(e) the Equipment shall not be further subleased or assigned without the express prior written consent of Lessor;

(f) the Equipment shall be located and used in the United States at all times during the term of the Sublease;

(g) Sublessee is not a governmental entity or tax exempt organization and the use by and sublease of the Equipment to Sublessee shall not result in any loss of depreciation or recovery deductions available to Lessor;

(h) no default under the Lease or Sublease has occurred and is continuing;

(i) the Sublease shall expire and control of the Equipment will be returned to Lessee on or before the expiration of the term of Lease in respect of the Equipment, unless the purchase option or termination option, if any, in the Lease is exercised pursuant to its terms;

(j) Lessee shall provide Lessor with evidence of insurance as required under the Lease (and of the continuing authority of the Sublessee to operate the Equipment);



POOR QUALITY

11/08/2007

(k) any and all credit information made available by Lessee to Lessor concerning Sublessee is true, complete and correct; and

(l) Lessor may rely upon the truth and accuracy of all representations and warranties made to Lessee by Sublessee in the Sublease to the same extent and effect as if such representations and warranties had been made directly to and for the benefit of Lessor

4 Sublessee specifically acknowledges and agrees that, notwithstanding anything to the contrary in the Sublease, LESSOR HAS NOT MADE NOR SHALL BE DEEMED TO HAVE MADE OR TO MAKE ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, AS TO THE DESIGN, COMPLIANCE WITH SPECIFICATIONS, OPERATION OR CONDITION OF, OR AS TO THE QUALITY OF THE MATERIAL, EQUIPMENT OR WORKMANSHIP IN. THE EQUIPMENT OR ANY COMPONENT THEREOF DELIVERED TO LESSEE OR SUBLESSEE HEREUNDER, AND LESSOR DOES NOT MAKE ANY WARRANTY OF MERCHANTABILITY OR FITNESS OF THE EQUIPMENT OR ANY COMPONENT THEREOF FOR ANY PARTICULAR PURPOSE OR AS TO TITLE TO THE UNITS OR ANY COMPONENT THEREOF, OR ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY UNIT OR ANY COMPONENT THEREOF (EITHER UPON DELIVERY THEREOF TO THE LESSOR OR OTHERWISE)

5 Sublessee hereby agrees that it is bound by all of the provisions of the INDEMNIFICATION Section of the Lease

6 Except as otherwise provided herein. Lessor hereby covenants and agrees that, so long as no default has occurred under the Lease, Lessor will not disturb Sublessee's quiet and peaceful possession of the Equipment and its use thereof.

7 As security for its obligations under the Lease, Lessee hereby assigns, sets over, and transfers to Lessor, its successors and assigns, all (except as otherwise provided herein) of its right, title, and interest in and to (i) the Sublease and all extensions and renewals thereof, (ii) all rentals and other sums due, now or hereafter under the Sublease, (iii) any and all proceeds of any insurance required under the Sublease, and (iv) all products and proceeds of the foregoing; provided, however, that Lessor shall not exercise its rights hereunder unless and until a default or event which, with notice and the lapse of time or both, would constitute a default under the Lease has occurred and is continuing Lessee does not hereby assign, set over or transfer to Lessor any of its right, title or interest in and to any provision of the Sublease which permits the Lessee to require the Sublessee. or which requires the Sublessee, to purchase any unit of Equipment Notwithstanding the foregoing assignment, Sublessee shall pay Lessee all rentals and other sums payable under the Sublease until Lessor delivers notice of a default under the Lease to Sublessee Upon Sublessee's receipt of such notice of default, Lessee hereby authorizes and directs Sublessee to pay Lessor all rentals and other sums payable and to become payable under the Sublease, provided however, that Lessor shall retain only such of the rentals herein assigned as are required from time to time to discharge Lessee's obligations under the Lease and shall remit any excess to Lessee. If any rentals are not paid within 10 days of the applicable due date, Sublessee agrees, notwithstanding anything to the contrary in the Sublease, to pay to Lessor a late charge of five cents ($ 05) per dollar on, and in addition to, the amount of such rental but not exceeding the lawful maximum, if any

8. Lessee agrees that at any time and from time to time, upon the written request of Lessor, Lessee will promptly and duly execute and deliver or cause to be duly executed and delivered any and all further instruments and documents as Lessor may deem desirable in perfect its security interest in the Sublease, to deliver to Lessor all original copies of the Sublease promptly upon execution thereof, and to mark prominently all other copies of the Sublease "Not an Original"

9 Lessor and Lessee agree that, notwithstanding anything to the contrary herein contained:

(a) Lessee shall remain liable for the payment of all sums and the performance of all obligations under the Lease, whether or not Lessor has exercised its rights under this Addendum; and

(b) Lessee shall promptly reimburse Lessor for all expenses incurred by Lessor in connection herewith or with the enforcement hereof.

10. The representations, warranties and covenants contained herein shall be binding upon Lessee and Sublessee and their respective successors and assigns, and the benefits thereof shall extend to and include the successors and assigns of Lessor All of Lessor's rights, privileges and indemnities contained herein shall survive the expiration or other termination of the Lease, the Sublease or this Addendum.

11. Lessor's failure to exercise any right hereunder shall not be considered a waiver of such or any other right

12 Subject to the forgoing terms and conditions, Lessor hereby consents to the execution and delivery of the Sublease and, if required by the Sublease, Lessee and Sublessee hereby consent to the assignment of the Sublease as set forth herein to Lessor.

