# **Exhibit D**



625 Highland Colony, Suite 202
Ridgeland, MS 39157
T: (601) 605-6190 Ext: 225
F: (601) 510-9166
e-mail: bookerr@gabrobins.com

## Second Report / Reply Requested / Check Requested

Date    March 31, 2008

**EMC Insurance Companies**
**Attn: Chuck Herrold**
**Property Claim Department**
717 Mulberry
Des Moines, IA 50309

| | |
|---|---|
| Insured | Warehouse 86, LLC |
| Policy No. | 3X2-22-78-08 |
| Policy Period | April 15, 2007-2008 |
| Claim No. | 478316 |
| GABR File # | 22520-17754 |
| Loss Loc. | 481 Airport Industrial Dr., Southaven, MS |
| Claimant | NA |
| Agency | Marchetti, Robertson & Brickell |
| Agency Loc. | Ridgeland, Mississippi |
| Type of Loss | CAT 27 / Tornado |
| Date of Loss | February 5, 2008 |

### ENCLOSURES:

1-Employee Directory (2 pages).
2-Photo Sheets (153 Images).
3-Contact List (3 pages).
4-Cover Letter from Insured dated March 14, 2008 (1 page).
5-Warehouse 86 Inventory Valuation (1 page).
6-Schedule A of DC Sales Validation (1 page).
7-Cost To Refinish Good – Expense Report for Location.
8-Inventory Item Counts (1 page).
9-Inventory Truck Load not in system (2 pages).
10-Inventory of DHL Items from Indianola and not in system (3 pages).
11-Inventory of Topics Inventory not in system (3 pages).
12-FOB Items on docks waiting for customer pickup (6 pages).
13-Asset List for DC-7 (12 pages).
14-Asset List Support (329 pages).
15-Inventory moved from Southaven to new warehouse on Perkins in Memphis TN (27 pages).
16-P & L for Warehouse 86, Southaven, MS (1 page).
17-Conveyor System Plans on CD (1 CD attached).
18-Email from Gayle Powelson dated 3/17/2008 4:07AM Radio Shack Conveyor
    System Evaluation (8 pages).
19-Email from Gayle Powelson dated 3/24/2008 10:14 AM Lease Documents (95 pages).
20-Email from Ernie Strahan III dated 3/3/2008 2:28 AM New Contact for Insured (2 pages).
21-Email from Ernie Strahan III dated 3/31/2008 11:58 AM Claim for Leased
    Equipment (23 pages).

Form CR0172 (Rev. 10/2001)

**Enclosures-continuing from Page #1:**
22-Email from Ernie Strahan III dated 3/31/2008 11:58 AM for Leased Equipment (9 pages).
23-Email from Ernie Strahan III dated 3/31/2008 11:59 AM for Leased Equipment (9 pages).
24-CP 7159 10-02 (5 pages).
25-Email from Insured dated 3/27/2008 with Release from GE (lienholder) (7 pages).
26-GAB Robins Interim Service Invoice Package.

### REPLY REQUESTED:

We have attached a copy of CP 7159 (10/02) which is the Broadened Property Coverage Extension. The Insured indicates that this form is attached to their insurance policy. This Endorsement is not listed on the policy information provided to us. Is this Policy Extension a portion of the policy?

### CHECK REQUESTED:

The insured has requested a $500,000.00 advance. We would request permission to obtain a Partial Proof of Loss in the amount of $500,000.00. This Proof of Loss would have the appropriate lienholders SC Kiosks, Inc., Trustmark National Bank, and Wells Fargo Financial.

### SUGGESTED RESERVES:

| | |
|---|---|
| Business Personal Property | $1,000,000.00 |
| Debris Removal | $    10,000.00 |
| Business Income | $    50,000.00 |
| Reserves | $1,060,000.00 |

If Broadened Property Coverage Extension CP 7159 applies, additional amounts reserved:

| | |
|---|---|
| Extra Expenses | $   25,000.00 |
| Cost of Taking Inventory | $     2,500.00 |
| Valuable Papers & Records | $   25,000.00 |
| Personal Property of Others | $   10,000.00 |
| Spoilage Coverage | $     2,500.00 |
| Total | $   65,000.00 |

### ABSTRACT OF COVERAGE:

In our "Reply Requested", we have reviewed the form that the insured is indicating to this writer that is attached to their policy. We await your reply before changing the reserves.

