# **Exhibit G**

2/98(R051903)968873091                                                    

# MASTER LEASE AGREEMENT

dated as of <u>July 3, 2003</u> ("Agreement")

**THIS AGREEMENT** is between General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") and Wireless Retail, Inc. ("Lessee") Lessor has an office at 16479 Dallas Parkway #300, Addison, TX 75001-2512  Lessee is a corporation organized and existing under the laws of the state of  Delaware   Lessee's mailing address and chief place of business is 8800 Chaparral, Scottsdale, AZ 85256  This Agreement contains the general terms that apply to the leasing of Equipment from Lessor to Lessee   Additional terms that apply to the Equipment (term, rent, options, etc) shall be contained on a schedule ("Schedule")

1. **LEASING:**

    (a)  Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the equipment and the property ("Equipment") described in any Schedule signed by both parties

    (b)  Lessor shall purchase Equipment from the manufacturer or supplier ("Supplier") and lease it to Lessee if on or before the Last Delivery Date Lessor receives (i) a Schedule for the Equipment, (ii) evidence of insurance which complies with the requirements of Section 9, and (iii) such other documents as Lessor may reasonably request  Each of the documents required above must be in form and substance satisfactory to Lessor  Lessor hereby appoints Lessee its agent for inspection and acceptance of the Equipment from the Supplier  Once the Schedule is signed, the Lessee may not cancel the Schedule

2. **TERM, RENT AND PAYMENT:**

    (a)  The rent payable for the Equipment and Lessee's right to use the Equipment shall begin on the earlier of (i) the date when the Lessee signs the Schedule and accepts the Equipment or (ii) when Lessee has accepted the Equipment under a Certificate of Acceptance ("Lease Commencement Date")   The term of this Agreement shall be the period specified in the applicable Schedule  The word "term" shall include all basic and any renewal terms

    (b)  Lessee shall pay rent to Lessor at its address stated above, except as otherwise directed by Lessor  Rent payments shall be in the amount set forth in, and due as stated in the applicable Schedule  If any Advance Rent (as stated in the Schedule) is payable, it shall be due when the Lessee signs the Schedule  Advance Rent shall be applied to the first rent payment and the balance, if any, to the final rent payment(s) under such Schedule  In no event shall any Advance Rent or any other rent payments be refunded to Lessee   If rent is not paid within ten (10) days of its due date, Lessee agrees to pay a late charge of five cents (S 05) per dollar on, and in addition to, the amount of such rent but not exceeding the lawful maximum, if any

3. **RENT ADJUSTMENT:**

    (a)  If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended, ("Code")), the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") is higher than thirty-five percent (35%) for any year during the lease term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum  The additional sum shall be equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less  35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (defined below), divided by (iii) the difference between the new Effective Rate (expressed as a decimal) and one (1)  The adjusted Termination Value shall be the Termination Value (calculated as of the first rent due in the year for which the adjustment is being made) minus the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all future years of the lease term)  The Termination Values and Tax Benefits are defined on the Schedule  Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made

    (b)  Lessee's obligations under this Section 3 shall survive any expiration or termination of this Agreement



4  **TAXES:**

    (a)  If permitted by law, Lessee shall report and pay promptly all taxes, fees and assessments due, imposed, assessed or levied against any Equipment (or purchase, ownership, delivery, leasing, possession, use or operation thereof), this Agreement (or any rents or receipts hereunder), any Schedule, Lessor or Lessee by any

governmental entity or taxing authority during or related to the term of this Agreement, including, without limitation, all license and registration fees, and all sales, use, personal property, excise, gross receipts, franchise, stamp or other taxes, imposts, duties and charges, together with any penalties, fines or interest thereon (collectively "Taxes")  Lessee shall have no liability for Taxes imposed by the United States of America or any state or political subdivision thereof which are on or measured by the net income of Lessor except as provided in Sections 3 and 14(c)  Lessee shall promptly reimburse Lessor (on an after tax basis) for any Taxes charged to or assessed against Lessor  Lessee shall show Lessor as the owner of the Equipment on all tax reports or returns, and send Lessor a copy of each report or return and evidence of Lessee's payment of Taxes upon request

(b)  Lessee's obligations, and Lessor's rights and privileges, contained in this Section 4 shall survive the expiration or other termination of this Agreement

5.  REPORTS:

(a)  If any tax or other lien shall attach to any Equipment, Lessee will notify Lessor in writing, within ten (10) days after Lessee becomes aware of the tax or lien  The notice shall include the full particulars of the tax or lien  and  the location of such Equipment on the date of the notice

(b)  Lessee will deliver to Lessor, Lessee's complete financial statements, certified by a recognized firm of certified public accountants within ninety (90) days of the close of each fiscal year of Lessee  Lessee will deliver to Lessor copies of Lessee's quarterly financial report certified by the chief financial officer of Lessee, within ninety (90) days of the close of each fiscal quarter of Lessee  Lessee will deliver to Lessor all Forms 10-K and 10-Q, if any, filed with the Securities and Exchange Commission within thirty (30) days after the date on which they are filed.

(c)  Lessor may inspect any Equipment during normal business hours after giving Lessee reasonable prior notice

(d)  Lessee will keep the Equipment at the Equipment Location (specified in the applicable Schedule) and will give Lessor prior written notice of any relocation of Equipment  If Lessor asks, Lessee will promptly notify Lessor  in writing of the location of any Equipment

(e)  If any Equipment is lost or damaged (where the estimated repair costs would exceed the greater of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)), or is otherwise involved in an accident causing personal injury or property damage, Lessee will promptly and fully report the event to Lessor in writing

(f)  Lessee will furnish a certificate of an authorized officer of Lessee stating that he has reviewed the activities of Lessee and that, to the best of his knowledge, there exists no default or event which with notice or lapse of time (or both) would become such a default within thirty (30)  days after any request by Lessor

(g)  Lessee will promptly notify Lessor of any change in Lessee's state of incorporation or organization

6.  DELIVERY, USE AND OPERATION:

(a)  All Equipment shall be shipped directly from the Supplier to Lessee

(b)  Lessee agrees that the Equipment will be used by Lessee solely in the conduct of its business and in a manner complying with all applicable laws, regulations and insurance policies and Lessee shall not discontinue use of the Equipment

(c)  Lessee will not move any equipment from the location specified on the Schedule, without the prior written consent of  Lessor

(d)  Lessee will keep the Equipment free and clear of all liens and encumbrances other than those which result from acts of Lessor.

(e)  Lessor shall not disturb Lessee's quiet enjoyment of the Equipment during the term of the Agreement unless a default has occurred and is continuing under this Agreement

7.  MAINTENANCE:

(a)  Lessee will, at its sole expense, maintain each unit of Equipment in good operating order and repair, normal wear and tear excepted  The Lessee shall also maintain the Equipment in accordance with manufacturer's recommendations  Lessee shall make all alterations or modifications required to comply with any applicable law, rule or regulation during the term of this Agreement  If Lessor requests, Lessee shall affix plates, tags or other identifying labels showing ownership thereof by Lessor  The tags or labels shall be placed in a prominent position on each unit of Equipment

(b)  Lessee will not attach or install anything on any Equipment that will impair the originally intended function or use of such Equipment without the prior written consent of Lessor  All additions, parts, supplies, accessories, and equipment ("Additions") furnished or attached  to any Equipment that are not readily removable

shall become the property of Lessor  All Additions shall be made only in compliance with applicable law  Lessee will not attach or install any Equipment to or in any other personal or real property without the prior written consent of Lessor

8.  STIPULATED LOSS VALUE:  If for any reason any unit of Equipment becomes worn out, lost, stolen, destroyed, irreparably damaged or unusable ("Casualty Occurrences") Lessee shall promptly and fully notify Lessor in writing  Lessee shall pay Lessor the sum of (i) the Stipulated Loss Value (see Schedule) of the affected unit determined as of the rent payment date prior to the Casualty Occurrence; and (ii) all rent and other amounts which are then due under this Agreement on the Payment Date (defined below) for the affected unit  The Payment Date shall be the next rent payment date after the Casualty Occurrence  Upon Payment of all sums due hereunder, the term of this lease as to such unit shall terminate

9   INSURANCE:

    (a)  Lessee shall bear the entire risk of any loss, theft, damage to, or destruction of, any unit of Equipment from any cause whatsoever from the time the Equipment is shipped to Lessee

