## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## JACKSON DIVISION

In re:

**WAREHOUSE 86, LLC**

**Debtor**

**CASE NO.   08-03423-EE**
**Chapter 11**

SCK, INC. and
RADIOSHACK CORPORATION

**Plaintiffs**

v.

**Adv. Pro. No. 09-00139-EE**

WAREHOUSE 86, LLC,

**Defendant.**

## WAREHOUSE 86, LLC'S REBUTTAL IN SUPPORT OF
## AMENDED MOTION FOR PARTIAL SUMMARY JUDGMENT
### [Relates to Adv. Dkt. ## 29; 30; 36; 39; & 41]

Warehouse 86, LLC, the Debtor-in-Possession herein ("Warehouse 86"),

submits the following rebuttal in support of its Amended Motion for Partial

Summary Judgment (Adv. Dkt. ## 30 (Motion) & 29 (Memorandum)), and

respectfully shows the following:

## I.   RadioShack must be dismissed.

Warehouse 86's memorandum (Adv. Dkt. # 29) pointed out, first, that the

Complaint (Dkt. # 197; Adv. Dkt. # 1), fails to state a claim on which RadioShack

Corporation "RadioShack") can recover in this adversary proceeding, which is

concerned solely and exclusively with rights to the three checks of Employer's
Mutual in the total amount of $2,089,882.35 paid into the registry of the Court
by Warehouse 86 (the "Insurance Proceeds"). *See* Dkt. # 184.   Second,
Warehouse 86 pointed out that in any event, as a factual matter, the Employer's
Mutual insurance policy in question confers no rights upon RadioShack.

   RadioShack's "response" is entirely non-responsive.   Rather than point to
any language in the Complaint that states a claim,[1] or to any language in the
Employer's Mutual policy that refers to RadioShack by name or class,
RadioShack's memorandum (Adv. Dkt. # 36) and Supplemental Response (Adv.
Dkt. # 41) merely assert:

- that RadioShack has a claim against Warehouse 86 for a rent deposit;

- that Warehouse 86 made rent payments to RadioShack; and

- that RadioShack had its own insurance policy.

From these premises RadioShack concludes:   "RadioShack has sufficient claims
to the [Employer's Mutual] Insurance Proceeds, which should not be dismissed."
*RadioShack/SCK Memorandum* (Adv. Dkt. # 36) at pp. 3, 12-13.

   This is a *non sequitur.*   There is nothing about any of RadioShack's
assertions that even remotely establishes that RadioShack has *any* claims to the
proceeds of the Employer's Mutual policy, or *any* rights under that insurance
policy – the only insurance policy and the only proceeds that are at issue in this

_____

[1] The Complaint's only substantive reference to RadioShack is found in
paragraph 29, where we are told that RadioShack, for no apparent reason, discharged
certain of SCK's debts.   Dkt. # 197, p. 5.   RadioShack's decision to act as a mere
volunteer – or, at best, to disregard corporate formalities, and treat SCK as an alter ego
– could never give RadioShack rights in the Employer's Mutual insurance proceeds.

adversary proceeding.    (SCK has rights under the Employer's Mutual policy because the policy refers to SCK.    The policy, however, makes no reference whatsoever to RadioShack.)    And there is *nothing* about any of RadioShack's assertions that even begins to cure the undisputed fact that the Complaint fails to state a claim upon which RadioShack can recover.[2]

RadioShack may have an "interest" in this litigation, in the popular sense that a favorable result for its subsidiary, SCK, would somehow ultimately benefit RadioShack.    RadioShack may even have a claim against Warehouse 86 (although, if it does, that is not the subject of this adversary proceeding).    But this is no substitute for language in the Complaint, in this adversary proceeding, that states a claim on behalf of RadioShack in this adversary proceeding, or language in the insurance policy at issue in this adversary proceeding that confers rights upon RadioShack.    RadioShack, therefore, must be dismissed from this adversary proceeding.

---

[2] This would have been true even under the old "no set of facts" test. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) ("complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").    It is all the more true under the newer, and much more demanding, *Twombly* test.    *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563, 570 (2007) (overruling *Conley*, and holding that, to survive motion to dismiss, complaint must allege facts adding up to a claim "that is plausible on its face"). *See also Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009) (re-affirming and expanding *Twombly*).

## II.  Warehouse 86 is entitled, as a matter of law, to the partial summary judgment sought.

### A.  Warehouse 86 is entitled, as a matter of law, to the portion of the proceeds that was paid for things other than "Covered Property."

Warehouse 86's memorandum pointed out that the Employer's Mutual policy makes losses payable to SCK and Warehouse 86 jointly, "as interests may appear," but only for "Covered Property":

### B. LOSS PAYABLE

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1. Adjust losses with you; and
2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

The memorandum went on to observe that :  (1)  of the Insurance Proceeds, Employer's Mutual paid $149,199.75 for things, such as loss of business income, that do not constitute "Covered Property" as defined in the policy; (2) under the language of the policy, as applied in *Abilene, Florists' Mutual,* and *Continental,*[3] loss payees have no rights in such payments; and (3) therefore, Warehouse 86 is entitled, as a matter of law, to judgment for these payments.  (The memorandum should have placed the $20,940.64 paid for Tornado Clean Up under this same heading.)

How did SCK respond to *Abilene, Florists' Mutual,* and *Continental?*  By ignoring them. Nowhere in SCK's response is there any suggestion that these

---

[3]*First Nat. Bank, Abilene Texas v. American States Ins. Co.*, 1998 WL 30246 *2 (10th Cir.) (unpublished); *Continental Mortg. and Equity Trust v. Meridian Mut. Ins. Co.,* 969 F.Supp. 460, 464 (E.D. Mich. 1997); *Florists' Mut. Ins. Co. v. Agstar of New Mexico, Inc.*, 2005 WL 3664325 *6 (D.N.M.).

cases can be distinguished, or were wrongly decided.   At an absolute minimum, Warehouse 86 has established its immediate right to $170,140.39 of the proceeds.

