UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF MISSISSIPPI JACKSON DIVISION

In Re:

WAREHOUSE 86, LLC, Case No. 08-03423-EE

DEBTOR, Chapter 11

SCK, INC. AND RADIOSHACK CORPORATION

PLAINTIFFS

Adv. Pro. No. 09-00139-EE

VERSUS

WAREHOUSE 86, LLC

ORIGINAL

DEFENDANT

***********************************************

DEPOSITION OF JAIME CABALLERO

***********************************************

APPEARANCES NOTED HEREIN

DATE: MAY 26, 2010

PLACE: BENNETT LOTTERHOS SULSER & WILSON

188 EAST CAPITOL STREET

JACKSON, MISSISSIPPI

TIME: 8:40 a.m.

---

AMANDA M. WOOTTON, CSR, RPR

AW REPORTING

338 Indian Gate Circle

Ridgeland, Mississippi 39157

(601) 898-9990

AWREPORTING.COM

EXHIBIT
ONE

of a crime other than a traffic thing?

A No.

MR. FREY: Off the record.

(Off the record.)

MR. FREY: (Continuing.)

Q Tell me what you did briefly, sir, to prepare for the deposition.

A I talked with the attorneys, looked over some documents, some invoices mainly that we paid out.

Q Invoices that RadioShack paid?

A Yes.

Q Okay. What were they for?

A I don't have them in front of me, but they were payments, I believe, made to GE. Do you have those available or --

Q I may have one. We'll come to that.

A Okay.

Q I'm really trying to find out what you recall you looked at.

A Just a few of the invoices that you may have or you should have.

Q All right. Things that RadioShack paid to GE?

A To GE and -- I don't recall. I'll

4

4

Q I'm sorry. Other than that, what?

A That's basically all I handed over, a few of the invoices that I had readily available in my file. So, yes, I did turn over everything I had to my attorney.

Q Well, tell me what it was you were looking for when you say "everything I had."

A Well, to be honest with you, I didn't know what I was looking for. The attorney asked me to give everything I had on my file and I knew that I had a few of the invoices in there, and I just turned those over. So I didn't spend a lot of time looking myself. It's just some files I've accumulated over a period of time.

Q Well, do you have a file on Warehouse 86? Do you have a file on this Warehouse? Do you have a file on the sublease? How do you do that?

A I have a file on Warehouse 86, which I've turned over.

Q All right. And how big is it?

A Maybe -- I didn't have much -- many files. It was a few invoices. Maybe eight pages found.

Q Did you see if anybody else had any

files?

A I didn't, no.

Q Do you know if anybody at either company looked for any other files?

A I don't know.

Q Okay. Well, there's three topics that you're here to address and the second one is the company's efforts to locate documents related to the case. Have you now told me everything you know about that?

A I've given all my files over to my attorney, yes.

Q Correct. And I've also asked do you know if anybody else did anything.

A I believe my attorney did, yes.

Q Okay. But you personally, can you tell me what was done at the company to look for documents?

A I can't.

Q Okay. What about --

MR. FREY: Well, before we leave that, can we locate in the documents that y'all have produced this gentleman's file?

MR. WATT: I can't -- no. I

2

2

2

2

2

include the ones you just called off --

A Yes.

Q -- right?

Any others?

A I believe that Exhibit 1 that you handed me and took back.

Q Yeah. The Notice of Deposition?

A Yeah. The Notice of Deposition.

Q All right. So besides looking at the Notice of Deposition and these few pages that made up your file and, of course, talking to your lawyers which I'm not asking you about, did you do anything else to prepare for the deposition?

A No.

MR. WATT: One second.

(Off the record.)

A Sorry, Bob. I did look at a few other items. We skimmed through McLarens Young's report on the conveyor system.

MR. FREY: (Continuing.)

Q Let me interrupt. Whatever other documents you looked at were in these two notebooks; is that fair?

A Well, I haven't looked at the entire

4

4

was required, but that's not our issue here?

A I don't believe so.

Q Okay. And then property insurance, which is at issue, right?

A Yes.

Q Okay. And your department had somebody whose job, at least in theory, it was to make sure that Warehouse 86 got the right insurance?

A Ask that again, please.

Q Yeah, yeah. The sublease asked Warehouse 86 to get a certain kind of insurance, right?

A Yes.

Q Okay. And there's got to be somebody in your shop that follows that and makes sure they did.

A Yes. There should have been, yes.

Q Okay. Do you know whether they did that?

A I do not.

Q Okay. Have you looked to see if they did?

A I did not, no.

Q Okay. Back when you were looking

1

4

through your file, did you look for any e-mails?

A No, I didn't.

Q Have you done that since then?

A No.

Q Leaving aside the specific case and just talking about how RadioShack and SCK normally do business, would there normally be somebody to make sure that the tenant got their insurance?

