1   Q   Okay. I just want to know if you
2   personally, sitting here today, can tell me any
3   more about what it is the company -- the
4   companies -- sorry, RadioShack and SCK, want and
5   why they want it in this lawsuit.
6   A   Bob, you lost me.
7   Q   Okay. Fair. I'm glad you -- okay.
8       The lawyers, of course, know what it
9   is the two companies want in this lawsuit and
10  why they should get it, right?
11  A   Yes.
12  Q   I'm asking if you know any more than
13  you've told me now about that.
14  A   No, I don't.
15  Q   Okay. So we've exhausted your
16  personal knowledge on that?
17  A   Yes.
18  Q   All right. Fair enough.
19      Sir, I believe you told me that Judy
20  McCampbell's first reaction was there's no
21  action items for us on the tornado. Warehouse
22  86 and IDI will handle that.
23  A   It would be a claim between the two.
24  Q   Okay. But did I get the idea that you
25  later -- or she later had a different thought?

44

1  Q    Okay. And they ended up getting the
2  two million something that we're fighting about,
3  right?
4  A    Yes.
5  Q    Okay. My question is, do you know
6  whether RadioShack ever got involved in that
7  process --
8          MR. WATT: Objection.
9  MR. FREY: (Continuing.)
10 Q    -- between Warehouse 86 and its
11 insurance company?
12 A    I don't recall.
13         MR. FREY: Okay. Let me go off
14         the record for a second.
15         (Off the record.)
16 MR. FREY: (Continuing.)
17 Q    Sir, y'all's lawyer sent a subpoena to
18 the Marchetti, M-A-R-C-H-E-T-T-I, Insurance
19 Agency and got some documents back. Okay?
20 A    Okay.
21 Q    I'm going to show them to you and you
22 can look at all of them, but I'm going to ask
23 you about the one that's numbered Page 80.
24 A    Eighty?
25 Q    Yes. I just want to see, is this the

**AW REPORTING**
**601-898-9990**

46

```
 1      A    I do not.
 2      Q    Sir, do you know anything about the
 3 lease being canceled, the prime lease?
 4      A    I do not.
 5      Q    Or the sublease being canceled?
 6      A    I do not.
 7      Q    Let me go back.  How did y'all hear
 8 about the fire?
 9      A    Bob, I don't recall.
10      Q    Okay.  Can I see that Marchetti
11 document?
12      A    (Witness complies.)  But I do remember
13 seeing it on the news.
14      Q    The fire, too?
15      A    Yeah.
16      Q    There is a company called McLarens
17 Young who was involved in handling the loss.  Do
18 you know anything about them, who they were
19 working for?
20      A    McLarens Young is written into our
21 property insurance policy with Liberty Mutual.
22 They're an adjuster firm.
23      Q    What do they do?
24      A    They're an adjusting firm.
25      Q    What does that mean?
```

1

```
 1      Q    Okay.  What did RadioShack own that
 2  was damaged by the tornado?
 3      A    The -- the alarm system.
 4      Q    Okay.  And that was the same as the
 5  security system?
 6      A    The security system.
 7      Q    Okay.  And it was damaged by the
 8  tornado?
 9      A    I believe so.
10      Q    Okay.  Who would know for sure?
11      A    McLarens Young International.
12      Q    Okay.  Anything else that RadioShack
13  owned that was damaged by the tornado?
14      A    Bob, if you would clarify "owned" for
15  me.
16      Q    Well, I will if I can.  What do you
17  mean when you use the word "owned"?
18      A    Like on our books?  Is that what --
19  like assets written on our books?
20      Q    Well, that would be one thing.
21      A    Okay.
22      Q    The security system was on your books.
23  You had to write them off.  I understand.
24      A    That would be what we owned.  Yeah.
25      Q    Okay.  And as far as the fire, do you
```

52

1   Q   All right. And who would we ask if we
2   just wanted to make sure?
3           MR. WATT: Objection.
4   A   It's in the documents that we provided
5   for you.
6   MR. FREY: (Continuing.)
7   Q   Okay. What documents would we be
8   looking at?
9   A   The invoices.
10  Q   The ones that you were responsible for
11  paying out?
12  A   Yes.
13  Q   So it's the same four things?
14  A   I believe so.
15  Q   All right. And let me just close the
16  loop on that. Back when I was asking you about
17  those invoices, I was asking you what you
18  personally had handled. Okay? Are there any
19  other things that RadioShack or SCK wants to be
20  paid for besides the four you've named, even if
21  you didn't personally handle them?
22  A   I don't recall.
23  Q   As far as you know, the --
24  A   As far as I know.
25  Q   The answer is no, as far as you know?