13 Except as expressly modified herein, the terms of the Lease shall remain in full force and effect.


POOR QUALITY


11/08/2007

**IN WITNESS WHEREOF,** the parties have executed this Addendum

LESSOR:

General Electric Capital Corporation

By:____________________

Name:____________________

Title:____________________

LESSEE:

SC Kiosks, Inc.

By: [signature]

Name: DAVID S. GOLDBERG

Title: VP SC Kiosks Inc.

1779

SUBLESSEE:
Warehouse 86, LLC

By: [signature]

Name: Ernest K Strahan, III

Title: CEO

## AFFIRMATION OF GUARANTY

The undersigned ("Guarantor"), having executed and delivered to Lessor a corporate guaranty ("Guaranty") pursuant to which Guarantor guaranteed to Lessor the full payment and performance of all obligations under the Lease, does hereby affirm, to and for the benefit of Lessor, that (a) Guarantor hereby consents to the sublease of the Equipment to Sublessee and (b) the Guaranty shall continue to apply to all obligations under the Lease to no less extent as a result of such sublease

RadioShack Corporation

By: [signature]

Its: SVP-General Counsel



POOR QUALITY

(6/87R021999) 4145183001

11/08/2007

# Exhibit A
# TO
# CONSENT TO SUBLEASE

## DESCRIPTION OF EQUIPMENT

| Number of Units | Manufacturer | Model and Type of Equipment |
|---|---|---|
| | Siemens Dematic Corp. | Conveyor system per Siemens Dematic proposal number 27844-Rev 03 dated 5-14-2003 Conveyors include but are not limited to model 1265 accumulation conveyor, model 1102 transportation conveyor, model 410 belt conveyor, gravity roller conveyor, and PS140 sorter plus all attachments and accessories thereto |
| | Frazier Industrial Company | racking further described below |

180

Single Deep Selective Racks

254 Type 4SX upright frames 23'-6" high, 44 inches deep
Front column double channel to 76" high with cap
Welded bullnose with angled cap
Bolt in C4 rubrail X 4" high
1,434 Type CB3 beams X 96 inches long
2,868 Bolt in pallet supports X 44 inches long
238 Back to back ties
254 Leveling Shims X 1/8" thick
508 Wedge Type Anchors ½ x 3 ¾"
254 Wedge type anchors ¾" X 6 ½"

Single Deep Selective Racks with Shelving

210 Type 4SX upright frames 23'-6" high, 44 inches deep
Front column double channel to 76" high with cap
Welded bullnose with angled cap
Bolt in C4 rubrail X 4" high
1,176 Type CB3 beams X 96 inches long
2,352 Bolt in pallet supports X 44 inches long
1,176 Type AB3X2 beams X 96 inches long-shelving beam
196 Back to back ties
210 Leveling Shims X 1/8" thick
420 Wedge Type Anchors ½ x 3 ¾"
210 Wedge type anchors ¾" X 6 ½"

Wire Decking for Shelving Levels

1,176 Welded wire mesh decks – 46" wide X 44" deep
2 X 4 X gauge welded wire with reinforcing channels

Row End Protection

18 Row end protectors – 98" long X 24" high – ¼" plate anchored on 12" centers

Pick Modules

52 Type 4SX upright frames 23'-6" high 54 inches deep
Front column double channel to 76" high with cap






11/08/2007 181

Welded bullnose with angled cap
Bolt in C4 rubrail X 4" high
192 Type CB3 beams X 96 inches long
384 Bolt in pallet supports X 54" long
64 Welded wire mesh decks – 46" wide X 54" deep
2 X 4 X gauge welded wire with reinforcing channels
52 Type 4SX upright frames 23'-6" high 54inches deep
52 Type 4SX monopost 23'-6" high
Column double channel to 112" high with cap
212 Monopost braces X 46" long
288 Type CB3 beams X 96 inches long
26 Cross aisle ties X 12' long
144 Carton flow shelf beds 96" wide X 96 inches deep
144 Carton flow shelf impact tray – 12" wide X 96" long
2,016 Tracks X 96 inches long (3 tracks per lane)
864 Guides X 120 inches long
192 Rack column adapter stips X 96" long
54 Lanes of double staggered 1 9" diameter skatewheel
4 pallet deep flow tracks X 206 inches long
Lanes consist of 2 runs of double staggered wheels, complete with 3/16" full width plate stop
Loading end equipped with ½" steel floor mounted bullnose
256 Floor angles X 40" wide – for mounting internal sections of pallet flow track to floor
64 Floor angles X 40" wide - for picking end of floor rail 3 X 4 X 3/16" angle anchored to floor
260 Levelling shims X 1/8" thick
260 Wedge type anchors ½ X 3 ¾" X 6 ½"

Netting for Rear of Single Deep Rack Rows
1 Lot (6,600 square feet) fabric safety netting for rear of rows model M-1500 – 2" square

Wide Span Shelving
5 Type 3SX upright frames 8' high, 18 inches deep
36 Type 3SX upright frames 8' high, 48 inches deep
264 Type CB3 beams X 96 inches long
264 Welded wire mesh decks – 46" wide X 44" deep
82 Wedge type anchors ½ X 3 ¾"

Additional Equipment to racking above:
Add 5th level of beams in 411 bays – 4" channel beam
Upgrade 2,898 remaining 3" pallet load beams to 4" channel
Upgrade safety supports for upper levels of rack in pick module to wire mesh decking
Additional cost for 3rd rail in pallet flow lanes
Additional cost for pallet separators

Equipment immediately listed above is located at: 481 Airport Industrial Dr, Suite 110, Southaven, De Soto County, MS 38671