The insured has provided us a Release from GE. GE is shown on the policy as a loss payee.

### CAUSE OF LOSS:

CAT 27. This is a tornado of February 5, 2008.

## SCOPE OF DAMAGE:

The computerized conveyor system is now a total loss. As you are aware there was a fire at this location on February 11, 2008.

## ADJUSTMENT:

We have been back to the site on several occasions. You will find enclosed an additional 153 Photo Images taken by our office. These photos were taken on various dates. We were originally advised that we would be allowed onto the site on March 3, 2008. We arrived at the appointed time and were told by security on site that we would not be allowed in the building until 11:00 A. M. on March 3rd. We left the site, went and obtained a copy of the fire report for the fire loss, and went back to the site and waited until 11:00. At 11:00 we were going to enter the building and we again were advised by security that we would have to enter the building on the north side where other parties were entering. We went around to the other side of the building and saw a large contingent of persons going into the building, which included IDI employees, the general contractor's employees, Diamond Steel and their representatives, insurance adjusters for same, and engineers and architects. We went into the building and began inspecting the inventory and the betterments and improvements along with the furniture, fixtures and equipment belonging to Warehouse 86. After we had been in the building more than 30 minutes but less than an hour, we were approached by IDI employees who asked us to identify ourselves and we did. We at that time were instructed that the building was still unsafe and we must leave. We questioned Ms. Mary Leesa Simmons, Vice President of Real Estate Management, as to why we were not being allowed in the building as others were in there even without hard hats or any other safety equipment and were advised that we would leave or we would be escorted from the premises. We left and called the adjuster representing IDI, Joel Fisher. We had several discussions with Mr. Fisher that day. We were not allowed back in the building at that time. We were advised that it would be one or two days prior to our being allowed back in. On March 5, 2008, we were allowed access to the building. Because of prior appointments, we were unable to be there until March 11th.

In our discussions with you, it was determined that we should get Callan Salvage and Appraisal Company involved in the loss again. We have provided them a copy of the inventory as supplied to us from Warehouse 86. They have been to the warehouse location in Southaven, Mississippi and to the new warehouse location on Perkins Avenue in Memphis, Tennessee. We have charged them trying to verify the inventory as submitted by the insured.

As you are aware, we met with the insured on March 14, 2008, and at that time we were provided a copy of Warehouse 86 Inventory Valuation, Schedule A of DC Sales Valuation, Cost to Finish Goods-Expense Report for Location, Inventory Item Counts, Inventory Truck Loads not in system, Inventory of DHL Items from Indianola not in system, Inventory of Topics not in system, a list of FOB Items on docks waiting for customer pickup, a copy of the Asset List for this location, and invoices to support the Asset List. The insured also provided us a list of the inventory items that he had moved from Southaven to the Perkins Location. At our request they also provided us a P&L for Warehouse 86, Southaven, Mississippi.

We have also received a copy of the Lease documents from the insured. You will find them attached for your review. The original Lease was signed by SC Kiosks, Inc., the original Radio Shack. Your insured signed a sublease to SC Kiosks, Inc., which included the conveyor system, the racking, security system and other betterments and improvements in the building.

We have been able to obtain a copy of the Radio Shack Conveyor System Evaluation along with diagrams and plans on the conveyor system. Because of the size and volume of the conveyor systems plans, we had them copied and they are on a CD attached. They are color coded and the legend indicates what additional sections of the conveyor system the insured had installed after they leased the premises. The sections that the insured had installed have been included in the Assets List and the support for the assets.

On March 31, 2008, we received emails from the insured with documents attached. The first email has the claim for the leased equipment showing the capitalized lessor's cost on the conveyor system and the racking system which totals $2,188,755.00. This is the leased cost not the purchase. Separate emails concern the buyout of the equipment from SC Kiosks from General Electric Capital Corporation totaling $1,064,361.78, which includes the conveyor system and the racking system. The third email from the insured is the Master Lease Agreement between GE Corporation and Wireless Retail.