    (b)  Lessee agrees, at its own expense, to keep all Equipment insured for such amounts and against such hazards as Lessor may reasonably require  All such policies shall be with companies, and on terms, reasonably satisfactory to Lessor  The insurance shall include coverage for damage to or loss of the Equipment, liability for personal injuries, death or property damage  Lessor shall be named as additional insured with a loss payable clause in favor of Lessor, as its interest may appear, irrespective of any breach of warranty or other act or omission of Lessee  The insurance shall provide for liability coverage in an amount equal to at least ONE MILLION U S DOLLARS ($1,000,000.00) total liability per occurrence, unless otherwise stated in any Schedule  The casualty/property damage coverage shall be in an amount equal to the higher of the Stipulated Loss Value or the full replacement cost of the Equipment  No insurance shall be subject to any co-insurance clause  The insurance policies shall provide that the insurance may not be altered or canceled by the insurer until after thirty (30) days written notice to Lessor  Lessee agrees to deliver to Lessor evidence of insurance reasonably satisfactory to Lessor

    (c)  Lessee hereby appoints Lessor as Lessee's attorney-in-fact to make proof of loss and claim for insurance, and to make adjustments with insurers and to receive payment of and execute or endorse all documents, checks or drafts in connection with insurance payments  Lessor shall not act as Lessee's attorney-in-fact unless Lessee is in default  Lessee shall pay any reasonable expenses of Lessor in adjusting or collecting insurance  Lessee will not make adjustments with insurers except with respect to claims for damage to any unit of Equipment where the repair costs are less than the lesser of ten percent (10%) of the original Equipment cost or ten thousand and 00/100 dollars ($10,000)  Lessor may, at its option, apply proceeds of insurance, in whole or in part, to (i) repair or replace Equipment or any portion thereof, or (ii) satisfy any obligation of Lessee to Lessor under this Agreement

10. RETURN OF EQUIPMENT:

    (a)  At the expiration or termination of this Agreement or any Schedule, Lessee shall perform any testing and repairs required to place the units of Equipment in the same condition and appearance as when received by Lessee (reasonable wear and tear excepted) and in good working order for the original intended purpose of the Equipment  If required the units of Equipment shall be deinstalled, disassembled and crated by an authorized manufacturer's representative or such other service person as is reasonably satisfactory to Lessor  Lessee shall remove installed markings that are not necessary for the operation, maintenance or repair of the Equipment  All Equipment will be cleaned, cosmetically acceptable, and in such condition as to be immediately installed into use in a similar environment for which the Equipment was originally intended to be used  All waste material and fluid must be removed from the Equipment and disposed of in accordance with then current waste disposal laws  Lessee shall return the units of Equipment to a location within the continental United States as Lessor shall direct  Lessee shall obtain and pay for a policy of transit insurance for the redelivery period in an amount equal to the replacement value of the Equipment  The transit insurance must name Lessor as the loss payee  The Lessee shall pay for all costs to comply with this section (a)

    (b)  Until Lessee has fully complied with the requirements of Section 10(a) above, Lessee's rent payment obligation and all other obligations under this Agreement shall continue from month to month notwithstanding any expiration or termination of the lease term  Lessor may terminate  the Lessee's right to use the Equipment upon ten (10) days notice to Lessee

    (c)  Lessee shall provide to Lessor a detailed inventory of all components of the Equipment including model and serial numbers  Lessee shall also provide an up-to-date copy of all other documentation pertaining to the Equipment  All service manuals, blue prints, process flow diagrams, operating manuals, inventory and maintenance records shall be given to Lessor at least ninety (90) days and not more than one hundred twenty (120) days prior to lease termination

    (d)  Lessee shall make the Equipment available for on-site operational inspections by potential purchasers at least one hundred twenty (120) days prior to and continuing up to lease termination  Lessor shall provide Lessee with reasonable notice prior to any inspection  Lessee shall provide personnel, power and other requirements necessary to demonstrate electrical, hydraulic and mechanical systems for each item of Equipment

11. DEFAULT AND REMEDIES:

(a) Lessor may in writing declare this Agreement in default if: (i) Lessee breaches its obligation to pay rent or any other sum when due and fails to cure the breach within ten (10) days; (ii) Lessee breaches any of its insurance obligations under Section 9; (iii) Lessee breaches any of its other obligations and fails to cure that breach within thirty (30) days after written notice from Lessor; (iv) any representation or warranty made by Lessee in connection with this Agreement shall be false or misleading in any material respect; (v) Lessee or any guarantor or other obligor for the Lessee's obligations hereunder ("Guarantor") becomes insolvent or ceases to do business as a going concern; (vi) any Equipment is illegally used; (vii) if Lessee or any Guarantor is a natural person, any death or incompetency of Lessee or such Guarantor; or (viii) a petition is filed by or against Lessee or any Guarantor under any bankruptcy or insolvency laws and in the event of an involuntary petition, the petition is not dismissed within forty-five (45) days of the filing date  The default declaration shall apply to all Schedules unless specifically excepted by Lessor

(b) After a default, at the request of Lessor, Lessee shall comply with the provisions of Section 10(a)  Lessee hereby authorizes Lessor to peacefully enter any premises where any Equipment may be and take possession of the Equipment  Lessee shall immediately pay to Lessor without further demand as liquidated damages for loss of a bargain and not as a penalty, the Stipulated Loss Value of the Equipment (calculated as of the rent payment date prior to the declaration of default), and all rents and other sums then due under this Agreement and all Schedules  Lessor may terminate this Agreement as to any or all of the Equipment.  A termination shall occur only upon written notice by Lessor to Lessee and only as to the units of Equipment specified in any such notice  Lessor may, but shall not be required to, sell Equipment at private or public sale, in bulk or in parcels, with or without notice, and without having the Equipment present at the place of sale  Lessor may also, but shall not be required to, lease, otherwise dispose of or keep idle all or part of the Equipment  Lessor may use Lessee's premises for a reasonable period of time for any or all of the purposes stated above without liability for rent, costs, damages or otherwise  The proceeds of sale, lease or other disposition, if any, shall be applied in the following order of priorities:  (i) to pay all of Lessor's costs, charges and expenses incurred in taking, removing, holding, repairing and selling, leasing or otherwise disposing of Equipment; then, (ii) to the extent not previously paid by Lessee, to pay Lessor all sums due from Lessee under this Agreement; then (iii) to reimburse to Lessee any sums previously paid by Lessee as liquidated damages; and (iv) any surplus shall be retained by Lessor  Lessee shall immediately pay any deficiency in (i) and (ii) above

(c) The foregoing remedies are cumulative, and any or all thereof may be exercised instead of or in addition to each other or any remedies at law, in equity, or under statute  Lessee waives notice of sale or other disposition (and the time and place thereof), and the manner and place of any advertising  Lessee shall pay Lessor's actual attorney's fees incurred in connection with the enforcement, assertion, defense or preservation of Lessor's rights and remedies under this Agreement, or if prohibited by law, such lesser sum as may be permitted  Waiver of any default shall not be a waiver of any other or subsequent default

(d) Any default under the terms of this or any other agreement between Lessor and Lessee may be declared by Lessor a default under this and any such other agreement

12. ASSIGNMENT: LESSEE SHALL NOT SELL, TRANSFER, ASSIGN, ENCUMBER OR SUBLET ANY EQUIPMENT OR THE INTEREST OF LESSEE IN THE EQUIPMENT WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR  Lessor may, without the consent of Lessee, assign this Agreement, any Schedule or the right to enter into a Schedule  Lessee agrees that if Lessee receives written notice of an assignment from Lessor, Lessee will pay all rent and all other amounts payable under any assigned Schedule to such assignee or as instructed by Lessor  Lessee also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee  Lessee hereby waives and agrees not to assert against any such assignee any defense, set-off, recoupment claim or counterclaim which Lessee has or may at any time have against Lessor for any reason whatsoever

13. NET LEASE: Lessee is unconditionally obligated to pay all rent and other amounts due for the entire lease term no matter what happens, even if the Equipment is damaged or destroyed, if it is defective or if Lessee no longer can use it  Lessee is not entitled to reduce or set-off against rent or other amounts due to Lessor or to anyone to whom Lessor assigns this Agreement or any Schedule whether Lessee's claim arises out of this Agreement, any Schedule, any statement by Lessor, Lessor's liability or any manufacturer's liability, strict liability, negligence or otherwise