### B.   SCK *is* "bound" by the loss adjustment effected between Employer's Mutual and Warehouse 86.

The second major point that Warehouse 86's memorandum made was that, as to the remaining Employer's Mutual proceeds, SCK has no right except to the extent that it can prove that both it and Warehouse 86 had an interest in the property for which Employer's Mutual paid; and then only "as [their] interests may appear."   (In this connection the memorandum observed that, as a matter of undisputed fact, SCK has no rights to, or interest in, the $681,685.36 paid for Warehouse 86's inventory, Warehouse 86's Business Personal Property, or Warehouse 86's Business Supplies.[4])

SCK responds to this by asserting that it is not "bound" by the "allocations" shown in the Employer's Mutual statements of loss. *RadioShack and SCK Memorandum* (Dkt. # 36) p. 9.   By this, SCK apparently means that even though the amounts that Employer's Mutual paid, and the items for which it paid, are undisputed, this Court should re-do the work of the adjuster, and find, after a trial, that Employer's Mutual should have paid $X more for this item, and $Y less for that item.

---

[4] The figure in Warehouse 86's principal memorandum was $702,626.00.   The difference is the $20,940.64 paid for Tornado Clean Up, which, as noted above, is not even "Covered Property."

**1.   The policy, which is the sole and exclusive source of SCK's rights to policy proceeds, expressly authorizes Warehouse 86 to adjust all losses, and gives no role whatsoever to SCK.**

SCK does not make clear where its proposed process would ultimately lead,[5] but we need not answer that question, because SCK can not get beyond the language of the policy.   Under the policy, SCK *is* "bound" by the loss adjustment Employer's Mutual effected that Warehouse 86.   The very same clause that gives SCK rights in the policy payments provides that *how much* shall be paid, and *for what,* will be determined between Employer's Mutual and Warehouse 86:

**B. LOSS PAYABLE**

For Covered Property in which both you and a Loss Payee shown in the Schedule or in the Declarations have an insurable interest, we will:

1. Adjust losses with you; and

2. Pay any claim for loss or damage jointly to you and the Loss Payee, as interests may appear.

"[W]e will . . . [a]djust losses with you."   The "you" here -- the one with whom Employer's Mutual will "adjust losses" – that is, agree on how much shall be

---

[5] Suppose the Court were to find that Employer's Mutual "should have" paid more for a widget in which SCK had an interest.   What then?   Employer's Mutual having been released, it is not possible to make Employer's Mutual pay more. Apparently SCK also wishes to show that Employer's Mutual "should have" paid less for a widget belonging to Warehouse 86, and then demand on "equitable" grounds that the "overpayment" on the Warehouse 86 widget be taken from Warehouse 86's other creditors, and given to SCK, to "make up" for the "underpayment" on the widget in which SCK had an interest.   But where is the authority for this astonishing bit of legerdemain?   SCK cites absolutely none.   As for equity, if Employer's Mutual has in fact "overpaid" for something, surely the equity in that overpayment belongs to Employers' Mutual?

The problem with SCK's theory, apart from an utter lack of authority, or even equity, is that a finding that Employer's Mutual "should have" paid more (or less) for a given widget can never change the fact that it did not do so.

- 6 -

paid, and for what[6] -- is not the "Loss Payee," SCK, but the Named Insured,
Warehouse 86.[7] To put it bluntly, the Loss Payee *is* "bound."

SCK cites *Georgia Home Ins. Co. v. Stein*, 18 So. 414 (Miss. 1895), and *First
Nat. Bank v. National Liberty Ins. Co. of America*, 156 Minn. 1, 4, 194 N.W. 6,
7 (Minn. 1923), correctly observing that in these cases the loss payee was not
bound by the adjustment agreed to by the insured, but these courts had no
occasion to pass on a policy that, like the one in the case at bar, expressly
authorizes the insured to adjust all losses.

Even without policy language to this effect, the result would be the same.
The law has long distinguished between policy language that "create[s] an
independent and a new contract" between the loss payee and the insurance
company, and policy language that makes the loss payee "a mere assignee or
appointee to receive the loss. . . ."   *Bacot v. Phenix Ins. Co. of Brooklyn*, 50 So.

---

[6]

> The word adjust is defined generally as meaning 'to settle' and as used in
> the field of insurance as meaning to determine the amount to be paid under a
> policy in settlement of a loss. An adjustment is defined to be, 'the settling and
> ascertaining the amount of the indemnity which the insured, after all proper
> allowances and deductions have been made, is entitled to receive, and the
> proportion which each underwriter is liable to pay under the policy. . . . the word
> adjust connotes the authority to settle.

*Farley v. Security Ins. Co. of New Haven, Conn.*, 73 N.E.2d 662, 668 (Ill. App. 1st Dist.
1947) (authorities, and some internal quotation marks, omitted) (*held:* individual
appointed by insurance company to adjust fire loss had apparent authority to agree to
pay); Miss. Code Ann. § 83-17-401 ("'Adjuster' means any person who, as an
independent contractor, or as an employee of an independent contractor, adjustment
bureau, association, insurance company or corporation, managing general agent or
self-insured, investigates or adjusts losses on behalf of either an insurer or a
self-insured, or any person who supervises the handling of claims").