A In the risk management or in real estate department when you clarify or just --

Q Yeah. Thank you. Anywhere, actually.

A Anywhere. Let me answer that by saying there should be.

Q Okay.

A Yeah.

Q And when it works the way it should, is that the risk management department or the real estate department?

A The real estate generally gives it to the risk management department and risk management will contact the broker and discuss and make sure that the limits are adequate, and then approve or disapprove or ask for more limits.

4

Q And the limits might be inadequate, but there might be some other problem, too, right?

A Perhaps.

Q And my point is they're going to look at the limits, but they're going to look at other things, too.

A Oh, yeah.

Q Okay. And they're going to be make sure that whatever's been tendered satisfies them, and if it doesn't, they'll tell the broker they want something else?

A That's right.

Q All right. But you don't know if that process actually happened in this case?

A I don't.

Q And who would we ask to find that out?

A I think I'm the best person you can ask --

Q Okay.

A -- to find that out.

Q All right. Is there another file we would look in?

A I don't know. You know, this is a situation where we're not -- RadioShack is not

1

in to subleasing buildings. This is kind of a one-of situation.

Q Do you know how far back y'all's e-mails go?

A Pertaining to --

MR. WATT: Objection.

MR. FREY: I'm sorry. Help me out.

MR. WATT: Just quantify that. I mean, what area?

MR. FREY: Okay. That's fair.

MR. FREY: (Continuing.)

Q The e-mails, if there were any, that had to do with approving or disapproving the insurance that Warehouse 86 offered, okay, would they still be around?

A If there were any, I'm sure -- well, I don't know.

Q Yeah. Because, you know, things don't last forever.

A Well, they don't, so I don't know.

Q All right. And who would we ask to find out how far back that e-mail retention goes?

A Ask our attorney.

2

2

Q How did you find out?

A I don't recall exactly how we found out, but I do remember watching it on the news as the reporters were discussing it on CNN, I believe.

Q Okay. And what did -- let me go back and pin something down. I don't want to be unduly wordy. I was going to say what did RadioShack and SCK do about it, but is it fair to say that at this point, SCK is not involved and it's RadioShack's risk management?

A That's right.

Q All right. So I'll ask. What did RadioShack do?

A At that point, we didn't do anything. Our director of risk management at that time felt that it was a problem or a claim between Warehouse 86 and IDI, therefore, RadioShack didn't get involved initially at all.

Q And the director's name?

A Judy McCampbell.

Q And is she still with the company?

A No, she's not.

Q Where is she?

A I don't know.

4

Q Well, where was she when last seen?
A At RadioShack.
Q Well, do you know where she was going?
A Oh, she -- she was laid off.
Q Okay. When was that?
A I don't know.
Q Who is in her place now?
A We don't have anyone in her place now.
Q So that was the director of risk management?
A Director of risk management.
Q How does that fit in the chart with you?
A I would normally report to the director.
Q Okay. So there's just a layer missing now?
A There is a layer missing.
Q Okay. All right. So she thought we don't need to do anything, Warehouse 86 and IDI will handle this?
A It was a claim between the two.
Q Okay. We don't have a dog in this fight?
A We don't.

4

Q All right. Now, was that -- how did you learn that? Was that something you read, something you heard?

A It was something she told me.

Q Okay. When did you talk to her about it?

A Immediately when we found out and we were watching it on TV.

Q Okay. So -- okay. All right. Well, what happened next from RadioShack's point of view?

A Judy McCampbell handled the rest of the situation until she left the company.

Q When did she leave?

A Bob, I can't give you an exact date, but I believe it was August '09.

Q Okay. And do you know what she did?

A I do not.

Q It wasn't part of your job to --

A It wasn't.

Q -- be interfacing with her about what she was doing?

A That's right.

MR. WATT: Let him finish the question before you begin answering.



MR. FREY: Yeah. I'm sorry. I'll try and do the same out of respect for our court reporter.

MR. FREY: (Continuing.)

Q Have you made any attempt to find Judy's files or e-mails so you can see what she was doing?

A I have not.

Q Who took over after she left whatever was left to be done on the warehouse situation?

A I believe our attorney, Jim Spisak did.

Q And do you know what was left to be done at that point?

A I do not.

Q I know somebody had to draw the short straw and come here today, and you've explained your position and how that fits in. Did you have any personal involvement in this?

A What do you mean?

Q Well, like you told me that you and Judy were watching the TV and she said, hey, that's their problem, that's IDI and Warehouse 86, right?

A Yes.

4

Okay. Start with the money paid for the conveyer. Tell me how much it was and why you should get it back here.

A The payment to GE Capital for the conveyer system, $1,064,361.78. It was completely destroyed in the tornado. And as stated in the sublease, we should be covered through Warehouse 86 for all damages.

Q All right. I'm not sure I got the figure. One million?