**AW REPORTING**
**601-898-9990**

1  A   The answer is I don't recall.
2  Q   Okay.  But sitting here today, you
3  only know of four things that RadioShack and SCK
4  wanted to be paid for and you've told us what
5  they are?
6          MR. WATT:  Objection.
7  MR. FREY: (Continuing.)
8  Q   Is that fair?
9  A   No, it's not fair.  I don't have all
10 the documents in front of me.  To the best of my
11 recollection, those are the items --
12 Q   Okay.
13 A   -- that I can recall right now.
14 Q   What would you look at to be sure?
15 A   I'd just have to look at the files
16 again.
17 Q   All right.  Well, what files?
18 A   Some of the invoices that I -- some of
19 the files that you have here in front of you.
20 I'd have to take my time and look through those
21 again to give you a definite answer.
22 Q   Well, you said earlier you don't have
23 all the files in front of you.  Really, you've
24 got them.  You just haven't looked at them?
25 A   Well, yeah.  Just --

54

```
 1      Q    There's not --
 2              MR. WATT:  Objection.
 3   MR. FREY: (Continuing.)
 4      Q    I'm sorry.  I want to -- I'm trying to
 5   figure out are there documents that aren't in
 6   this room that you'd have to look at?
 7      A    I don't know.
 8      Q    Did anybody, whether it's RadioShack
 9   or IDI or somebody else, get paid anything from
10   any insurance company for the conveyer system?
11              MR. WATT:  Objection.
12              MR. FREY:  Can you tell me what
13         the problem is?
14              MR. WATT:  I don't understand the
15         question.  I mean, it seems pretty
16         broad.  It sounds overly broad and
17         confusing.
18              MR. FREY:  I don't think that
19         you're confused is an objection.
20              MR. WATT:  I said the question is
21         confusing.
22              MR. FREY:  Okay.  Well, the
23         witness has already told me that if he
24         doesn't understand it, he'll tell me.
25         So it's not an appropriate objection
```

*1*

```
 1              to say you think it's confusing.  If
 2              he's confused, he'll tell me.
 3                   MR. WATT:  I'm not going to argue
 4              with you.  I've stated an objection.
 5              You asked me the basis of it and I
 6              explained it.
 7                   MR. FREY:  Well -- and now, I'm
 8              suggesting that that's an improper
 9              objection.
10                   MR. WATT:  Okay.
11  MR. FREY: (Continuing.)
12       Q    Did anybody get paid anything from any
13  insurance company for the conveyer system?
14       A    Ask that question again.  I'm sorry.
15       Q    Did anybody get paid anything from any
16  insurance company for the conveyer system?
17       A    No.  To the best of my knowledge, no.
18       Q    Do you know whether any of the money
19  Employers Mutual paid was for the conveyer
20  system?
21       A    I do not.
22       Q    IDI had their own insurance company,
23  right?
24       A    I don't know.
25       Q    Okay.  RadioShack had their own,
```

56

```
1  right?
2       A    Yes.
3       Q    And that was Liberty?
4       A    Yes.
5       Q    Okay.  Did Liberty pay anything for
6  the conveyer system?
7       A    No.
8       Q    Did y'all make a claim for it?
9       A    No.  With Liberty?
10      Q    Yes, sir.  With Liberty.
11      A    No.
12      Q    Can you tell me why not?
13      A    Because there's no claim between
14 RadioShack and Liberty.  The claim is between
15 Warehouse 86 and RadioShack.  Warehouse 86
16 should make RadioShack whole for all the damages
17 sustained.
18      Q    Now, I want to be fair with you.  I
19 asked earlier if you knew more about the basis
20 for the company's positions, and you told me
21 that wasn't your area.
22      A    Yes.
23      Q    Is it true it's also not your area to
24 explain the basis for what you just said, y'all
25 should be made whole for everything?
```

```
 1              MR. WATT:  Objection.
 2  MR. FREY: (Continuing.)
 3      Q    If you know more about the basis, I'll
 4  ask you.  And if you don't, I won't.
 5              MR. WATT:  Objection.
 6  MR. FREY: (Continuing.)
 7      Q    Do you understand what I'm asking?
 8      A    I do.
 9      Q    Okay.  You said that it's y'all's
10  position that you should be made whole for
11  everything, right?
12      A    Yes.
13      Q    Okay.  But if I asked you show me that
14  in the sublease or show me that somewhere else,
15  that wouldn't be your area?
16      A    That would not be my area.
17      Q    Okay.  So you know the position, but
18  you're not prepared to discuss the support?
19      A    That's right.
20      Q    All right.
21              THE WITNESS:  Bob, I'm going to
22          have to take another break.
23              MR. FREY:  Sure.
24              (Off the record.)
25
```