Liberty Mutual insures SC Kiosks and their interest in the racking system and the conveyor system.

If you refer to the email from Mr. Strahan, Liberty Mutual is proceeding to dispose of the conveyor system. Both Radio Shack and Warehouse 86 have concluded that the conveyor system is a total loss but they will try to sell the salvage. They are indicating that they both believe that 30% of the racking is either undamaged or only partially damaged, which leaves 70% that is damaged from the fire and subsequent exposure to water and is not usable. They are now indicating that they believe a little damage as a result of the tornado that most of the damage was due to the fire. This would be to their benefit due to their limited amount of coverage.

They indicate that Radio Shack believes that they are entitled to be made whole by Warehouse 86 and/or Diamond Steel. This is a contract between Warehouse 86 and Radio Shack and is a third party claim against Diamond Steel. This would not involve you directly.

We have enclosed the email and all of the attachments for your review.

Would like to engage a forensic accountant to assist in running the number and assist in verifying the numbers verses the inventory provided by Callan and that provided by Warehouse 86, and if so, do you have a preference? If not, we could get a forensic accountant from the State of Tennessee being U. S. Financial out of Nashville, or Madsen, Driscoll and Damico to assist.

Our intent would be once we receive the inventory verification of lack thereof from Callan, to proceed on establishing numbers we know are a direct result of the tornado. We believe that there will be enough uncontested numbers on the furniture, fixtures and equipment inventory betterments and improvements. If we can establish the uncontested numbers on the tornado then we should be able to settle the claim based upon that number.

We met with the insured and obtained a copy of the Sales Valuation, which is "the Inventory Valuation for DC-7" it is Item #5 in the enclosures. The insured does not purchase the items normally. They have agreements with the vendors that they sell the items on their website which is BargainLand.com. every item bid starts at $.99 and is sold to the highest bidder regardless of the cost. This income is then shared with the vendor they obtained the information from. We were supplied the inventory valuation and they only have given us four

months history. The reason we are only seeing the four months history is that until four months ago the insured was selling all of their items on eBay. At that point they swapped and started their own website. They have taken the gross selling price of all items for each month and divided it by the number of items sold to come up with an average selling price per item. Their finishing costs are their labor to repackage, repair whatever needs to be done to the product to make it ready for sale. This is an average of labor to finish goods of $11.82 with overhead required to finish the goods at $5.65. This is a total finishing cost of $17.48 and this finishing costs added to the raw costs is a total cost based upon their calculations of $35.89 per item in inventory. This could be a tire, chrome rim, a DVD, or computer. They are valuing the inventory at $700,921.23. It should be noted that they indicated to us at this meeting that approximately half of the physical inventory did not belong to them. It belonged to certain partners or vendors who were responsible for carrying their own insurance and they are not making claim for these items.

Enclosure #8 is the Inventory Items Count which shows that the total number of items that belong to Warehouse 86 is 19,532 items. Items owned by others total 27,745 items.

The Valuation of Inventory is very unusual. We have never seen one exactly like this. The insured states they know of no other business that values the inventory this way but that they are unlike any other business that they are aware of. They do not buy their items at retail they do not buy them at wholesale. They basically buy them at a below market price.

Your policy provides replacement cost coverage on the item as presented including the furniture, fixtures and equipment. In reviewing the Asset Items List, the insured bought all the items basically off either their own website or off another website and the prices that they have used in the Asset List are again substantially below replacement cost.

### SALVAGE:

Callan Salvage is assisting with the inventory. We are unaware if there will be any return or not at this time.

### FUTURE HANDLING:

1-Await your reply.
2-Review Inventory with Callan Salvage & Appraisal Company.
3-Report all information to you.
4-Continue investigation.
5-Keep you advised as developments occur.

Our next report will follow as developments occur, but in no event later than May 2, 2008.


Richard W. Booker, RPA, AIC
Executive General Adjuster

RWB/jr


Form CR0172 (Rev. 5/2000)     5

728