14. INDEMNIFICATION:

(a) Lessee hereby agrees to indemnify Lessor, its agents, employees, successors and assigns (on an after tax basis) from and against any and all losses, damages, penalties, injuries, claims, actions and suits, including legal expenses, of whatsoever kind and nature arising out of or relating to the Equipment or this Agreement, except to the extent the losses, damages, penalties, injuries, claims, actions, suits or expenses result from Lessor's gross negligence or willful misconduct ("Claims")  This indemnity shall include, but is not limited to, Lessor's strict liability in tort and Claims, arising out of (i) the selection, manufacture, purchase, acceptance or rejection of Equipment, the ownership of Equipment during the term of this Agreement, and the delivery, lease, possession, maintenance, uses, condition, return or operation of Equipment (including, without limitation, latent and other defects, whether or not discoverable by Lessor or Lessee and any claim for patent, trademark or copyright infringement or environmental damage) or (ii) the condition of Equipment sold or disposed of after use by Lessee, any sublessee or employees of Lessee  Lessee shall, upon request, defend any actions based on, or arising out of, any of the foregoing

(b) Lessee hereby represents, warrants and covenants that (i) on the Lease Commencement Date for any unit of Equipment, such unit will qualify for all of the items of deduction and credit specified in Section C of the applicable Schedule ("Tax Benefits") in the hands of Lessor, and (ii) at no time during the term of this Agreement will Lessee take or omit to take, nor will it permit any sublessee or assignee to take or omit to take, any action (whether or not such act or omission is otherwise permitted by Lessor or by this Agreement), which will result in the disqualification of any Equipment for, or recapture of, all or any portion of such Tax Benefits

(c) If as a result of a breach of any representation, warranty or covenant of the Lessee contained in this Agreement or any Schedule (i) tax counsel of Lessor shall determine that Lessor is not entitled to claim on its Federal income tax return all or any portion of the Tax Benefits with respect to any Equipment, or (ii) any Tax Benefit claimed on the Federal income tax return of Lessor is disallowed or adjusted by the Internal Revenue Service, or (iii) any Tax Benefit is recalculated or recaptured (any determination, disallowance, adjustment, recalculation or recapture being a "Loss"), then Lessee shall pay to Lessor, as an indemnity and as additional rent, an amount that shall, in the reasonable opinion of Lessor, cause Lessor's after-tax economic yields and cash flows to equal the Net Economic Return that would have been realized by Lessor if such Loss had not occurred  Such amount shall be payable upon demand accompanied by a statement describing in reasonable detail such Loss and the computation of such amount. The economic yields and cash flows shall be computed on the same assumptions, including tax rates as were used by Lessor in originally evaluating the transaction ("Net Economic Return")  If an adjustment has been made under Section 3 then the Effective Rate used in the next preceding adjustment shall be substituted

(d) All references to Lessor in this Section 14 include Lessor and the consolidated taxpayer group of which Lessor is a member  All of Lessor's rights, privileges and indemnities contained in this Section 14 shall survive the expiration or other termination of this Agreement  The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns

15. DISCLAIMER:  LESSEE ACKNOWLEDGES THAT IT HAS SELECTED THE EQUIPMENT WITHOUT ANY ASSISTANCE FROM LESSOR, ITS AGENTS OR EMPLOYEES  LESSOR DOES NOT MAKE, HAS NOT MADE, NOR SHALL BE DEEMED TO MAKE OR HAVE MADE, ANY WARRANTY OR REPRESENTATION, EITHER EXPRESS OR IMPLIED, WRITTEN OR ORAL, WITH RESPECT TO THE EQUIPMENT LEASED UNDER THIS AGREEMENT OR ANY COMPONENT THEREOF, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY AS TO DESIGN, COMPLIANCE WITH SPECIFICATIONS, QUALITY OF MATERIALS OR WORKMANSHIP, MERCHANTABILITY, FITNESS FOR ANY PURPOSE, USE OR OPERATION, SAFETY, PATENT, TRADEMARK OR COPYRIGHT INFRINGEMENT, OR TITLE  All such risks, as between Lessor and Lessee, are to be borne by Lessee  Without limiting the foregoing, Lessor shall have no responsibility or liability to Lessee or any other person with respect to any of the following; (i) any liability, loss or damage caused or alleged to be caused directly or indirectly by any Equipment, any inadequacy thereof, any deficiency or defect (latent or otherwise) of the Equipment, or any other circumstance in connection with the Equipment; (ii) the use, operation or performance of any Equipment or any risks relating to it; (iii) any interruption of service, loss of business or anticipated profits or consequential damages; or (iv) the delivery, operation, servicing, maintenance, repair, improvement or replacement of any Equipment  If, and so long as, no default exists under this Agreement, Lessee shall be, and hereby is, authorized during the term of this Agreement to assert and enforce whatever claims and rights Lessor may have against any Supplier of the Equipment at Lessee's sole cost and expense, in the name of and for the account of Lessor and/or Lessee, as their interests may appear

16. REPRESENTATIONS AND WARRANTIES OF LESSEE: Lessee makes each of the following representations and warranties to Lessor on the date hereof and on the date of execution of each Schedule

(a) Lessee has adequate power and capacity to enter into, and perform under, this Agreement and all related documents (together, the "Documents")  Lessee is duly qualified to do business wherever necessary to carry on its present business and operations, including the jurisdiction(s) where the Equipment is or is to be located

(b) The Documents have been duly authorized, executed and delivered by Lessee and constitute valid, legal and binding agreements, enforceable in accordance with their terms, except to the extent that the enforcement of remedies may be limited under applicable bankruptcy and insolvency laws

(c) No approval, consent or withholding of objections is required from any governmental authority or entity with respect to the entry into or performance by Lessee of the Documents except such as have already been obtained

(d) The entry into and performance by Lessee of the Documents will not: (i) violate any judgment, order, law or regulation applicable to Lessee or any provision of Lessee's Certificate of Incorporation or bylaws; or (ii) result in any breach of, constitute a default under or result in the creation of any lien, charge, security interest or other encumbrance upon any Equipment pursuant to any indenture, mortgage, deed of trust, bank loan or credit agreement or other instrument (other than this Agreement) to which Lessee is a party

(e) There are no suits or proceedings pending or threatened in court or before any commission, board or other administrative agency against or affecting Lessee, which if decided against Lessee will have a material adverse effect on the ability of Lessee to fulfill its obligations under this Agreement

(f) The Equipment accepted under any Certificate of Acceptance is and will remain tangible personal property

(g) Each financial statement delivered to Lessor has been prepared in accordance with generally accepted accounting principles consistently applied  Since the date of the most recent financial statement, there has been no material adverse change

(h) Lessee's exact legal name is as set forth in the first sentence of this Agreement and Lessee is and will be at all times validly existing and in good standing under the laws of the State of its incorporation or organization (specified in the first sentence of this Agreement)

(i) The Equipment will at all times be used for commercial or business purposes

(j) Lessee is and will remain in full compliance with all laws and regulations applicable to it including, without limitation, (i) ensuring that no person who owns a controlling interest in or otherwise controls Lessee is or shall be (Y) listed on the Specially Designated Nationals and Blocked Person List maintained by the Office of Foreign Assets Control ("OFAC"), Department of the Treasury, and/or any other similar lists maintained by OFAC pursuant to any authorizing statute, Executive Order or regulation or (Z) a person designated under Section 1(b), (c) or (d) of Executive Order No. 13224 (September 23, 2001), any related enabling legislation or any other similar Executive Orders, and (ii) compliance with all applicable Bank Secrecy Act ("BSA") laws, regulations and government guidance on BSA compliance and on the prevention and detection of money laundering violations.