[7] *See* Dkt. # 197-8, Exhibit C, part 1, page 10 of 22 ("Throughout this policy the
words 'you' and 'your' refer to the Named Insured shown in the Declarations.   The
words 'we', 'us', and 'our' refer to the Company providing this insurance").

729, 734 -735 (Miss. 1909).    *Accord, Peerless Ins. Co. v. Bailey Mortg. Co.,* 345

F.2d 14, 16  (5th Cir. 1965) (Miss. law) (citing *Bacot*).    In the former case, no act

or omission of the principal insured can diminish the rights of the loss payee.

The loss payee is entitled to be paid, as his interest may appear, even if the

principal insured is guilty of fraud or arson. *Id.*   In the latter case, however, the

loss payee's rights are derivative of, and dependent on, the principal insured's

rights.   *Id.*   If, for example, he commits fraud during the adjustment process,

and so forfeits all right to payment, the loss payee, as "a mere assignee or

appointee," naturally receives nothing.    *Id.*   It follows, *a fortiori,* that if, during

the adjustment process, the principal insured agrees to receive less than others

(specifically the loss payee) might think is due, that agreement, as a practical

matter, "binds" the loss payee.[8]

The language used in the Employer's Mutual policy has repeatedly been

held to make the loss payee "a mere assignee or appointee to receive the loss."[9]

_____

[8] The point is an old one, long recognized in the insurance industry.   *See* Note, Status Of The Mortgagee Under His Mortgagor's Insurance Policy, 10 Columbia L. Rev. 153-56 (1910), on line at
http://books.google.com/books?id=yucrAAAAIAAJ&pg=PA153&dq=Status+Of+The+Mortgagee+Under+His+Mortgagor's+Columbia&cd=1#v=onepage&q&f=false   explaining that, while some cases reach the result reached in *Stein* and *National Liberty,* the result is different where the policy has an "appraisal clause" – a clause governing how the insurance company and the named insured are to determine how much is owed on a loss.   In such cases the loss payee *is* bound: "The mortgagee who has entered into no contractual relations with the insurer has no right as a stranger to participate in the adjustment of a loss, because such right is by the forms of the policy limited to the insurer and insured." The *National Liberty* court frankly acknowledged the split in the cases; the Note explains that split).

[9] *Michigan Heritage Bank v. Federal Ins. Co.*, 2004 WL 1801031 **2-3   (Mich. App. 2004) (no independent contract; creditor "simply an appointee," whose rights derived wholly from those of the principal insured, where policy provided that "For covered property (other than building), in which you and a Loss Payee shown in the

As a "mere appointee or assignee," SCK has only such rights as may be derived

from the rights of Warehouse 86.   If Employer's Mutual, adjusting the loss with

Warehouse 86, as the policy plainly provides, reaches some agreement with

Warehouse 86 about the nature and extent of the loss, then that agreement

binds Warehouse 86 and, as a practical matter, anyone claiming by, through, or

under Warehouse 86 – including SCK.

SCK is indeed "bound" by the adjustment made by Warehouse 86 and

Employer's Mutual -- because of what the policy says ("we will adjust losses with

you"), and also because of what it does not say (language sufficient to "create an

independent and a new contract" between the loss payee and the insurance

company, and raise SCK above the status of "a mere assignee or appointee to

receive the loss. . .).

---

Declarations have an insurable interest, we will • adjust losses with you; and • pay any claim for loss or damage jointly with you and the Loss Payee, as interests may appear"); *Suburban, Inc. v. Cincinnati Ins. Co.*, 751 N.E.2d 601, 605 (Ill. App. 3rd Dist. 2001) (essentially same policy language, same holding); *Northwestern Nat. Cas. Co. v. Khosa, Inc.,* 520 N.W.2d 771, 773-75 (Minn. App. 1994) (essentially same policy language, same holding); *Farmers & Depositors Bank v. Com. Ins. Co. of N.Y.,* 312 Ky. 151, 153-154, 226 S.W.2d 773, 774 - 775 (Ky. 1950) (same holding, where policy provided that "[a]ny loss hereunder is payable as interest may appear to the insured and Farmers and Depositors Bank"); *Great American Ins. Co. of New York v. Brock Const. Co., Inc.*,   2007 WL 2844945, *8 ( (E. D. Ky. 2007) (essentially same policy language, same holding).   For the kind of policy language necessary to create an independent contract in favor of the loss payee, *see Universal Savings Bank v. Bankers Standard Ins. Co.,*   2004 WL 3016644, *1 (Cal. App. 2 Dist. 2004) ("The Loss Payee has the right to receive loss payment even if the Loss Payee has started foreclosure or similar action on the covered property. [¶] c. If we deny your claim because of your acts or because you have failed to comply with the terms of this insurance, the Loss Payee will still have the right to receive loss payment if the Loss Payee. . .")

### 2. SCK waived any contrary rights, not once but twice.

Although it is not necessary to do so, the policy being the sole and exclusive source of SCK's rights in the policy proceeds, for the sake of completeness, we will address SCK's argument that Warehouse 86, by adjusting these losses, breached portions of the Sublease and Equipment Lease. *SCK Memorandum* (Adv. Dkt. # 36) p. 10. Even if SCK had any basis for or proof of this claim, it would do no more than place SCK among Warehouse 86's general unsecured creditors. It would *not* entitled SCK to a preferential share in the policy proceeds. That argument, however, is entirely theoretical because the claim could never be established. Why? Because SCK waived whatever rights it had under these portions of the Sublease and Equipment Lease claim, not once, but twice.