A One million 64.

Q 064 then.

A $361.78.

Q Right. Thanks.

And how was that number arrived at? I know that's what you paid GE. How did y'all know how much to pay it?

A I don't recall. We got an invoice from GE.

Q Okay.

A I don't know how they calculate it. I don't...

Q Did you make any effort to see that they calculated the right amount?

A I wasn't involved in the case at that

time.

Q Okay. Who would know whether RadioShack made an effort to see that 1,064,000 figure was correct?

A I guess, Bob, that would have to had to have been Judy McCampbell.

Q All right. And explain to me -- you said the sublease gives y'all a claim for that. Can you help me with that?

A I'd have to look at the sublease.

Q I think we can view that.

THE WITNESS: Bob, I would really like to take a break.

MR. FREY: Yes, sir.

(Off the record.)

MR. FREY: (Continuing.)

Q We're going to look at the sublease. Let me hand you a big stack. And, again, I'm not going to clutter up the record by marking it, but what it is is the attachments to y'all's complaint. And they have identification at the top. It looks to me like the very first one is the sublease. I just want to see if that's your impression, as well.

A Yes. I'm familiar with this.

1

Q All right. Now, the first thing I want to ask is how far back in that stack does the sublease and any attachments to the sublease go? The sublease has some attachments is my understanding.

A Yes.

Q It's got like a Schedule B. It may include the master lease. Do you know the answer?

A I do not.

Q All right. Fair enough. Then let's just talk about the part you know, which is the sublease itself.

A Well, I don't -- I'm not --

Q Not an expert on that.

A -- covered in reading subleases.

Q Fair enough.

Well, anyway, though, as I say, you drew the short straw, so you're here to talk for the company. Help me understand the company's claim to the 1,064,000 paid to GE for the conveyor system.

A I'm sorry, Bob. I guess I don't understand your question. I just told you I'm not an expert in reading leases and --

1

Q All right. Well, let's not look at the lease then.

A Okay.

Q I don't want to be unfair with you.

It's my understanding that y'all wrote four checks that you were personally involved with, and each of those you think you ought to get reimbursed for.

A Yes.

Q All right. And I just want to understand why. What's the basis for that? And I'm starting with the amount paid to GE for the conveyer system. The reason I mentioned the sublease is I thought you did, but if you don't want to talk about the sublease, that's fine.

A Well, I'm not qualified enough to really talk about the sublease. It's not my area.

Q All right. See if this is fair: It's your understanding there's something in the sublease that the lawyers can deal with that adds up to you should get reimbursed for the money paid to GE; is that fair?

A Yes.

Q All right. Now, the conveyer system,

1

1

1

is that the same or different, or do you know, from what's been called "leased equipment"?

A I don't know.

Q All right. Okay. Just real quickly because I think I'll -- I know what you're going to say, but as to the half million dollar deductible that Radio Shack paid to IDI, okay, it's your understanding that y'all have a right to be reimbursed for it, but you're not prepared to describe the ins and outs of that?

A That's right.

Q Okay. And the same is true of the money paid to InMotion for dismantling the conveyer?

A Yes.

Q And the same is true of the money paid to Dematic for whatever it was paid for?

A Yes.

Q All right. Now, do you know what else, if anything, either RadioShack or SCK are trying to get out of this lawsuit?

A You know, I don't have my notes in front of me, but I do recall a security system that we had installed that I didn't pay a bill out. But however, we took it off our books, so

we wrote it off after the tornado.

Q All right. Do you know what amount you wrote off?

A I don't recall, Bob.

Q But the amount you wrote off is what you'd be seeking reimbursement for?

A Yes, as well.

Q And, again, the --

MR. WATT: Objection.

MR. FREY: I'm sorry. What's -- help me here.

MR. WATT: Well, I think that's kind of vague in what that means because there are two different numbers. There's a depreciated amount and there's a value, so there's a book value and there's a replacement value.

MR. FREY: All right. Well, I don't want to put either of you on the spot, but if you'll just tell me which one.

MR. WATT: We're seeking the replacement value.

MR. FREY: Which is less than the amount written off -- I'm sorry -- is

1

more than the amount written off?

MR. WATT: Yeah. Just to help you, the replacement value is 163. The depreciated value is 81,500, one half of that.

MR. FREY: Both of those are in thousands, not --

MR. WATT: Yes, yes. I'm sorry.

MR. FREY: (Continuing.)

Q Okay. Again, though, you wouldn't be the one to tell me why the basis for that claim, right?

A No.

Q Okay. You've told me now all you personally did that has to do with this case, correct?

A I believe so.

Q All right. Have you told me now everything you know about the company's position on why it should get some or all of its money?

A Can you restate.

Q Yeah. I just want to know if there's -- you've told me that you're not the one to read the sublease, for example.

A (Witness nods head affirmatively.)

1

1