58

```
 1   MR. FREY: (Continuing.)
 2        Q    Sir, it's going to be the same
 3   question as to the IDI betterments.  Do you know
 4   if any insurance company paid anything to them?
 5        A    Yes.  Liberty Mutual paid IDI.
 6        Q    Do you know how much they paid?
 7        A    I don't know the exact amount, Bob.
 8   It should be in the file.
 9        Q    Is it like 400 something grand?
10        A    It's about 900,000.
11        Q    Nine hundred.
12             And I take it that wasn't enough?
13                MR. WATT:  Excuse me.  Objection.
14   MR. FREY: (Continuing.)
15        Q    Well, you don't want to get paid
16   twice, so what's the difference between the 900
17   sum Liberty paid and the amount that y'all want?
18        A    We subsequently paid the deductible.
19        Q    What was the deductible?
20        A    Two occurrences of 250,000 each.
21        Q    That was the 500 you mentioned
22   earlier?
23        A    Yes.
24        Q    And what are the betterments?
25        A    You know, I can't tell you offhand,
```

```
 1   but I did see it in the report and it had the
 2   list of the betterments and improvements.
 3        Q    Whose report, McLarens'?
 4        A    Yes, McLarens'.
 5        Q    And just by general description, what
 6   are we talking about, stuff that y'all built
 7   into the warehouse like offices?
 8        A    I believe so, Bob.
 9        Q    All right.
10        A    Plywood, Sheetrock.
11        Q    Okay.
12        A    Plumbing.
13        Q    And then do you know if any insurance
14   company paid anything for the alarm security
15   system?
16        A    I do not.
17        Q    Sir, I'm looking at y'all's complaint
18   in there and there are some allegations in here
19   about what the sublease says and Section 7 of
20   Schedule B to the sublease.  You're not prepared
21   to discuss that stuff today, are you?
22        A    I'm not.
23        Q    In fairness, that's not your area?
24        A    That's right.
25        Q    Have you ever seen a breakdown of the
```

60

```
1   amounts that Employers Mutual paid --
2       A    I have not.
3       Q    -- that add up to the two-something
4   million that's in the registry of the court that
5   we're fighting over?
6       A    I don't recall.
7       Q    You know what amount I'm talking
8   about, the amount Employers Mutual paid?
9       A    I have not seen a breakdown.
10      Q    All right.  Well, let me back up.  You
11  know Employers Mutual paid a little over
12  two million, right?
13      A    I do.
14      Q    And it paid it jointly to Warehouse 86
15  and to SCK?
16      A    Yes.
17      Q    Because SCK was a lost payee, right?
18      A    Yes.
19      Q    Okay.  Do you know what they paid for?
20      A    I do not.
21      Q    And do you know whether either
22  RadioShack or SCK had an interest in any of the
23  things that they paid for?
24      A    I don't know what they paid for --
25      Q    Right.
```

```
 1      A    -- so I wouldn't know --
 2      Q    It would follow logically -- yeah, I
 3 understand.
 4           Sir, one of the things that your
 5 company's filed in the lawsuit -- and it's
 6 Docket 36 for your lawyer -- says that Warehouse
 7 86 influenced the final allocation of the
 8 insurance proceeds, that is, the amount that
 9 Employers Mutual paid and what they paid it for.
10      A    Okay.
11      Q    Do you know anything about that?
12      A    About the influence or --
13      Q    Yes, sir.
14      A    No.
15      Q    Then it goes on and it says that your
16 company disputes various aspects of the
17 Employers Mutual allocations.  Okay.  It says,
18 for example, the leasehold improvements were
19 only damaged to 174,000 and apparently Employers
20 Mutual said more.  Do you know anything about
21 that?
22      A    No, sir.
23      Q    And it says that all the damage to the
24 leasehold improvements was caused by fire, and I
25 take it that Employers Mutual said some were
```

```
 1   tornado.  Do you know anything about that?
 2        A    No.
 3        Q    You don't know about anything like
 4   that, about whether Employers Mutual paid the
 5   right amount for the right thing?
 6        A    I don't recall any of that.
 7        Q    Some of the things that your companies
 8   have filed also say that Warehouse 86 should not
 9   have been involved in adjusting the loss.  Do
10   you know anything about that?
11        A    No.
12             MR. WATT:  Objection.
13             MR. FREY:  Well, can you help me
14        with that?
15             MR. WATT:  I think that's a
16        mischaracterization of what's been
17        alleged.
18             MR. FREY:  Well, can you say it
19        in a way that it's fair and get to the
20        bottom of it?
21             MR. WATT:  I think instead of
22        referring to what you think RadioShack
23        may have alleged, just simply ask him
24        if he is aware of any wrong influence
25        or whatever, but I'm just not sure
```

```
 1              that we have alleged that Warehouse 86
 2              wrongfully participated in the claim
 3              adjustment.  That sounded as if what
 4              you were asking.
 5                   MR. FREY:  All right.  Let me try
 6              it this way.
 7   MR. FREY: (Continuing.)
 8        Q     Page 10 of Document 36, which y'all
 9   filed says, quote, The debtor -- that's
10   Warehouse 86 -- impermissibly adjusted claims
11   regarding the subleased equipment without
12   plaintiffs' -- that's y'all -- participation and
13   consent.  My question is, do you know anything
14   about that?
15        A     I don't recall it.
16        Q     Okay.
17                   MR. WATT:  Thank you.
18                   MR. FREY:  Is that fair?
19                   MR. WATT:  Yeah.  That's a
20              different question.  Thank you.
21                   MR. FREY:  Okay.  All right.
22   MR. FREY: (Continuing.)
23        Q     Well, just to make sure we're not
24   confused, the same document, Document 36, Page 9
25   says, "The debtor" -- that's Warehouse 86 --
```