## 17. EARLY TERMINATION:

(a) On or after the First Termination Date (specified in the applicable Schedule), Lessee may, so long as no default exists hereunder, terminate this Agreement as to all (but not less than all) of the Equipment on such Schedule as of a rent payment date ("Termination Date")  Lessee must give Lessor at least ninety (90) days prior written notice of the termination

(b) Lessee shall, and Lessor may, solicit cash bids for the Equipment on an AS IS. WHERE IS BASIS without recourse to or warranty from Lessor, express or implied ("AS IS BASIS")  Prior to the Termination Date, Lessee shall (i) certify to Lessor any bids received by Lessee and (ii) pay to Lessor (A) the Termination Value (calculated as of the rent due on the Termination Date) for the Equipment, and (B) all rent and other sums due and unpaid as of the Termination Date

(c) If all amounts due hereunder have been paid on the Termination Date, Lessor shall (i) sell the Equipment on an AS IS BASIS for cash to the highest bidder and (ii) refund the proceeds of such sale (net of any related expenses) to Lessee up to the amount of the Termination Value  If such sale is not consummated, no termination shall occur and Lessor shall refund the Termination Value (less any expenses incurred by Lessor) to Lessee

(d) Notwithstanding the foregoing, Lessor may elect by written notice, at any time prior to the Termination Date, not to sell the Equipment  In that event, on the Termination Date Lessee shall (i) return the Equipment (in accordance with Section 10) and (ii) pay to Lessor all amounts required under Section 17(b) less the amount of the highest bid certified by Lessee to Lessor

## 18. PURCHASE OPTION:

(a) Lessee may at lease expiration purchase all (but not less than all) of the Equipment in any Schedule on an AS IS BASIS for cash equal to its then Fair Market Value (plus all applicable sales taxes)  Lessee must notify Lessor of its intent to purchase the Equipment in writing at least one hundred eighty (180) days in advance If Lessee is in default or if the Lease has already been terminated Lessee may not purchase the Equipment.

(b) "Fair Market Value" shall mean the price that a willing buyer (who is neither a lessee in possession nor a used equipment dealer) would pay for the Equipment in an arm's-length transaction to a willing seller under no compulsion to sell.  In determining the Fair Market Value the Equipment shall be assumed to be in the condition in which it is required to be maintained and returned under this Agreement.  If the Equipment is installed it shall be valued on an installed basis  The costs of removal from current location shall not be a deduction from  the value of the Equipment  If Lessor and Lessee are unable to agree on the Fair Market Value at least one hundred thirty-five (135) days before lease expiration, Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine Fair Market Value  The independent appraiser's determination shall be final, binding and conclusive  Lessee shall bear all costs associated with any such appraisal

(c) Lessee shall be deemed to have waived this option unless it provides Lessor with written notice of its irrevocable election to exercise the same within fifteen (15) days after Fair Market Value is told to Lessee

## 19. MISCELLANEOUS:

(a) LESSEE AND LESSOR UNCONDITIONALLY WAIVE THEIR RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN LESSEE AND LESSOR RELATING TO THE SUBJECT MATTER OF THIS TRANSACTION OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN LESSEE AND LESSOR  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT  THIS WAIVER IS IRREVOCABLE  THIS WAIVER MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING  THE WAIVER ALSO SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

ANY RELATED DOCUMENTS, OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THIS TRANSACTION OR ANY RELATED TRANSACTION  THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT

(b) The Equipment shall remain Lessor's property unless Lessee purchases the Equipment from Lessor and until such time Lessee shall only have the right to use the Equipment as a lessee  Any cancellation or termination by Lessor of this Agreement, any Schedule, supplement or amendment hereto, or the lease of any Equipment hereunder shall not release Lessee from any then outstanding obligations to Lessor hereunder  All Equipment shall at all times remain personal property of Lessor even though it may be attached to real property  The Equipment shall not become part of any other property by reason of any installation in, or attachment to, other real or personal property

(c) Time is of the essence of this Agreement  Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right at any other time to demand strict compliance with this Agreement  Lessee agrees, upon Lessor's request, to execute, or otherwise authenticate, any document, record or instrument necessary or expedient for filing, recording or perfecting the interest of Lessor or to carry out the intent of this Agreement  In addition, Lessee hereby authorizes Lessor to file a financing statement and amendments thereto describing the Equipment described in any and all Schedules now and hereafter executed pursuant hereto and adding any other collateral described therein and containing any other information required by the applicable Uniform Commercial Code  Lessee irrevocably grants to Lessor the power to sign Lessee's name and generally to act on behalf of Lessee to execute and file financing statements and other documents pertaining to any or all of the Equipment  Lessee hereby ratifies its prior authorization for Lessor to file financing statements and amendments thereto describing the Equipment and containing any other information required by any applicable law (including without limitation the Uniform Commercial Code) if filed prior to the date hereof  All notices required to be given hereunder shall be deemed adequately given if sent by registered or certified mail to the addressee at its address stated herein, or at such other place as such addressee may have specified in writing  This Agreement and any Schedule and Annexes thereto constitute the entire agreement of the parties with respect to the subject matter hereof  NO VARIATION OR MODIFICATION OF THIS AGREEMENT OR ANY WAIVER OF ANY OF ITS PROVISIONS OR CONDITIONS, SHALL BE VALID UNLESS IN WRITING AND SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE PARTIES HERETO

(d) If Lessee does not comply with any provision of this Agreement, Lessor shall have the right, but shall not be obligated, to effect such compliance, in whole or in part  All reasonable amounts spent and obligations incurred or assumed by Lessor in effecting such compliance shall constitute additional rent due to Lessor  Lessee shall pay the additional rent within five days after the date Lessor sends notice to Lessee requesting payment  Lessor's effecting such compliance shall not be a waiver of Lessee's default

(e) Any rent or other amount not paid to Lessor when due shall bear interest, from the due date until paid, at the lesser of eighteen percent (18%) per annum or the maximum rate allowed by law  Any provisions in this Agreement and any Schedule that are in conflict with any statute, law or applicable rule shall be deemed omitted, modified or altered to conform thereto

(f) Lessee hereby irrevocably authorizes Lessor to adjust the Capitalized Lessor's Cost up or down by no more than ten percent (10%) within each Schedule to account for equipment change orders, equipment returns, invoicing errors, and similar matters  Lessee acknowledges and agrees that the rent shall be adjusted as a result of the change in the Capitalized Lessor's Cost  Lessor shall send Lessee a written notice stating the final Capitalized Lessor's Cost, if it has changed

(g) THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL IN ALL RESPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF CONNECTICUT (WITHOUT REGARD TO THE CONFLICT OF LAWS PRINCIPLES OF SUCH STATE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, REGARDLESS OF THE LOCATION OF THE EQUIPMENT

(h) Any cancellation or termination by Lessor, pursuant to the provisions of this Agreement, any Schedule, supplement or amendment hereto, of the lease of any Equipment hereunder, shall not release Lessee from any then outstanding obligations to Lessor hereunder

(i) To the extent that any Schedule would constitute chattel paper, as such term is defined in the Uniform Commercial Code as in effect in any applicable jurisdiction, no security interest therein may be created through the transfer or possession of this Agreement in and of itself without the transfer or possession of the original of a Schedule executed pursuant to this Agreement and incorporating this Agreement by reference; and no security interest in this Agreement and a Schedule may be created by the transfer or possession of any counterpart of the Schedule other than the original thereof, which shall be identified as the document marked "Original" and all other counterparts shall be marked "Duplicate"

(j)  Each party hereto agrees to keep confidential, the terms and provisions of the Documents and the transactions contemplated hereby and thereby (collectively, the "Transactions")  Notwithstanding the foregoing, the obligations of confidentiality contained herein, as they relate to the Transactions, shall not apply to the federal tax structure or federal tax treatment of the Transactions, and each party hereto (and any employee, representative, or agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the federal tax structure and federal tax treatment of the Transactions  The preceding sentence is intended to cause each Transaction to be treated as not having been offered under conditions of confidentiality for purposes of Section 1 6011-4(b)(3) (or any successor provision) of the Treasury Regulations promulgated under Section 6011 of the Internal Revenue Code of 1986, as amended, and shall be construed in a manner consistent with such purpose  In addition, each party hereto acknowledges that it has no proprietary or exclusive rights to the federal tax structure of the Transactions or any federal tax matter or federal tax idea related to the Transactions

IN WITNESS WHEREOF, Lessee and Lessor have caused this Agreement to be executed by their duly authorized representatives as of the date first above written

LESSOR:
General Electric Capital Corporation

By: _____

Name:  Joyce Taylor

Title:  Sr. Risk Analyst

LESSEE:
Wireless Retail, Inc.