The insurance policy was issued after the Sublease was executed, and the policy tendered by Warehouse 86 to SCK satisfied Warehouse 86's obligations under the Sublease. *See Affidavit of Ernest K. Strahan, III,* attached hereto. If the insurance policy was in any way unsatisfactory to SCK, it was incumbent on SCK to speak up, and demand different coverage, different terms or even a different policy. SCK's decision to accept the policy, however, which expressly stated that Warehouse 86 would be the party to "[a]djust losses," worked a waiver of any contrary provisions in the Sublease and Equipment Lease. *See Mundy v. Arcuri,* 267 S.E.2d 454, 457 (W.Va. 1980) (where the contract required purchaser of building to obtain "adequate" fire insurance, and the seller of building knew, at the time of the sale, the amount of insurance obtained by

- 10 -

purchaser, but did not demand more; *held:*    seller waived contract provision

that required "adequate" insurance); *Whalen v. K-Mart Corp.,*    519 N.E.2d 991

(Ill. App. 1st Dist. 1988) (subcontractor, required by contract to obtain insurance,

failed to do so; *held:*    requirement waived, where general contractor party knew

or should have known that vendor had failed to obtain the required insurance,

but allowed him to begin performing nonetheless); *Upchurch Plumbing, Inc. v.*

*Greenwood Utilities Com'n,*    964 So.2d 1100, 1112 ¶30 (Miss. 2007) ("the actions

and pattern of conduct of the parties determine if a waiver or modification

occurred. To determine the point at which any waiver occurs, the Court should

look to the actions of the relevant party after that party has sufficient information

to be on notice of the alleged deviation from the contractual duty.    If, after

acquiring knowledge of the deviation from a known right articulated in the

contract, a party fails to insist on its contractual rights, or acts inconsistently

with such rights, then that party waives the right to require such performance")

(citations omitted); *Brent Towing Co. v. Scott Petroleum Corp.,* 735 So.2d 355,

359-60 ¶¶ 14-15 (Miss. 1999) (waiver of contract breach inferred from action of

party claiming breach).[10]

---

[10] SCK may, perhaps, respond by asserting that it saw only a copy of the
Certificate of Insurance, and not the policy itself.    If so, this was the consequence of
SCK's decision not to ask for a copy of the policy.    *See Gulf Guaranty Life Ins. Co. v.*
*Kelley,*    389 So.2d 920, 922  (Miss., 1980) (recipient of certificate of insurance was
bound by terms in master policy to which certificate referred, even though the recipient
never saw master policy. "The insured has the right to examine the master policy if he
should desire to do so. He may not neglect or purposely omit acquainting himself with
the terms and conditions of the insurance policy and then complain of his ignorance of
them").

SCK waived these supposed rights a second time when it sat on its hands while Warehouse 86 adjusted the loss with Employer's Mutual. SCK received immediate notice of the tornado on February 12, 2008 and of Employer's Mutual's involvement in the adjustment process not later than March 2008. *Affidavit of Ernest K. Strahan, III,* attached hereto. The Order granting the motion to deposit the Insurance Proceeds was entered on August 26, 2009 (Dkt. # 184), and the Agreed Order Granting Debtor's Motion to Compromise and Settle Disputed Claims with Employers Mutual Casualty Insurance Company was entered on February 4, 2010 (Dkt. # 224). SCK never once protested Warehouse 86's involvement, and never once asked to be involved in the adjustment process. *Affidavit of Ernest K. Strahan, III,* attached hereto. Like the Little Red Hen, Warehouse 86 did all the work; SCK, combining the dog, the cat, and the duck, and going them one better, not only demands to eat the bread, but complains about how it was baked! The law answers with a single word, "waiver."

Finally, and in any event, even all of the ignoring the forgoing, the fact remains that SCK has made no attempt to show how the result would have been any different if it or someone else adjusted the loss with Employer's Mutual. It is not enough for SCK to say that, in its opinion, Employer's Mutual "should have" paid more for this, or less for this. Where is the evidence upon which a trier of fact could find that Employer's Mutual *would have* paid more?

### 3. Neither of SCK's two remaining arguments can overcome the clear policy language.

SCK makes two other arguments, vis, that Warehouse 86 somehow influenced the Employer's Mutual adjuster, and that Warehouse 86 should have purchased a policy that had higher limits of liability. *See RadioShack/SCK Memorandum* (Adv. Dkt. # 36) pp. 9-11. The answer to the first, apart from pointing out that SCK has no *evidence whatsoever*,[11] is that, as we have seen, the policy expressly conferred upon Warehouse 86 the right to "adjust losses." This necessarily includes the right to present information to the insurance company, and argue one's position. It is well known commercial real estate leasing that if the Loss Payee wishes to "insinuate itself into the settlement of the loss" he must negotiate for, and obtain, a policy that does not leave the adjustment of losses to the Named Insured.[12]

---

[11] More than two decades post-*Celotex,* it is black-letter law that the non-movant must do more than "dispute." He must offer <u>evidence</u>. *Little v. Liquid Air Corp.* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) ("nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial. This burden is not satisfied with some metaphysical doubt as to the material facts, by "conclusory allegations, by unsubstantiated assertions, or by only a "scintilla" of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts*") (emphasis original; citations omitted).