64

```
 1    "influenced the final allocation of the
 2    insurance proceeds under the statements of loss
 3    for its benefit and plaintiffs'" -- that's y'all
 4    -- "detriment."
 5              Do you know anything about that?
 6         A    No.
 7         Q    All right.  Sir, I believe at one
 8    point, y'all were still looking for Miriam
 9    Harris' file.  Do you know anything about her
10    file?
11         A    I do not.
12         Q    Who was she or who is he?
13         A    Miriam Harris is an employee with
14    RadioShack.
15         Q    And what is her responsibilities?
16         A    I don't know.
17              MR. FREY:  Lee, I don't want to
18         put you on the spot, but was that, at
19         one time, missing and has it been
20         found?
21              MR. WATT:  I may have not stated
22         to you accurately in our prior
23         discussions about that, that item was
24         included as possible item of documents
25         in response to your Request for
```

1

2

66

1   or is protected under the
2   attorney-client privilege or the
3   investigation exemption.
4           MR. FREY:  What is the
5   investigation exemption?
6           MR. WATT:  Prepared in
7   anticipation of litigation.
8           MR. FREY:  Okay.
9   MR. FREY: (Continuing.)
10      Q    Sir, if you wanted to know what was in
11  the warehouse and damaged and damaged by what,
12  would you first go to McLarens?
13      A    For?
14      Q    To find out what was damaged by the
15  tornado and fire.
16      A    Yes.  I would go to their report.
17      Q    You don't personally know of
18  individuals other than McLarens that we could
19  talk to and ask what they saw?
20      A    I do not.
21      Q    Okay.  Do you know whose contractor
22  set the place on fire?
23      A    I don't know whose contractor set it
24  on fire.
25      Q    Okay.  All right.  Have you now told

1

```
 1   me what you know about this case?
 2              MR. WATT:  Objection.
 3        A    Can you --
 4   MR. FREY: (Continuing.)
 5        Q    Yeah.  You've told me everything you
 6   personally did, right?
 7        A    Yes.
 8        Q    Okay.  And you've told me the
 9   company's position as best you know it, right?
10        A    Yes.
11        Q    Okay.  Is there anything else --
12              MR. WATT:  Objection.
13   MR. FREY: (Continuing.)
14        Q    -- that you know about this case?
15        A    No.
16              MR. FREY:  Okay.  All right.
17         Well, I don't want to take up any more
18         of your time.  I do want to visit with
19         you because I think we're going to
20         need to do some more on this.  But I
21         think we're done with you.  Thank you
22         so much.
23              (Off the record.)
24              MR. FREY:  Lee, thank you for
25         visiting with me off the record.  It's
```

68

1  our view that we need another witness
2  or witnesses to respond to the topics,
3  and it's your view that you don't; is
4  that fair?
5      MR. WATT: That's absolutely our
6  position.
7      MR. FREY: All right.
8      (Off the record.)
9      MR. WATT: I'd like to make just
10 two quick points in furtherance of the
11 disagreement between Mr. Frey and me.
12 One is that other people to whom
13 correspondence may have been directed
14 or was directed or other people who
15 signed correspondence or documents are
16 no longer with the company.
17     Next point is --
18     MR. FREY: Before we leave that
19 and I don't want to put you on the
20 spot, but do you want to say who they
21 are or not? You don't have to.
22     MR. WATT: They're just not with
23 the company.
24     MR. FREY: Okay.
25     MR. WATT: Judy McCampbell signed