By: X _____

Name: ✓ Glenn Cantrell

Title: ✓ CFO

1000 (3/91)

# AMENDMENT



**THIS AMENDMENT** is made as of the √3 rd of July, 2003 , between General Electric Capital Corporation, together with its successors and assigns, if any, and Wireless Retail, Inc. in connection with that certain Master Lease Agreement, dated or dated as of July 3, 2003 ("Agreement") The terms of this Amendment are hereby incorporated into the Agreement as though fully set forth therein  The Agreement is hereby amended as follows:

Master Lease Changes

- Section 3 (a) is deleted and the following is inserted in its place

III    RENT ADJUSTMENT:

(a)    The periodic rent payments in Annex B have been calculated on the assumption (which, as between Lessor and Lessee, is mutual) that the maximum effective corporate income tax rate (exclusive of any minimum tax rate) for calendar-year taxpayers ("Effective Rate") will be thirty-five percent (35%) each year during the Term of this Lease

(b)    If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended (the "Code"), the Effective Rate is higher than thirty-five percent (35%) for any year during the lease Term, then Lessor shall have the right to increase such rent payments by requiring payment of a single additional sum equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less 35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value (as that term is described below) divided by the difference between the new Effective Rate (expressed as a decimal) and one (1)  Lessee shall pay to Lessor the full amount of the additional rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made

(c)    If, solely as a result of Congressional enactment of any law (including, without limitation, any modification of, or amendment or addition to, the Internal Revenue Code of 1986, as amended (the "Code"), the Effective Rate is lower than thirty-five percent (35%) for any year during the lease Term, then Lessor shall, upon request, reduce such rent payments by remitting to the Lessee a single additional sum equal to the product of (i) the Effective Rate (expressed as a decimal) for such year less 35 (or, in the event that any adjustment has been made hereunder for any previous year, the Effective Rate (expressed as a decimal) used in calculating the next previous adjustment) times (ii) the adjusted Termination Value divided by the difference between the new Effective Rate (expressed as a decimal) and one (1)  Lessor shall pay to Lessee the full amount of the reduced rent payment on the later of (i) receipt of notice or (ii) the first day of the year for which such adjustment is being made  As used herein, the adjusted Termination Value shall be the Termination Value (calculated as of the first rental due in the year for which such adjustment is being made) less the product of the Tax Benefits that would be allowable under Section 168 of the Code (as of the first day of the year for which such adjustment is being made and all subsequent years for which such adjustment is being made)

- Section 5 (b) on the first line, ninety (90) is deleted and one hundred and twenty (120) is inserted in its place
- Section 5(f) is deleted
- Section 10 (b) is amended by deleting "ten (10)" in the last line and inserting "thirty (30)" in its place
- Section 11 (a) is amended in the first line by inserting "to Lessee" after the word "writing"
- Section 11 (a) (iii) is amended by inserting "under this Lease" after the word "obligations"
- Section 11 (a) (viii) is amended by deleting "forty-five (45)" in the next to the last sentence and inserting "sixty (60)" in its place
- Section 11 (a) (viii) is amended in the last sentence by inserting "under this Master Lease Agreement" after the word "Schedules"
- Section 11 (b) is amended on the second line in the third sentence by deleting "without further demand"
- Section 11 (b) in the 8th sentence is amended by deleting  "reasonable period of time" and insert "60 days"
- Section 11 (b) (i) is amended by inserting "Lessor will provide any invoices or other documentation to Lessee if requested in writing by lessee"
- Section 11 (c), the second sentence is amended by deleting "Lessee waives" and inserting "If Lessee requests in writing, Lessor will provide"
- Section 14 (b) is amended by deleting "hereby represents, warrants and covenants" and inserting "acknowledges that it is the Lessor's intent"
- Section 14 (b) (ii) is amended by inserting at the beginning before the word  "at"  "Lessee hereby represents, warrants and covenants that"
- Section 17 (c) is amended in the last sentence by deleting "(less any expenses incurred by Lessor)" and inserting "(less any reasonable expenses incurred by Lessor)"
- Section 18 (a) is amended in the second sentence by deleting "one hundred eighty (180)" and inserting "one hundred thirty-five (135)"
- Section 19 (e) is amended by deleting "eighteen percent (18%)" and inserting "fifteen percent (15%)" in its place

TERMS USED, BUT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE AGREEMENT   EXCEPT AS EXPRESSLY AMENDED HEREBY, THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment by signature of their respective authorized representative set forth below

SECURED PARTY:                                DEBTOR:

General Electric Capital Corporation          Wireless Retail, Inc.

By:_____           By:X _____

Name:_____           Name: ✓ Glenn Cantrell

Title:_____           Title: ✓ CFO

1000 (3/91)  4145183001

*MULT1000*

## AMENDMENT

**THIS AMENDMENT** is made as of the twenty-fourth day of July, 2003, between General Electric Capital Corporation, together with its successors and assigns, if any, and Wireless Retail, Inc. in connection with that certain Equipment Schedule No. 001, dated or dated as of <u>July 3, 2003</u> ("Agreement")  The terms of this Amendment are hereby incorporated into the Agreement as though fully set forth therein  The Agreement is hereby amended as follows:

F  STIPULATED LOSS AND TERMINATION VALUE TABLE is amended to replace all Stipulated Loss Value Percentages as currently shown with the value of the specific corresponding month of the Termination Value Percentage such that the Stipulated Loss Value Percentage for any specific month will be the same number as the Termination Value Percentage for that same month  This will cover all rentals from 1-60

TERMS USED, BUT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE AGREEMENT   EXCEPT AS EXPRESSLY AMENDED HEREBY, THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT

**IN WITNESS WHEREOF,** the parties hereto have executed this Amendment by signature of their respective authorized representative set forth below

SECURED PARTY:
General Electric Capital Corporation

By: _____

Name:   Joyce Taylor

Title:   Sr. Risk Analyst

DEBTOR:
Wireless Retail, Inc.

By: _____

Name:   GLENN CANTRELL

Title:   CFO

1000 (3/91)  4145183002

# AMENDMENT

**\*MULT1000\***

THIS AMENDMENT is made as of the eleventh day of November, 2003, between General Electric Capital Corporation, together with its successors and assigns, if any, and Wireless Retail, Inc. in connection with that certain Master Lease Agreement, dated or dated as of July 3, 2003 ("Agreement") The terms of this Amendment are hereby incorporated into the Agreement as though fully set forth therein  The Agreement is hereby amended as follows:

change state of incorporation of Wireless Retail, Inc. from Delaware to Arizona

TERMS USED, BUT NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE MEANINGS GIVEN TO THEM IN THE AGREEMENT   EXCEPT AS EXPRESSLY AMENDED HEREBY, THE AGREEMENT SHALL REMAIN IN FULL FORCE AND EFFECT

IN WITNESS WHEREOF, the parties hereto have executed this Amendment by signature of their respective authorized representative set forth below

LESSOR:
General Electric Capital Corporation

By:_____

Name: _____

Title:_____

LESSEE:
Wireless Retail, Inc.

By: _____

Name: _Glenn Cantrell_____

Title: _CFO_____

2001 (6/87) 963873091



## CORPORATE LESSEE'S
## BOARD OF DIRECTORS RESOLUTION

The undersigned hereby certifies: (i) that she/he is the Secretary of Wireless Retail, Inc.; (ii) that the following is a true and correct copy of resolutions duly adopted at a meeting of the Board of Directors of said Corporation duly held on the _3 r d_ day of _July_ , 2003; and (iii) that said resolutions have not been amended, rescinded, modified or revoked, and are in full force and effect:

"**RESOLVED**, that each of the officers of this Corporation, whose name and signature appears below:

| NAME | TITLE | SIGNATURE |
|------|-------|-----------|
| Glenn Cantrell | CFO | X Glenn Cantrell |
| | | |
| | | |

or the duly elected or appointed successor in office of any or all of them, be, and hereby is, authorized and empowered in the name and on behalf of this Corporation to enter into, execute and deliver a master lease agreement with General Electric Capital Corporation (together with its successors and assigns, if any, "Lessor") as Lessor, providing for the leasing to (or sale and leaseback by) this Corporation, from time to time, of certain equipment, and further providing for this Corporation to indemnify said Lessor against certain occurrences and against the loss of contemplated tax treatment; and

**FURTHER RESOLVED**, that each officer of this Corporation be, and hereby is, authorized and empowered in the name and on behalf of this Corporation to enter into, execute and deliver any documents and to do and perform all other acts and deeds which may be necessary or appropriate to effectuate the lease (or sale and leaseback) of equipment from Lessor; and