[12] M.A. Senn, *Commerical Real Estate Leases: Preparation, Negotiation, and Forms* (Aspen 2006) at §10.09 p. 10-42 (emphasis supplied):

> *As Their Interests May Appear.* When several insureds are indicated on a property policy, the policy may provide that losses will be payable to them "as their interest may appear;" this term is analogous to the additional insured under the liability policy. The losses will be paid to the insureds in the relation to their insurable interests in the insured property at the time of the loss. **This is an invitation for a claimant to insinuate itself into the settlement of the loss unless the policy provides that the first named insured is solely responsible for settling claims;** that may be particularly troubling if the interloper uses its

- 13 -

SKC's final argument is that the limits of liability on the Employer's Mutual policy were too low and that the party responsible for purchasing too little insurance ought to be penalized by forfeiting its share of the proceeds *RadioShack/SCK Memorandum* (Adv. Dkt. # 36) p. 11.   SCK, again, has no authority at all for this argument.   More fundamentally and conclusively, SCK waived, as a matter of law, any right that it had to demand higher limits.   As we saw above, the policy was issued after the Sublease, and tendered by Warehouse 86 to SCK in satisfaction of Warehouse 86's obligations under the Sublease. *Affidavit of Ernest K. Strahan,* III, attached hereto.   If the amount or coverage under the insurance policy was in any way unsatisfactory to SCK, it was incumbent on SCK to speak up and to demand a different policy.   SCK's decision to accept the tendered insurance policy, the limits of which were plainly stated, worked a waiver of any contrary provisions in the Sublease and Equipment Lease.   Under *Mundy, Whalen,* and *Upchurch, supra,* SCK waived (and is estopped to assert) its right to insist on more, other, or different insurance coverage.   There is nothing inequitable about telling SCK that it is too late to complain about that which it freely and voluntarily accepted.

## III.   SCK's claims against Warehouse 86 (as opposed to SCK's rights, if any, to the policy proceeds) are irrelevant.

SCK's last hope for avoiding partial summary judgment is based on two breach of contract claims against Warehouse 86: (1) "by executing the Sublease, the Debtor agreed to assume sole responsibility for all damage to the leasehold

position in order to improve its rights under the lease.

improvements and the Subleased Equipment due to fire or other casualty"; and (2) "by naming SCK as a loss payee in the policy, the Debtor agreed that the leasehold improvements and the Subleased Equipment would be insured," and that proceeds would be payable to SCK "to the extent of any damage" to same. *RadioShack/SCK Memorandum* (Adv. Dkt. # 36) p. 12.   To begin with, these assertions are simply incorrect.[13]   More fundamentally, they are irrelevant to this declaratory judgment action which is solely concerned about the rights to the Insurance Proceeds.   To the extent, if any, that SCK can prove that Warehouse 86 failed to perform some contractual promise (and can prove damages as a result), then SCK will have a general unsecured claim against the Debtor, but it must get in line with the other general unsecured creditors.   SCK is not entitled to cut in line and take a priority position as to the Employer's Mutual policy proceeds.   The Bankruptcy Code does not permit SCK to attempt to bootstrap a breach of contract claim into a secured claim to the Insurance Proceeds.

SCK cites two cases for the proposition that it "holds a lien or even greater interest" in the proceeds.   *In re: Estes*, 105 F. Supp. 761 (D. Tex. 1952), turned

---

[13] The policy, obviously, says no such thing.   And the Sublease says no such thing.   While it speaks generally of "surrender[ing] the premises" at the end of the lease "in the same condition . . . reasonable wear and tear excepted," Sublease ¶5(f), Dkt. # 191-1, Exhibit A part 1, page 4 of 25, this falls far short of the specificity needed to place on the tenant the risk of losses not due to his negligence.   *Levey v. Dyess*, 1875 WL 6550, *5 (Miss.) ("covenant to redeliver or restore to the lessor in the same plight and condition, usual wear and tear excepted (or other words of like import), does not bind the covenantor to rebuild in case of casual destruction by fire, or impose the burden of the loss on him"). In light of all of the principles set forth in *Dyess,* the Sublease can have only one meaning:   as to destruction not caused by the tenant's negligence, the tenant's sole and exclusive obligation is to purchase insurance.

on the distinction, highlighted in *Bacot, supra,* 50 So.2d at 734, between a loss payee who is "a mere assignee or appointee to receive the loss," and one who, by virtue of special policy language, is party to a "independent and new contract" between himself and the insurance company.   "The [creditor's] interest," observed the *Estes* court, "attached at the time the policy was issued," observed the *Estes* court (something that can not be said to happen of a mere assignee or appointee).   *Estes,* 105 F. Supp. at 765-66.   The *Estes* court continued:

> It was in the nature of a contractual interest between himself [the creditor] and the insurance company. In other words, the policy reflected a contract not only between the company and Estes [the debtor] but also between the company and Rapstine [the creditor]. . . . If his interest is looked at as an equitable lien again it was acquired at the time the policy was issued. . . .

*Estes,* 105 F. Supp. at 765-66.

Small wonder, then, that the creditor in *Estes* was treated with special solicitude.   But *Estes* offers no comfort for SCK which, as we have seen, *supra* p. 8 & n. 9, is (to use the *Bacot* court's words) "a mere assignee or appointee to receive the loss. . . ." The Employer's Mutual policy simply does not have the language necessary to create a "independent and new contract" between the loss payee and the insurance company.

Little needs to be said of SCK's other case, *Farwell v. Johnson,* 121 Misc. 556, 201 N.Y.S. 327 (1923).   It is a trial court decision, not an appellate decision.[14] More importantly, in the three quarters of a century since it was handed down *Farwell* has been cited twice, neither time for the point for which

---

[14] In New York, the "Supreme Court" is a trial court, "roughly equivalent to the 'district courts', 'superior courts,' or 'circuit courts' of other states." http://en.wikipedia.org/wiki/New_York_Supreme_Court

- 16 -

SCK cites it.    It is probable that the *Farwell* court, if asked, would explain that it, too, based its decision on the view that the policy language in question there set up a "independent and new contract" between the loss payee and the insurance company.

The bottom line is that SCK's breach of contract claims against Warehouse 86 are irrelevant to the policy proceeds.