**FURTHER RESOLVED**, that the Lessor may rely upon the aforesaid resolutions until receipt by it of written notice of any change

**IN WITNESS WHEREOF**, I have set my hand and affixed the seal of said Corporation this _3 r d_ day of _July_ , 2003

(CORPORATE SEAL)

X _____
Secretary

2205 (R021303) 968873091                                                        

## CORPORATE GUARANTY

Date: July 3, 2003

General Electric Capital Corporation
16479 Dallas Parkway #300
Addison, TX 75001-2512

To induce you to enter into, purchase or otherwise acquire, now or at any time hereafter, any promissory notes, security agreements, chattel mortgages, pledge agreements, conditional sale contracts, lease agreements, and/or any other documents or instruments evidencing, or relating to, any lease, loan, extension of credit or other financial accommodation (collectively "Account Documents" and each an "Account Document") to Wireless Retail, Inc., a corporation organized and existing under the laws of the State of AZ ("Customer"), but without in any way binding you to do so, the undersigned, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby guarantee to you, your successors and assigns, the due regular and punctual payment of any sum or sums of money which the Customer may owe to you now or at any time hereafter, whether evidenced by an Account Document, on open account or otherwise, and whether it represents principal, interest, rent, late charges, indemnities, an original balance, an accelerated balance, liquidated damages, a balance reduced by partial payment, a deficiency after sale or other disposition of any leased equipment, collateral or security, or any other type of sum of any kind whatsoever that the Customer may owe to you now or at any time hereafter, and does hereby further guarantee to you, your successors and assigns, the due, regular and punctual performance of any other duty or obligation of any kind or character whatsoever that the Customer may owe to you now or at any time hereafter (all such payment and performance obligations being collectively referred to as "Obligations")  Undersigned does hereby further guarantee to pay upon demand all losses, costs, attorneys' fees and expenses which may be suffered by you by reason of Customer's default or default of the undersigned  As used in this Guaranty, "you" shall mean General Electric Capital Corporation and all its subsidiaries

This Guaranty is a guaranty of prompt payment and performance (and not merely a guaranty of collection)  Nothing herein shall require you to first seek or exhaust any remedy against the Customer, its successors and assigns, or any other person obligated with respect to the Obligations, or to first foreclose, exhaust or otherwise proceed against any leased equipment, collateral or security which may be given in connection with the Obligations  It is agreed that you may, upon any breach or default of the Customer, or at any time thereafter, make demand upon the undersigned and receive payment and performance of the Obligations, with or without notice or demand for payment or performance by the Customer, its successors or assigns, or any other person  Suit may be brought and maintained against the undersigned, at your election, without joinder of the Customer or any other person as parties thereto  The obligations of each signatory to this Guaranty shall be joint and several

The undersigned agrees that its obligations under this Guaranty shall be primary, absolute, continuing and unconditional, irrespective of and unaffected by any of the following actions or circumstances (regardless of any notice to or consent of the undersigned): (a) the genuineness, validity, regularity and enforceability of the Account Documents or any other document; (b) any extension, renewal, amendment, change, waiver or other modification of the Account Documents or any other document; (c) the absence of, or delay in, any action to enforce the Account Documents, this Guaranty or any other document; (d) your failure or delay in obtaining any other guaranty of the Obligations (including, without limitation, your failure to obtain the signature of any other guarantor hereunder); (e) the release of, extension of time for payment or performance by, or any other indulgence granted to the Customer or any other person with respect to the Obligations by operation of law or otherwise; (f) the existence, value, condition, loss, subordination or release (with or without substitution) of, or failure to have title to or perfect and maintain a security interest in, or the time, place and manner of any sale or other disposition of any leased equipment, collateral or security given in connection with the Obligations, or any other impairment (whether intentional or negligent, by operation of law or otherwise) of the rights of the undersigned; (g) the Customer's voluntary or involuntary bankruptcy, assignment for the benefit of creditors, reorganization, or similar proceedings affecting the Customer or any of its assets; or (h) any other action or circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor

This Guaranty, the Account Documents and the Obligations may be assigned by you, without the consent of the Undersigned  The Undersigned agrees that if it receives written notice of an assignment from you, the Undersigned will pay all amounts due hereunder to such assignee or as instructed by you  The Undersigned also agrees to confirm in writing receipt of the notice of assignment as may be reasonably requested by assignee  The Undersigned hereby waives and agrees not to assert against any such assignee any of the defenses set forth in the immediate preceding paragraph

This Guaranty may be terminated upon delivery to you (at your address shown above) of a written termination notice from the undersigned  However, as to all Obligations (whether matured, unmatured, absolute, contingent or otherwise) incurred by the Customer prior to your receipt of such written termination notice (and regardless of any subsequent amendment, extension or other modification which may be made with respect to such Obligations), this Guaranty shall nevertheless continue and remain undischarged until all such Obligations are indefeasibly paid and performed in full

The undersigned agrees that this Guaranty shall remain in full force and effect or be reinstated (as the case may be) if at any time payment or performance of any of the Obligations (or any part thereof) is rescinded, reduced or must otherwise be restored or returned by you, all as though such payment or performance had not

been made  If, by reason of any bankruptcy, insolvency or similar laws effecting the rights of creditors, you shall be prohibited from exercising any of your rights or remedies against the Customer or any other person or against any property, then, as between you and the undersigned, such prohibition shall be of no force and effect, and you shall have the right to make demand upon, and receive payment from, the undersigned of all amounts and other sums that would be due to you upon a default with respect to the Obligations

Notice of acceptance of this Guaranty and of any default by the Customer or any other person is hereby waived  Presentment, protest demand, and notice of protest, demand and dishonor of any of the Obligations, and the exercise of possessory, collection or other remedies for the Obligations, are hereby waived  The undersigned warrants that it has adequate means to obtain from the Customer on a continuing basis financial data and other information regarding the Customer and is not relying upon you to provide any such data or other information  Without limiting the foregoing, notice of adverse change in the Customer's financial condition or of any other fact which might materially increase the risk of the undersigned is also waived  All settlements, compromises, accounts stated and agreed balances made in good faith between the Customer, its successors or assigns, and you shall be binding upon and shall not affect the liability of the undersigned

Payment of all amounts now or hereafter owed to the undersigned by the Customer or any other obligor for any of the Obligations is hereby subordinated in right of payment to the indefeasible payment in full to you of all Obligations and is hereby assigned to you as a security therefor  The undersigned hereby irrevocably and unconditionally waives and relinquishes all statutory, contractual, common law, equitable and all other claims against the Customer, any other obligor for any of the Obligations, any collateral therefor, or any other assets of the Customer or any such other obligor, for subrogation, reimbursement, exoneration, contribution, indemnification, setoff or other recourse in respect of sums paid or payable to you by the undersigned hereunder, and the undersigned hereby irrevocably and unconditionally waives and relinquishes any and all other benefits which it might otherwise directly or indirectly receive or be entitled to receive by reason of any amounts paid by, or collected or due from, it, the Customer or any other obligor for any of the Obligations, or realized from any of their respective assets

THE UNDERSIGNED HEREBY UNCONDITIONALLY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF, DIRECTLY OR INDIRECTLY, THIS GUARANTY, THE OBLIGATIONS GUARANTEED HEREBY, ANY OF THE RELATED DOCUMENTS, ANY DEALINGS BETWEEN US RELATING TO THE SUBJECT MATTER HEREOF OR THEREOF, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN US  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT (INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS)  THIS WAIVER IS IRREVOCABLE MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS GUARANTY, THE OBLIGATIONS GUARANTEED HEREBY, OR ANY RELATED DOCUMENTS  IN THE EVENT OF LITIGATION, THIS GUARANTY MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT

As used in this Guaranty, the word "person" shall include any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or any government or any political subdivision thereof

This Guaranty is intended by the parties as  a final expression of the guaranty of the undersigned and is also intended as a complete and exclusive statement of the terms thereof  No course of dealing, course of performance or trade usage, nor any paid evidence of any kind, shall be used to supplement or modify any of the terms hereof  Nor are there any conditions to the full effectiveness of this Guaranty  This Guaranty and each of its provisions may only be waived, modified, varied, released, terminated or surrendered, in whole or in part, by a duly authorized written instrument signed by you  No failure by you to exercise your rights hereunder shall give rise to any estoppel against you, or excuse the undersigned from performing hereunder  Your waiver of any right to demand performance hereunder shall not be a waiver of any subsequent or other right to demand performance hereunder