## CONCLUSION

Perhaps the easiest way to be sure that this case is ripe for the partial summary judgment sought by Warehouse 86 is to ask "What fact issues are there to try?"    SCK offers a list (Adv. Dkt. # 36, pp.3-4), but none of these are "genuine issues of material fact."    The first four are purely legal assertions — four different ways of putting the "We are not bound" argument.    The sixth and seventh, which represent SCK's critique of the loss adjustment effected between Warehouse 86 and Employer's Mutual, are not material because, as we have seen, SCK *is* "bound" by that adjustment.    The eighth, the assertion that "RadioShack has an interest in the Sublease and the Insurance Proceeds," is not a disputed issue of fact to be tried, but a legal argument, fully refuted above.

This leaves the fifth, which claims that some of the items in the warehouse belonged to SCK.    The law answers "Fine!    If and to the extent that Employer's Mutual paid for them, your pro rata interest will be protected!"

This adversary proceeding has but one subject: rights in the proceeds of the Employer's Mutual policy.    Warehouse 86 has demonstrated that RadioShack has no rights in those proceeds; thus RadioShack ought to be

- 17 -

dismissed.   Warehouse 86 has demonstrated, too, that whatever claims SCK may have against Warehouse 86 generally, the only rights SCK has in the policy proceeds arise from the policy, and are necessarily governed by the policy language, and the language of the policy stands as an insuperable obstacle to SCK's claims.   The matter is fully ripe for partial summary judgment, which will allow the parties to prepare for trial on the one fact issue that is genuine, and material, to wit, "As to each item of 'Covered Property' for which Employer's Mutual paid, what SCK interest, if any, appears?"

> Respectfully submitted,
>
> WAREHOUSE 86, LLC
>
>
> By: *s/ Robert M. Frey*
> ROBERT M. FREY (MB No. 5531)
> STEPHEN W. ROSENBLATT (MB No. 5676)
>
> Its Attorneys

OF COUNSEL:

BUTLER, SNOW, O'MARA, STEVENS & CANNADA, PLLC
1020 Highland Colony Parkway, Suite 1400
Ridgeland, Mississippi   39158-6010
601-948-5711
601-985-4500 (fax)

## CERTIFICATE OF SERVICE

I, Robert M. Frey, one of the attorneys for Warehouse 86, LLC, certify that

I have this day caused a true and correct copy of the foregoing pleading send by

electronic mail to the following persons:

> Marcus M. Wilson, Esq.
> BENNETT LOTTERHOS SULSER & WILSON, P.A.
> One Jackson Place
> 188 East Capitol Street, Suite 1400
> Jackson, Mississippi   39201
> mwilson@blswlaw.com
>
> ATTORNEYS FOR SCK, INC. and RADIOSHACK CORPORATION
>
> Ronald McAlpin, Esq.
> OFFICE OF THE UNITED STATES TRUSTEE
> Suite 706, A. H. McCoy Federal Building
> 100 West Capitol Street
> Jackson, Mississippi   39269
> Ronald.McAlpin@USDOJ.gov

May 24, A. D. 2010.

> s/ Robert M. Frey
> ROBERT M. FREY

Jackson 5171613v2

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

Case No. 08-03423-EE
In re: WAREHOUSE 86, LLC, Debtor. Chapter 11

SCK, INC. and RADIOSHACK CORPORATION,
Adv. Pro. No. 09-00139-EE

Plaintiffs v. WAREHOUSE 86, LLC, Defendant.

### AFFIDAVIT OF ERNEST K. STRAHAN, III

STATE OF MISSISSIPPI

COUNTY OF HINDS

BEFORE ME, the undersigned authority, on this day personally appeared Ernest K. Strahan, III, who, being duly sworn, deposed and upon his oath stated as follows:

.1.      My name is Ernest K. Strahan, III.  I am over twenty one years of age, of sound mind, and have never been convicted of a felony or of a crime involving dishonesty or false statement.  The facts stated herein are within my personal knowledge and are true and correct.

2.      I played a role in securing, on behalf of Warehouse 86, the property insurance required by SCK under the Sublease.  I recall that SCK would not fully turn possession of the warehouse over to Warehouse 86 until SCK received evidence of the insurance that Warehouse 86 obtained.  After SCK received the final version of the Certificate of Insurance and allowed Warehouse 86 to have full access to the warehouse with keys, at no time that I recall did SCK (or Radio Shack) complain about the type or amount of insurance that Warehouse 86 obtained, or about any of the terms or conditions of that insurance.

3.      I played a role, too, in responding to the tornado and the fire.  I have reviewed parts of an "Activity Log" which, I am told, has been produced by the Marchetti Robertson insurance agency, which handled Warehouse 86's Employer's Mutual policy. Copies of the pages to which I refer are attached hereto as Exhibit A.  I see by their log that as early as February 12, 2008, the day after the fire, and just a few days after the tornado, a "Mike Rutledge, agent for Radio Shack," was aware of the fire, and knowledgeable enough about the Employer's Mutual policy to call the Marchetti Robertson firm about the fire.  I see by their log that SCK and Radio Shack people were

**EXHIBIT A**

frequently communicating about the losses; on March 4, for example, Radio Shack was contacting the Marchetti Robertson firm for a copy of the Employer's Mutual policy. My own recollection is in accord: immediately, or almost immediately, after the tornado and fire, SCK and or Radio Shack people were informed. At no time that I recall did SCK (or Radio Shack) complain about how Warehouse 86 and Employer's Mutual were working together to adjust the loss, nor did they ask to be involved, much less assert that Warehouse 86 had no right to be involved.

   Further Affiant Sayeth Not.

              ERNEST K. STRAHAN, III


SWORN TO AND SUBSCRIBED before me this 24 day of May, A.D. 2010.