This Guaranty shall bind the undersigned's successors and assigns and the benefits thereof shall extend to and include your successors and assigns  In the event of default hereunder, you may at any time inspect undersigned's records, or at your option, undersigned shall furnish you with a current independent audit report

If any provisions of this Guaranty are in conflict with any applicable statute, rule or law, then such provisions shall be deemed null and void to the extent that they may conflict therewith, but without invalidating any other provisions hereof

Each signatory on behalf of a corporate guarantor warrants that he had authority to sign on behalf of such corporation and by so signing, to bind said guarantor corporation hereunder

**IN WITNESS WHEREOF**, this Guaranty is executed the day and year above written

Wireless America, Inc,

By:   X  _Glen Carter_
         (Signature)

Title:  _CFO_
         (Officer's Title)

ATTEST:  X  _____
              (Secretary/Assistant Secretary

## Certified Resolution

The undersigned hereby certifies that he is Secretary of Wireless America, Inc., that the following resolution was passed at a meeting of the Board of Directors of said corporation held on _July 3_, _2003_ duly called, a quorum being present, that said resolution has not since been revoked or amended, and that the form of guaranty referred to therein is the form shown attached hereto:

"**RESOLVED** that it is to the benefit of this corporation that it execute a guaranty of the obligations of Wireless Retail, Inc. ("Customer") to General Electric Capital Corporation (together with its successors and assigns, if any, the "Lessor") and that the benefit to be received by this corporation from such guaranty is reasonably worth the obligations thereby guaranteed, and further that such guaranty shall be substantially in the form annexed to these minutes, and further that the _President_ and _CFO_ (Title of Officers) of this corporation are authorized to execute such guaranty on the behalf of this corporation "

**WITNESS** my hand and the seal of this corporation on this _3rd_ day of _July 2003_

[Seal]

X _____
Secretary

4145183001

# *MULT1015*

**DIRECTIONS:** *Please complete and return with your signed deal documents or FAX to 972-713-3596*
*Please make any necessary corrections to the following information:*

Customer name  <u>Wireless Retail, Inc.</u>

Customer e-mail address  <u>paulroberts@wirelessretailinc.com</u>    Billing e-mail address  _____

Contact name  <u>Paul Roberts</u>    Title  <u>Treasurer</u>

Contact phone  <u>480 346 4361</u>    FAX  <u>480 346 0377</u>

1. **Where would you like your invoice sent?**

   Billing address  <u>8800 E Chaparral Suite 300</u>

   City/State/Zip  <u>Scottsdale AZ 85250</u>

   Attention  <u>Paul Roberts</u>    Phone  <u>480 346 4361</u>

   Department  <u>Finance</u>

2. **What information would you like on your invoice?**

   *NO* Company Purchase Order number (if checked, list PO number: _____ )

   *YES* Equipment serial number, model number and description

   *YES* Equipment location

   *Yes* Rent and sales tax broken down by asset

3. We can provide you with one invoice that incorporates the billing for all your Commercial Equipment Financing accounts with *THE SAME DUE DATE, THE SAME BILLING ADDRESS* and *THE SAME NUMBER OF ADVANCE BILLING DAYS.*

   Would you like to receive one combined invoice?    ⟨ Yes ⟩    ⟨ No

4. To help us plan for possible future enhancements to invoices, what other information would you like to see on your invoice?

   <u>- payment number & number of remaining payments</u>
   <u>- confirmation of & amount of last pymt received</u>

Melva Dutt
Region Documentation Specialist
Account Schedule # 4145183001

State of _Georgia_
County of _Fulton_



## CONSENT TO INSTALLATION

The undersigned depose and say that:
Each has and claims the interest set forth beneath his signature hereto in and to all that portion of the building described in that certain Industrial Lease Agreement between Industrial Developments International, Inc. ("Owner") and Wireless Retail, Inc. ("Customer") dated June 17, 2003 (the "Lease") commonly known as: Building C, Airways Distribution Center, DeSoto County, Mississippi (the "Premises") and located on the real property described on Exhibit A attached hereto and as more particularly set forth in _____ at page(s) _____ (Liber and page of recorded deeds, mortgages, and leases);

Said premises are presently occupied by Customer. Customer has entered into a lease, security agreement, chattel mortgage or similar agreement dated _July 3, 2003_, ("Agreement") with General Electric Capital Corporation ("Interest Holder"), whereby the said Interest Holder shall have the ownership of, first lien on or other paramount rights to the personal property ("Personal Property") described on Exhibit B hereto subject only to the Customer's rights as provided in said Agreement.

THEREFORE, in consideration of One Dollar ($1.00) and other good and valuable consideration the receipt of which is hereby acknowledged and in order to induce the Interest Holder to enter into the Agreement to permit the Customer to locate the Personal Property on the Premises and any assignee to purchase and/or to take any assignment of said Agreement, the undersigned do hereby jointly and severally covenant and agree that the Personal Property has been or may be affixed or otherwise installed or kept at, in, or upon the Premises in accordance with the terms of the Lease, and that said Personal Property is to remain personal property notwithstanding the manner in which it may become or is affixed to or installed at the premises and that the Interest Holder's claim in and to such Personal Property shall remain undiminished and unaffected by such affixation, installation or storage throughout the term of the Agreement and any extension thereof, and until and unless the Interest Holder or any assignee thereof shall formally release or transfer its interests in and to such Personal Property to or in favor of such Customer.

The undersigned further agree that the Interest Holder and any assignee may enter upon the Premises during the term of the Lease at all reasonable times upon at least two (2) days written notice (and at all times accompanied by an agent or employee of Owner) to inspect and/or remove said Personal Property from the Premises whenever it deems it necessary to do so to protect its interest. Interest Holder shall pay to Owner reasonable compensation for any physical damage to the Premises caused by such removal. Interest Holder shall and does hereby agree to indemnify, defend (with counsel satisfactory to Owner) and hold harmless Owner, its partners, and its and their respective agents, associates, partners, officers, shareholders, members, employees, representatives, heirs, executors, administrators, successors and assigns from and against any and all suits, damages, claims, causes of action, liability, costs and expenses (including attorneys' fees and expenses at the trial and appellate levels) which may arise as a result of such entry or removal, or as a result of any other exercise by Interest Holder of its rights or remedies as against Customer and/or the Personal Property, other than to the extent caused by Owner's negligence or willful misconduct. Interest Holder shall perform any such removal of the Personal Property in accordance with the rules and regulations then applicable to the Premises and in accordance with the terms of the Lease.

Interest Holder hereby waives any claim or cause of action against Owner for injury or damage to person or property or any other claim whatsoever, other than to the extent resulting from Owner's negligence or willful

misconduct, in connection with or arising out of Interest Holder's entry upon the Premises and/or its removal of the Personal Property therefrom.

Each undersigned hereby waives each and every right which he now has in the Personal Property (to the extent and for so long as Customer does not own the Personal Property) or which he may hereafter acquire (to the extent and for so long as Customer does not own the Personal Property) under the laws of the State of Mississippi or by virtue of any deed, lease, mortgage or other agreement now in effect or hereafter received by the undersigned to own, levy upon, distrain, seize, restrain or otherwise hold or possess said Personal Property for any reason.  To the extent the Personal Property is deemed to be owned by Customer, Owner hereby subordinates its contractual lien rights concerning the Personal Property to Interest Holder to the extent Interest Holder has provided funds for the acquisition of the Personal Property.

[signatures begin on following page]

- 2 -

WITNESS our hands and seal this _____ 8th _____ day of __ July __, 2003.

**OWNER**                                              Address  3424 Peachtree Rd. NE
                                                              Atlanta GA 30326
INDUSTRIAL DEVELOPMENTS
INTERNATIONAL, INC., A DELAWARE            Phone  464-479-4600
CORPORATION

By:
   Name: _____
   Title: _____
          HENRY D. GREGORY, JR.
          PRESIDENT

Sworn to before me this _____ 8th _____ day of
__ July __, 2003.