              NOTARY PUBLIC

My Commission Expires:

STATE OF MISSISSIPPI
VICKIE RUSSUM
NOTARY PUBLIC
ID No 73321
Comm Expires
March 30, 2012
HINDS COUNTY

LL

EXHIBIT A

# Marchetti Robertson and Brickell Ins. & Bonding

**Activity Log**
**Activity Report**

02/08/2010   Page 3

| Action | Date/Time | By | Policy | Co | Term | Tran | Effective | System Date |
|---|---|---|---|---|---|---|---|---|
| **Policy Change** | | | | | | | | |
| Warehouse 86 LLC | 11/27/2007 11:59 A.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 10/13/2007 | 11/27/2007 12:01 P.M. |
| Policy Memo, First Request, add Wells Fargo as loss payee back on (deleted in error) - copier @Southaven, MS is leased per email from Ernie on 11/1/2/07 -emailed request to Ruby @EMC add Wells Fargo as loss payee on copier to Southaven, MS per email from Ernie on 11/1/2/07 | | | | | | | | |
| **Billing** | | | | | | | | |
| Warehouse 86 LLC | 01/21/2008 04:54 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 01/21/2008 04:55 P.M. |
| decrease bppt $50,000, & delete payroll for Indianola, MS location - ($269.00) & ($646.00) | | | | | | | | |
| **Form Letter** | | | | | | | | |
| Warehouse 86 LLC | 01/21/2008 05:02 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 01/21/2008 05:03 P.M. |
| Endorsements to Insured decreasing Indianola bppt deleting GL payroll & adding Wells Fargo as loss payee - Direct Billed | | | | | | | | |
| **Mail Out** | | | | | | | | |
| Warehouse 86 LLC | 01/31/2008 03:12 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 01/31/2008 03:13 P.M. |
| sent Ernie Strahan a copy of PKG & umbrella policies to POB per email reques | | | | | | | | |
| **Claim** | | | | | | | | |
| Warehouse 86 LLC | 02/06/2008 08:46 A.M. | RGC Claim: | 3X2-22-78-08 02/05/2008 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/06/2008 08:47 A.M. |
| tornado hit Indianola,MS warehouse | | | | | | | | |
| **Claim** | | | | | | | | |
| Warehouse 86 LLC | 02/06/2008 08:50 A.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/06/2008 08:51 A.M. |
| faxed loss notice for 2/5/08 tornado damage to Indianola, MS location to claims dept @EMC -501-957-2245 | | | | | | | | |
| **Claim** | | | | | | | | |
| Warehouse 86 LLC | 02/06/2008 01:43 P.M. | RGC Claim: | 3X2-22-78-08 02/05/2008 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/06/2008 01:43 P.M. |
| faxed revised property loss notice to EMC as I had wrong address (showed Indianola, MS in lieu of Southaven, MS) on notice | | | | | | | | |
| **Claim** | | | | | | | | |
| Warehouse 86 LLC | 02/07/2008 10:18 A.M. | RGC Claim: | 3X2-22-78-08 02/05/2008 #473316 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/07/2008 10:22 A.M. |
| Claim #473316 - Jim Jones said he is the adjuster on 2/5/08 claim - outside adjuster Roland Becker @G+B looked at contents today and said Insured is under Insured, advised John what adjuster told me | | | | | | | | |
| **Claim** | | | | | | | | |
| Warehouse 86 LLC | 02/12/2008 09:05 A.M. | RGC Claim: | 3X2-22-78-08 02/11/2008 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/12/2008 09:06 A.M. |
| weldar ignited fire & destroyed building & salvage | | | | | | | | |
| **Telephone In** | | | | | | | | |
| Warehouse 86 LLC | 02/12/2008 02:06 P.M. | JGT | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/12/2008 02:07 P.M. |
| Mike Rutledge agent for Radio Shack called to advise that the building for Warehouse 86 had burned. Radio Shack subleases bldg to insured, they also had a conveyor system in the bldg that burned approx value $600,000. Mike Rutledge can be reached @ 972-340-2305 if any ?-jt | | | | | | | | |