__ Charlotte Robinson __
              Notary Public

'otary Public. Gwinnett County, Geor···
··· ·· ·· rission Expires Oct. 6, 2005

INTEREST HOLDER

Address   16479 Dallas Parkway, Suite 300
          Addison, TX 75001

GENERAL ELECTRIC CORPORATION

Phone   (972) 713-2539

By: _____
    Name:   Joyce Taylor
    Title:  Senior Risk Analyst

Sworn to before me this ___25th___ day of
___August___ , _2003_ .

_____
Notary Public

My Commission Expires ___11-29-03___

CUSTOMER                                    Address   8800 E. Chaparral Road
                                                      Suite 300
WIRELESS RETAIL, INC.                                 Scottsdale, AZ 85250
                                            Phone   (480) 346-4400
By: _____
    Name: _____
    Title:  Glenn Contrell, CFO

Sworn to before me this ___17th___ day of
___July___ , _2003_ .

_____
Notary Public

VICTORIA PARKER
Notary Public, Maricopa Co., AZ
My Comm. Expires Sept. 22, 2003

- 4 -

Exhibit A

Lot 7, Airport Industrial Park P.B.P. (proposed)

Being Part of the JMH Development property as described in Book 368 Page 509 and being in the Northeast Quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, DeSoto County, Mississippi and being more particularly described as follows:

Commencing at the recognized and accepted northeast corner of the northeast quarter of Section 24, Township 1 South, Range 8 West Chickasaw Cession in Southaven, Desoto County, Mississippi; thence South 00 Degrees 09 Minutes 32 Seconds West with the centerline of Airways Boulevard a distance of 1529.64 feet to a point; thence North 90 Degrees 00 Minutes 00 Seconds West a distance of 1677.91 feet to a point on curve in the south line of Airport Industrial Drive, said point being the true point of beginning; thence southeastwardly along a curve to the right having a radius of 35.00 feet a distance of 54.71 feet (chord = South 44 Degrees 35 Minutes 00 Seconds East 49.31 feet, Delta = 89 Degrees 33 Minutes 34 Seconds) to a point in the west line of Market Street (proposed); thence South 00 Degrees 11 Minutes 47 Seconds West with the west line of Market Street (proposed) a distance of 467.49 feet to a point in the north line of Lot 8, Airport Industrial Park P.B.P. (proposed); thence North 89 Degrees 48 Minutes 13 Seconds West with the north line of Lot 8 (proposed) a distance of 1055.59 feet to a point in the east line of Hamilton Road; thence North 00 Degrees 24 Minutes 18 Seconds West with the east line of Hamilton Road a distance of 461.85 feet to a point of curvature; thence northeastwardly along a curve to the right having a radius of 35.00 feet a distance of 55.16 feet (chord = North 44 Degrees 44 Minutes 28 Seconds East 49.62 feet, Delta = 90 Degrees 17 Minutes 33 Seconds) to a point of tangency in the south line of Airport Industrial Drive; thence North 89 Degrees 53 Minutes 14 Seconds East with the south line of Airport Industrial Drive a distance of 983.51 feet to a point of curvature; thence southeastwardly along a curve to the right having a radius of 566.00 feet and with the south line of Airport Industrial Drive a distance of 7.40 feet (chord = South 89 Degrees 44 Minutes 16 Seconds East 7.40 feet, Delta = 00 Degrees 44 Minutes 59 Seconds) to the point of beginning and containing 12.13 acres of land.

ATL01/11460431v3

## Exhibit B

## DESCRIPTION OF EQUIPMENT

| Number of Units | Capitalized Lessor's Cost | Manufacturer | Serial Number | Model and Type of Equipment |
|---|---|---|---|---|
| 1 | $1,801,571 00 | Siemens Dematic Corp | | Conveyor system per Siemens Dematic proposal number 27844-Rev 03 dated 5-14-2003  Conveyors include but are not limited to model 1265 accumulation conveyor, model 1102 transportation conveyor, model 410 belt conveyor, gravity roller conveyor, and PS140 sorter plus all attachments and accessories thereto |
| 1 | $364,551 88 | Frazier Industrial Company | | racking further described below |

Single Deep Selective Racks

| 254 | Type 4SX upright frames 23'-6" high, 44 inches deep |
| | Front column double channel  to 76" high with cap |
| | Welded bullnose with angled cap |
| | Bolt in C4 rubrail X 4" high |
| 1,434 | Type CB3 beams X 96 inches long |
| 2,868 | Bolt in pallet supports X 44 inches long |
| 238 | Back to back ties |
| 254 | Leveling Shims X 1/8" thick |
| 508 | Wedge Type Anchors ½ x 3 ¾" |
| 254 | Wedge type anchors ¾" X 6 ½" |

Single Deep Selective Racks with Shelving

| 210 | Type 4SX upright frames 23'-6" high, 44 inches deep |
| | Front column double channel  to 76" high with cap |
| | Welded bullnose with angled cap |
| | Bolt in C4 rubrail X 4" high |
| 1,176 | Type CB3 beams X 96 inches long |
| 2,352 | Bolt in pallet supports X 44 inches long |
| 1,176 | Type  AB3X2 beams X 96 inches long-shelving beam |
| 196 | Back to back ties |
| 210 | Leveling  Shims X 1/8" thick |
| 420 | Wedge Type Anchors ½ x 3 ¾" |
| 210 | Wedge type anchors ¾" X 6 ½" |

Wire Decking for Shelving Levels

| 1,176 | Welded wire mesh decks – 46" wide X 44" deep |
| | 2 X 4 X gauge welded wire with reinforcing channels |

Row End Protection

| 18 | Row end protectors – 98" long X 24" high – ¼" plate anchored on 12" centers |

Pick Modules

| | |
|---|---|
| 52 | Type 4SX upright frames 23'-6" high 54 inches deep |
| | Front column double channel to 76" high with cap |
| | Welded bullnose with angled cap |
| | Bolt in C4 rubrail X 4" high |
| 192 | Type CB3 beams X 96 inches long |
| 384 | Bolt in pallet supports X 54" long |
| 64 | Welded wire mesh decks – 46" wide X 54" deep |
| | 2 X 4 X gauge welded wire with reinforcing channels |
| 52 | Type 4SX upright frames 23'-6" high 54inches deep |
| 52 | Type 4SX monopost 23'-6" high |
| | Column double channel to 112" high with cap |
| 212 | Monopost braces X 46" long |
| 288 | Type CB3 beams X 96 inches long |
| 26 | Cross aisle ties X 12' long |
| 144 | Carton flow shelf beds 96" wide X 96 inches deep |
| 144 | Carton flow shelf impact tray – 12" wide X 96" long |
| 2,016 | Tracks X 96 inches long (3 tracks per lane) |
| 864 | Guides X 120 inches long |
| 192 | Rack column adapter stips X 96" long |
| 54 | Lanes of double staggered 1 9" diameter skatewheel |
| | 4 pallet deep flow tracks X 206 inches long |
| | Lanes consist of 2 runs of double staggered wheels, complete with 3/16" full width plate stop |
| | Loading end equipped with ¼" steel floor mounted bullnose |
| 256 | Floor angles X 40" wide – for mounting internal sections of pallet flow track to floor |
| 64 | Floor angles X 40" wide -  for picking end of floor rail 3 X 4 X 3/16" angle anchored to floor |
| 260 | Levelling shims X 1/8" thick |
| 260 | Wedge type anchors ½ X 3 ¾" X 6 ½" |

Netting for Rear of Single Deep Rack Rows

| | |
|---|---|
| 1 | Lot (6,600 square feet) fabric safety netting for rear of rows model M-1500 – 2" square |

Wide Span Shelving

| | |
|---|---|
| 5 | Type 3SX upright frames 8' high, 18 inches deep |
| 36 | Type 3SX upright frames 8' high, 48 inches deep |
| 264 | Type CB3 beams X 96 inches long |
| 264 | Welded wire mesh decks – 46" wide X 44" deep |
| 82 | Wedge type anchors ½ X 3 ¾" |

Additional Equipment to racking above:

Add 5th level of beams in 411 bays – 4" channel beam
Upgrade 2,898 remaining 3" pallet load beams to 4" channel
Upgrade safety supports for upper levels of rack in pick module to wire mesh decking
Additional cost for 3rd rail in pallet flow lanes
Additional cost for pallet separators

Equipment immediately listed above is located at:  481 Airport Industrial Dr. Suite 110,  Southaven, De Soto County, MS 38671

Initials: _____         _____
            Lessor                        Lessee