18

# Marchetti Robertson and Brickell Ins. & Bonding

02/08/2010    Page    4

## Activity Log
## Activity Report

| Action | Date/Time | By | Policy | Co | Term | Tran | Effective | System Date |
|---|---|---|---|---|---|---|---|---|
| **Telephone Out**<br>Warehouse 88 LLC<br>left message for Jim Jones asking him to show SC Kiosts (RadioShack) as loss payee in regard to claim #478316 | 02/13/2008 12:06 P.M. | RGC | 3X2-22-78-08 | | | PCH | 11/08/2007 | 02/13/2008 12:06 P.M. |
| **Telephone In**<br>Warehouse 88 LLC<br>Jim Jones @EMC said he would add SC Kiosts, General Electric & Wells Fargo as loss payees on the loss of 2/11/08; he said they would subrogate against welder to try to get as much $$ back as possible;he said they would not be able to view salvage of fire until possibly 2/14/08 | 02/13/2008 01:49 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 11/08/2007 | 02/13/2008 02:11 P.M. |
| **Telephone Out**<br>Warehouse 88 LLC<br>advised Jim Jones contact for SC Kiosts, Inc. (RadioShack) is Bob Donohoo per email from Eric/Emie/Judy McCampbell-RadioShack | 02/14/2008 04:30 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/14/2008 04:33 P.M. |
| **E-Mail In**<br>Warehouse 88 LLC<br>Jody McCampbell @RadioShack advised she would be the contact regarding loss at Southaven, MS - phone: 817-415-3042 or contact Mike Rutledge-McCleary Henry Bowles Troy at 817-877-3681 - left message on Jim Jones' (EMC adjuster) voice mail | 02/14/2008 04:49 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/14/2008 04:51 P.M. |
| **E-docs**<br>Warehouse 88 LLC<br>email regarding access to bldg at Southaven | 02/15/2008 04:14 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/15/2008 04:21 P.M. |
| **E-Mail Out**<br>Warehouse 88 LLC<br>asked Ernie if they had rented warehouse at 3865 S. Perkins/3834 Knight, Memphis, TN and if so what he needed to insure -bldg, contents, gross receipts. | 02/19/2008 12:04 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/19/2008 12:06 P.M. |
| **Policy Memo**<br>Warehouse 88 LLC<br>Policy Change Request, First Request, emailed request to Coleman@EMC to add AI & LP for Stuart Irby on all locations per email from John | 02/22/2008 04:33 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 04/15/2007 | 02/22/2008 04:35 P.M. |
| **Telephone Out**<br>Warehouse 88 LLC<br>left message for Coleman Cummins requesting certified copy of policy to be overnighted or emailed to me; asked him to call me back - Ernie called John M requesting this due to claim | 02/25/2008 04:12 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/25/2008 04:13 P.M. |
| **Telephone Out**<br>Warehouse 88 LLC<br>Charles Brock X328 - claims manager @EMC said he has to request certified copy from underwriting - he said it takes a few days as underwriting has to pull forms & make sure everything is in order & the underwriting manager has to sign off on it; sent email to Coleman Cummins; Charles Brock & John M asking Coleman call us when policy is ready; | 02/28/2008 04:22 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/28/2008 04:32 P.M. |
| **Policy Memo**<br>Warehouse 88 LLC<br>Policy Change Request, First Request, add Memphis, TN warehouse; add Al-Colliers Management Services & Zomax Incorporated; Increase Fire Damage & med pay - emailed to Coleman @EMC asked him to provide us with a quote before issuing if possible | 02/29/2008 02:28 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 02/29/2008 02:26 P.M. |
| **Telephone In**<br>Warehouse 88 LLC | 03/04/2008 02:18 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/04/2008 02:31 P.M. |

Marchetti Robertson and Brickell Ins. & Bonding

**Activity Log**
**Activity Report**

02/08/2010    Page    5

| Action | Date/Time | By | Policy | Co | Term | Tran | Effective | System Date |
|---|---|---|---|---|---|---|---|---|
| **E-Mail Out** Warehouse 86 LLC Mike Rutledge @McCaskery,Henry,Bowles,Troy (Radio Shack's agent) called to ask if a copy of property policy could be sent to Judy @Radio Shack also wants to recommend a salvage company (Stoner & Company) to do the salvage for the conveyor belt; gave him Jim Jones phone number @EMC | 03/04/2008 04:07 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/04/2008 04:09 P.M. |
| **Claim** Warehouse 86 LLC sent Ernie quote for adding S Perkins,Memphis,TN warehouse - asked him to advise if he wanted me to emit policy | 03/07/2008 01:18 P.M. | RGC Claim: 02/14/2008 | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/07/2008 01:19 P.M. |
| **E-Mail Out** Warehouse 86 LLC unknown person/s stole high value items from Southaven, MS location per email from Ernie Strahan - faxed to Jim Jones @EMC 601-957-2245 | 03/14/2008 04:15 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 04/15/2007 | 03/14/2008 04:16 P.M. |
| **Telephone In** Warehouse 86 LLC sent Susan White a copy of email sent to Coleman Cummins requesting Stuart M. Irby be added as an additional insured - per telecom with Susan she was going to check on it | 03/20/2008 03:39 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/20/2008 03:41 P.M. |
| **Telephone Out** Warehouse 86 LLC Gail (consultant for Warehouse 86) called to see if we could issue COI for Stuart Irby; told her I had to check with company to see if they were going to add it; Coleman said he wanted to see contract before I issued COI; emailed John & he said it was ok to send Coleman the contract | 03/20/2008 04:38 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/20/2008 04:39 P.M. |
| **Telephone In** Warehouse 86 LLC advised Gail that company underwriter was reviewing contract with Stuart Irby & it would probably be Monday before we can do COI - she said ok | 03/25/2008 10:43 A.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/25/2008 10:45 A.M. |
| **E-Mail Out** Warehouse 86 LLC Told Ernie I had seen commercial for Overstock.com and asked if this was connected to him. He said it is not | | | | | | | | |
| **E-Mail Out** Warehouse 86 LLC asked Jim Jones @EMC status of claim check(s) and how check(s) will be issued - with all loss payees or separate checks | 03/28/2008 10:29 A.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/28/2008 10:29 A.M. |
| **Telephone In** Warehouse 86 LLC Jim Jones said they should have claim check issued in next week or so - they will probably issue one check with all loss payees listed - he said Richard Booker met with insured on 3/14/08 and Finally got documentation he needed to fill out paper work to be submitted to company regarding payment of claim - advised John M | 03/28/2008 11:41 A.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 02/13/2008 | 03/28/2008 11:43 A.M. |
| **Policy Memo** Warehouse 86 LLC Policy Change Request, First Request, Jaslee General Electric Capital Corp as loss payee/additional insured per email from John M - who recd email from Gail Powelson (saved in Warehouse emails)- emailed request to Coleman Cummins @EMC | 03/28/2008 12:12 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 03/11/2008 | 03/28/2008 12:20 P.M. |
| **Policy Change** Warehouse 86 LLC | 03/28/2008 12:20 P.M. | RGC | 3X2-22-78-08 | EMCPC | 04/15/2007 to 04/15/2008 | PCH | 03/11/2008 | 03/28/2008 12:22 P.M. |